# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NOELL DEL ROSSI, and DAWN BARBER, individually, and on behalf of all similarly-situated individuals, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| - vs - | : | NO. 1:24-CV-09478 |
| FORMAN MILLS, INC., GOODE PARTNERS LLC, GOODE FORMAN HOLDINGS LLC, GOODE HEAVYWEIGHT COINVEST LLC, and TOBIAS KELLER | : | |
| Defendants. | : | |

Oral deposition of KEVIN HESS, taken pursuant to notice via Zoom Videoconferencing, taken on Friday, January 30, 2026, beginning at approximately 10:00 a.m., before Katherine A. Zacek, Professional Court Reporter and Notary Public.

APPEARANCES:

MORGAN ROOKS, P.C.
BY: FRANKLIN J. ROOKS, JR., ESQUIRE
525 Route 73 North, Suite 104
Marlton, New Jersey 08053
Fjrooks@morganrooks.com
Representing the Plaintiff

GOODLEY MCCARTHY LLC
BY: JAMES E. GOODLEY, ESQUIRE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 394-0541
James@gmlaborlaw.com

BLANK ROME
BY: ANTHONY A. MINGIONE, ESQUIRE
1271 Avenue of the Americas
New York, NY 10020
Anthony.mingione@blankrome.com
Representing the Defendant, Forman Mills

COZEN O'CONNOR
BY: JASON CABRERA, ESQUIRE
Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-7267
JCabrera@cozen.com
Representing Goode Defendants

PASHMAN STEIN WALDER HAYDEN P.C.
BY: DOMINIQUE KILMARTIN, ESQUIRE
Court Plaza South
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(551) 295-0828
Dkilmartin@pashmanstein.com
Representing the Defendant, Tobias Keller

INDEX

| WITNESS | PAGE |
|---|---|
| KEVIN HESS | |
| By MR. ROOKS | 4, 193 |
| By MR. CABRERA: | 188 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Security agreement | 75 |
| Exhibit 2 | 2/6/2023 E-mail | 78 |
| Exhibit 3 | Amendment 14 to agreement | 82 |
| Exhibit 4 | 6/5/2023 E-mail | 91 |
| Exhibit 5 | Reduction in force | 99 |
| Exhibit 6 | 6/6/2023 E-mail | 100 |
| Exhibit 7 | RIFs | 105 |
| Exhibit 8 | Salary data on RIFs | 135 |
| Exhibit 9 | Director Agreement | 150 |
| Exhibit 10 | Visitacion Group Invoice | 154 |
| Exhibit 11 | Hub International Invoice | 156 |
| Exhibit 12 | 6/15/2023 E-mail | 165 |
| Exhibit 13 | 6/2/2023 E-mail | 185 |

Page 4

(It is hereby stipulated and agreed by and among counsel for the respective parties that reading, signing, sealing, filing and certification are waived; and that all objections, except as to the form of the question, are reserved to the time of trial.)

\- - -

KEVIN HESS, after having been duly sworn was examined and testified as follows:

\- - -

BY MR. ROOKS:

Q. Good morning, Mr. Hess. My name is Franklin Rooks, Junior. I'm an attorney with Morgan Rooks, P.C., and I represent plaintiffs in this matter against Forman Mills and the other defendants. Today -- is Kevin okay?

A. Yeah, absolutely. Please.

Q. Okay. All right. So I just have I guess a few housekeeping things just to go over before we, you know, get started really. You know, this deposition is being transcribed by the court reporter. And

deposition's are generally unlike other conversations in which people kind of talk over one another and interrupt and things like that.

It's very difficult for the court reporter to record two people talking at once. So I will ask that during this deposition, that even if you anticipate what I'm going to ask, just let me ask the question in full and then maybe pause. You know, your attorney may want to object to the question that I ask, and then answer.

And conversely, I mean, I'll do my best not to interrupt or talk over you. Since the deposition is being transcribed, verbal gestures can't be -- I'm sorry, nonverbal gestures can't be recorded like nods of the head, shrugs and things like. While you're certainly welcomed to do that, they need to be accompanied by a verbal response.

And when I say "verbal response," I guess I'll say spoken words and not uh-huhs and uh-huhs and things like that. So do you understand all that so

far?
A. Understood.
Q. Okay. Have you taken any medication or anything like that that would impair your ability to recall events from the past?
A. No.
Q. Okay. Have you taken any type of medication that would prevent you from answering truthfully today?
A. No.
Q. And you do understand that you are under oath with this deposition and that this testimony has the same effect as if it were given in court?
A. Yes.
Q. Okay. Have you ever been deposed before?
A. Yes.
Q. Okay. How recently?
A. About a year and a half.
Q. Okay. And what was that in connection with?
A. It was in connection with another Forman Mills case.

Q. Okay. What case was that?
A. Forman Mills against v. Threadstone.
Q. Threadstone. Okay. Who's thread -- Threadstone or Treadstone?
A. Thread, I think it was Treadstone.
Q. Okay. I think Tread --
A. It's some time ago.
Q. Treadstone was in The Bourne Identity movies I think, right?
A. Yeah, maybe I'm confusing the two.
Q. This is something different than that.
A. Yeah.
Q. So you, you know, basically know what goes on in a deposition.
A. Yes, sir.
Q. Have you done anything to prepare for today's deposition?
A. I've spoken with Anthony.
Q. One thing --
A. Aside from that, no.
Q. I don't want to know anything that you and Anthony spoke about. Any conversations that you had with your

Page 8

attorneys, that's considered to be privileged. If I ask a question, just know that I'm not asking for any information on any conversations that you had with counsel. So you said you had conversations with Anthony?
A. Uh-huh, yes.
Q. Did you review any documents in connection with preparation?
A. Just the -- the filing, but other than that, no. And I don't have access to any Forman Mills's materials or anything like that so, no, I didn't review anything else.
Q. Okay. So you know that you're appearing today as the designated representative of Forman Mills, correct?
A. Yes.
Q. Okay. And you understand that you're not testifying in a personal capacity but instead in the capacity of the defendant?
A. Yes.
Q. Okay. Have you seen the Notice of Deposition that we provided to your

counsel?
A. I did.
Q. Okay. And that Notice of Deposition contained a number of topics; do you recall that?
A. Yes. Yes, sir.
Q. And had you reviewed all of the topics that were listed on that Notice of Deposition?
A. Yes, sir.
Q. Okay. Are you prepared to testify about those topics that are within that Notice of Deposition?
A. Yes.
Q. Okay. Got it. So can you tell me what's your, I guess highest level of education?
A. I received a bachelor's degree.
Q. Okay. When did you receive that?
A. I got my bachelor's degree in 1994. I was enrolled in an MBA program for a period of time in 2019, '20. I didn't get my MBA, though.
Q. You said you graduated, I think you said 1994 with your bachelor's?

Page 10

A. Yes, sir.
Q. And what's the bachelor's degree in?
A. In finance and business management.
Q. Okay. And where did you earn that degree?
A. Franklin University.
Q. Where is that?
A. Columbus, Ohio.
Q. Are you from Ohio?
A. Yes.
Q. Okay. Is that where you're testifying from today, Ohio?
A. Yes, yes.
Q. Okay. All right. And then you said that you were enrolled in an MBA program?
A. Uh-huh.
Q. Where was that?
A. That was in -- at Rutgers in -- in Camden.
Q. Okay.
A. And I only took a couple classes and then I discontinued.
Q. Okay. Why did you discontinue?

A. Because I really -- honestly, I wasn't learning anything and it was kind of like a joke. I just didn't feel like I was gaining value out of it or learning anything from it.
Q. Okay. So you were the, I guess the CFO, chief financial officer of Forman Mills?
A. I was from about September of '22 until my departure in March of '24. Prior to that, I was a controller at Forman Mills from around July of 2018 until September '22.
Q. When you were the controller, was that the starting position that you came in at Forman Mills?
A. Yes.
Q. Okay.
A. I was a consultant for a number of months prior to that. But that was my first actual employment role with Forman Mills.
Q. And what kind of consulting did you do for Forman Mills?
A. I started in January of '18. I was

Page 12

helping out with their audit and the budget process. So that was primarily what I worked on for, you know, the first few months I was there.
Q. Okay. Do you have any like, any certifications like CPA or anything like that?
A. No, sir.
Q. Okay. And how did you come to land that consulting position with Forman Mills?
A. I was contacted by the CEO at the time who I've worked with previously many years before that. You know, they -- they needed some help, some guidance, so I came in just as a consulting role. And then, like I said, after a number of months, they -- they asked me to stay permanently.
Q. And who was that, the CEO that reached out to you?
A. Mike Kvitko.
Q. Mike Kvitko, okay. And you said you knew Mike Kvitko from a prior role?
A. Yes.
Q. Okay. And what -- I'm sorry. What role was that that you had that you know

Mike Kvitko?
A. We had worked together at Cheryl & Company in the late '90s.
Q. Okay. I'm sorry. What company was that?
A. It's a company called Cheryl & Co., Cheryl & Company, Cheryl & Co. It's in Ohio. It's in -- it's a west of Ohio company.
Q. Is that a, I guess a clothing retailer, something along those lines?
A. It was a cookie and dessert company. Similar to like a Mrs. Fields if you want to think about it like that.
Q. So you were recruited by Mr. Kvitko to come on board as a consultant, and then you came on board as the controller and from the controller you then assumed the CFO position, right?
A. Correct.
Q. Okay. Now, you said that you live in Ohio. Did you relocate at all?
A. I did.
Q. To New Jersey?
A. Yeah, I lived in Jersey in '18, I

Page 14

moved over there. And then after I left, departed from Forman Mills and I moved back to Ohio.

Q. And where in New Jersey did you live?

A. Cherry Hill.

Q. Okay. All right. I also neglected to say that if you at any point in time need to take a break, just let us know. The only I guess limitation is that if there's a question pending, we'd like you to finish the question before you take the break.

A. Okay.

Q. All right. So you lived in Cherry Hill, New Jersey and went to work at Forman Mills corporate location?

A. Yes.

Q. Okay. And is that the corporate office that's located in Pennsauken, New Jersey?

A. Correct.

Q. Okay. And what is the address of the corporate address in Pennsauken, New Jersey?

A. Pardon me?
Q. Do you know the address?
A. 1070 Thomas Busch Boulevard.
Q. Okay.
A. I understand they've moved since, but that was the address when I was there.
Q. Do you know when that location moved?
A. No, not exactly. I just -- I think late last year, I believe, but I'm not sure.
Q. Okay. And when did your employment end?
A. I left in mid-March of 2024.
Q. Okay. And why did you leave?
A. I had wanted to move back home to Ohio for quite a while. And I felt like at that time it was a good time for me to leave. The company was in, you know, a good financial position. And like I said, I've been wanting to move back home. All my family is in Ohio and, you know, my son's in the midwest, so for family reasons.
Q. Okay. Got it. So Forman Mills, it

Page 16

was a -- it's a portfolio company of Goode Partners LLC; is that right?
A. It was a PortCo of yeah, Goode Partners for most of my time there.
Q. So the questions that I have for you will concern the time period that you were there, okay? And not prior to that. So, you know, I believe that Forman Mills was acquired sometime in 2016. I'm not asking you anything about that.
A. Okay.
Q. So did you have communications with Goode Partners over the course of your employment with Forman Mills?
A. I did.
Q. Okay. Do you regularly communicate with a gentleman named David Oddi?
A. I did have yeah, communication with him. I don't know how you would define regular, but I did speak with him and we were in board meetings and things like that together.
Q. Okay. So yeah, regular communications is a little ambiguous. How frequently did you speak with Mr. Oddi,

let's say in 2022?
A. In 2022, communication would have been mostly board meetings. Maybe an occasional e-mail here and there, but mostly board meetings in '22.
Q. Okay. How about in let's say the first quarter of 2023, how frequently did you communicate with Mr. Oddi?
A. That was more frequent. As we were experiencing liquidity issues, so it would have been more frequent in '23.
Q. Okay. So if we talk about the first quarter of 2023, frequency, would you say there was weekly, daily, monthly, how would you characterize that in the first quarter of 2023?
A. January through March of '23, I -- I'm not sure exactly. I would say probably monthly or maybe even weekly towards February, March. I don't recall for sure. But I would say either weekly or monthly.
Q. Okay. And if you can recall, what were the, I guess the substance of those let's say weekly, monthly communications with Mr. Oddi?

A. It would have been around the performance of our stores at that time.

Q. Can you I guess maybe break down performance a little bit?

A. It would have been, you know, like a high-level summary of, you know, our sales, our liquidity, cash flow. Profitability, you know, the metrics, KPIs of the store performance.

Q. Okay. How about for the second quarter of 2023, how frequently did you communicate with Mr. Oddi?

A. Well, that was around April. The April time frame is when things got very challenging with the bank and liquidity, so it would have been more frequent throughout April and May, at least weekly. Sometimes probably, you know, even more frequent than that.

Q. Okay. In connection with this litigation, you said that you left in March, I think you said of 2024?

A. Correct.

Q. All right. We served, you know, requests for discovery to your attorney.

Did you participate in any of the discovery efforts with respect to let's say producing documents, e-mails, things like that?
A. Before I left, I do recall the litigation. I don't recall personally pulling e-mails. We had, you know, an IT staff that did that. But I was aware of the legal -- the litigation around the case.
Q. Okay.
A. Does that answer your question?
Q. It does. Thank you.
A. Okay.
Q. So my understanding is that there's other individuals that's let's say involved with Goode Partners, LLC. There's an individual named I believe Joe Ferreira?
A. Ferreira.
Q. Are you familiar with Mr. Ferreira?
A. I am.
Q. Okay. So over let's say the year -- 2022 calendar year, did you communicate on a regular basis with Mr. Ferreira?
A. Yeah. When I speak about, you

know, communication with Mr. Oddi, really we were communicating with Goode which was Mr. Oddi and Mr. Ferreira, right? Kind of like a package. It wasn't like an e-mail where we're meeting with one separate from the other. They were generally meetings together with both of them.
Q. Okay. So if I asked the same questions, how frequently was your communication with Mr. Ferreira, would you say it would be the same answer as Mr. Oddi?
A. Correct. Yes.
Q. Okay. And also when I had asked you the question about the first quarter of 2023 and the second quarter of 2023, would you say your answer, as it pertains to your communications with Mr. Ferreira, would be the same as Mr. Oddi?
A. Yes.
Q. Okay. There's another individual I believe, Daniel Bonoff. Did you have any communications with him in 2022?
A. Dan not as much. I believe Dan left or became less engaged before 2023.

Although my memory's a bit hazy. So I think he became less engaged at some point during that time period.

Q. Okay. When you say "less engaged," my question would be well, how engaged was he in the first place with respect to Forman Mills? And I'm talking about Mr. Bonoff -- I'm sorry, yeah, Daniel Bonoff, how engaged was Mr. Bonoff in let's say 2022 with Forman Mills?

A. Yeah. And I'll say in 2018, '19, '20, '21, you know, he attended the board meetings as did, you know, Mr. Oddi and the others. I don't recall exactly when. Again, my memory's a little hazy, but I believe sometime in '22 he came less. Maybe he wasn't in all the board meetings. And it became the focus was more on Joe and David Oddi.

Q. Okay. So --

A. I can't really remember when exactly that -- that was to be honest.

Q. Okay. So in 2022, how engaged was or I'll say were, how engaged were Mr. Oddi and Mr. Ferreira in Forman Mills?

Page 22

A. Yeah. In 2022, it would have been, you know, regular board meetings. We put out -- as I recall, we put out like a weekly deck or dashboard that they would have gotten e-mails on. And then the board meetings. I think that was about the extent of it.
Q. Okay.
A. So, you know, they had some reviews here and there, but it wasn't like daily or even necessarily weekly.
Q. Okay. And how engaged were Mr. Ferreira and Mr. Oddi in the first quarter of 2023?
A. In 2023, they were -- again, we had board meetings, but we'd have update calls and things of that nature as well. So, you know, they were -- they were both engaged.
Q. And the same question, how engaged were Mr. Ferreira and Mr. Oddi in the second quarter of 2023?
A. They were -- they were more engaged.
Q. Okay.
A. We had more frequent conference

calls and meetings.
Q. Can you describe their engagement beyond let's say conference calls and meetings?
A. Can you elaborate on that? What you mean.
Q. Sure. Sure. Did they, let's say give directives to you for --
(Reporter clarification.)
MR. CABRERA: Objection.
You can answer the question.
BY MR. ROOKS:
Q. I said, did they give you directives. For -- I think I said for example. Did they give you directives? And then Mr. Cabrera objected but said that you could, you know, answer.
A. And aside from the meetings I was involved in I know with Mr. Oddi in particular was also having -- having meetings outside my purview. He was trying to -- we were trying to sell the company to the actual firm that ended up acquiring Forman Mills. So Mr. Oddi was also actively participating, leading much of

Page 24

that discussion with the acquisition target.

As far as directives, you know, we were having group meetings and group conference calls and, you know, since some of the decisions were made, were made collectively. Not like Mr. Oddi or Mr. Ferreira calling me and directing me to do something, if that's what you're asking.

Q. So when you say "decisions were made collectively," are you saying collectively between yourself, Mr. Oddi and Mr. Ferreira?

A. And, you know, Mike Kvitko. We also had a consultant during that period, Stu Kessler. So he was involved as well. So we collectively, you know, we made decisions.

Q. And again, that was for 2023?

A. That was for Q2 of 2023.

Q. Okay. So if we go back to let's say, 2021, 2019, 2020, were you, Mr. Oddi, Mr. Ferreira collectively making decisions then or were you more autonomous?

A. Back then it was more management

making decisions, right? And then the oversight of the private equity. So, you know, we -- management tends to make the decisions and relay it and communicate it to the board and the private equity during that time.

Q. Have you ever heard of the term like, "micromanagement?"

A. Yes.

Q. If I say that, you know what I mean?

A. Yes.

Q. Okay. So in 2018, 2019, 2020, 2021, would you describe Goode Partners involvement as micromanagement?

A. No.

MR. CABRERA: Objection.

You can answer.

BY MR. ROOKS:

Q. I'm sorry. You could just repeat your answer if you wouldn't mind?

A. No, I wouldn't.

Q. Okay. So in the first quarter of 2023 and the first quarter of -- I'm sorry, second quarter of 2023, would you

characterize Mr. Ferreira's involvement and
Mr. Oddi's involvement was micromanagement?
A. No.
MR. CABRERA: Objection to form.
You can answer.
THE WITNESS: I spoke too soon. No.
BY MR. ROOKS:
Q. But you would say that it was certainly more hands-on, Mr. Oddi's involvement, Mr. Ferreira's involvement was more hands-on in the first and second quarter of 2023 than it was at any other period of time, correct?
MR. CABRERA: Objection.
THE WITNESS: Yes.
BY MR. ROOKS:
Q. So you mentioned Mike Kvitko and you said that you knew him from a prior position with a Mrs. Fields-like employer, right? And that he recruited you --
MR. MINGIONE: For the record, those cookies are delicious. My wife used to order them all the time. They're great,

for the record. Sorry, Frank. I had to say it.

BY MR. ROOKS:

Q. So Mr. Kvitko recruited you to come over to Forman Mills. Mr. Kvitko's position at Forman Mills, I think you said he was the CEO?

A. Yes.

Q. Okay. And do you know how long Mr. Kvitko was the CEO of Forman Mills?

A. He joined after the Goode acquisition sometime in 2017 and then he left Forman Mills after the sale to Mr. Dushey in probably July of '23, right around there.

Q. So you were the CFO, Mike Kvitko, the CEO. Were there any other executive positions at Forman Mills let's say during the 2022 to 2023 time period?

A. My predecessor as CFO would have been, because I became CFO in September of '22, so my predecessor as CFO. And then we had various senior management positions along the way as well. Head of stores and chief -- an officer in charge of

Page 28

allocations, right? An officer in charge of the stores, you know. A chief merchant. We had other senior leadership positions as well.
Q. But you have that in your title, you have that letter C, which is chief, right? And Mike Kvitko is also chief, you know, chief operating officer, chief financial officer. Was there a chief operating officer or any title like that?
A. There was -- let me think. In '22, '23, I don't know if there was a COO. We did have directors, so maybe that's a distinction, separate from, you know, officers. The chief merchant, I think we had chief merchandising officer during that period.
Q. So let's look at I guess let's say the third and fourth quarter of 2022 and the first and second quarter of 2023, that time period. If I asked you like, who's the executive team, who would you say? I know you would say yourself, right?
A. Yeah, I would say Mike, myself in that period. A gentleman Brian Lattman who

was the chief merchant. Juan Lebron who was in charge of allocations and Ryan Solleder who headed the stores. So that's who, you know, I would consider like, the management -- senior management team.

Q. So five of you, right?

A. Right.

Q. And you would agree that there were I guess decisions that the management team could make on their own, correct?

A. Yes.

Q. Okay. And would you agree that there are certain decisions that the executive team could not make on their own?

A. Yeah, yes.

Q. Okay. And you in your position as the CFO, you did not have unlimited authority, right?

A. Correct.

Q. Okay. And similarly, Mr. Kvitko, even though he was CEO, his authority was not unlimited either, correct?

A. Correct.

Q. Okay. Would you agree that there were certain decisions that the executive

team would need to have sought approval for?
A. Yes.
Q. Okay. Like for example, if you wanted to let's say close a nonperforming store, would that be a decision that you and the executive team could make on your own, or would you need to have some type of approval in order to do that?
A. Well, typically, you know, new stores, clothes stores, capital expense budgets and budgets in general are matters that we would review with the board and get the board's consent or approval for.
Q. Right. So when we talk about decisions that you could not make on your own and decisions that you needed approval for, that approval would come from the board, right?
A. Correct.
Q. Or let me ask you this, would you ever go to Mr. Oddi or Mr. Ferreira or Mr. Bonoff for approval?
A. Well, we would go to the full board, right? Not one or two. It would

be, you know, a full board that we'd go to to present.
Q. Yeah, I know. I wasn't sure if -- I mean, I understand there might be decisions that you have to go to the full board for. My question is, were there any decisions that you would not have to go to the full board for but instead go to Mr. Oddi, Mr. Ferreira or Mr. Bonoff for?
A. I can't really think of examples of that. I mean, I suspect, you know, there could be cases where Mike Kvitko for example would call one of them for guidance or advice, but if we're talking about getting approval or getting board consent, we would go to the whole group, not -- not just one of them.
Q. So what would happen in a situation where -- strike that.
Let me ask you about the board. The board met how frequently?
A. The board met -- I believe the board met quarterly.
Q. Okay. So if -- and when you say "quarterly," I mean, were there designated

like, dates, months that the board meeting would occur? For example, a quarter is three months, right?
A. Uh-huh.
Q. So there would be a board meeting for each quarter?
A. Correct.
Q. There would be a Q1, Q2, Q3, Q4 meeting, right?
A. Right.
Q. When would the Q1 meeting occur?
A. Well, and we were on a fiscal calendar ending in January. So I would -- you know, again, my -- my memory's a little bit hazy, but I would think May, August, November, you know, every three.
Q. Okay. But there would be -- would you say there would be one every let's say May, every August?
A. Yeah, every three months.
Q. Okay. So it was basically fixed. The date might change, right, but the month of the --
A. Correct, yeah. The day of the month might change but the month would be

static. That's my recollection was like, quarterly board meetings, full board meetings. And then, you know, we'd send like, a weekly deck with KPIs and whatnot.
Q. Yeah. I mean, you used that word earlier, "deck," and I know KPIs is performance indicator, right?
A. Uh-huh.
Q. Can you just explain what the deck is that you're talking about?
A. Yeah. Sorry. So weekly we put together a presentation of sales, marketing efforts, liquidity, you know, operational slides on the performance, and we typically did that weekly and sent out to the board.
Q. Okay. Your answer just prompted me to remember something. If possible, can you avoid using pronouns? When you say "we" or "they," I don't necessarily know who you're talking about.
A. Okay.
Q. I just want to make it clear for the record. So when you say we created the deck, is the we, you know, you and --
A. It's the Forman Mills' management

Page 34

team.
Q. Okay. So we created a deck is the Forman Mills' management team created the deck?
A. Yes, sir.
Q. And so the deck was created by the Forman Mills' management team and then the deck was shared with whom?
A. It was shared with the internal leadership, internal management team as well as the board.
Q. And I'm sorry. How frequently was this deck generated?
A. Weekly.
Q. Weekly, okay. And was there a weekly call with the Goode Partners to review the deck?
A. Not that I recall.
Q. Okay. So when the deck was created, you said it was distributed, right?
A. Yes.
Q. It was distributed internally at Forman Mills, right?
A. Yes.

Q. And then also distributed to the board?
A. Yes.
Q. Okay. And once it was distributed, what then happened? Was there a review call? Was there -- like, was it just sent out hey, FYI or was it we've got a call?
A. Yeah, it was just sent out Mondays as an FYI. There weren't like weekly cadence calls to my -- to my recollection.
Q. Okay. So we talked about the board meeting, you know, on fixed months for the quarterly board meeting. But what happened in the event that you needed a decision on something and really didn't want to wait three months for that board meeting, would you then go to Mr. Oddi, Mr. Ferreira or Mr. Bonoff?
A. Yeah, we could --
MR. CABRERA: Objection.
You can answer.
THE WITNESS: I'm sorry?
MR. CABRERA: Sorry. I had to insert an objection, but you can answer the question.

THE WITNESS: Okay. We would most likely communicate that through e-mail or we could have a special conference call.
BY MR. ROOKS:
Q. Okay.
A. Depending on, you know, what the nature was.
Q. And that conference call would be between the management team and the Goode Partners people?
A. Correct.
Q. Okay. So we talked about, just briefly about the limits of authority, right? So store closings or something you said that you would typically get board approval for, board consent for, right?
A. Yeah, openings, closings, any kind of cap expend, our annual budgets, things of that nature. So refinancing or anything, you know, significant, really significant or strategic in nature.
Q. So can you tell me when seeking board approval would be discretionary at the discretion of the management team versus when it would be mandatory, like we

have to get board approval for? Can you tell me anything about that?

MR. MINGIONE: Objection to form. Just, Frank, are you differentiating a time period for this question? I just don't -- or are you...

MR. ROOKS: I can rephrase.

BY MR. ROOKS:

Q. Let's say in 2021, right, were there things -- I don't want to say things. Were there decisions that the management team -- strike that. Let me rephrase.

In 2021, what was discretionary in that the executive team had the discretion to say, we should get approval from the board for this decision versus mandatory, we need to get board approval for this decision?

A. Well, there weren't thresholds like above X number of dollars you need to get approval. There wasn't anything that structured. You know, day-to-day decisions we could just make on our own, right? Like what merchandise the team is buying, what the store hours are, you know. Normal

course, hirings, firings, none of that -- none of that decision-making went to the board level, right?

It's just kind of considered, you know, that's management-level stuff. But just like, you know, any -- any company or any job, you know, we all have a boss, right? So it's, you know, what -- what did we need them to be aware of. What do they need to consent to or approve.

It's somewhat subjective, right? But, you know, strategic things, openings, closings, things of that nature, we would just naturally want them to be involved in those kind of decisionmaking scenarios.

Q. So if you were going to -- strike that.

When a new store is opened, what is the typical term of the lease that is signed?

A. It's normally like a ten-year lease with renewal options.

Q. Okay. So if you are going to obligate the company to a ten-year lease,

that would be something that you would get board approval for, right?
A. Correct.
Q. Okay. That is something that the management team would not do on their own, correct?
A. Correct.
Q. Okay. And if you can, just why wouldn't the management team -- why would the management team feel that it's necessary to get board approval to execute a ten-year lease on their own?
A. Because it's a significant change in the business. And the liability or the revenue or whatever's a function of that decision is -- is meaningful and significant. So thus, we would want board consent for something of that nature.
Q. Understood. So similarly, if you were going to close a nonperforming store, you would get board approval because it would be a matter of significance, right?
A. Right.
Q. There might be a term remaining on the lease?

Page 40

A. Correct.
Q. Okay. In terms of let's say financing or refinancing, is that -- that is something that you would need to get consent from the board for?
A. Correct.
Q. Okay. Or is that something that the board would take control over in that the board determines who you're using for financing or how financing is being done?
A. They would certainly be involved or be engaged. I wouldn't say they'd take over, but they -- they like to be involved in the process. Because we -- we did do that a couple different -- in a couple different situations during my tenure and they were typically involved in those.
Q. Okay. When you say, you did that during your tenure, can you just explain the that?
A. Okay. I'm sorry. There were a couple situations where we refinanced debt while I was at Forman, and Goode Partners would be involved in that decisionmaking, right? We would present, you know, hear

the different financial institutions and their terms and they would review those scenarios.
Q. Okay. Can you tell me let's say during 2023, the first and second quarter, what was Mr. Oddi's involvement in the business decisions that Forman Mills was making?
MR. CABRERA: Objection to form.
You can answer.
THE WITNESS: In which time period did you say?
BY MR. ROOKS:
Q. The first and second quarter of 2023.
A. Mr. Oddi, I mean, he was in the board. He was part of the decisionmaking in that time period.
Q. Do you recall any specific business decisions that Mr. Oddi was involved in during the first and second quarter of 2023?
A. Again, in that March, April, May time period, he -- he was involved with all

Page 42

of us and meetings and conversations with our bank at the time and with Mr. Dushey on the sale. Mr. Oddi was a key part of closing the sale of the company to Mr. Dushey.

And so he worked directly with him in several -- in several meetings and calls. He was doing everything he could to help facilitate the sale. And on the balance sheet at the time, there was some money owed to Goode, and he was trying to restructure it so that he could facilitate the sale to Mr. Dushey.

So they had some conversations, just the two of them, towards that end.

Q. Okay. Would you say that Mr. Oddi was more involved than Mr. Ferreira, less involved or the same level of involvement in the first quarter and second quarter of 2023?

MR. CABRERA: Objection.

You can answer.

THE WITNESS: I would say in the first quarter, they were both, you

know, fairly equally involved. And then the second quarter Mr. Oddi was probably more involved than Mr. Ferreira.
BY MR. ROOKS:
Q. Okay. So you mentioned "Board of Directors," you used that term, right? And I think you testified that the Forman Mills executive team did in fact report to that Board of Directors, right?
A. Yes.
Q. Okay. And the board meetings again were held on a quarterly basis. Where were they held? And let's say for 2021, 2022 and the first and second quarter of 2023.
A. Yes. Post-COVID, I believe they were all remote meetings.
Q. I'm sorry. You said post-COVID, those meetings were remote?
A. Correct.
Q. Okay.
A. Yeah, just through Zoom.
Q. Okay. When was, if you recall, when was the last in-person board meeting?
A. Probably would have been pre-COVID. So late 2019 or early 2020. Although, that

Page 44

said, I faintly recall a meeting at Goode Partners' New York office, I think that was in 2021 or 2022. But that may not have been a board meeting. I think the last formal in-person board meeting would have been probably early in 2020.
Q. Okay. And when the board meetings were held in person, let's say pre-COVID, were they at the Pennsauken location?
A. Yes.
Q. Okay. So when you guys had the board meeting let's say post-COVID, virtually, who were the -- strike that.
So with the post-COVID board meetings for let's say 2022, who were the attendees of the board meeting?
A. I can't speak to the attendance of each of them, but in 2022, it would have been Mr. Oddi, Mr. Ferreira, I believe Dan Bonoff, Mike Kvitko, my predecessor, Brian Sullivan, somebody from Cohesive, which was an investor in one of the Goode funds. And then observers probably would have -- there was a Goode analyst that would observe board meetings.

Typically, I would observe board meetings as well as the chief merchant, the head of stores, you know, Ryan Solleder, Brian Lattman, Juan Lebron, you know, we were all observers, typically we would attend the board meetings as well.

Q. In addition to being observers, were any of the executive team presenters at the board meetings?

A. Yeah. So each board meeting we would have a -- pre link the PowerPoint presentation. And so each of the senior management team typically would have a section, you know, they'd cover -- I would cover financials, for example.

And, you know, we might have a section on marketing, a section on store operations. If there were any openings, any store openings or closings, there would be a section on that. So yeah, there would be participation by some of the senior leadership.

Q. You mentioned the executive team. You mentioned Mr. Oddi, Mr. Ferreira, Mr. Bonoff. You had mentioned your

predecessor, Mr. Sullivan. Somebody from Cohesive Capital. If we talk about who were the board members, I'm not sure I'm really clear on that. Mr. Oddi was a board member; is that correct?
A. Yes.
Q. Mr. Ferreira was a board member?
A. Yes.
Q. Okay. And Mr. Bonoff was a board member?
A. Yes.
Q. Okay. So that's three. Were there more than three board members?
A. I think there was one at Cohesive Partners that was also a board member. I'm struggling to remember his name. But I believe that was it in terms of actual board members -- named board members.
Q. No other board seats, it was just the four?
A. Yes.
Q. Okay. In the -- let's say the first quarter of 2023, were there any special board meetings called, to your knowledge?

A. In the first quarter of '23, not that I recall.
Q. You said that there would have been an analyst from Goode Partners present?
A. Yeah, there was an analyst that would normally attend board meetings. And, you know, most calls. He would be on.
Q. Okay. Any other observers that you can recall?
A. Just Cohesive. No, I don't -- I don't recall any other observers.
Q. Any lenders participate or any lenders present during the board meetings?
A. There may have been somebody from Monroe Capital as an observer in some means. I don't recall. I know they weren't board members, but there may have been somebody from Monroe observing a board meeting.
Q. Okay. So Monroe Capital you just mentioned, right? That was one of the lenders to Forman Mills?
A. Yeah. So Forman had an ABL lender, Cooks Business Capital and a senior subordinated lender with no payables of --

that was Monroe Capital. Both in Chicago.
Q. And you say ABL, base lender, is that what you mean?
A. Yeah, correct. Yeah, a line of credit revolver, lender.
Q. And as CFO, did you interact regularly with the various lenders?
A. Yes.
Q. Okay. You said that Monroe Capital provided I guess a revolving credit facility, right?
A. No. It was Eclipse that had the revolver. Monroe provided term debt.
Q. Okay. Term debt. Like mortgage debt, right, when you say "term?"
A. Yeah, yeah. Just the term notes, you know, were subordinated to Eclipse, the revolver.
Q. Right. So for everyone's understanding, when you say -- can you give an explanation of what a revolver is?
A. Yeah. So Eclipse provided a revolving line of credit debt facility to Forman that, you know, substantially had all the assets pledged. All the inventory

and cash as collateral. And it was an asset-based lending facility.

So there were advanced rates for inventory, for, you know, any cash in transit, things like that that provided collateral, total collateral value. And you can borrow up to that -- that collateral amount. And then below that was Monroe, which had, you know, notes subordinated to Eclipse.

Q. And you may have said this, but I'll ask again. What is the purpose of a revolver? What function does a revolver serve for a business like Forman Mills?

A. So it's working capital. Now, in the case of Forman Mills, the -- all the cash would -- would go to a lockbox, right? A digital lockbox and get swept to pay down the debt facility with Eclipse. And then we would do -- Forman Mills would request a draw against that line of credit.

So you've got a line of credit balance and every day there's a paydown based on the cash receipts the company brings in, which is cash and credit cards

Page 50

and whatnot, every day it sweeps to pay down the line. And then when we had payroll or check runs or what have you, we would do a draw request against that same revolving line of credit facility.

Q. Now, you said Eclipse, right?
A. Eclipse Business Capital.
Q. Okay. Was there any relationship with an Encina Business Credit?
A. It was formally known as Encina.
Q. Okay. So Encina and Eclipse are one in the same you're saying?
A. Correct. Yes.
Q. Okay. Now, this revolver, right, there was -- I think you said there's some type of calculation that was used to determine how much money would be available for Forman Mills?
A. Correct.
Q. And again, that's based on the -- the calculation is based on the assets, right?
A. Yes. It's based on -- yeah, how much inventory you have with deposits in transit and things like that.

Q. Okay. Is calculation based on inventory and receivables?
A. Correct.
Q. And who set up the, I guess the banking relationship with Encina?
A. Forman Mills had always had that -- that debt structure in place. We previously had it with CIT Bank. And then we refinanced it with Encina, who became Eclipse I want to say in 2020 or 2019, somewhere abouts there.
And -- so that would have been, you know, my predecessor with my involvement of course, that did the refinance to Encina later Eclipse.
Q. You just said that "Forman Mills had always had that."
A. Forman Mills always had a revolving credit facility, right?
Q. But when you say that they always had that credit facility, I understand that Forman Mills was sold to Goode Partners by Mr. Rick Forman, I believe in 2016.
And if you know, is -- when you say they always had that banking

relationship with Encina or Eclipse, did that carry over from Mr. Rick Forman, the previous owner, or was it something once Goode Partners came on board, then the relationship with Encina or Eclipse was created between Forman Mills?

MR. MINGIONE: Objection to the form. I think he said -- there was a CIT to Eclipse, right? I think you want to rephrase, Frank. I think you said -- I think you said -- I think Mr. Hess testified that it was -- started as CIT and refinanced to Eclipse at some point, right?

THE WITNESS: Yeah. Thank you for clarifying. I can't speak to what Rick Forman, what his debt structure was like. After Goode acquired the company, there was a revolving credit facility set up with CIT Bank, right? And then that continued until the company refinanced that with Encina at the time, which became Eclipse, and I want to say that was in like, late 2019.

BY MR. ROOKS:

Q. Okay. Thank you. That does clear things up a little bit.

A. Okay.
Q. So we've got, you know, Encina and Monroe. Were there any other lenders that Forman Mills borrowed from let's say from 2018 and beyond, up until September -- I'm sorry, the second quarter of 2023?
A. No.
Q. Okay. So you had said earlier that you had, you know, were in communications with these various lenders throughout the course of your employment, right?
A. Yes.
Q. And were you in contact or in communication with these lenders in your position as controller and CFO or just CFO?
A. Both --
Q. Okay. So with these lenders, let's say Monroe and Eclipse, were you -- when I say "you," I mean Forman Mills. Were you required to provide them with let's say certain financial reports on a periodic basis or certain metrics, certain indicators? What type of things were you required to give to these lenders?
A. The Eclipse we provided borrowing

Page 54

base reports. Which -- and the detail around it. And the borrowing base reports would report the collateral values, you know, how much inventory there was, receivables, things of that nature and then the supporting documents behind it.

So we were required to do borrowing base reports to the revolving lender. Monroe required financial statements, as did Eclipse. They both required financial statements monthly.

Q. Okay. Was there ever a period of time in which you had to present reports to Monroe or Encina on a weekly basis?

A. Yes. It was -- there was a period of time it was monthly, and then with Eclipse it went to weekly borrowing basis.

Q. Do you know when it went to weekly?

A. I really don't.

Q. If you had to give a year, would you be able to say a year in which it went to weekly?

A. I would say somewhere in 2022 it went to weekly.

Q. Okay. And why -- what was the

reason for it going from monthly to weekly?
MR. MINGIONE: Objection to the form.
But you can answer.
THE WITNESS: It was a request they made because the fluctuations were pretty dramatic. And they just wanted, you know, weekly visibility and, you know, so we complied.
BY MR. ROOKS:
Q. You said "the fluctuations were pretty dramatic." What fluctuations are you referring to?
A. The fluctuations in collateral value in loan balance, things, you know, that directly impact the availability.
Q. Okay. So --
A. And they -- what they had said to me or made reference to is that, you know, all of their clients basically reported weekly and they wanted to get us on that same cadence.
Q. When you say, the "they," and the they you're referring to is Encina?
A. Correct.

Page 56

Q. Okay. So with these, I don't know if you say borrowing agreements or lending agreements, but the agreements between Forman Mills and let's say Encina, there were, I guess you would term it "covenants" between -- covenants contained in these lending agreements, right?
A. Right. In the credit agreements they had covenants.
Q. So what's the correct term I should use? Is it lending agreements, credit agreements, borrowing agreement? Credit agreement, is that --
A. Typically it's a credit agreement, yeah.
Q. So the credit agreement had covenants in it, correct?
A. Correct.
Q. Okay. And I understand a covenant can be a positive covenant or a negative covenant, right?
A. Correct.
Q. Okay. So if you can, what positive covenants did the credit agreement with Encina contain?

A. The covenants with Encina or Eclipse, both of them would have covenants related to senior leverage ratios or fixed charge covenant ratio that you have to meet, you know, usually, you know, 1.1 on the fix charge or two and a half or three on the senior leverage.

But it's -- they both had those ratios that you had to maintain. Fixed charge for example, I believe it was 1.1 or greater. And that's a measure of the company's ability to service a debt. Fixed charges are debt service plus cap X. So you have to generate enough EBITDA to essentially support the debt coverage.

Q. You just said "they both." So when you say -- are we talking Monroe and Encina?

A. Yes. My apologies. Yes.

Q. Okay. No worries.

A. Maybe I'm not such a great witness. I keep making that same mistake.

Q. So again, we were talking about these positive covenants and you mentioned EBITDA, which I understand to be earnings

Page 58

before interest, right? Taxes, depreciation, amortization?
A. Correct.
Q. And what is that a measure of?
A. The senior leverage?
Q. The EBITDA, what would you -- I know what it stands for, but how would you explain what it is?
A. Yeah. I would explain EBITDA is essentially the profit, you know, the profit that should flow to cash, right? It's -- you're taking the profit and you're adding back noncash items like depreciation, amortization, taxes, interest. So on a debt fee -- a debt-free company, that would be your profit on a cashless transaction.
Q. Was there a, I guess a regular EBITDA and a lender's EBITDA that you used?
A. Forman Mills like most companies, you have an EBITDA, which is a straight calculation. And then most credit agreements in my experience also have allowable add-backs to get to an adjusted EBITDA.

Q. Okay. And when you say "add-backs."
A. I'm sorry.
Q. Can you just explain what you mean by add-backs?
A. Yeah. So most -- again, EBITDA is a straight calculation off of the financial statements. Most credit agreements have terminology that allows a company to add back or do an addition to EBITDA to get to what they call an adjusted EBITDA, which is what typically the covenants are based off.
And these adjustments could be -- typically are noncash related like an add-back for a gap ASC 842 rent, deferred rent or an add-back for option expense, for example, that's cashless, it doesn't involve cash. That would be another permitted add-back. They usually have an add-back for most credit -- for management fees paid to the private equity group.
So those are just a few examples of permitted, usually permitted add-backs to get to an adjusted EBITDA.
Q. So management -- Forman Mills paid

Page 60

Goode Partners a management fee, right?
A. Correct.
Q. Okay. And how frequently was that management fee paid?
A. In normal course, it was -- I believe it was quarterly. However, the last long period of time before I left or before the sale, we stopped paying the management fees. So Forman Mills was accruing the management fee, but they didn't -- Forman Mills didn't pay the management fee for probably a year or two prior to the sale. I think it was two years.
Q. Do you know what the management fee was, the dollar amount on an annual basis?
A. I don't know exactly. I think it was around 25,000 a month is what I want to say, but I'm not -- I'm not sure to be honest with you.
Q. Okay. I'm not asking you to guess or anything like that. So we talked about these positive covenants and then the other type of covenant would be a negative covenant, right? Do you recall what type

of negative covenants existed in the
lending agreement with Monroe and Eclipse?
A. Yeah. In addition to the financial
ratio covenants, there were also
requirements for us to pay the rents for
the store -- store leases. Honestly to pay
taxes and pay the rents and things of that
nature to, you know, maintain their
position and collectability on the
inventory.
There were requirements to
file audited financials within I think it
was 90 days of the fiscal year end, so we
had to have, you know, annual audits.
There were requirements on reporting
financial statements monthly. We had 30
days from each month end to file internal
financials, 45 days on quarterly financials
and then 90 days on the annual audited
financials.
Q. So these financial covenants, would
you agree, lay out or set out some level of
performance expectations for Forman Mills?
A. Well, the fixed charge and senior
leverage covenant are guardrails in terms

of EBITDA. There may have been an EBITDA level dollar amount requirement in the credit agreement, although I don't recall for sure. But that -- that certainly may have been the case as well.

Q. So in -- would you agree that at some point in time, Forman Mills started to experience liquidity issues?

A. Yes.

Q. Okay. And just so I'm clear, if you know, for the record, when we say a "liquidity issue," how would you describe or define a liquidity issue?

A. A liquidity issue is when you're availability is below what the company needs in terms of working capital. Or when the availability is too low or you're burning cash, right? Unsustainable level either and/or I think the situation would qualify as a liquidity issue.

Q. Okay. So to your -- the best of your knowledge, when did Forman Mills first start to experience these liquidity issues?

A. It would have been, you know, probably mid- to late '22 there were some

challenges. Now, we still had availability, you know, so it wasn't a crisis at that point, but certainly there were some warning signs. And we did attempt to do some renegotiation with Monroe back in that time period.

Q. Okay. So in your -- the response you just gave, you said -- you used two words or phrases. You said "challenges" and you also said "warning signs." Can you give me a little more I guess clarity as to what challenges you were referring to and what warning signs you were referring to?

A. Yeah. Do you mind if I go back a little bit further and -- it's kind of -- and set the stage for you a little bit more?

Q. No, no. That's fine. If it helps explain. That's certainly fine.

A. Okay. So during COVID in '20 and '21, business was booming. Our -- our -- the Forman Mills customer is low income in urban areas, but very low income. They -- it's a deep discount space, you know, a large percentage of the customers are on

Page 64

government benefits and they just don't have much discretionary cash.

During COVID when the stimulus money was flowing, business was incredible. And the company had just incredible performance. The sales were off the charts, everything was great. Once the stimulus stopped, the opposite happened. It -- it just -- business plunged actually worse than pre-COVID because now the same customers are battling food inflation, rent, utilities. And they had actually a lot less disposable income than they had pre-COVID, right?

So throughout the course of '22, once that stimulus stopped, it was just straight down, the company performance. You know, the sales were down, week after week after week. Pretty substantially. So over the course of '22 what the company saw was deteriorating top-line performance and deteriorating total liquidity available over the course of the year and it was dramatic change, right?

Because again, the Forman Mills customers just didn't have discretionary income. It was all getting sucked up with the record-high inflation. So all that to set the stage. So in -- later in 2022, you know, we're seeing these continuous sales declines and, you know, cash being burned through operations.

And so that's what I was saying about warning signs were popping up. We did talk to Monroe to try to get some consideration on the debt, the term debt. They agreed to -- I don't remember exactly when, I think it was around September, they agreed to differ principal payments on the notes and we had requested some concessions. They did give us a concession on the principal. We had talked about differing interests, but they did not agree to that.

Q. Okay.

A. But we were trying to, you know, get some concessions out of Monroe.

Q. Okay. So --

A. I hope that helps.

Page 66

Q. Yeah. No, no. It does. 'Cause we were talking about, you know, liquidity issues and -- but these liquidity issues, and you just mentioned concessions and things like that. Would you say that these liquidity issues caused Forman Mills to violate the covenants that were contained within those credit agreements?

A. Yes, that continuous deterioration of the customer and the sales over time burning cash. And those economic situations led to Forman Mills violating, you know, some of the covenants. And then that happened in '23.

Q. Okay. And the violation of those covenants resulted in amendments to these credit agreements, right?

A. Correct. Yeah. When there's a default, we would go back and get a waiver and amendment.

Q. Okay. And there were a number of amendments, correct, to these credit agreements, right?

A. Correct, yeah.

Q. Okay. And you would agree it was

getting I guess harder and harder to borrow money from let's say Encina?
A. It wasn't harder and harder. We had a threat facility in place, right? And subject to the borrowing basis, if we had availability, we could draw on it. So I wouldn't say it was easier or harder, but what we saw was that total available liquidity over time start to evaporate.
Q. I'm sorry. You said --
A. Until '20 -- you know, March, April 2023 when it had gotten precarious.
Q. You said that the liquidity began to you said evaporate, right?
A. Yes.
Q. Okay. Now --
A. The total liquidity available, right? So you've got an X amount of a limit on your -- your revolving facility. And then, you know, you've got X amount of capital -- or I'm sorry, X amount of collateral. Which creates how much you have available on the line of credit and then the loan balance. And that difference is the availability on the line of credit.

Page 68

And over the course of the year, you know, that number, you know, dipped lower and lower throughout the course of the year.

Q. Right. So this credit agreement was in place and I don't want to put words in your mouth, but what I get from that is, the credit agreement was in place, but Forman Mills' access to that credit was becoming less because of the liquidity?

A. We had less capital available, correct. Yeah, we had less liquidity available over the course of the year.

Q. Okay. And as a consequence, right, that your communication with these lenders Encina, Monroe, your communications increased in frequency?

A. Yes, as we're motoring through the year as, you know, the numbers with -- as with any company, right? The worst numbers, the more visibility and the more questions and meetings and stuff arise.

Q. So the liquidity issues that Forman Mills was experiencing let's say in 2022 and Q1 and Q2 of 2023, what, if any, problems did the liquidity create with

meeting payroll?
A. It didn't until that March, April of '23 time frame. Prior to that, there weren't issues making payroll.
Q. Okay.
A. Because we had liquidity available through -- through 2022.
Q. Okay. So what kind of payroll issues was -- or did Forman Mills phase in 2023, Q1 and Q2?
A. Well, around end of March, maybe early April, there was a point where our liquidity had shrunk to -- to a level that making the next payroll was going to be questionable, right? So we flagged that. And we had some discussions with Goode, Monroe and Eclipse and we weren't able to -- Forman Mills was not able to get more capital out of any of those.
And in early April, I think it was early, mid-April, Eclipse put some reserves in place on our revolving credit facility that made it where we couldn't fund this upcoming payroll, whatever exact date that was. And that's what led to, you

know, a lot of the issues we had with Eclipse. And ultimately what led to the events and the balance of April, May and June.

Q. Okay. So the liquidity, the cash flow challenge that you experienced in 2022 and forward, I just want to make sure I'm clear, created liquidity issues, which affected the ability of Forman Mills to utilize the revolver, right?

A. Yeah. We weren't generating profitability, we weren't generating enough cash to fund the operations of the business. So we were relying on the credit facility to bridge that gap, right? And in '23, you know, that buffer of availability on the revolver -- revolving line of credit, just shrunk to a negligible amount, right? So that created the liquidity crisis.

Q. What type of interest rates was Forman Mills paying on the debt that was with Monroe?

A. It was a premium to the traditional bank rates. I don't remember the

percentage and, you know, obviously rates have changed dramatically since a few years ago. I don't remember the rate. But it was a premium to, you know, the traditional bank rates, right? Because it was subordinated debt.

Q. How about with the interest rate that was charged by Eclipse, do you recall what type of interest rate you were paying with Eclipse?

A. I think Eclipse was around 10, if I recall. But again, I'm not sure of that. It was a little bit of a premium too, like a traditional bank facility safe you go to, you know, Chase or PNC or whatnot. Eclipse was a little bit of a premium to that. I want to say it was nine and a half or 10, something like that, but I could be mistaken, though.

Q. At any point in time, let's say from 2022, beginning of 2022 and on, did Forman Mills explore other lending, borrowing, financing options?

A. Not in '22. We did -- wait a minute. I think we did in '22. Actually,

Page 72

yes, we did in May, June, right around that time frame of 2022. We were exploring a refinance with another institution and that was Brian Sullivan, my predecessor was working with a couple different institutions I recall to try to refinance the debt or, you know, do something -- have some options there.

Q. When you say "refinance the debt," are we talking about Monroe, your debt being with Monroe, getting another institution to basically pay off that debt and refinance -- finance that new debt through the new institution, right?

A. Well, we were looking at refinancing the revolving credit facility. And then, you know, potentially Monroe too. But it was really centered around the revolving credit facility. See if there were any options there to do that.

Q. So when you say "refinance," right, is that different than a recapitalization?

A. Well -- recap -- it could be. Recapitalization, you know, could entail new capital, right? As opposed to just

refinancing the debt, which you may not have cash out of, right, pull cash out of. It could be one in the same, but not necessarily.
Q. You said that your predecessor, Mr. Sullivan, explored refinancing with several different institutions, right?
A. Yes.
Q. Was a recapitalization explored as well, if you know?
A. Recapitalization in terms of Goode and Monroe? Is that the question?
Q. Yes.
A. We had discussed that in the fall of '22, and in early '23 there were conversations about Goode putting in more capital or Monroe putting in more capital. There were discussions about one of those seniors.
Q. Again, just jumping back to Mr. Sullivan, you said that he explored refinancing with other institutions. I think I know the answer, but I'll ask. Was that successful at all?
A. No.

Page 74

Q. Okay. Did you in your tenure as CFO explore any options for refinancing with other lenders?
A. No, no, I didn't. Not in my role as CFO, I didn't.
Q. Okay.
A. Other than subsequent to the sale, which of course, then I did, but prior to the sale, no, I did not.
Q. Okay. This might be a good point to take a break. I want to organize a few notes. Let's take a ten-minute break.
(Recess.)
BY MR. ROOKS:
Q. You had said earlier that I guess Encina had put some I guess reserves in place. Can you tell me what you mean by reserves that were put in place?
A. Yes. So early April, right around the early April '23 time frame, put in additional reserves in the borrowing base, which further tightened our available liquidity.
Q. Okay. So I'm going to introduce a document. We'll just call it Exhibit 1.

(At this time, a document was marked for identification as Exhibit No. 1.)

BY MR. ROOKS:

Q. And it's a document that was produced by your attorneys here. I'll give you a Bates number for the record. It's FM-005324 through 5330. And I'm going to share my screen. Let's see if I can do that here. All right; do you see that?

A. We can now.

Q. Cash pledge and security agreement. Have you seen this document before?

A. I -- yeah, I have.

Q. Okay. It's again, like I said, it's identified by the stamps in the bottom right-hand corner FM-005324 through 5330. Okay. The subject or I guess the top of the agreement or document says, "cash pledge and security agreement." And it says, "made between Goode Partners Consumer Fund III and it looks like Encina Business Credit, LLC." And it's dated January 15th, 2021; do you see that?

A. Yes.

Q. Can you I guess tell me what the significance of this document is?
A. I believe that was where Goode Partners put a collateral to Eclipse that allowed us to have more liquidity. So if I remember that one right, Goode gave Eclipse collateral, right? Which Eclipse then added that into our borrowing base at Forman Mills, gave Forman Mills additional available liquidity.
Q. Okay. And you testified earlier about COVID, right, and that there was some -- I guess COVID had an effect on the business and people's -- I'm sorry, the market, the demographic market that Forman Mills served, right?
A. Yes.
Q. And when we talk about COVID period, how would you define the COVID period? That, you know, it was -- I believe it started in March of 2020. But, I mean, what would you say? I mean, if we talk about a period lasting, beginning when and ending when?
A. Yeah. As it pertains to Forman

Mills, I would say late March of 2020
until -- until late in I think it was '21
was like one phase. As it relates to
Forman Mills, I consider it when the
closure, you know of, you know, all
businesses and whatnot. And then the
period in which the government was
providing stimulus, right?
And then once the stimulus
ended, that's like another phase of COVID.
COVID was obviously still going on back
then, but that entered a different phase.
That's at least how I look at it. They're
like those three phases.
Q. You would say there was a COVID
phase when things got good and a COVID
phase when things got bad, right?
A. Correct.
Q. You referenced stimulus money. If
you can, what's the good period, the period
in which the stimulus money was giving a
boost to Forman Mills?
A. Throughout -- all throughout 2020
and then, you know, some portion of '21
when they started pulling the stimulus

Page 78

back.
Q. Okay. So I'm going to introduce another document. We'll call it Exhibit 2.
(At this time, a document was marked for identification as Exhibit No. 2.)
BY MR. ROOKS:
Q. Let's find it here. Let me share my screen again. And you see my screen okay?
A. Yes.
Q. This is a -- we'll call it Exhibit 2. It was another document that was produced by the attorneys for Forman Mills, and it's got an identification number of FM-005795 in the bottom right-hand corner. Okay. This is, it looks like it's an e-mail from Joe Ferreira to you, correct?
A. Okay.
Q. You've seen this e-mail before, correct?
A. I assume so, but that looks like the proper e-mail address, but yeah, I assume so.
Q. Okay. The subject of the e-mail is

a Forman Mills 2023 plan. Do you see that right here?
A. Yes, yes.
Q. Can you tell me what you recall about this e-mail, the subject of this e-mail, which is the Forman Mills 2023 plan and what that was? What was the Forman Mills' 2023 plan?
A. What he's referring to is the budget for 2023.
Q. Okay. Budget.
A. Yeah. Just skim down through that.
Q. And it says, "Mike/Kevin, thank you for presenting the 2023 initiatives to us yesterday"; do you see that?
A. Yes.
Q. Do you recall what the 2023 initiatives were?
A. No, I don't. But that would involve, you know, store openings, closings, cap X, you know, overall marketing spend. These would be like the initiatives, right? Any kind of labor savings we're hoping to achieve with stores or the distribution center. That would be

Page 80

the nature of the niche that he's talking about. No, I don't recall like, what those initiatives were in detail.

Q. Okay. This e-mail's dated, it looks like February 6th, 2023, right?

A. Yes.

Q. Okay. So at that point in time, Forman Mills was experiencing a liquidity crisis, correct?

A. I don't know about crisis. It was certainly tight liquidity. Yeah, for sure.

Q. Okay. So the access to capital was restricted at the time?

A. It was declining. We didn't have a lot of free working capital or free cash throw at our disposal. So the liquidity was certainly tightening. At that point there hadn't been a default or issues with Eclipse as I recall. But it's certainly, you know, tight liquidity.

Q. So you said at that time there had not been a default with Eclipse, right?

A. I -- I don't believe so. I think we were in good standing with them at that time, I believe. And I don't think there

were any defaults at that time.
Q. Okay. Hold on one second here. Well, earlier we talked about amendments to the credit agreements.
A. Right.
Q. Right? And I want to make sure I'm clear that would the credit agreement be amended in the absence of a default?
A. Generally not unless, you know, you change some terms and conditions. If there was an amendment done in early 2023, then I would be corrected and there would have been a default most likely.
Q. Okay.
A. I -- like I said, I don't at this moment in time, I don't remember a default in February. I don't remember us having a default until more like March or April, but I could be wrong.
Q. Right. And let me introduce another document here. We'll call this Exhibit 3.
(At this time, a document was marked for identification as Exhibit No. 3.)

BY MR. ROOKS:
Q. And this is -- I'll put it up in a second. I just want to put the numbers here. It's produced by your attorneys and it's FM-002218 through 2233. Let me share this here. Okay?
A. Okay.
Q. All right. Now, the top of this document says, "waiver and amendment number 14 to credit agreement." And it is dated April 27th of 2023; do you see that?
A. Yeah, I do.
Q. Okay. Now, would you agree that this would suggest that there were 13 prior amendments to the credit agreement since this is number 14?
A. Yes. Yeah, they're sequential.
Q. Would you agree that that's a lot of amendments to go through, 14?
A. That's over the course of what, five years, right?
Q. I don't know.
A. Or a number of years. It seems like a lot, but like I said, it's over a number of years. Let me read that third

paragraph.
Q. Sure. That's exactly where I was heading.
A. Okay. Yeah, I'm aware of what this is.
Q. Okay. Can you explain what this is then?
A. Right. So we provided that letter of credit to CIT and that created a default apparently, but we issued that 5-million-dollar letter of credit to CIT, which is a factor for I want to say a majority of the product vendors that Forman Mills was buying product from. And so that Eclipse had an issue and said that that created a default in the credit agreement, us just issuing that letter of credit outside of our agreement with them.
Q. Okay. Now, paragraph three begins with "whereas, events of default have occurred and are continuing as a result." You see that, right?
A. Uh-huh.
Q. This is not -- the default that's here is not the first default that Forman

Mills had with Encina Business Credit or Monroe, correct?
A. Are you asking had there been defaults in the past?
Q. Correct, I am.
A. I would think so. I don't know all the, you know, off the top of my head, I don't know the nature and circumstances of other defaults, but I wouldn't be, you know, surprised at all if we had. Actually, I know we did have multiple defaults around the time of COVID. So yes, there were other defaults prior to this.
Q. All right. I'm going to stop sharing that.
A. Like, for example, COVID, we had a whole string of defaults, right? The credit doesn't allow us to close stores, right? It doesn't allow us to not pay rent. Forman Mills and just about every other, you know, retailer in the country did.
Q. All right. So we talked briefly about a 2023 plan, right?
A. Yes.

Q. And we also talked that there had been defaults and we talked about a tightening of the liquidity or available credit, right?
A. Yes.
Q. You testified earlier about cash flow and limited access to credits under the, I'll say the credit agreement with Eclipse, right?
A. Yes.
Q. Do you recall how much credit let's say was available in let's say the first quarter of 2023?
A. I don't remember exactly. I would -- I would guess it's, you know, it's 2, 3 million, somewhere around that range. Like 2 to 4 million during the course of that quarter, roughly.
Q. And during this let's say the first quarter of 2023, was Forman Mills let's say stretching out payments to vendors, for example, not paying them on time?
A. In any kind of scenario where liquidity's shrinking and getting tight, that's usually one of the go-to strategies.

Page 86

So I don't believe we were on the rinse so much, but we probably did, Forman Mills probably did stretch vendors, you know, somewhat to the extent we could. That would be kind of the normal process in that situation.

Now, if -- the product vendors you have less flexibility on, right, because if you stretch it more than like a few days, then they don't want to ship you new -- new product, right? So your hands are a little bit tied.

Q. To your knowledge, was there ever any threats of a vendor threatening to cut off providing merchandise in 2023, first quarter?

A. In 2023, in the first quarter, not that I recall. I mean, we had a lot of vendors, right? So there could have been one here and there, but not that I -- not that I recall.

Q. If one vendor cut you off, would you just go to another vendor and get materials, supplies?

A. Most likely, unless it's like a

really significant vendor. But yeah, that would most likely be the result.

Q. Okay. Would you say I guess analogize this to let's say walking on a tight rope, you know, with who to pay and, you know, managing cash flow in the first and second quarters of 2023?

A. Would I say -- what was the question?

Q. Was it like walking a tight rope with balancing available cash?

A. Yes, yes, yeah, definitely challenging.

Q. Okay. So getting to this e-mail, the 2023 plan. Knowing that, you know, cash flow was tight, what initiatives can you recall as to how Forman Mills was going to resolve this cash flow issue, liquidity crisis -- liquidity issues I'll say.

A. Yeah. I don't recall like, you know, specific initiatives. I would suspect -- the hope was always, you know, in '23, even in '22, the hope was always that the comparable store sales would flatten out, right?

Instead of continuing to deteriorate and, you know, that would -- that that would create additional margin dollars and additional liquidity if same store sales would stop the descent and flatten out. So I think, you know, that was part of the hope that that would happen.

And then, you know, stretching vendors a little bit in the meantime to buy time and, you know, cut costs where we could of course. Manage the overhead and to buy time until comparable store sales would start to gain some traction.

Q. Did you negotiate or renegotiate any terms with vendors, for example?

A. Resale, I don't recall. I don't recall any -- anything that's of real substance in terms of vendor negotiations.

Q. Were there in let's say Q1 of 2023, to your knowledge, any cost-cutting campaigns that the company embarked upon?

A. Yes, that was something I was trying to do as well is cut overhead to the extent we can, but without creating, you

know, panic among employees or vendors, maintaining the strategic value of the company as a going concern, right, was important. So we were trying to cut costs where we could without impacting the company, the viability and the long-term success of the company.

Q. In the first quarter of 2023, how many stores did Forman Mills have?

A. I think there were 45.

Q. Okay. And 45 stores, in what states were these stores located?

A. They were in Pennsylvania, New York, Maryland, Ohio, Michigan, Illinois, District of Columbia. I think that's it. Wisconsin.

Q. Okay. How did you guys get all the way out in Wisconsin? It seems like a disconnect from every place else.

A. Yeah. It's not too far from Chicago. So there were like, six stores in Chicago, and Wisconsin was the next place up or, you know, reasonable proximity to Chicago.

Q. Okay. So with these 45 stores --

so there were 45 stores and a corporate office in Pennsauken, New Jersey, right?
A. Yeah, and distribution center in Cinnaminson.
Q. That was going to be my next question. What other facilities or operations did Forman Mills have? So you said the Cinnaminson distribution center, and anything else?
A. Just the stores, the corporate office and the distribution center.
Q. Okay. And as of the first quarter of 2023, how many employees would you say Forman Mills had, company-wide?
A. I think it was around 2,200.
Q. Okay. And the Forman Mills, again, the corporate office is located in Pennsauken, New Jersey, right? How many employees in total worked at the Forman Mills corporate office let's say as of June 5th, 2023?
A. Prior to -- physically at the Pennsauken address, 60 or 70 roughly.
Q. So I'm going to introduce another document in a second. So on June 5th there

was a communication that went out that instructed employees, certain employees to work from home. Would you agree with that? And I'm going to introduce a document here. We'll call this Exhibit 4.

(At this time, a document was marked for identification as Exhibit No. 4.)

BY MR. ROOKS:

Q. This was a document that was produced in discovery by our side. And it's got a number, identification number as NDR016. So let me just share that; you see that?

A. Yeah, I do.

Q. Okay. Rosa Rosario sent that, it looks like to a corporate distribution list. Does that sound about right?

A. Yes, I see it.

Q. Who is Rosa Rosario?

A. She was the or is the director of human resources.

Q. Okay. I see that it says that right there. And again, you see the date there, it says June 5th. Can we agree that

that would be June 5th of 2023, right?
A. Yes.
Q. It says, "In-office day for tomorrow, Tuesday, June 6th, 2023 is canceled." Do you see that there?
A. Yes, I do.
Q. Okay. So did Forman Mills at this Pennsauken corporate location, did they operate on like on hybrid basis or were they in the office full-time? Do you know at this time?
A. It was largely hybrid. It varied a little bit by team. So like my team was mostly in office. But it was a hybrid situation.
Q. And there were certain dates, right, that the employees were required to work in the office, right?
A. Well, again, that varied by team, right? Different teams would have different, you know, in-office days.
Q. Right. But they weren't 100 percent remote, correct?
A. For the most part. I mean, there were -- I think there were a few a hundred

percent remote, but those were the exceptions, not the rule.
Q. Okay. So again, this basically says that the in-office day for the 6th was canceled. And I take that to mean, you tell me if this is accurate, that instead of coming into the office, these employees would be working from home?
A. Yes, I think that's a safe assumption.
Q. All right. Let me just stop that. So would you agree that there was some type of Zoom meeting held on the afternoon of June 5th -- I'm sorry, June 6th, 2023?
A. Yes, in which then the case -- yes, I would.
Q. Okay. And that meeting that occurred via Zoom, that was held with a number of employees that were affected by a termination; is that correct?
A. Yes.
Q. Okay. The Zoom meeting, was that conducted by Mr. Kvitko?
A. Yes. I mean, he led most of the discussion, yes.

Page 94

Q. Okay. And were you present on that Zoom meeting?
A. I was.
Q. Okay. What do you recall about that Zoom meeting?
A. I remember that we had spoken with counsel, right?
Q. I'm not asking you about what you said with counsel. So you spoke with them, but I don't want to know what was --
A. I understand. I understand. I'm saying --
Q. Just being cautious.
A. Right. I understand. Mike had a short script to read from, right? That we had developed with counsel and he read that. There was a good amount of shock and then he fielded some questions and answers from the team.
Q. Okay. Now, since that script was read to the employees, that script would not be privileged. So --
A. Understood.
Q. Can you tell me what that script was to the extent that you recall what was

read to the employees?
A. Yeah. I don't remember exactly. But it was pretty short and it just made the announcement that we were doing a RIF and that it would affect, you know, many of the people on this call and didn't elaborate, didn't go into a great level of detail. But that was the short end of it.
Q. Okay. And when you say "RIF," you mean reduction in force, right?
A. Reduction in force, yes.
Q. And that reduction in force that you're referring to, that was an immediate reduction in force, correct?
A. Yes.
Q. That Zoom meeting that was held, was that held let's say towards the end of the day on the 6th?
A. I don't recall, but I would presume it was sometime in the afternoon.
Q. Okay. If I said 4 o'clock, would that sound about right?
A. Yeah, that would sound right.
Q. Okay. So Mike Kvitko read a short script to the attendees of the Zoom

meeting. Was there I guess an opportunity during that Zoom meeting for Mr. Kvitko to field questions?
A. Yeah, there was some questions afterwards and, you know, he -- he responded against, you know, probably against what counsel was suggesting, which was just keep it very short and sweet.
MR. MINGIONE: Let's not talk about what counsel mentioned.
THE WITNESS: Sorry. Yeah, there was some question and answer afterwards.
BY MR. ROOKS:
Q. So were there things that Mr. Kvitko was not permitted to say?
MR. MINGIONE: Objection to the form.
If your answer would go into anything you communicated with the corporate attorneys, don't provide that information, please.
THE WITNESS: Okay.
What was the question again?
MR. ROOKS: So -- I'm sorry.

Kathy, can you read back the question?

(Record read.)

MR. MINGIONE: Same objection.

BY MR. ROOKS:

Q. You can answer.

MR. MINGIONE: You can answer. Other than things that counsel may have said.

THE WITNESS: Yeah. There were -- we were advised, and the script was short and sweet, to not go into a lot of specifics of things that we didn't know, right? So we were advised -- well, I can't say what we advised. We were trying to -- we didn't want to make any forward-looking statements or suggest things that we didn't know to be true and factual and things that would actually happen, right?

And at that moment in time, we were actively trying to sell the company, and we were actively preparing for a bankruptcy filing. We didn't know in all honestly, which direction it was going to go. So we couldn't make claims and

assertions on eventualities that -- that we didn't know, we didn't have control over.
BY MR. ROOKS:
Q. During this Zoom meeting, did you speak at all?
A. I -- as I recall, I did once. I tried to kind of end in a conversation or to try to halt a discussion. I don't even remember what it was about. But that was the extent of my speaking on the call.
Q. Okay. Besides yourself and Mr. Kvitko, did any members of the -- let's say the executive suite or the executive team speak to the employees?
A. Not that I recall.
Q. Okay. I want to introduce another document. Let me share the screen here. Okay. This is a document that was produced by your attorneys. It's -- we're going to call this Exhibit 5.
(At this time, a document was marked for identification as Exhibit No. 5.)
BY MR. ROOKS:
Q. And this is a document that's

identified, it's got the numbers here. It starts with FM000407 through FM000409. Okay. And the top of the document, it says, "Forman Mills" and right beneath that it says, "reduction in force FAQs"; do you see that?
A. Yes.
Q. Have you seen this document before?
A. Yes. Yes, I have.
Q. And I just want to introduce a counterpart to this document. Let me see if I can introduce this here. All right. I'm going to call this Exhibit 6.
(At this time, a document was marked for identification as Exhibit No. 6.)
BY MR. ROOKS:
Q. Which was produced by plaintiff. It says NDR031 through NDR032; do you see that?
A. Yes, I do.
Q. And I'm just going to go back to Exhibit 5 and you see there's a list of questions, right? It starts with, "Why is my employment being terminated?" And it

Page 100

ends with, it looks like a list of state unemployment offices; do you see that?
A. Yes, I do.
Q. Okay. And would you agree, based on seeing Exhibit Number 6, that this RIF FAQ was sent to the employees?
MR. MINGIONE: Objection to form.
THE WITNESS: It appears to be the same as the other attachment you presented, right?
BY MR. ROOKS:
Q. Yes. It is. It's the same questions. I think it's a little easier to read on the Exhibit 5. Okay. So you said that you did see this before, correct?
A. Yes, yeah, I did.
Q. When was the first time that you saw this document?
A. It would have been, you know, leading up to the announcement.
Q. Okay.
A. I don't remember exactly, but...
Q. So you saw this document before it was e-mailed to the employees, right?

A. I believe so.
Q. Okay. Do you know who drafted or prepared this reduction in force FAQ document?
A. I don't recall. Sorry.
Q. Did you --
A. It might have been Rosa in -- in conjunction with, you know, Mike and I. And our attorneys, but I'm not a hundred percent sure of that.
Q. Okay. I'm going to go back to 6. The RIF FAQ document was e-mailed, right? We see that in the upper left-hand corner.
A. Yes.
Q. And it looks like it came from an e-mail address Formanmillshr@formanmills.com, right?
A. Yes.
Q. Okay. Would that have been I guess Rosa, or is that a generic --
A. That's a generic box that's sent from. It probably would have been from Rosa.
Q. Okay. All right. So this e-mail, I think you said you may have participated

in drafting this e-mail or this RIF FAQ?
A. I'm not sure if I participated in drafting. I imagine I did. It was probably Mike and I with Rosa and our attorneys. I'm sure that I would have seen it before it was -- was published.
Q. So Rosa would not be able to send this out on her own, correct?
A. Correct.
Q. She would have needed to have approval from somebody in order to distribute this to the employees, right?
A. Yes.
Q. And do you know who would have given her that green light to send this out to the employees?
MR. MINGIONE: Again, just to the extent that your -- this would call for attorney-client communications, I would direct you not to answer it.
BY MR. ROOKS:
Q. Let me rephrase the question. Did Mike Kvitko give approval or did you give approval for Rosa to send this out?
A. I believe Mike would have given her

approval. Rosa reported to Mike, so I would think he would have.

Q. Okay. Now, this agreement, I'm sorry, this document was sent to the individuals who were terminated on June 6th, 2023, right?

MR. MINGIONE: Objection to the form.

But you can answer.

THE WITNESS: Yes.

BY MR. ROOKS:

Q. Okay. And is there any doubt in your mind that the individuals were not terminated?

MR. MINGIONE: Objection to the form.

But you can answer.

THE WITNESS: I'm sorry. I don't understand the question.

BY MR. ROOKS:

Q. The individuals that received this document were all terminated, correct?

MR. MINGIONE: Same objection.

You can answer.

THE WITNESS: I would think

so, yes.
BY MR. ROOKS:
Q. Okay. And there is a list of, it looks like state unemployment offices; do you see that?
A. Yes.
Q. Okay. Do you know why this letter would have included a list of state unemployment offices with it?
MR. MINGIONE: To the extent you wouldn't be divulging attorney-client communications.
THE WITNESS: It would be helpful to the people that were affected.
BY MR. ROOKS:
Q. Okay. It would be helpful for them to know this information to apply for unemployment benefits. Is that what you're saying?
A. Yeah, yes, to be helpful to those people impacted.
Q. Okay. Let me stop sharing this. I want to introduce another document. Let me see here. Just give me a second to pull it up. I'm going to introduce this document

here as Exhibit 7, okay?
(At this time, a document was marked for identification as Exhibit No. 7.)
BY MR. ROOKS:
Q. All right. This is a document that was produced by your attorneys. There's no I guess Bates number on this. It's just -- it's an Excel spreadsheet that has in the upper left-hand corner, it says, "Forman Mills Corporate Office Employee Roster"; you see that there?
A. Yes.
Q. I can make this a little bigger if that -- so there's I guess a number of columns in this spreadsheet, A through, I don't know -- A through M; do you see that?
A. Yes.
Q. And the first column, column A, says the heading and then it says "site" and it's got this number 9999; do you see that?
A. Yes.
Q. That would represent the corporate office?

Page 106

A. Correct.
Q. Okay. And I don't think I've asked this, but have you seen this document or a document similar to this before?
A. It looks familiar to me from back then at that time, yes.
Q. Okay. And I'm going to scroll over to -- let me go column by column. Column B, it says, "last name," right? Column C, "first name"?
A. Yes.
Q. And this would reflect the employees that were assigned to the Forman Mills corporate office; is that correct?
A. It looks like a complete list of the corporate office employees.
Q. Let me scroll down, all the way down to the bottom. I want to see how many rows there are. So I'm just going to do this. I want to delete the first three rows, okay? That'll make it easier to sort. It's not changing the substance of the document. That way I can freeze the rows. Let me do this here. View, freeze, top row. Okay. I'm going to scroll all

the way down here.
And it says the first row is headings and the last row is I guess labeled 125. That would mean that there are basically 124 people identified here. Does that sound right?
A. Yes. Correct.
Q. Okay. All right. And we've got again, last name, first name, job assignment description. Is that the job title that these individuals occupied?
A. Yes, correct.
Q. Okay. And there's a status and that means active unless -- I see one there's leave. I don't know if that means FMLA or something like that?
A. Yeah, some kind of leave of absence.
Q. The person is still employed there, but I guess on a leave, right?
A. Right.
Q. And then we've got this column F that says, "original hire date"; do you see that?
A. Yes.

Q. And there's an "employee, employment status, effective start"; do you see that?
A. Yes.
Q. For the first person here, it looks like a Brian Chalker accounting controller. Do you know Mr. Chalker?
A. Yes.
Q. It says the hire date is 4/17/2023 and the employment status effective start date is 4/17/2023, right?
A. Yeah, I see it.
Q. And this would have been his date of hire?
A. Yes, correct.
Q. Now let's go down to the third person listed is Dong Liu, I guess it is. Staff accountant.
A. Yes.
Q. Do you know that person?
A. Yes.
Q. Okay. And here it says "original hire 11/1/2018." And then it has employee, employment status effective start. It's got some date, 5/8/2022. Do you know what

this column represents?
A. No, that doesn't really in all honesty make sense to me. That it would be a date different than the hire date. I don't know what May 8th, 2022 would have been. In that case, Al -- Albert was the name he went by. And, you know, he didn't like, leave and come back. Yeah, I'm sorry. I don't really understand what that column is supposed to represent.
Q. Because you testified earlier that you were the controller previously, right, before you became a CFO?
A. Right.
Q. And as the controller, you would have worked in the same corporate office in Pennsauken, right?
A. Yes.
Q. And this person was employed in 2018 and that's the same time that you were, right?
A. Yes, yes.
Q. And to your knowledge --
A. That individual worked for me.
Q. Okay. So that individual's

Page 110

employment was continuous, right?
A. Yes, yeah.
Q. All right. If you go down to the -- a couple more, there's this Eva Kasavage person?
A. Yes.
Q. Do you know Ms. Kasavage?
A. I do. She worked for me as well.
Q. It says she started in '97.
A. Right.
Q. And then it's got a date here 5/8/2022. The same date as Dong. Do you see that there?
A. Yes. Yeah, I do.
Q. And did that --
A. There's a lot of 5/8/2022 dates, right? Lillian. And 7/15. Yeah, I don't know what that column, like I said, what that column represents. I don't know if it's the last change, like maybe there was a raise or something like that and that's the last change. I don't know. I would just be speculating on what that column represents.
Q. For the people that we just talked

about, Eva and Dong, to the best of your knowledge, their employment has been continuous, correct?
A. Right.
Q. They didn't leave and come back or anything like that?
A. No.
Q. Okay. Yeah. I was just trying to -- no trick questions.
A. Yeah.
Q. I'm just trying to like -- I saw this in the spreadsheet and I didn't know what it meant, so I figured I would --
A. Yeah. If it was like a date in 2020 because, you know, there was a period where we essentially furloughed almost everything, but that would be in 2020, not 2022.
Q. Okay. All right.
A. Again, I'm speculating that, you know, maybe that's, you know, some date of, you know, a change of some kind.
Q. Okay. Do you know where this information would have come from?
A. It looks like it's a census data

Page 112

file that probably Rosa would have put
together.
Q. Okay.
A. And it's probably directly coming
out of our Dayforce, which is our -- their
payroll system that we use, Forman Mills
used.
Q. Okay. Now, there's another column,
there's other columns, but I'm going to
skip over to RIF; do you see that?
A. Yes.
Q. And you see here, one, two, three,
four, five, the first five are Ys. The
letter Y, right? You see?
A. Yes, I do.
Q. And there's an adjacent column,
column L. It says, "remaining," right?
A. I see.
Q. It looks like either one. Either K
or L columns would contain a Y, not both.
Either one or the other, right?
A. Correct.
Q. Okay. And if a person has a Y in
column K, that would mean that they were
terminated on the June 6th, 2023 date,

right?

MR. MINGIONE: Objection to the form.

But you can answer.

THE WITNESS: Correct.

BY MR. ROOKS:

Q. I'm going to sort this so that we get all the Ys in column K. So I'm not changing any data. I'm just changing the order of the -- let me see here. Sort, where's the sort button? Wrong column. Sort. Okay. And see now it's ordered so all the Ys in column K appear?

A. Yes.

Q. And then it starts, it looks like on row 91 where Ys, the letter Y appears in remaining; do you see that?

A. Yes.

Q. And again, since we're not going to count the top row here, the last Y in column K is at row 90; do you see that?

A. Yes.

Q. So that would indicate that 89 persons were terminated on June 6th, 2023, correct?

Page 114

A. Correct.

MR. MINGIONE: Objection to the form.

You can answer.

THE WITNESS: Correct.

BY MR. ROOKS:

Q. Sorry. Can you just repeat your answer, Kevin?

A. Correct.

Q. To the best of your knowledge, were 89 people affected by the termination that happened on June 6th, 2023?

MR. MINGIONE: Objection to the form.

You can answer.

THE WITNESS: That sounds directionally correct.

BY MR. ROOKS:

Q. Okay. Do you believe that more than 89 people were affected?

A. No.

Q. Okay. And then we've got this remaining, you know, column where it's got Ys here. I'm going to do this, I'm going to sort this here. So we've got all the Ys

in column L up top. I'm going to scroll down, okay? And again, since the first row is a heading row, we're going to the last Y in column L and that's at row 32; do you see that?
A. Yes.
Q. So that would mean, and correct me if I'm wrong, that 31 people remained after the June 6th, 2023 termination at the corporate office?
MR. MINGIONE: Same objection.
You can answer.
BY MR. ROOKS:
Q. I saw you nodding your head.
A. Yes, correct.
Q. Okay. So to the best of your knowledge, after 89 individuals were terminated on June 6th, 2023, there were still 31 employees remaining who were assigned to this corporate office in Pennsauken?
MR. MINGIONE: Objection to the form.
You can answer.
THE WITNESS: Yes.

Page 116

BY MR. ROOKS:
Q. Now, the reduction of these 89 people, or the termination of these 89 people resulted in the elimination of Forman Mills' obligation to pay their salary since they were no longer employed, right?
MR. MINGIONE: Objection to the form.
You can answer.
THE WITNESS: Yes.
BY MR. ROOKS:
Q. Okay. And can you tell me what is the annualized savings that Forman Mills would have achieved by terminating these 89 individuals?
A. If you click and drag over the Ys in column J, and you could probably tell me. I don't remember off the top of my head, but any Y in column K, if you click column J and drag it down, you can calculate it.
Q. Scroll down.
A. Yeah, that number there.
Q. It looks like $7,788,430.28?

A. Roughly. Before tax but yeah, roughly.
Q. Right, right, tax. So that doesn't count the payroll taxes that Forman Mills would have to pay on behalf of these individuals, correct?
A. Correct. Yeah. That's just the gross salary amount.
Q. Okay.
A. So you have to add on top of that roughly -- roughly 8 1/2 percent.
Q. Okay. Now, the employees that were in the corporate office -- strike that.
There's a column here, M and it says, "company-paid benefits" and it's completely blank. But is that accurate, that the company didn't pay any benefits on behalf of these individuals?
A. The benefits, it was in a portion of the month, right? So whatever that month is, the company would have paid the benefits in that -- that period. So beyond what we were obligated to or beyond what that month is, no, there was no plan to pay benefits beyond the month of June.

Page 118

Q. No. I understand that. But I'm asking about I guess benefits for these employees. While they were employed, did they receive some type of company-sponsored health insurance?
A. Yes, they did.
Q. Okay. The company did --
A. I think I understand what you're asking. Yeah, there wasn't a calculation on that Excel file of what that savings would have been. Is that what you're asking?
Q. No, no, no. I'll get to that, but I was just -- since column M was blank, it was my understanding that these individuals did receive some type of company-sponsored health insurance. So I just want -- now I'm just asking to verify that, that did these individuals in fact receive health insurance through the company?
A. Yes, many of them are on the company -- or were on the company health insurance programs and would have gotten, you know, all those benefits paid in a normal course throughout the month of June

regardless of termination or not.
Q. Right. Right. So let's look at this, let's say pre June 6th, the employees would have received company health insurance, right?
A. Yeah, health, dental, vision, all those.
Q. The company didn't pay 100 percent of the premium though, did they?
A. No. It was a split. The employee covered a portion of it.
Q. Okay. Right. So the company did pay or contribute something towards the cost of health insurance?
A. Correct. Correct.
Q. Now, you've got employees that are single, you've got employees that are married, right? Was there a different contribution depending on someone's marital status or was the contribution fixed per employee?
A. It wasn't fixed per employee. If memory serves, the company paid a percentage based on what plan you were on and if you were, you know, single, married

Page 120

filing -- married with spouse or family coverage. So depending on the plan and depending on the type of coverage, I think the company's percentage of contribution varied a little bit.

Q. Okay. Do you have an idea of roughly the dollar amount that the company contributed per employee for health insurance?

A. No. Honestly, I don't recall.

Q. Okay. And -- you mentioned you said some type of percentage, the company contributed a percentage. And I guess percentages could go from like, 1 percent -- or zero percent to 100 percent, but we know that the company didn't contribute zero and they didn't contribute a hundred. Do you have an idea, like, was it 75 percent, 50 percent, any idea?

A. I think it was around 50 percent. 52, somewhere around half.

Q. Okay. Do you have any idea of what the -- let's say in 2023, what the monthly cost of a premium, health insurance premium was for let's say a single person?

A. Not that I can recall. I was trying to think of my coverage and I just don't even remember what it was. Sorry.
Q. Okay. So we talk about, you know, just getting back to this column M, which is company-paid benefits, we just talked about health insurance. Did Forman Mills have a 401(k) plan for the employees?
A. Yes, we did.
Q. And was there a company match on that 401(k)?
A. There was.
Q. And do you recall what that match was?
A. There were various periods where there was a Safe Harbor plan. But I think where it was in '23 was -- and it was split like, 50 percent of the first 4 percent and then 10 percent of the next -- couple percents, something like that. Where it was a tiered structure and the more you contributed, the percentage went down.
Q. Was there a maximum dollar amount that Forman Mills would contribute per employee for the 401(k)?

Page 122

A. No. No, but the contributions were capped. The, you know, the company would match X percent up to what the employee contributed, right? So there was -- theoretically there was a cap because of the employee contributions.
Q. Okay.
A. It's always a match. It was never a company contribution without the matching funds from the employee.
Q. Right. Right. Understood. We've got health insurance that the company contributed towards, we've got the 401(k) match. Were there any other benefits that the employees at the corporate office received?
A. All of the health insurance. It wasn't just health. It was dental, vision, you know, those kind of insurance programs. Aside from that and the 401(k), it's your traditional PTO time.
Q. Well, in terms of like the dental, I mean, did the company make any contribution towards the dental?
A. I think the employee paid, funded

the dental piece.
Q. Right, right, yes. I'm asking about benefits that the company financially participated in. That's why I didn't ask you about dental, you know.
A. Got it.
Q. So we've got, you know, the health insurance, the company contributed a portion of the premium. We've got the 401(k) match. Did any of the employees at the corporate office receive a, let's say a cellphone allowance?
A. There were some employees that had an auto allowance. Really the field district managers that traveled a lot. I think there were six, seven, eight, something like that, personnel that had auto allowances.
Q. Do you know how much the auto allowances were on a monthly basis for these individuals?
A. Five, $600.00 each, right around there.
Q. And at the end of the year, you know, when the company issues the, what is

Page 124

it, the W-2s, would they be issued any type of W-2 or 1099 reflecting that auto allowance compensation?
A. Yes.
Q. Do you know -- let me just go back to something here. Hold on one second. Let me go back to this spreadsheet here. We've got annual salary, right? So we totaled this salary up to be $7,000,000 in salary expense, right? Remember that?
A. Yes.
Q. That salary, that expense here would not include any type of auto allowance or anything else that was reported on the W-2, right?
A. Right. That would just be gross salaries.
Q. Right. Right. So the actual compensation to at least those five individuals that you've referenced would be their base salary plus that 5 to $600 per month in car allowance?
A. Yeah. The auto allowance, would be reported on a 1099.
Q. Okay. And I think I asked about

the cellphone. I think you said there was no cellphone allowance, but it was -- you said there was an auto allowance, right?
A. Yeah. I don't remember any cellphone allowances. But yeah, there were, like I said, auto allowances for around six or eight people.
Q. Okay. Were there any -- other forms of compensation that any of these individuals at the corporate office received outside of the company's contribution towards health insurance benefits, 401(k) and base salary?
A. Some people were part of a bonus, you know, senior leaders were part of a bonus program. But there were no bonuses paid out in '23, so or, you know, thereafter.
Q. Okay. When you say "there were no bonuses paid out," just tell me about the bonuses. Were bonuses let's say differed or not earned?
A. They weren't earned.
Q. Okay. But in prior years -- well, strike that.

Page 126

What was the -- who at the corporate office was eligible for bonus compensation?

A. Anybody director level and above, so it was a fairly lengthy list of people. Yeah, nothing was earned in '22 or '23.

Q. Let me just do this here. Is this document still being shared?

MR. MINGIONE: No.

THE WITNESS: No.

BY MR. ROOKS:

Q. Let's see here. Okay. Let me just pop this up again. This spreadsheet here. So I filtered this out for only the people who remained. I'm sorry, not -- my bad. I need to do it the other way around. I need to filter it out here for the people that were separated. Okay. So here we go. This is all the people that were separated as of June 6th, 2023. So was this Mr. -- Mr. Chalker, was he eligible for a bonus?

A. No.

Q. I'm not talking about whether he earned or not, but at the position, was he in a position that would have, could have

earned a bonus?
A. No.
Q. Okay. Michael Bowers?
A. No.
Q. Dong?
A. No.
Q. Karen?
A. No.
Q. Robin?
A. No.
Q. This other Karen?
A. No.
Q. How about this, just tell me who.
A. Okay. Okay. Mike Kvitko. Brian Lattman.
Q. Mike Kvitko and Brian Lattman. So Mike Kvitko was in a position that was eligible for bonus compensation, right?
A. That's what you asked me, right, is --
Q. Yes. Yes.
A. -- who would be part of this bonus pool that's created for the management incentive bonus, right?
Q. Right.

Page 128

A. And so the gentlemen below, Brian Lattman, Juan Lebron, yes, yes. Jared, yes. Keep going down. No, no, no, no, no. No, no, no, no, no. One second. Go a little bit slower now. The buyers' assistants, no. Yeah, you can keep scrolling down. The buyers, I don't remember if the buyers were. I know the seniors were. Monique, yes.
Q. I'm sorry, Monique?
A. Line 95. Virginia Smith. Again, anybody director level and above. Keep going down.
Q. That's --
A. That's the end of it. Anybody director level and above. So there were some merchants that would be -- have been included in the program, but I don't see those on the list. They're just buyers there and associates.
Q. Right. Yeah. This is only the list of the people that were let go. So there might have been other people that got bonuses, but they remained.
Now I'm looking over here and

I look at the salaries of some of these people, so this individual here, Zachary Padgett, it looks like he had a salary of $185,000. And this other person here, a salary of it looks like $180,000. It's Seth Sugarman. Those seem like high salaries relative to some of the other people.

These individuals would have not been part of this bonus pool you talked about?

A. That's what I said earlier. Buyers, I don't recall if buyers were or not. I know the associates and the assistant buyers, I know none of those were. The buyers may have been. I don't recall for sure.

Q. $210,000 salary.

A. Who's the 210 and 216, Sherri? Oh, go over to -- Sherri Walton was --

Q. I'm sorry?

A. Sherri Walton, yeah, she was part of the program because she was a DMM. If you see DMM, they absolutely were.

Q. This person is DMM?

Page 130

A. Yes, she would have been as well.
Q. Okay. Let's see if we got anybody else here, DMM. This person has $139,000, but...
A. She's a buyer.
Q. Yeah.
A. Yeah. And then there's some people that are on that other list that were part of it as well.
Q. Okay. All right. So tell me about this bonus. I think you said "bonus pool." Is that what it was, a bonus pool?
A. Yeah. So director-level and above positions, if the company achieved the EBITDA plan or EBITDA budget, then those positions would be eligible for a bonus as a percent of their salary. Like I said, they didn't earn anything in 2022 or 2023 because the company wasn't anywhere close to the profitability.
Q. Okay. But the bonus plan or the bonus -- like, let's say that there were ten people in the bonus pool. Would the bonus money be divided by ten evenly or was it based on something else?

A. No. It was a percent of your salary. So it could be anywhere from 10 up to 30 percent of your salary.
Q. Okay. So if the bonus pool -- strike that.
So if the bonus -- if the individuals in the bonus pool, would they all get the bonus or if even the goals were achieved?
A. Yeah, if even the goals were achieved, everybody gets it or everybody doesn't, right? And the percentage is consistent as well. Obviously 10 percent of a hundred thousand is a lot different than 10 percent of 300,000, right?
Q. Right, right.
A. It's 10 percent or, you know, 20 percent or a maximum of 30 percent of your salary.
Q. Okay. Understood.
A. It's a sliding scale, so, you know, if the company made budget, you know, it would be the 10 percent, but if they exceeded budget by whatever, then it was a graduating scale up to the maximum of 30

percent.
Q. Okay. You said 2023 no one got it?
A. Right.
Q. 2022 no one got it?
A. Right.
Q. How about 2021?
A. During COVID there was a payout of it. I think that was in early 2021, I believe. In like, April of 2021.
Q. Okay. And I'm sorry, Kevin, you may have said this. The bonus, was it an annual thing, quarterly thing?
A. It was only annual.
Q. Okay. And outside of that bonus that we just discussed and outside of the 401(k) and health insurance contributions, any other type of compensation that individuals in the corporate office were eligible for receiving?
A. No, I don't believe so.
Q. Okay. So --
MR. MINGIONE: If you're changing topics at some point, maybe -- it's after 1:00, maybe lunch or break or something. I don't know if the court

reporter needs a -- just whatever. I felt like it's a transitional phase.

MR. ROOKS: This is probably good. Sometimes when I'm just focused, I forget about, you know...

MR. CABRERA: Eating?

MR. ROOKS: Yeah, yeah. I certainly don't want to neglect the needs of anyone else. So thank you for bringing it up. Yeah, I'm okay if we take a break.

(Recess.)

BY MR. ROOKS:

Q. So we left off talking about some salary and benefit information. I want to go back to the -- actually, I'm sorry, introduce a new document. Document number 7, was that Excel document that I put up without a Bates number and that was produced by your attorneys.

Let me just pop that up for a second again. Just give me a second here. There we go. All right. Let me just put this back. So this is the document we were just referring to prior to the break. We had the -- again, this was Exhibit 7 with

Page 134

the Excel file, right?
And I want to introduce another document now that was also provided by your attorneys. Let me just make that small. And this will be Exhibit Number 8.
(At this time, a document was marked for identification as Exhibit No. 8.)
BY MR. ROOKS:
Q. And -- I don't know how to get rid of this box here. There we go. So this document, again, Exhibit Number 8, I'm just going to give you the file name for -- since we don't have a Bates number on it. It says, "Salary data on RIFs. 6.23." And then bunch of numbers, 123 -- I'm sorry, 132490592.1.
And this document has a number of columns, site, same as the other spreadsheet. Do you see that where it says "site" and it's got 999 identified and that would correspond to the corporate office, right?
A. Yes.
Q. Okay. And then there's a bunch of

other columns here. But I want to I guess go to this annual salary column; you see that there?
A. Yes.
Q. Okay. And let's go down to you. I think you're here. You might not be on this one. Maybe you are.
A. It's by last name it looks like.
Q. I don't see you on here.
A. Is that just the list of people that were --
Q. That's what it is. I'm sorry. You're not on here.
A. Yeah.
Q. So this annual salary, is this the annual salary for 2023?
A. Yeah, that was the annual salary at that time.
Q. Okay.
A. Now, that said, if it was hourly, it was their hourly rate times 2,080, the salary equivalent.
Q. Got it. And I just want to scroll over and then there's additional information. It's got, you know, address

and things like that. And it's got 2020 gross income, 2021, 2022; you see that? And then it's got information for 401(k) match, et cetera, health benefits; you see that there?
A. Yes.
Q. All right. So let me scroll back to this. And what I'm going to do, I'm going to filter this, okay? Let me just go -- all right. So I don't know what's up with this. I'm hitting my -- let me try it this way. All right.
I'm going to go back to Exhibit 7. So here this is again, all the lists of people I got sorted that were as part of that reduction in force, right? We saw Brian Chalker. Brian Chalker was terminated on June 6th, correct?
A. Yes.
Q. Okay. Let me go back to this document here, Exhibit 8. And I'm just going to search for his last name. And I don't see his last name on here.
A. I can tell you why if that's the question.

Q. Yeah, tell me why.
A. So this file we're looking at was done after the fact. All the employees that were part of the RIF were offered employment to come back, right? Brian Chalker is one that in that interim period, he accepted another position. So I'm assuming that's why he's not on this list that we're looking at right now is because he had accepted another position with another company.
Q. Okay. So -- all right. But what we are I guess we're looking for is salary data on all the individuals affected by the RIF, and he was in fact an individual that was affected by the RIF, correct?
A. Correct.
Q. And he is not included here, right?
A. Correct.
Q. Okay. But he should've been included in this, correct?
A. I don't know the question in terms of what that file -- we were asked to do in preparation of that file. He worked for the company for maybe eight weeks, six

weeks, something like that prior to the RIF. He was offered to come back, but like I said, he accepted another position and never came back. So I don't know what we were asked to represent in this file.
Q. Okay.
A. But I can only express why I think he wasn't on that file.
Q. Okay. And that makes sense, that he was only there for eight weeks. To your knowledge, is there anyone not on this list that was --
A. I think he was the only one that -- that had that circumstance.
Q. Okay. Understood. All right. So now I want to go back to this thing here, Exhibit Number 7. And let's pull up Mr. Lattman.
A. You missed it. There you go.
Q. Brian Lattman. Here it's got a salary, annual salary $316,000. And that would have been his annual salary at the time of the RIF; is that correct?
A. Correct.
Q. Okay. So let me go here. Now,

this document has a higher salary, which you said was also at the time of the RIF. So here this document says he was earning $325,686.41 and this document says that he's earning $316,200.40, both for 2023, right?

A. Yes.

Q. So I don't know what the -- why there's a discrepancy. So I'm going to ask you. You said that there was no bonus paid out in 2023, right?

A. Right.

Q. And this is annual salary, not total compensation. So any idea why this -- why this would be, you know, like $9,000 less than the salary reported on the other document?

A. No, I don't have any explanation to that $9,000 difference. I assume it was run on like a calendar year, both. Both files, but no, I don't have any explanation for that. I don't know what that $9,000 difference would be.

Q. Okay. And we're going to go to another person here. This person here,

Gail Masse or something like that?
A. Masse.
Q. Yeah. So this has got her annual salary as being $161,000. $161,159.96. And then we'll go to -- where is this here? I just had it. Where is it? So we go here. It's the same document.
A. That's the same one we just looked at.
Q. That's the same one. All right.
A. Yeah. You're looking for the file salary data.
Q. There it is. So we go here. Nope. Not it. And we have a different number.
A. Both cases, that salary data file is a little bit greater than the other one, correct?
Q. Correct. It's the -- this number here is higher than on the other document that we received, which is here. 161 on this one, 164 on the other. I'm just looking to see if there's any reason for the disparity. Did the data not come from the same source?
A. Yeah. Did you look at -- now I'm

asking you the questions. Did you look at all employees or many of them like that? Or just these two that you noticed?

Q. I just looked through a couple. There's several more. I don't want to take up too much time, but...

A. Yeah. Because the source should in both cases be our Dayforce payroll service. So the only thing I can think of is if one was run on like a calendar year and one was run on a fiscal year or something like that where the dates are not the same. That's the only thing I can think of.

Because in neither of those cases that you called out were there raises, you know, in that time period. So I don't know what other than the difference in the data set, you know, in terms of the dates, I don't know how else that we would explain that variance.

Q. Okay. But you're saying that the data might have been run on a different day, calendar versus fiscal, but it's still -- the ultimate source of this data would be that Dayforce?

A. Yes. Both of them should've been Dayforce, right? Is the source of the data and that wouldn't change. If they're using the same parameters, it would result in the same data. So that's why I'm speculating a little bit that maybe the date range was different between the two reports.
Q. Okay. Do you know who would have created this report?
A. I'm assuming it would have been Rosa.
Q. Okay. All right. So going back to this, we've got again, 89 people from the corporate office that were separated on June 6th, 2023. And we have a number of people who are still remaining. I'm just going to go back to this -- looking at the remaining people here. So I think we had said earlier that there were still 31 people remaining after the 89 people were separated, correct?
A. Correct.
Q. Okay. So it looks like they're -- I'm going up to these titles. There were still two accounts payable people remaining

after June 6th?
A. Yes.
Q. There were it looks like three.
There's a --
A. Allocation analyst.
Q. Allocation analyst. It looks like there's one, two of those people remaining?
A. Yes.
Q. All right. And you, of course, stayed, right?
A. Yes.
Q. And then we've got a financial planning and analyst manager remaining?
A. Yes.
Q. Two of the three human resources personnel remaining?
A. Yes.
Q. That's correct, right?
A. Yes.
Q. Okay. And we've got one, two, three, four data -- excuse me, information technology employees remaining?
A. Yes.
Q. One inventory control manager remaining?

Page 144

A. Yes.
Q. Five loss prevention people?
A. Correct.
Q. One, two, three, four --
A. Five.
Q. Five, right. One marketing person remaining?
A. Yes.
Q. Two payroll administrative -- two payroll employees remaining?
A. Right.
Q. Two sales audit people remaining, correct?
A. Yes.
Q. And one, two, three, four, five, six, it looks like seven store operation people remaining in the corporate office?
A. Yes.
Q. Okay. So the corporate office was not entirely shut down, correct?
A. Correct.
Q. Okay. Would you agree that all of the people who remained still enabled the company to perform the essential functions which were necessary to operate Forman

Mills?
A. Correct. That was the intent, is to leave the bare-bones skeleton crew that could continue to operate the company.
Q. Okay. All right. Now, the corporate office, you testified to this earlier, the corporate office never shut down, correct?
A. Correct.
Q. I'm sorry. It was a little -- could you just repeat that?
A. Correct.
Q. Now, these -- the employees, the 89 affected people from the termination on January 6th, right, they didn't terminate themselves, right?
MR. MINGIONE: Objection.
You can answer.
BY MR. ROOKS:
Q. I'm sorry --
MR. MINGIONE: You said January.
BY MR. ROOKS:
Q. I'm sorry. Yeah. This is January. Let me repeat that. The 89 people that

were terminated on June 6th, 2023 did not terminate themselves, right?
A. Correct.
MR. MINGIONE: Objection to form.
You can answer.
BY MR. ROOKS:
Q. Somebody else was responsible for terminating them, correct?
A. Yes.
Q. Okay. There was a gentleman brought on board as the sole director of Forman Mills in May of 2023, correct?
A. Yes.
Q. That individual is Tobias Keller, correct?
A. Yes.
Q. Okay. Did you know Mr. Keller before he came to Forman Mills to serve as the sole director?
A. No, I did not.
Q. Mr. Keller became -- would you agree that Mr. Keller came on board as a independent director of Forman Mills in May of 2023?

A. Yes.
Q. If I said the effective date of like, May 24th of 2023, does that sound about right?
A. Yeah. I don't remember the exact day, but that sounds about right.
Q. Okay. And how were you introduced to Mr. Keller?
A. He I believe was a -- we were connected to him through attorneys, our attorneys, or Goode's attorney. I don't know exactly who brought him into the fold. But he took over as director when Goode -- the Goode individuals resigned from the board.
Q. Okay.
A. I believe he was a referral from one of our legal counsels, though.
Q. Okay. So you said that the Goode individuals resigned from the board, right?
A. Yes.
Q. Okay. And who were those individuals that resigned?
A. Mr. Oddi, Mr. Ferreira. Those are the two that come to mind. There may have

Page 148

been somebody from Cohesive may have been part of that as well.

Q. When did you first meet Mr. Keller?

A. It was probably days or maybe a week before he came on as a director. Like a week or so before that.

Q. So about approximately a week before that May 24th effective date?

A. Yeah, like a week or two within that window.

Q. Okay. And when -- did you meet Mr. Keller in person?

A. No. I met him virtually.

Q. Okay. To your knowledge, did Mr. Keller ever come to the corporate office in Pennsauken, New Jersey?

A. I don't believe so.

Q. Okay. Now, Mr. Keller became again, an independent director when the other board members resigned, right?

A. Yes.

Q. Okay. I want to introduce some documents here. So there was an independent director agreement executed between Forman Mills and Mr. Keller,

correct? Are you familiar with that?
A. Yes. Yes.
Q. Let's see here. I want to introduce it as -- this would be Exhibit Number 9.
(At this time, a document was marked for identification as Exhibit No. 9.)
BY MR. ROOKS:
Q. And it has got a Bates number on the bottom, FM-006268 through FM-006276. Let me write this down. So have you ever seen this agreement before?
MR. MINGIONE: It's not up there.
THE WITNESS: You didn't share it. You haven't shared it yet.
BY MR. ROOKS:
Q. I'm sorry. I'll try that again here.
A. So the answer's no.
Q. How about this one, have you seen this one before?
A. Yes, I -- yes, I have seen that.
Q. Okay. When did you first see that?

Page 150

A. It was right around that mid-May time frame, I don't remember exactly, but when we were first talking to him about bringing him on as a director.
Q. Okay. So this agreement has a number of paragraphs. I just want to go to this compensation paragraph, right? It says, "for services to be rendered by director hereunder as long as director remains a director of any of the company. Company agrees to pay director a monthly fee of $25,000 prorated for the -- I'm sorry, a monthly fee of $25,000 which is prorated for the first month"; do you see that there?
A. Yes, I do.
Q. Okay. And you just testified that, you know, there were other board members prior to Mr. Keller becoming the sole board member, right?
A. Yes.
Q. Okay. And to your knowledge, have any of the other board members received $25,000 a month compensation?
A. No, none of them did.

Q. Okay. And you would know that in your position as the CFO, right?
A. Correct.
Q. Would you say that this was unusual for a board member to receive $25,000 a month compensation?
A. Yes.
Q. Okay. Do you know why he was being -- Mr. Keller was being paid $25,000 a month?
A. The company needed a director, an independent director that would represent all parties, not just the interest of Goode Partners, for example. So the Goode Partners resigned from the board and we needed an independent director.
He had no affiliation with Forman Mills or Goode Partners and he had to be compensated something, especially for, you know, the situation that he was getting himself into. Does that answer your question?
Q. Yes. But what situation was he getting himself into?
A. A company on the brink of

bankruptcy or a company on the brink of selling, right? Again, you know, we were marching down both paths simultaneously, trying to sell the company but also preparing to, you know, file bankruptcy. So that's the situation that -- that he was stepping into.
Q. And I think you said he had to represent the interest of the parties, right?
A. Yes.
Q. What parties are you talking about?
A. He -- the company, the employees, the stakeholders, the banks, right? He -- you know, the other parties that former board members were affiliated with Goode, right? And so we needed an impartial director that could be independent of, you know, any one party.
Q. When you --
A. We felt like he was independent and could represent all stakeholders.
Q. You just identified employees as one of the parties that he had to represent the interest of, right?

A. He -- you know, we wanted him -- he was going to represent all stakeholders, right? Everybody. I'm using that collectively, stakeholders.
Q. Would those stakeholders have included the 89 people that were terminated on June 6th, 2023?
A. I would include employees as stakeholders, yeah.
Q. Okay. So we've got this guy coming on board getting 25 grand a month. And let me stop sharing this one. And let me introduce another document here. Okay. This will be Exhibit 10.
(At this time, a document was marked for identification as Exhibit No. 10.)
BY MR. ROOKS:
Q. This is another document that was produced by your attorneys. I'll pull it up in a second, but it's FM-006295. Okay. Have you seen this document before?
A. Yes. Yes, I have.
Q. This is an invoice submitted to Forman Mills Holdings, LLC, Forman Mills,

Inc. It looks like it has the address of the corporate office, right?
A. Yes.
Q. And it's a retainer for $85,000, right?
A. Yes.
Q. Okay. Has Forman Mills ever paid a retainer to any board member in the amount of $85,000?
A. Previous to this, no.
Q. Okay. Has Forman Mills ever paid a retainer at all to any board member for their service, to your knowledge?
A. No, not to my knowledge.
Q. Okay. And you would have -- you would know about this, right --
A. Correct.
Q. -- because you were the CFO? I'm going to go back to Exhibit 9 here. It has an indemnification section; do you see that?
A. Yes.
Q. Has Forman Mills ever executed an independent director agreement with any of its board members?

A. No, I don't believe so.
Q. Has Forman Mills ever entered into any type of agreement with its board members which provided indemnification for them other than a D&O policy?
A. Right. Yeah. We had a standard D&O policy. Aside from that, no.
Q. So this type of indemnification wasn't necessary for any of the other board members when they served, correct?
A. Correct.
Q. Okay. Let me stop sharing this. So Forman Mills, you just said that Forman Mills does have a D&O policy, right?
A. Yes, they did have one.
Q. And there was a D&O policy in effect in let's say the first and second quarter of 2023?
A. Yes. Yeah, I'm sure there was.
Q. Okay. And that policy that was in place at the time would have covered all the board members that were then serving, right?
A. Yeah, I would think so.
Q. Okay. But a separate D&O policy

was taken out after Mr. -- coinciding with Mr. Keller's joining of the board, right?
A. Yeah, I believe so, yeah, that was my -- that's my recollection.
Q. All right. I want to pull up another document. Let me just find it here. Give me one second, here. Just bear with me. Technology here. Here we go.
I'm going to introduce this as -- it's a document that was produced by Mr. Keller's attorney. It is, for the record, it's Exhibit Number 11 and it's document Keller, K-E-L-L-E-R 00011.
(At this time, a document was marked for identification as Exhibit No. 11.)
BY MR. ROOKS:
Q. You see this document that I've introduced as Exhibit Number 11?
A. Yes, we see it.
Q. Okay. This is a, looks like an invoice from HUB International Northeast Limited; do you see that?
A. Yes, yeah.
Q. Have you seen this document before?

A. I probably have. I don't remember it specifically, but I'm sure I saw it back at the time.
Q. Would you -- this is an invoice for $89,000. $89,250. Do you think you might have seen something like this before it gets paid?
A. Yes, I would have. I don't remember that specific invoice, but I'm sure I did see it back at the time.
Q. Okay. All right. So this is an invoice that Forman Mills paid, correct?
A. Correct. I'm assuming we paid it, yes.
Q. Okay. I just want to look at this document for a minute and go over a couple things. So it says that this is, "policy description Lead Side A, D&O." And it's got a hyphen and it says, "Tobias Keller"; do you see that?
A. Yes.
Q. And it's got a policy term date here, 6/15/2023 to 8/1/2023; do you see that?
A. Yes, I do.

Page 158

Q. Okay. That looks like about, I don't know, 45, 48 days or so, right?
A. Yes, correct. Right around there.
Q. Okay. Now, you testified that Forman Mills does in fact or did in fact have a D&O policy prior to this, right?
A. Yes.
Q. And in your experience, are the D&O policies that Forman Mills maintained annual policies or do you buy them every 45 days?
A. They're typically annual.
Q. Okay. And do you recall what the premium would be for the annual D&O policy?
A. I don't recall what we were paying for D&O back then unfortunately.
Q. You might not remember the exact number. Do you know -- strike that.
The D&O policy that was in place prior to this would have covered all of the directors and officers, right?
A. I would assume so, yes.
Q. Okay. Did you take out -- strike that.
Prior to this Hub

International invoice here, did you take out D&O policies for all of the directors at once, or were there individual policies in that were there -- was there one policy per director?
A. Previous to this, it was one policy that covered everybody.
Q. Okay. But this is one policy that covers one person, correct?
A. Yes, it appears so.
Q. Okay. Now, the other policies in the past, the D&O policies that covered all of the directors at once, I know you don't know the exact dollar amount of the premiums, but did they anywhere approach $89,000 on an annual basis?
A. On an annual basis I'm sure it was probably more than that. But if you're asking if the 85,000 seems high, it does. That is a high premium.
Q. And it does seem high for 45 days or so, right?
A. Yeah, yeah.
Q. Okay. You, as the CFO, you were an officer of the company, correct?

Page 160

A. Yes.
Q. Mike Kvitko was an officer of the company, correct?
A. Yes.
Q. Okay. And you still would have been covered under the existing D&O policy that was in place at the time, right?
A. Yes.
Q. As would Mike Kvitko, right?
A. Yes.
Q. Okay. Now, to your knowledge, did Forman Mills take out any separate D&O policy for you?
A. No, we did not.
Q. Okay. Did Forman Mills take out any separate D&O policy for Mr. Kvitko?
A. No.
Q. Did Forman Mills take out any separate D&O policy for any other officer of the company at that time, did Forman Mills?
A. No.
Q. Okay. Do you know if the D&O policy that was in place at the time was -- had its liability limits increased for the

current officers?
A. I don't recall making any change to our existing D&O policies or D&O policy. I don't remember making any -- any edits to that from the renewal. The renewals were in October. I don't recall changing our actual D&O policy other than what we're looking at right now.
Q. Okay. Under whose direction was this separate D&O policy for Mr. Keller taken?
A. I believe that that was part of the negotiation in terms of what his requirements were to become an independent director. So it would have been discussed with, you know, Mike, myself and Stuart Kessler at the time.
Q. Who is Stuart Kessler?
A. Stuart Kessler was a consultant with PKF Clear Thinking that was assisting us during this process.
Q. Okay. Who's PKF Clear Thinking?
A. PKF. I think it's PKF O'Connor Davies is the exact legal, I believe entity name. But they were a -- restructuring --

a consulting firm that does a lot of work for troubled and restructured companies and troubled companies, distressed companies.
Q. Okay.
A. So they were engaged throughout April, May, June in that time frame.
Q. Okay. Can you tell me like, why was it -- I understand you said that Mr. Keller had some deal for coming on as the independent director, but why was it necessary to take out an additional policy for Mr. Keller?
MR. MINGIONE: Objection to the form.
But you can answer.
THE WITNESS: He -- you know, he had this special arrangement in terms of the fees and the D&O policy, like I said. Why exactly, you know, it settled on whatever the coverage is on this invoice, I can't really speak to that, all right? But, you know, these were conditions essentially of him, him coming on as an independent director.
BY MR. ROOKS:

Q. You used the phrase, you said, "special arrangements." What were the special arrangements with Mr. Keller coming on board?

A. I mean, I think you just covered them in the last few, you know, presentations. The monthly fee, right? And the D&O policy.

Q. So the document that I introduced earlier which was -- not that one.

A. I was referring to the invoice that you --

Q. Yeah.

A. -- presented.

Q. I'm sorry. I'm looking for the retainer invoice.

A. Yes, yeah.

Q. That's what I'm looking for. There we go. This is it. That's it. Okay. That was a retainer, right? Was any portion of that retainer refunded, to your knowledge?

A. I don't remember. There were retainers we did around that time for professional services outside of even this

one. That we did get some refunds on. I don't recall if we got a partial refund on this or not.
Q. Do you know if Mr. Keller invoiced the company for more than this retainer subsequently?
A. I don't believe so.
Q. All right. Let me just --
A. Once the company was sold and he resigned and he was gone. So you can look at the date of sale to Mr. Dushey and it was a pretty short window of time. So I don't believe there was anything else invoiced.
Q. Okay. Let me just stop sharing this document. I'm going to put up another document in a second. Let me just find it here. If you can just give me a minute here while I pull this document up. I'm just going to go off camera. Just give me one minute or so.
All right. Back. Found it. Okay. All right. So let me introduce another document here. This is going to be, it looks like Exhibit Number 12.

(At this time, a document was marked for identification as Exhibit No. 12.)

BY MR. ROOKS:

Q. This was a document that was produced by Mr. Keller's attorney. It's Keller 00017. All right. Here we go. Okay. This document, which I've introduced as Exhibit Number 12, is an e-mail from Stephanie Goldberg HUB International to Kevin Hess, to you; do you see that?

A. Yes, yes.

Q. And like I said, the identification number at the bottom right-hand corner is Keller-00017. Do you remember seeing this e-mail?

A. That looks familiar. So I'm sure I received it.

Q. Okay. So are you familiar with what a Lead Side A insurance policy is?

A. I am, but I wouldn't say that I'm an expert.

Q. What's your familiarity with a Lead Side A policy?

A. I haven't been involved in too many

underwritings of such a policy, but I'm a little familiar with it.
Q. What is your familiarity, what would you say it is?
A. I would say in a M&A situation or a potential liquidation situation, it's to provide, you know, coverage, D&O, essentially D&O coverage for these individuals named.
Q. Okay. So this e-mail states that -- it says, "Kevin, we'll put together a proposal but wanted to get you the premium indications in the meantime." And then it's got some bullet points here. And one of the bullet points is prior acts date. And that date, it looks like it's May 24th, 2024. (Date of engagement.) Right? Do you see that?
A. Yes.
Q. So that would be the date of Mr. Keller's engagement?
A. Correct.
Q. Okay. So this D&O policy for Mr. Keller would begin as of the date that he was installed as the sole director,

right?
A. Yes.
Q. Okay. And again, if you go down to one of these bullet points, it says, "amend insured person/executive." And it says, "only/solely Tobias Keller," right?
A. Yes.
Q. So it only covers Mr. Keller?
A. Right. The tail, six-year tail.
Q. Right. And I'm glad you brought that up, tail. Tell me what that means, the six-year tail?
A. It means that there's -- he has coverage beyond the end of the engagement.
Q. Okay. Got it. Let me stop sharing that. Okay. So did you have any conversations with anyone at Goode Partners regarding Mr. Keller becoming the sole independent director?
A. Not that I recall.
Q. Okay. I touched on this briefly earlier, but how did you learn or become aware that the board was resigning and being replaced by Mr. Keller?
A. I'm not sure if there was a call

Page 168

or -- that I was involved with or if Mike Kvitko told me. I don't recall exactly how I found out, but I think there was a conference call and the Goode gentlemen told us that they were resigning.
Q. The Goode -- you said Goode gentlemen told you they were resigning and they also told you that they were being replaced by Mr. Keller?
A. I don't know if that happened at the same time or not. I'm a bit hazy on the exact timing of those discussions.
Q. But even if they didn't occur at the same time, you were informed that the existing board was resigning, correct?
A. Yes.
Q. And you were also informed at some point that the board was being replaced by Mr. Keller?
A. Yes.
Q. And did you ask why the board was --
A. No, I didn't ask why. I mean, I was, you know, in -- going through -- everything we were going through, I was

there at the office every day, so I didn't really need to ask why to be honest.
Q. You didn't need to ask why because you knew why?
A. I -- I knew why Goode was resigning from the board and why we would need an independent director. So I don't remember asking Mike or David or anybody, you know, the particulars about why that was necessary.
Q. Did -- what was Mr. Keller hired to do?
A. Mr. Keller was brought on to be an independent director and to give us direction, oversight and be, you know, somebody independent that can make -- help make informed decisions without being burdened by, you know, self-interest and things of that nature. That's my interpretation of why -- why he was necessary.
Q. Okay. So prior to Mr. Keller becoming the sole independent director, there was a board of directors in place, right?

Page 170

A. Yes.
Q. And you met with that board, those board members on a quarterly basis, right?
A. Yes.
Q. Okay. Then Mr. Keller is installed as the sole board member on May 24th, 2023, right?
A. Yes.
Q. Okay. At that point -- I'm sorry. Prior to that point, your board meetings again, were on a quarterly basis. So from the point at which Mr. Keller came on board, what was your frequency of interaction with Mr. Keller?
A. It was frequent. And now he spoke with Mike, you know, more so than I did. But Mike and I had conversations with him regularly, you know. Maybe not daily, but multiple conversations a week.
Q. Which is very, very different than your prior interaction with the board, right?
A. Correct.
Q. So you went from interacting with the board on a quarterly basis to a much,

much, much more frequent basis, right?
A. Yes.
Q. Okay. Did you have planned meetings with Mr. Keller?
A. No. I think it was as the situation was unfolding or as topics came up, we would have ad hoc meetings as needed.
Q. What were the things that you, I say you as Forman Mills' management team, discussed with Mr. Keller?
A. We discussed the potential sale of the company. The diligence related to that. The preparation and work towards the bankruptcy filing. The issues we were having with funding from Eclipse. Those -- those type of issues that we were discussing with him.
Q. Okay. What conversations did you have with Mr. Keller concerning staffing?
A. I'm sure we discussed with him the RIF. That was the only staffing really discussions that was going on. And that time frame was about the planned RIF or the RIF, so I'm sure we discussed that with him

Page 172

as well.
Q. You said "planned RIF." So when was the RIF? And again, we're talking about the June 6th, 2023 RIF. When --
A. Yes.
Q. -- did planning for that RIF begin?
A. Not very far in advance. Probably a week before that, maybe a little bit longer.
Q. Okay.
A. It was not far in advance.
Q. Whose idea was it for the RIF?
A. Again, getting back to some of the earlier testimony, I don't even know if I went into this level of detail. But Eclipse, we had a lockbox, right? I talked about all the money came in, swept to pay down the line of credit, and when we needed money, we did a draw, right? I went through that earlier; do you recall?
Q. Yes, I do.
A. So in April we were in default. At some point mid- to late April, every draw that we wanted after that came with strings attached. The strings attached were, you

have to hire an investment banker to sell the company. You have to hire legal counsel. You have to prepare for a bankruptcy file. Every draw came with strings attached.

And, you know, you have to cut overhead, you know, we're not going to fund, you know, this draw if you don't do X, Y and Z. You know, a couple of the demands were you have to be ready to file by this date.

So in order to get funding to cover payroll or to cover rent or whatever, we had to meet these -- these requirements by the bank. And we had to detail out what we were paying, who we were paying and for what purpose in the weeks leading up to the RIF.

So part of the -- the RIF was driven by, we've got to get -- request a draw to cover payroll, and they were pushing us to file bankruptcy and they were pushing us to reduce costs to get funding.

Q. Okay. Now, you saw earlier on the one exhibit, I think it was Exhibit Number

Page 174

7, when we calculated up savings from the salary expense for those 89 employes, it was something like 7 million dollars or something like that, right? Remember that?
A. Yes, about 7.8 million, yes.
Q. Okay. Now, as the CFO, right, you would agree that you do not have the authority to make a decision to terminate those employees, right?
A. Independently, no, I would not have that authority.
Q. Okay. Mike Kvitko, would not have that authority to independently terminate those employees, correct?
A. Whether or not he has the authority, you know, an officer of the company wouldn't do it on their own in a vacuum.
Q. Right. And Mike Kvitko did not do it on his own in a vacuum, correct?
A. Correct.
Q. Okay. There was an order given by somebody to terminate these individuals, correct?
A. There was discussion between Mike,

myself, Toby, Stuart Kessler, driven by, you know, the bank and then bank funding. So yeah, there was a discussion among all parties, right? I don't know if one person said this is what you have to do. But it was a group collaboration on it.
Q. Okay. The termination of those 89 employees on June 6th, 2023 was greenlit or green-lighted by someone, correct?
A. By -- all those individuals I just named, yes.
Q. But those individuals, you didn't have the authority to do it on your own?
A. Correct.
Q. Mike Kvitko wouldn't have done it on his own you just said, right?
A. Right. Correct.
Q. Someone had to give him or give Forman Mills the okay you can do this, correct?
A. Yeah. Again, I think all these individuals I named we discussed it and we all agreed that this was the best course of action to -- I mean, unfortunately -- nobody wants to fire people and let people

Page 176

go, especially 89 people. But, you know, we were also weighing okay, if we don't fire these 89 people, then 2,200 people are going to get fired. So that was kind of, you know, what we were weighing at that time.
Q. The termination of those 89 people on June 6th, 2023 could not have occurred without the consent of Toby Keller, correct?
A. That's correct.
Q. Okay. What's your awareness of the federal WARN Act?
MR. MINGIONE: Objection to the form.
But you can answer.
THE WITNESS: I am aware of the WARN Act in or around that time and since then.
BY MR. ROOKS:
Q. Was Mr. Kvitko aware of the federal WARN Act?
MR. MINGIONE: Objection to the form.
But you can answer.

THE WITNESS: Yes, we were made aware by counsel of the WARN Act.
MR. MINGIONE: Kevin, a reminder to not divulge communications with or from counsel.
THE WITNESS: Apologies.
BY MR. ROOKS:
Q. Independent of the source of awareness, you were -- the executive team at Forman Mills was aware of the WARN Act, correct?
A. Yes.
Q. Okay. Was the -- did the executive team at Forman Mills, were they aware of their obligations under the WARN Act?
A. Yes.
Q. Okay. Was Forman Mills aware of their obligation under the WARN Act prior to June 6th, 2023?
A. Yes.
Q. Okay. Was Forman Mills aware of the New Jersey State equivalent of the WARN Act?
A. Yes, yes.
Q. Was Forman Mills aware of the New

Jersey -- I'll just call it the New Jersey WARN Act for simplicity. If I say New Jersey WARN Act, you will know that I'm referring to the state equivalent of the federal WARN Act?
A. Yes, yes.
Q. So was Forman Mills aware of its obligations under the New Jersey WARN Act prior to June 6th of 2023?
A. Yes.
Q. Okay. What discussions outside of counsel occurred at Forman Mills about the New Jersey WARN Act and the federal WARN Act prior to June 6th, 2023?
A. As I recall, all the discussions were with legal counsel.
Q. Okay. Were any conversations held amongst the executive team outside of legal counsel concerning the WARN Act?
A. Not that I recall. We relied on them.
Q. I just want to make one distinction. So Mr. -- it's my understanding that Mr. Keller is in fact an attorney, okay? So when you talk about

legal discussions with counsel, if you had discussions with Mr. Keller outside of other attorneys, you can talk about that.
A. Understood. I'm talking about other counsel.
Q. Okay. I just want to make sure we're clear for purposes of invoking a privilege, any conversations that happened with Mr. Keller and the executive team are not privileged.
A. Understood. Yeah, I was referring to other legal counsel.
Q. Okay. Okay. So I'm clear, you know, let me ask you this, did you have any conversations with Mr. Keller about potential termination of these individuals?
A. One-on-one, no, I didn't. In a group setting outside of counsel, I didn't.
Q. You had worked with a number of these people for a while, correct?
A. A number of the employees?
Q. Yeah. I think you testified that there was -- that person I think the name was Dong, you call him Al?
A. Albert Liu, yeah.

Q. Yeah. You had worked with that individual for a while, right?
A. Yeah, most employees I've been, yeah, working with for a long time.
Q. So I guess my question is, did you have any conversations with Mr. Keller about alternatives to laying these people off?
A. No, not that I -- I can recall.
Q. Okay. And you testified that the executive team, Forman Mills, was aware of the obligations under both the federal and state WARN Act prior to June 6th of 2023, right?
A. Yes, yes.
Q. And even though you, Forman Mills, was aware of those obligations, which included severance pay, right?
MR. MINGIONE: Objection to the form.
THE WITNESS: Yes.
MR. MINGIONE: Mr. Hess isn't a lawyer. Not asking him what his -- yeah. That's...
MR. ROOKS: I'm sorry. Can

you restate the objection?

MR. MINGIONE: Mr. Hess is not a lawyer. You're now -- you can ask him his lay understanding. That's fine. I'm just making a distinction that he's not an expert in statutory interpretation.

MR. ROOKS: Understood. Understood.

BY MR. ROOKS:

Q. Did you generally understand that the New Jersey WARN Act had a severance provision?

A. Yes, I did.

Q. Okay. And despite that awareness, the --

MR. MINGIONE: Waiting for the lights to go back on. My lights went off. I was sitting so still. I had to wheel over that way. Sorry. I'm back.

BY MR. ROOKS:

Q. I think I just said, you're aware of the statutory requirement to pay a severance to the Forman Mills' affected employees, right?

A. Yes.

Page 182

Q. But even though you were aware and again, when I say "you," I mean Forman Mills, not you personally.
A. Understood.
Q. But even though you were aware of those obligations, an e-mail was still generated to those employees telling them that they would not get any severance pay?
A. Correct. Yes, that's correct.
Q. Can you tell me why the employees were told they were not going to get any severance pay when in fact, Forman Mills knew it was their obligation to pay that?
A. Well, again, you would have to keep in mind, you know, there was a possibility that the very next day we could have filed bankruptcy. So I can't assure -- we couldn't assure employees of anything. Because we didn't know.
I mean, you said were there any other -- a few minutes ago, were there any other alternatives you guys discussed. The biggest alternative was trying to sell this company, right? That was the alternative. To answer your question, we

couldn't really assure them of anything because within 24 hours, we -- we could have filed bankruptcy.
Q. Right. Right. You also I think testified that Mr. -- there was this -- I think you said Mr. Dushey?
A. Mr. Dushey, yes.
Q. Mr. Dushey, he is the -- I guess the owner of the Shoppers World; is that correct?
A. Yes. And he was the acquirer of Forman Mills.
Q. Okay. Had you had any conversation with Mr. Dushey prior to June 6th, 2023?
A. Prior to June 6th, I had conversations with him in terms of the diligence.
Q. Okay.
A. That was ongoing.
Q. All right. What were those, I guess the conversations about -- strike that.
Did the conversations that you had -- did the conversations that you had with Mr. Dushey involve conversations about

staffing of the corporate office?
A. I don't believe so. Not that I can recall other than just, you know, these are the expenses and this is the, you know, census data around who does what and head count and, you know, those kind of things.
My conversations with him around diligence was all about the financial statements, the accounts payable aging, who we owed, right? When it was due, what the overhead structure was. And then, you know, census-type data. That's what most of my conversation with Sam prior to the acquisition was about.
Q. Okay. I want to introduce another document. This will be Exhibit Number 13.
(At this time, a document was marked for identification as Exhibit No. 13.)
BY MR. ROOKS:
Q. It's got a Bates number of Keller-00149. This was produced in connection with the subpoena served to Mr. Keller. Let me share that now. Okay. All right. This is an e-mail from Mike

Kvitko to Mr. Keller, copying you. Dated June 2nd, 2023; do you see that?
A. Yes, I do.
Q. Okay. Now, this document -- I'm sorry. This e-mail references I guess two attachments you guys worked up for Sammy and again, I think Sammy is Mr. Dushey, right?
A. Yes.
Q. Okay. There's something about Kevin's assumptions, but then it says second, is about "a staffing plan reduction that Sammy asked me for that shows how we'd skinny down the office and DC staff as early as next week if he buys the company."
So can you tell me what this means? This staffing reduction planning skimming down the office. What's this e-mail mean?
A. Without looking at the worksheet or whatever is attached, I think what Mike is referring to is if Sam acquired the company, how much reduction could we have in the corporate office and in the DC, the distribution center. And let's see, if he

Page 186

buys the company.
So he's probably looking at combining -- because Shoppers World was a competing company to Forman Mills. So I'm interpreting this -- a little bit of this to if there's a combination, what he can save in corporate and DC labor costs.
Q. Did you let him know that he could save about 7 million bucks in labor costs by letting go 89 people?
A. I think what you're looking at, I think is a different exercise then the RIF.
Q. Okay.
A. Do you understand what I'm saying? I think you're talking about two different exercises.
Q. Let's talk about -- let's talk about both exercises. Let's talk about the RIF exercise and then this other exercise.
A. Okay. Okay. Can you scroll down just a little bit? Okay. Let me read my e-mail here. Okay. This four-week cash flow was based on this -- these assumptions. So it did not reflect any kind of RIF, right? It was just -- this is

like, the normal course what the next four weeks looks like.
Q. Okay. So that's the one exercise. And the RIF was the other exercise?
A. Correct. I think this e-mail you're sharing is a different exercise than the RIF discussion.
Q. Okay.
A. I believe.
Q. All right. In terms of the -- let me just strike that.
Give me five minutes. I just want to regroup. I'm almost done with the questions I have. And just so you know, Kevin, after I conclude the questions that I have for you, you know, your attorney may have some questions for you. So -- but just give me a few minutes. Let me just take five minutes to look over my notes and then come back, okay?
(Recess.)
BY MR. ROOKS:
Q. The 89 people that were affected by the termination on June 6th of 2023, Forman Mills did not pay any of those individuals

a severance; that's correct, right?
A. Correct. They were all rehired before the next payroll period. They were all rehired. So there was no loss of pay or benefits or anything like that. So yeah, there was no severance paid.
Q. Okay.
MR. ROOKS: I don't have any more questions for you. I do thank you for your participation today. Anthony, Jason, Dominique may have questions, but I don't have any more.
THE WITNESS: You're welcome.
MR. CABRERA: Anthony, I do have a couple. Do you want me to go or did you --
MR. MINGIONE: Yeah, go ahead. Go ahead. I'll wait for you guys.
MR. CABRERA: Okay.
\- - -
EXAMINATION
\- - -
BY MR. CABRERA:
Q. Mr. Hess, thank you for your time today, especially since you're out in Ohio.

I just have a couple of quick things I wanted to follow up on. So earlier this morning, sort of the beginning of the day, plaintiffs' counsel was asking you questions about your level of interaction with David Oddi and Joe Ferreira in the Q1 of 2023 and Q2 of 2023. Do you remember those topics?
A. I do.
Q. Okay. Q2 of 2023, are you construing that as I am, as April, May and June of 2023?
A. Yes. Yeah, calendar quarters.
Q. And then sort of more recently this afternoon we talked about how -- or you talked about how Toby Keller came on board as an independent board member May 24th of 2023 and the Goode participants all resigned from the board; is that right?
A. Yes, yes.
Q. So this morning when you were talking about your level of interaction with, I'll just call them kind of Goode people or Goode folks in Q2 of 2023, were you referring to the times before they

Page 190

resigned, before May 24th, 2023 or after?
A. Before.
Q. After they had resigned from the board in May 24th-ish, 2023, did you have -- did you go to them for approval or consideration of anything that was going on at Forman Mills?
A. No.
Q. And then just a moment ago you mentioned that the individuals who were suggested to the RIF were all rehired before the next payroll period and there were no loss of benefits; is that what you said?
A. Yes.
Q. So I just want to clarify this because I -- my notes are a little confusing on it and it's probably my fault. But the health benefits, for those employees at the corporate office who had elected the health insurance program that was offered from Forman Mills, did those employees have benefits for the entire month of June regardless of whether or not they were part of the RIF or not?

A. Yes.
Q. So employee A who on June 1st was a member of the plan and, you know, had hit all the premiums, yada, yada, yada, that employee had the same health coverage on June 2nd, on June 7th, on June 15th, on June 30th whether or not they had been included in the RIF or not; is that correct?
A. Yeah. The way that -- correct. The way the health insurance works is that the first of the month you pay your premiums, and we have coverage through the end of the month until the next month's premiums are due.
So within a month there is no discontinuation of coverage. And that was the case with all these employees. They -- they had health insurance the entire time -- the entire month.
Q. For a particular employee who got notice of the RIF on June 6th and then had to go to the hospital on June 8th, that hospital visit on June 8th was still covered by insurance if they had elected

Page 192

the plan under the terms that would have happened if there was no event on June 6th, right?
A. Correct.
MR. ROOKS: Objection to form.
But go ahead.
THE WITNESS: Correct.
BY MR. CABRERA:
Q. Let me just double-check, but I think that may be it.
A. If I could interject, the June 6th, I think, I believe the previous Friday was a payroll. So by the time we processed the next payroll, we had rehired everybody and paid all the employees retroactive.
Q. Got it.
MS. KILMARTIN: And I have no questions, Anthony, so if Jason is finished up, then you can go ahead.
MR. CABRERA: Now the pressure's all on me there.
MS. KILMARTIN: Sorry, Jason.
MR. CABRERA: I took a lot of notes. I just want to make sure.
MR. MINGIONE: The heat's on.

It's not like it's Friday or anything.
MR. CABRERA: Right? And now for my second hour of questions, let's talk about...
And I am done. Thank you very much.
MR. MINGIONE: I have no questions.
- - -
EXAMINATION
- - -
BY MR. ROOKS:
Q. I just have one other question. With those health insurance benefits that Jason just brought up, those employees could have elected COBRA and continued their coverage too, correct?
MR. MINGIONE: Objection to the form.
THE WITNESS: After the RIF, they -- they could have. They would have been covered through the end of June anyway through normal course. But they could've elected coverage through COBRA thereafter, yes.

MR. ROOKS: All right. That's all.

(Deposition concluded at 3:16 p.m.)

CERTIFICATION

I, Katherine A. Zacek, Professional Shorthand Reporter and Notary Public, do hereby state that the foregoing is a true and accurate transcript of the stenographic notes taken by me in the aforementioned matter.

..............

KATHERINE ZACEK
Notary Public
My commission expires
On September 30, 2028

**A**

**a.m** 1:21
**ability** 6:5 57:12 70:9
**ABL** 47:23 48:2
**able** 54:21 69:17 69:18 102:7
**abouts** 51:11
**absence** 81:8 107:18
**absolutely** 4:20 129:24
**accepted** 137:7 137:10 138:3
**access** 8:11 68:8 80:12 85:7
**accompanied** 5:21
**accountant** 108:18
**accounting** 108:6
**accounts** 142:25 184:9
**accruing** 60:10
**accurate** 93:6 117:16 195:6
**achieve** 79:24
**achieved** 116:15 130:14 131:9 131:11
**acquired** 16:9 52:17 185:22
**acquirer** 183:11
**acquiring** 23:23
**acquisition** 24:1 27:12 184:14
**Act** 176:13,18 176:22 177:2 177:10,15,18 177:23 178:2,3 178:5,8,13,14 178:19 180:13 181:11
**action** 1:2 175:24
**active** 107:14
**actively** 23:25 97:21,22
**acts** 166:15
**actual** 11:21 23:23 46:17 124:18 161:7
**ad** 171:7
**add** 59:9 117:10
**add-back** 59:15 59:16,19,20
**add-backs** 58:24 59:2,5,24
**added** 76:8
**adding** 58:13
**addition** 45:7 59:10 61:3
**additional** 74:21 76:9 88:3,4 135:24 162:11
**address** 14:23 14:24 15:2,6 78:23 90:23 101:16 135:25 154:1
**adjacent** 112:16
**adjusted** 58:24 59:11,24
**adjustments** 59:13
**administrative** 144:9
**advance** 172:7 172:11
**advanced** 49:3
**advice** 31:14
**advised** 97:11 97:14,15
**affect** 95:5
**affiliated** 152:16
**affiliation** 151:17
**aforementioned** 195:8
**afternoon** 93:13 95:20 189:15
**aging** 184:10
**ago** 7:8 71:3 182:21 190:9
**agree** 29:8,12,24 61:22 62:6 65:19 66:25 82:13,18 91:3 91:25 93:12 100:4 144:22 146:23 174:7
**agreed** 4:2 65:13 65:15 175:23
**agreement** 3:13 3:15,21 56:12 56:13,14,16,24 61:2 62:3 68:4 68:7 75:12,19 75:20 81:7 82:10,15 83:16 83:18 85:8 103:3 148:24 149:13 150:5 154:24 155:3
**agreements** 56:2 56:3,3,7,8,11 56:12 58:23 59:8 66:8,17 66:23 81:4
**agrees** 150:11
**ahead** 188:17,18 192:6,19
**Al** 109:6 179:24
**Albert** 109:6 179:25
**Allocation** 143:5 143:6
**allocations** 28:1 29:2
**allow** 84:18,19
**allowable** 58:24
**allowance** 123:12,14 124:3,14,22,23 125:2,3
**allowances** 123:18,20 125:5,6
**allowed** 76:5
**allows** 59:9
**alternative** 182:23,25
**alternatives** 180:7 182:22
**ambiguous** 16:24
**amend** 167:4
**amended** 81:8
**amendment** 3:15 66:20 81:11 82:9
**amendments** 66:16,22 81:3 82:15,19
**Americas** 2:12
**amortization** 58:2,14
**amount** 49:8 60:16 62:2 67:18,20,21 70:18 94:17 117:8 120:7 121:23 154:8 159:14
**analogize** 87:4
**analyst** 44:24 47:4,5 143:5,6 143:13
**and/or** 62:19
**announcement** 95:4 100:21
**annual** 36:18 60:16 61:14,19 124:8 132:12 132:13 135:2 135:15,16,17 138:21,22 139:13 140:3 158:10,12,14 159:16,17
**annualized** 116:14
**answer** 5:12 19:11 20:11,17 23:11,17 25:18 25:21 26:6 33:16 35:21,24 41:11 42:23 55:4 73:23 96:12,19 97:6 97:7 102:20 103:9,17,24 113:4 114:4,8 114:15 115:12 115:24 116:10 145:18 146:6 151:21 162:15 176:16,25 182:25
**answer's** 149:21
**answering** 6:10
**answers** 94:18
**Anthony** 2:11 7:20,24 8:6 188:10,14 192:18
**Anthony.ming...** 2:13
**anticipate** 5:8
**anybody** 126:4 128:12,15 130:2 169:8
**anyway** 193:22
**apologies** 57:19 177:6
**apparently** 83:10
**appear** 113:13
**APPEARAN...** 2:1
**appearing** 8:16
**appears** 100:9 113:16 159:10
**apply** 104:17
**approach** 159:15
**approval** 30:1,9 30:14,17,18,23 31:15 36:16,23

37:1,16,18,21 39:2,11,21 102:11,23,24 103:1 190:5
**approve** 38:10
**approximately** 1:19 148:7
**April** 18:13,14 18:17 41:24 67:11 69:2,12 69:20 70:3 74:19,20 81:18 82:11 132:9 162:6 172:22 172:23 189:11
**areas** 63:23
**arrangement** 162:17
**arrangements** 163:2,3
**ASC** 59:15
**aside** 7:22 23:18 122:20 155:7
**asked** 12:17 20:8,14 28:21 106:2 124:25 127:19 137:23 138:5 185:13
**asking** 8:3 16:10 24:9 60:21 84:3 94:8 118:2,9,12,18 123:2 141:1 159:19 169:8 180:23 189:4
**assertions** 98:1
**asset-based** 49:2
**assets** 48:25 50:21
**assigned** 106:13 115:20
**assignment** 107:10
**assistant** 129:15
**assistants** 128:6
**assisting** 161:20
**associates** 128:20 129:14
**assume** 78:22,24 139:19 158:22
**assumed** 13:18
**assuming** 137:8 142:10 157:13
**assumption** 93:10
**assumptions** 185:11 186:24
**assure** 182:17 182:18 183:1
**attached** 172:25 172:25 173:5 185:21
**attachment** 100:10
**attachments** 185:6
**attempt** 63:5
**attend** 45:6 47:6
**attendance** 44:17
**attended** 21:12
**attendees** 44:16 95:25
**attorney** 4:15 5:11 18:25 147:11 156:11 165:6 178:25 187:16
**attorney-client** 102:19 104:11
**attorneys** 8:1 75:6 78:14 82:4 96:21 98:19 101:9 102:5 105:7 133:19 134:4 147:10,11 153:20 179:3
**audit** 12:1 144:12
**audited** 61:12 61:19
**audits** 61:14
**August** 32:15,19
**authority** 29:18 29:21 36:13 174:8,11,13,16 175:13
**auto** 123:14,18 123:19 124:2 124:13,23 125:3,6
**autonomous** 24:24
**availability** 55:16 62:15,17 63:2 67:6,25 70:16
**available** 50:17 64:23 67:8,17 67:23 68:10,12 69:6 74:22 76:10 85:3,12 87:11
**Avenue** 2:12
**avoid** 33:18
**aware** 19:7 38:9 83:4 167:23 176:17,21 177:2,10,14,17 177:21,25 178:7 180:11 180:17 181:21 182:1,5
**awareness** 176:12 177:9 181:14

**B**

**B** 106:9
**bachelor's** 9:18 9:20,25 10:2
**back** 14:2 15:16 15:21 24:21,25 58:13 59:10 63:6,14 66:19 73:20 77:11 78:1 97:1 99:22 101:11 106:5 109:8 111:5 121:5 124:5,7 133:15 133:23 136:7 136:13,20 137:5 138:2,4 138:16 142:12 142:17 154:19 157:2,10 158:16 164:22 172:13 181:17 181:19 187:20
**bad** 77:17 126:15
**balance** 42:10 49:23 55:15 67:24 70:3
**balancing** 87:11
**bank** 18:15 42:2 51:8 52:19 70:25 71:5,14 173:15 175:2,2
**banker** 173:1
**banking** 51:5,25
**bankruptcy** 97:23 152:1,5 171:15 173:4 173:22 182:17 183:3
**banks** 152:14
**BARBER** 1:3
**bare-bones** 145:3
**base** 48:2 54:1,2 54:8 74:21 76:8 124:21 125:13
**based** 49:24 50:20,21,23 51:1 59:12 100:4 119:24 130:25 186:23
**basically** 7:15 32:21 55:20 72:12 93:3 107:5
**basis** 19:23 43:12 53:22 54:14,17 60:16 67:5 92:9 123:20 159:16 159:17 170:3 170:11,25 171:1
**Bates** 75:7 105:8 133:18 134:14 149:10 184:21
**battling** 64:11
**bear** 156:7
**becoming** 68:9 150:19 167:18 169:23
**began** 67:13
**beginning** 1:19 71:21 76:23 189:3
**begins** 83:19
**behalf** 1:4 117:5 117:18
**believe** 15:10 16:8 19:17 20:22,24 21:16 31:22 43:15 44:19 46:17 51:23 57:10 60:6 76:3,21 80:23,25 86:1 101:1 102:25 114:19 132:9 132:20 147:9 147:17 148:17 155:1 156:3 161:12,24 164:7,13 184:2 187:9 192:12
**beneath** 99:4
**benefit** 133:14
**benefits** 64:1 104:18 117:15 117:17,19,22 117:25 118:2

118:24 121:6
122:14 123:3
125:13 136:4
188:5 190:13
190:19,23
193:14
**best** 5:14 62:21
111:1 114:10
115:16 175:23
**beyond** 23:3
53:5 117:22,23
117:25 167:14
**bigger** 105:14
**biggest** 182:23
**bit** 18:4 21:1
32:15 52:25
63:15,16 71:13
71:16 86:12
88:10 92:13
120:5 128:5
140:16 142:6
168:11 172:8
186:5,21
**blank** 2:11
117:16 118:14
**board** 13:16,17
16:21 17:3,5
21:12,17 22:2
22:5,16 25:5
30:13,19,25
31:1,6,8,15,21
31:21,22,23
32:1,5 33:2,2
33:15 34:11
35:2,11,13,16
36:15,16,23
37:1,16,17
38:3 39:2,11
39:17,21 40:5
40:8,9 41:18
43:5,9,11,23
44:4,5,7,12,14
44:16,25 45:2
45:6,9,10 46:3
46:4,7,9,13,15
46:18,18,19,24
47:6,13,17,18
52:4 146:12,23
147:15,20
148:20 150:18
150:19,23
151:5,15
152:16 153:11
154:8,12,25
155:3,9,22
156:2 163:4
167:23 168:15
168:18,21
169:6,24 170:2
170:3,6,10,13
170:21,25
189:16,17,19
190:4
**board's** 30:14
**Bonoff** 20:22
21:8,9,9 30:23
31:9 35:18
44:20 45:25
46:9
**bonus** 125:14,16
126:2,21 127:1
127:18,22,24
129:10 130:11
130:11,12,16
130:21,22,23
130:24 131:4,6
131:7,8 132:11
132:14 139:10
**bonuses** 125:16
125:20,21,21
128:24
**booming** 63:21
**boost** 77:22
**borrow** 49:7
67:1
**borrowed** 53:4
**borrowing**
53:25 54:2,8
54:17 56:2,12
67:5 71:23
74:21 76:8
**boss** 38:7
**bottom** 75:16
78:16 106:18
149:11 165:14
**Boulevard** 15:3
**Bourne** 7:9
**Bowers** 127:3
**box** 101:21
134:11
**break** 14:9,13
18:3 74:11,12
132:24 133:10
133:24
**Brian** 28:25
44:20 45:4
72:4 108:6
127:14,16
128:1 136:17
136:17 137:5
138:20
**bridge** 70:15
**briefly** 36:13
84:23 167:21
**bringing** 133:9
150:4
**brings** 49:25
**brink** 151:25
152:1
**brought** 146:12
147:12 167:10
169:13 193:15
**bucks** 186:9
**budget** 12:1
79:10,11
130:15 131:22
131:24
**budgets** 30:12
30:12 36:18
**buffer** 70:16
**bullet** 166:14,15
167:4
**bunch** 134:16,25
**burdened**
169:18
**burned** 65:8
**burning** 62:18
66:11
**Busch** 15:3
**business** 10:4
39:14 41:7,20
47:24 49:14
50:7,9 63:21
64:4,9 70:14
75:22 76:14
84:1
**businesses** 77:6
**button** 113:11
**buy** 88:10,13
158:10
**buyer** 130:5
**buyers** 128:7,8
128:19 129:13
129:13,15,16
**buyers'** 128:5
**buying** 37:24
83:14
**buys** 185:15
186:1

**C**

**C** 28:6 106:9
**Cabrera** 2:16
3:7 23:10,16
25:17 26:4,16
35:20,23 41:9
42:22 133:6
188:14,19,23
192:8,20,23
193:2
**cadence** 35:10
55:22
**calculate** 116:22
**calculated** 174:1
**calculation**
50:16,21 51:1
58:22 59:7
118:9
**calendar** 19:22
32:13 139:20
141:10,23
189:13
**call** 31:13 34:16
35:6,7 36:3,8
59:11 74:25
78:3,12 81:21
91:5 95:6
98:10,20 99:13
102:18 167:25
168:4 178:1
179:24 189:23
**called** 13:6
46:24 141:15
**calling** 24:8
**calls** 22:16 23:1
23:3 24:5
35:10 42:8
47:7
**Camden** 10:21
**camera** 164:20
**campaigns**
88:22
**canceled** 92:5
93:5
**cap** 36:18 57:13
79:21 122:5
**capacity** 8:21,21
**capital** 30:11
46:2 47:15,20
47:24 48:1,9
49:15 50:7
62:16 67:21
68:10 69:19
72:25 73:17,17
80:12,15
**capped** 122:2
**car** 124:22
**cards** 49:25
**carry** 52:2
**case** 6:25 7:1
19:9 49:16
62:5 93:15
109:6 191:18
**cases** 31:12
140:15 141:8
141:15
**cash** 18:7 49:1,4
49:17,24,25
58:11 59:18
62:18 64:2

65:8 66:11 70:5,13 73:2,2 75:12,19 80:15 85:6 87:6,11 87:16,18 186:22
**cashless** 58:17 59:17
**Cause** 66:1
**caused** 66:6
**cautious** 94:13
**cellphone** 123:12 125:1,2 125:5
**census** 111:25 184:5
**census-type** 184:12
**center** 79:25 90:3,8,11 185:25
**centered** 72:18
**CEO** 12:11,18 27:7,10,17 29:21
**certain** 29:13,25 53:21,22,22 91:2 92:16
**certainly** 5:19 26:11 40:11 62:4 63:3,19 80:11,17,19 133:8
**certification** 4:4 195:2
**certifications** 12:6
**cetera** 136:4
**CFO** 11:7 13:19 27:16,20,21,22 29:17 48:6 53:15,15 74:2 74:5 109:13 151:2 154:18 159:24 174:6
**Chalker** 108:6,7
126:21 136:17 136:17 137:6
**challenge** 70:6
**challenges** 63:1 63:9,12
**challenging** 18:15 87:13
**change** 32:22,25 39:13 64:24 81:10 110:20 110:22 111:22 142:3 161:2
**changed** 71:2
**changing** 106:22 113:9,9 132:23 161:6
**characterize** 17:15 26:1
**charge** 27:25 28:1 29:2 57:4 57:6,10 61:24
**charged** 71:8
**charges** 57:13
**charts** 64:7
**Chase** 71:15
**check** 50:3
**Cherry** 14:6,15
**Cheryl** 13:2,6,7 13:7
**Chicago** 48:1 89:21,22,24
**chief** 11:7 27:25 28:2,6,7,8,8,9 28:15,16 29:1 45:2
**Cinnaminson** 90:4,8
**circumstance** 138:14
**circumstances** 84:8
**CIT** 51:8 52:9 52:12,18 83:9 83:11
**CIVIL** 1:2
**claims** 97:25
**clarification** 23:9
**clarify** 190:16
**clarifying** 52:15
**clarity** 63:11
**classes** 10:23
**clear** 33:22 46:4 52:24 62:10 70:8 81:7 161:20,22 179:7,13
**click** 116:17,20
**clients** 55:20
**close** 30:5 39:20 84:18 130:19
**closing** 42:4
**closings** 36:14 36:17 38:13 45:19 79:21
**closure** 77:5
**clothes** 30:11
**clothing** 13:10
**COBRA** 193:16 193:24
**Cohesive** 44:21 46:2,14 47:10 148:1
**coinciding** 156:1
**COINVEST** 1:10
**collaboration** 175:6
**collateral** 49:1,6 49:6,8 54:3 55:14 67:22 76:4,7
**collectability** 61:9
**collectively** 24:7 24:11,12,17,23 153:4
**Columbia** 89:15
**Columbus** 10:9
**column** 105:19 105:19 106:8,8 106:8,9 107:22
109:1,10 110:18,19,23 112:8,16,17,24 113:8,11,13,21 114:23 115:1,4 116:18,20,21 117:14 118:14 121:5 135:2
**columns** 105:16 112:9,20 134:19 135:1
**combination** 186:6
**combining** 186:3
**come** 12:9 13:16 27:4 30:18 109:8 111:5,24 137:5 138:2 140:23 147:25 148:15 187:20
**coming** 93:7 112:4 153:10 162:9,23 163:3
**commission** 195:16
**communicate** 16:16 17:8 18:12 19:23 25:4 36:2
**communicated** 96:20
**communicating** 20:2
**communication** 16:18 17:2 20:1,10 53:14 68:14 91:1
**communicatio...** 16:12,24 17:24 20:18,23 53:9 68:15 102:19 104:12 177:4
**companies** 58:20 162:2,3 162:3
**company** 13:3,4 13:6,7,9,13 15:19 16:1 23:22 38:6,25 42:4 49:24 52:17,20 58:16 59:9 62:15 64:5,17,21 68:19 88:22 89:3,6,7 97:21 117:17,21 118:7,20,22,22 119:4,8,12,23 120:7,12,16 121:10 122:2,9 122:12,23 123:3,8,25 130:14,19 131:22 137:11 137:25 144:24 145:4 150:10 150:11 151:11 151:25 152:1,4 152:13 159:25 160:3,20 164:5 164:9 171:13 173:2 174:17 182:24 185:15 185:23 186:1,4
**company's** 57:12 120:4 125:11
**company-paid** 117:15 121:6
**company-spo...** 118:4,16
**company-wide** 90:14
**comparable** 87:24 88:13
**compensated** 151:19
**compensation** 124:3,19 125:9 126:3 127:18 132:17 139:14

150:7,24 151:6
**competing** 186:4
**complete** 106:15
**completely** 117:16
**complied** 55:9
**concern** 16:6 89:3
**concerning** 171:20 178:19
**concession** 65:17
**concessions** 65:17,23 66:4
**conclude** 187:15
**concluded** 194:4
**conditions** 81:10 162:22
**conducted** 93:23
**conference** 22:25 23:3 24:5 36:3,8 168:4
**confusing** 7:11 190:18
**conjunction** 101:8
**connected** 147:10
**connection** 6:23 6:24 8:9 18:20 184:23
**consent** 30:14 31:15 36:16 38:10 39:18 40:5 176:9
**consequence** 68:13
**consider** 29:4 77:4
**consideration** 65:12 190:6
**considered** 8:1 38:4
**consistent** 131:13
**construing** 189:11
**consultant** 11:19 13:16 24:15 161:19
**consulting** 11:23 12:10,15 162:1
**Consumer** 75:21
**contact** 53:13
**contacted** 12:11
**contain** 56:25 112:20
**contained** 9:4 56:6 66:7
**continue** 145:4
**continued** 52:19 193:16
**continuing** 83:21 88:1
**continuous** 65:7 66:9 110:1 111:3
**contribute** 119:13 120:16 120:17 121:24
**contributed** 120:8,13 121:22 122:4 122:13 123:8
**contribution** 119:19,20 120:4 122:9,24 125:12
**contributions** 122:1,6 132:16
**control** 40:8 98:2 143:24
**controller** 11:11 11:14 13:17,18 53:15 108:6 109:12,15
**conversation** 98:7 183:13 184:13
**conversations** 5:2 7:25 8:4,5 42:1,15 73:16 167:17 170:17 170:19 171:19 178:17 179:8 179:15 180:6 183:16,21,23 183:24,25 184:7
**conversely** 5:13
**COO** 28:12
**cookie** 13:12
**cookies** 26:24
**Cooks** 47:24
**copying** 185:1
**corner** 75:17 78:16 101:13 105:10 165:14
**corporate** 14:17 14:19,24 90:1 90:10,17,20 91:17 92:8 96:21 105:11 105:24 106:14 106:16 109:16 115:10,20 117:13 122:15 123:11 125:10 126:2 132:18 134:22 142:14 144:17,19 145:6,7 148:15 154:2 184:1 185:24 186:7 190:20
**correct** 8:17 13:20 14:22 18:23 20:13 26:15 29:10,19 29:22,23 30:20 32:7,24 36:11 39:3,6,7 40:1,6 43:19 46:5 48:4 50:13,19 51:3 55:25 56:10,17,18,22 58:3 60:2 66:18,22,24 68:11 77:18 78:18,21 80:9 84:2,5 92:23 93:20 95:14 100:16 102:8,9 103:22 106:1 106:14 107:7 107:12 108:15 111:3 112:22 113:5,25 114:1 114:5,9,17 115:7,15 117:6 117:7 119:15 119:15 136:18 137:16,17,19 137:21 138:23 138:24 140:17 140:18 142:21 142:22 143:18 144:3,13,20,21 145:2,8,9,12 146:3,9,13,16 149:1 151:3 154:17 155:10 155:11 157:12 157:13 158:3 159:9,25 160:3 166:22 168:15 170:23 174:14 174:20,21,24 175:9,14,17,20 176:10,11 177:11 179:20 182:9,9 183:10 187:5 188:1,2 191:9,10 192:4 192:7 193:17
**corrected** 81:12
**correspond** 134:22
**cost** 119:14 120:24
**cost-cutting** 88:21
**costs** 88:11 89:4 173:23 186:7,9
**could've** 193:23
**counsel** 4:2 8:5 9:1 94:7,9,16 96:7,10 97:8 173:3 177:2,5 178:12,16,19 179:1,5,12,18 189:4
**counsels** 147:18
**count** 113:20 117:4 184:6
**counterpart** 99:11
**country** 84:21
**couple** 10:23 40:15,15,22 72:5 110:4 121:19 141:4 157:16 173:9 188:15 189:1
**course** 16:13 38:1 51:14 53:11 60:5 64:15,20,23 68:1,3,12 74:8 82:20 85:17 88:12 118:25 143:9 175:23 187:1 193:23
**court** 1:1,23 2:21 4:25 5:6 6:15 132:25
**covenant** 56:19 56:20,21 57:4 60:24,25 61:25
**covenants** 56:5 56:6,9,17,24 57:1,2,24 59:12 60:23 61:1,4,21 66:7 66:13,16
**cover** 45:14,15 173:13,13,21
**coverage** 57:15 120:2,3 121:2

162:20 166:7,8 167:14 191:5 191:13,17 193:17,24
**covered** 119:11 155:21 158:20 159:7,12 160:6 163:5 191:25 193:22
**covers** 159:9 167:8
**COVID** 63:20 64:3 76:12,13 76:18,19 77:10 77:11,15,16 84:12,16 132:7
**COZEN** 2:15
**CPA** 12:6
**create** 68:25 88:3
**created** 33:23 34:2,3,6,20 52:6 70:8,19 83:9,16 127:23 142:9
**creates** 67:22
**creating** 88:25
**credit** 48:5,10 48:23 49:21,22 49:25 50:5,9 51:19,21 52:18 56:8,11,12,14 56:16,24 58:22 59:8,20 62:3 66:8,17,22 67:23,25 68:4 68:7,8 69:22 70:14,18 72:16 72:19 75:23 81:4,7 82:10 82:15 83:9,11 83:16,17 84:1 84:18 85:4,8 85:11 172:18
**credits** 85:7
**crew** 145:3
**crisis** 63:3 70:20 80:9,10 87:19
**current** 161:1
**customer** 63:22 66:10
**customers** 63:25 64:11 65:2
**cut** 86:14,22 88:11,24 89:4 173:6

**D**

**D&O** 155:5,7,14 155:16,25 157:18 158:6,8 158:14,16,19 159:2,12 160:6 160:12,16,19 160:23 161:3,3 161:7,10 162:18 163:8 166:7,8,23
**daily** 17:14 22:10 170:18
**Dan** 20:24,24 44:19
**Daniel** 20:22 21:8
**dashboard** 22:4
**data** 3:20 111:25 113:9 134:15 137:14 140:12 140:15,23 141:18,22,24 142:2,5 143:21 184:5,12
**date** 32:22 69:25 91:24 107:23 108:9,11,13,25 109:4,4 110:11 110:12 111:14 111:21 112:25 142:6 147:2 148:8 157:22 164:11 166:16 166:16,17,20 166:24 173:11
**dated** 75:23 80:4 82:10 185:1
**dates** 32:1 92:16 110:16 141:12 141:19
**David** 16:17 21:19 169:8 189:6
**Davies** 161:24
**DAWN** 1:3
**day** 32:24 49:23 50:1 92:3 93:4 95:18 141:23 147:6 169:1 182:16 189:3
**day-to-day** 37:22
**Dayforce** 112:5 141:8,25 142:2
**days** 61:13,17,18 61:19 86:10 92:21 148:4 158:2,11 159:21
**DC** 185:14,24 186:7
**deal** 162:9
**debt** 40:22 48:13 48:14,15,23 49:19 51:7 52:16 57:12,13 57:15 58:15 65:12,12 70:22 71:6 72:7,9,10 72:12,13 73:1
**debt-free** 58:15
**decision** 30:6 35:14 37:16,18 39:16 174:8
**decision-maki...** 38:2
**decisionmaking** 38:15 40:24 41:18
**decisions** 24:6 24:10,18,23 25:1,4 29:9,13 29:25 30:16,17 31:5,7 37:11 37:22 41:7,21 169:17
**deck** 22:4 33:4,6 33:9,24 34:2,4 34:6,8,13,17 34:19
**declines** 65:7
**declining** 80:14
**deep** 63:24
**default** 66:19 80:18,22 81:8 81:13,16,18 83:9,16,20,24 83:25 172:22
**defaults** 81:1 84:4,9,12,13 84:17 85:2
**defendant** 2:13 2:24 8:22
**defendants** 1:12 2:19 4:18
**deferred** 59:15
**define** 16:19 62:13 76:19
**definitely** 87:12
**degree** 9:18,20 10:2,6
**DEL** 1:2
**delete** 106:20
**delicious** 26:24
**demands** 173:10
**demographic** 76:15
**dental** 119:6 122:18,22,24 123:1,5
**departed** 14:2
**departure** 11:10
**depending** 36:6 119:19 120:2,3
**deposed** 6:17
**deposition** 1:14 4:24 5:8,15 6:13 7:16,19 8:25 9:4,9,13 194:4
**deposition's** 5:1
**deposits** 50:24
**depreciation** 58:2,14
**descent** 88:5
**describe** 23:2 25:14 62:12
**description** 3:11 107:10 157:18
**designated** 8:16 31:25
**despite** 181:14
**dessert** 13:12
**detail** 54:1 80:3 95:8 172:15 173:15
**deteriorate** 88:2
**deteriorating** 64:21,22
**deterioration** 66:9
**determine** 50:17
**determines** 40:9
**developed** 94:16
**differ** 65:15
**differed** 125:21
**difference** 67:24 139:19,23 141:17
**different** 7:12 40:15,16 41:1 72:5,22 73:7 77:12 92:20,21 109:4 119:18 131:14 140:14 141:22 142:7 170:20 186:12 186:15 187:6
**differentiating** 37:4
**differing** 65:19
**difficult** 5:5

**digital** 49:18
**diligence** 171:13 183:17 184:8
**dipped** 68:2
**direct** 102:20
**directing** 24:8
**direction** 97:24 161:9 169:15
**directionally** 114:17
**directives** 23:8 23:14,15 24:3
**directly** 42:6 55:16 112:4
**director** 3:21 91:21 126:4 128:12,16 146:12,20,24 147:13 148:5 148:19,24 150:4,9,9,10 150:11 151:11 151:12,16 152:18 154:24 159:5 161:15 162:10,24 166:25 167:19 169:7,14,23
**director-level** 130:13
**directors** 28:13 43:6,9 158:21 159:2,13 169:24
**disconnect** 89:19
**discontinuation** 191:17
**discontinue** 10:25
**discontinued** 10:24
**discount** 63:24
**discovery** 18:25 19:1 91:11
**discrepancy** 139:9
**discretion** 36:24 37:15
**discretionary** 36:23 37:14 64:2 65:3
**discussed** 73:14 132:15 161:15 171:11,12,21 171:25 175:22 182:22
**discussing** 171:18
**discussion** 24:1 93:25 98:8 174:25 175:3 187:7
**discussions** 69:16 73:18 168:12 171:23 178:11,15 179:1,2
**disparity** 140:23
**disposable** 64:13
**disposal** 80:16
**distinction** 28:14 178:23 181:5
**distressed** 162:3
**distribute** 102:12
**distributed** 34:20,23 35:1 35:4
**distribution** 79:25 90:3,8 90:11 91:17 185:25
**district** 1:1,1 89:15 123:15
**divided** 130:24
**divulge** 177:4
**divulging** 104:11
**Dkilmartin@...** 2:23
**DMM** 129:23,24 129:25 130:3
**document** 74:25 75:1,5,13,19 76:2 78:3,4,13 81:21,23 82:9 90:25 91:4,6 91:10 98:17,18 98:21,25 99:3 99:8,11,14 100:19,24 101:4,12 103:4 103:22 104:23 104:25 105:2,6 106:3,4,23 126:8 133:16 133:16,17,23 134:3,6,12,18 136:21 139:1,3 139:4,17 140:7 140:19 149:6 153:13,15,19 153:22 156:6 156:10,13,14 156:18,25 157:16 163:9 164:16,17,19 164:24 165:1,5 165:8 184:16 184:17 185:4
**documents** 8:8 19:3 54:6 148:23
**doing** 42:8 95:4
**dollar** 60:16 62:2 120:7 121:23 159:14
**dollars** 37:20 88:4 174:3
**Dominique** 2:21 188:11
**Dong** 108:17 110:12 111:1 127:5 179:24
**double-check** 192:9
**doubt** 103:12
**drafted** 101:2
**drafting** 102:1,3
**drag** 116:17,21
**dramatic** 55:7 55:12 64:24
**dramatically** 71:2
**draw** 49:21 50:4 67:6 172:19,23 173:4,8,21
**driven** 173:20 175:1
**due** 184:11 191:15
**duly** 4:10
**Dushey** 27:14 42:2,5,13 164:11 183:6,7 183:8,14,25 185:7

**E**

**E** 2:7
**e-mail** 3:14,16 3:18,24,25 17:4 20:4 36:2 78:18,20,23,25 79:5,6 87:14 101:16,24 102:1 165:9,16 166:10 182:6 184:25 185:5 185:19 186:22 187:5
**e-mail's** 80:4
**e-mailed** 100:25 101:12
**e-mails** 19:3,6 22:5
**earlier** 33:6 53:8 74:15 76:11 81:3 85:6 109:11 129:12 142:19 145:7 163:10 167:22 172:14,20 173:24 189:2
**early** 43:25 44:6 69:12,20,21 73:15 74:19,20 81:11 132:8 185:15
**earn** 10:5 130:18
**earned** 125:22 125:23 126:6 126:24 127:1
**earning** 139:3,5
**earnings** 57:25
**easier** 67:7 100:14 106:21
**Eating** 133:6
**EBITDA** 57:14 57:25 58:6,9 58:19,19,21,25 59:6,10,11,24 62:1,1 130:15 130:15
**Eclipse** 48:12,17 48:22 49:10,19 50:6,7,11 51:10,15 52:1 52:5,9,13,21 53:18,25 54:10 54:17 57:2 61:2 69:17,21 70:2 71:8,10 71:11,15 76:4 76:6,7 80:19 80:22 83:15 85:9 171:16 172:16
**economic** 66:11
**edits** 161:4
**education** 9:17
**effect** 6:14 76:13 155:17
**effective** 108:2 108:10,24 147:2 148:8

**efforts** 19:2 33:13
**eight** 123:16 125:7 137:25 138:10
**either** 17:21 29:22 62:19 112:19,19,21
**elaborate** 23:5 95:7
**elected** 190:21 191:25 193:16 193:24
**eligible** 126:2,21 127:18 130:16 132:19
**elimination** 116:4
**embarked** 88:22
**employed** 107:19 109:19 116:6 118:3
**employee** 105:11 108:1 108:23 119:10 119:21,22 120:8 121:25 122:3,6,10,25 191:2,5,21
**employees** 89:1 90:13,19 91:2 91:2 92:17 93:7,19 94:21 95:1 98:14 100:6,25 102:12,16 106:13,16 115:19 117:12 118:3 119:3,16 119:17 121:8 122:15 123:10 123:13 137:3 141:2 143:22 144:10 145:13 152:13,23 153:8 174:9,14 175:8 179:21 180:3 181:24 182:7,10,18 190:20,23 191:18 192:15 193:15
**employer** 26:21
**employes** 174:2
**employment** 11:21 15:12 16:14 53:11 99:25 108:2,10 108:24 110:1 111:2 137:5
**enabled** 144:23
**Encina** 50:9,10 50:11 51:5,9 51:15 52:1,5 52:20 53:2 54:14 55:24 56:4,25 57:1 57:18 67:2 68:15 74:16 75:22 84:1
**ended** 23:23 77:10
**ends** 100:1
**engaged** 20:25 21:2,4,5,9,23 21:24 22:12,18 22:19,23 40:12 162:5
**engagement** 23:2 166:17,21 167:14
**enrolled** 9:21 10:16
**entail** 72:24
**entered** 77:12 155:2
**entire** 190:23 191:19,20
**entirely** 144:20
**entity** 161:24
**equally** 43:1
**equity** 25:2,5 59:21
**equivalent** 135:22 177:22 178:4
**especially** 151:19 176:1 188:25
**ESQUIRE** 2:3,7 2:11,16,21
**essential** 144:24
**essentially** 57:15 58:10 111:16 162:23 166:8
**et** 136:4
**Eva** 110:4 111:1
**evaporate** 67:9 67:14
**evenly** 130:24
**event** 35:14 192:2
**events** 6:5 70:3 83:20
**eventualities** 98:1
**everybody** 131:11,11 153:3 159:7 192:14
**everyone's** 48:19
**exact** 69:24 147:5 158:17 159:14 161:24 168:12
**exactly** 15:9 17:18 21:14,22 60:17 65:13 83:2 85:14 95:2 100:23 147:12 150:2 162:19 168:2
**EXAMINATI...** 188:21 193:10
**examined** 4:10
**example** 23:15 30:4 31:13 32:2 45:15 57:10 59:17 84:16 85:22 88:16 151:14
**examples** 31:10 59:23
**exceeded** 131:24
**Excel** 105:9 118:10 133:17 134:1
**exceptions** 93:2
**excuse** 143:21
**execute** 39:11
**executed** 148:24 154:23
**executive** 27:17 28:22 29:14,25 30:7 37:14 43:8 45:8,23 98:13,13 177:9 177:13 178:18 179:9 180:11
**exercise** 186:12 186:19,19 187:3,4,6
**exercises** 186:16 186:18
**exhibit** 3:13,14 3:15,16,17,18 3:19,20,21,22 3:23,24,25 74:25 75:2 78:3,5,12 81:22,24 91:5 91:7 98:20,22 99:13,15,23 100:5,15 105:1 105:3 133:25 134:5,7,12 136:14,21 138:17 149:4,7 153:14,16 154:19 156:12 156:15,19 164:25 165:2,9 173:25,25 184:16,18
**EXHIBITS** 3:10
**existed** 61:1
**existing** 160:6 161:3 168:15
**expectations** 61:23
**expend** 36:18
**expense** 30:11 59:16 124:10 124:12 174:2
**expenses** 184:4
**experience** 58:23 62:8,23 158:8
**experienced** 70:6
**experiencing** 17:10 68:23 80:8
**expert** 165:22 181:6
**expires** 195:16
**explain** 33:9 40:19 58:8,9 59:4 63:19 83:6 141:20
**explanation** 48:21 139:18 139:21
**explore** 71:22 74:2
**explored** 73:6,9 73:21
**exploring** 72:2
**express** 138:7
**extent** 22:7 86:4 88:25 94:25 98:10 102:18 104:10

**F**

**F** 107:22
**facilitate** 42:9 42:12
**facilities** 90:6

**facility** 48:11,23 49:2,19 50:5 51:19,21 52:18 67:4,19 69:23 70:15 71:14 72:16,19
**fact** 43:8 118:19 137:3,15 158:5 158:5 178:24 182:12
**factor** 83:12
**factual** 97:18
**faintly** 44:1
**fairly** 43:1 126:5
**fall** 73:14
**familiar** 19:19 106:5 149:1 165:17,19 166:2
**familiarity** 165:23 166:3
**family** 15:22,23 120:1
**FAQ** 100:6 101:3,12 102:1
**FAQs** 99:5
**far** 6:1 24:3 89:20 172:7,11
**fault** 190:18
**February** 17:20 80:5 81:17
**federal** 176:13 176:21 178:5 178:13 180:12
**fee** 58:15 60:1,4 60:10,12,15 150:12,13 163:7
**feel** 11:3 39:10
**fees** 59:21 60:9 162:18
**felt** 15:17 133:1 152:21
**Ferreira** 19:17 19:18,19,24 20:3,10,18 21:25 22:13,20 24:8,13,23 30:22 31:9 35:17 42:18 43:3 44:19 45:24 46:7 78:18 147:24 189:6
**Ferreira's** 26:1 26:12
**field** 96:3 123:14
**fielded** 94:18
**Fields** 13:13
**Fields-like** 26:21
**figured** 111:13
**file** 61:12,17 112:1 118:10 134:1,13 137:2 137:23,24 138:5,8 140:11 140:15 152:5 173:4,10,22
**filed** 182:16 183:3
**files** 139:21
**filing** 4:4 8:10 97:23 120:1 171:15
**filter** 126:17 136:9
**filtered** 126:14
**finance** 10:4 72:13
**financial** 11:7 15:20 28:9 41:1 53:21 54:9,11 59:7 61:3,16,21 143:12 184:9
**financially** 123:3
**financials** 45:15 61:12,18,18,20
**financing** 40:3 40:10,10 71:23
**find** 78:8 156:6 164:17
**fine** 63:18,19 181:4
**finish** 14:12
**finished** 192:18
**fire** 175:25 176:3
**fired** 176:4
**firings** 38:1
**firm** 23:23 162:1
**first** 11:21 12:3 17:7,13,15 20:15 21:6 22:13 25:23,24 26:13 28:20 41:5,15,22 42:20,25 43:14 46:23 47:1 62:22 83:25 85:12,19 86:15 86:17 87:6 89:8 90:12 100:18 105:19 106:10,20 107:2,9 108:5 112:13 115:2 121:18 148:3 149:25 150:3 150:14 155:17 191:12
**fiscal** 32:12 61:13 141:11 141:23
**five** 29:6 82:21 112:13,13 123:22 124:19 144:2,5,6,15 187:12,19
**fix** 57:6
**fixed** 32:21 35:12 57:3,10 57:13 61:24 119:20,22
**Fjrooks@mor...** 2:4
**flagged** 69:15
**flatten** 87:25 88:6
**flexibility** 86:8
**flow** 18:7 58:11 70:6 85:7 87:6 87:16,18 186:23
**flowing** 64:4
**fluctuations** 55:6,11,12,14
**FM-002218** 82:5
**FM-005324** 75:8 75:17
**FM-005795** 78:16
**FM-006268** 149:11
**FM-006276** 149:11
**FM-006295** 153:21
**FM000407** 99:2
**FM000409** 99:2
**FMLA** 107:16
**focus** 21:18
**focused** 133:4
**fold** 147:12
**folks** 189:24
**follow** 189:2
**follows** 4:11
**food** 64:11
**force** 3:17 95:10 95:11,12,14 99:5 101:3 136:16
**foregoing** 195:5
**forget** 133:5
**form** 4:6 26:5 37:4 41:10 52:8 55:3 96:18 100:8 103:8,16 113:3 114:3,14 115:23 116:9 146:5 162:14 176:15,24 180:20 192:5 193:19
**formal** 44:5
**formally** 50:10
**Forman** 1:8,9 2:13 4:17 6:25 7:2 8:12,17 11:7,11,16,21 11:24 12:10 14:2,16 15:25 16:8,14 21:7 21:10,25 23:24 27:5,6,10,13 27:18 33:25 34:3,7,24 40:23 41:7 43:7 47:22,23 48:24 49:14,16 49:20 50:18 51:6,16,18,22 51:23 52:2,6 52:16 53:4,19 56:4 58:20 59:25 60:9,11 61:23 62:7,22 63:22 65:1 66:6,12 68:8 68:22 69:9,18 70:9,22 71:22 76:9,9,15,25 77:4,22 78:14 79:1,6,7 80:8 83:13,25 84:20 85:20 86:2 87:17 89:9 90:7,14,16,19 92:7 99:4 105:10 106:13 112:6 116:5,14 117:4 121:7,24 144:25 146:13 146:19,24 148:25 151:18 153:25,25 154:7,11,23 155:2,13,13

157:12 158:5,9 160:12,15,18 160:20 171:10 175:19 177:10 177:14,17,21 177:25 178:7 178:12 180:11 180:16 181:23 182:2,12 183:12 186:4 187:24 190:7 190:22
**Formanmillsh...** 101:17
**former** 152:15
**forms** 125:9
**forward** 70:7
**forward-looki...** 97:16
**found** 164:22 168:3
**four** 46:20 112:13 143:21 144:4,15 187:1
**four-week** 186:22
**fourth** 28:19
**frame** 18:14 69:3 72:2 74:20 150:2 162:6 171:24
**Frank** 27:1 37:4 52:10
**Franklin** 2:3 4:15 10:7
**free** 80:15,15
**freeze** 106:23,24
**frequency** 17:13 68:16 170:13
**frequent** 17:9,11 18:16,18 22:25 170:15 171:1
**frequently** 16:25 17:7 18:11 20:9 31:21 34:12 60:3
**Friday** 1:17 192:12 193:1
**full** 5:10 30:24 31:1,5,8 33:2
**full-time** 92:10
**function** 39:15 49:13
**functions** 144:24
**fund** 69:24 70:13 75:22 173:8
**funded** 122:25
**funding** 171:16 173:12,23 175:2
**funds** 44:22 122:10
**furloughed** 111:16
**further** 63:15 74:22
**FYI** 35:7,9

**G**

**Gail** 140:1
**gain** 88:14
**gaining** 11:4
**gap** 59:15 70:15
**general** 30:12
**generally** 5:1 20:6 81:9 181:10
**generate** 57:14
**generated** 34:13 182:7
**generating** 70:11,12
**generic** 101:20 101:21
**gentleman** 16:17 28:25 146:11
**gentlemen** 128:1 168:4,7
**gestures** 5:16,17
**getting** 31:15,15 65:3 67:1 72:11 85:24 87:14 121:5 151:21,24 153:11 172:13
**give** 23:8,13,15 48:20 53:24 54:20 63:11 65:17 75:6 102:23,23 104:24 133:21 134:13 156:7 164:18,20 169:14 175:18 175:18 187:12 187:18
**given** 6:15 102:15,25 174:22
**giving** 77:21
**glad** 167:10
**go** 4:22 24:21 30:22,24 31:1 31:5,7,8,16 35:17 49:17 63:14 66:19 71:14 82:19 86:23 95:7 96:19 97:12,25 99:22 101:11 106:8 108:16 110:3 120:14 124:5,7 126:18 128:4,22 129:20 133:15 133:22 134:11 135:2,5 136:10 136:13,20 138:16,19,25 139:24 140:5,6 140:13 142:17 150:6 154:19 156:8 157:16 163:19 164:20 165:7 167:3 176:1 181:17 186:10 188:15 188:17,18 190:5 191:23 192:6,19
**go-to** 85:25
**goals** 131:8,10
**goes** 7:16
**going** 5:9 38:17 38:24 39:20 55:1 69:14 74:24 75:8 77:11 78:2 84:14 87:17 89:3 90:5,24 91:4 97:24 98:19 99:13,22 101:11 104:25 106:7,19,25 112:9 113:7,19 114:24,24 115:1,3 128:3 128:13 134:13 136:8,9,13,22 139:9,24 142:12,17,24 153:2 154:19 156:9 164:16 164:20,24 168:24,25 171:23 173:7 176:4 182:11 190:6
**Goldberg** 165:10
**good** 4:14 15:18 15:20 74:10 77:16,20 80:24 94:17 133:4
**Goode** 1:8,9,9 2:19 16:1,3,13 19:16 20:2 25:14 27:11 34:16 36:9 40:23 42:11 44:1,22,24 47:4 51:22 52:4,17 60:1 69:16 73:11,16 75:21 76:3,6 147:13,14,19 151:13,14,18 152:16 167:17 168:4,6,6 169:5 189:18 189:23,24
**Goode's** 147:11
**GOODLEY** 2:6 2:7
**gotten** 22:5 67:12 118:23
**government** 64:1 77:7
**graduated** 9:24
**graduating** 131:25
**grand** 153:11
**great** 26:25 57:21 64:7 95:7
**greater** 57:11 140:16
**green** 102:15
**green-lighted** 175:9
**greenlit** 175:8
**gross** 117:8 124:16 136:2
**group** 3:22 24:4 24:5 31:16 59:21 175:6 179:18
**guardrails** 61:25
**guess** 4:22 5:23 9:16 11:6 13:10 14:10 17:23 18:3 28:18 29:9 48:10 51:4 56:5 58:18 60:21 63:11 67:1 74:15,16 75:18 76:1,13

85:15 87:3 96:1 101:19 105:8,15 107:3 107:20 108:17 118:2 120:13 135:1 137:13 180:5 183:8,21 185:5
**guidance** 12:14 31:13
**guy** 153:10
**guys** 44:11 89:17 182:22 185:6 188:18

**H**

**Hackensack** 2:22
**half** 6:21 57:6 71:17 120:21
**halt** 98:8
**hands** 86:11
**hands-on** 26:11 26:13
**happen** 31:18 88:8 97:19
**happened** 35:5 35:13 64:8 66:14 114:12 168:10 179:8 192:2
**Harbor** 121:16
**harder** 67:1,1,3 67:3,7
**HAYDEN** 2:20
**hazy** 21:1,15 32:15 168:11
**head** 5:18 27:24 45:3 84:7 115:14 116:20 184:5
**headed** 29:3
**heading** 83:3 105:20 115:3
**headings** 107:3
**health** 118:5,17 118:19,22 119:4,6,14 120:8,24 121:7 122:12,17,18 123:7 125:12 132:16 136:4 190:19,21 191:5,11,19 193:14
**hear** 40:25
**heard** 25:7
**heat's** 192:25
**HEAVYWEI...** 1:10
**held** 43:12,13 44:8 93:13,18 95:16,17 178:17
**help** 12:14 42:9 169:16
**helpful** 104:14 104:16,20
**helping** 12:1
**helps** 63:18 65:25
**hereunder** 150:9
**Hess** 1:14 3:4 4:9,14 52:11 165:11 180:22 181:2 188:24
**hey** 35:7
**high** 129:6 159:19,20,21
**high-level** 18:6
**higher** 139:1 140:19
**highest** 9:16
**Hill** 14:6,16
**hire** 107:23 108:9,14,23 109:4 173:1,2
**hired** 169:11
**hirings** 38:1
**hit** 191:3
**hitting** 136:11
**hoc** 171:7
**Hold** 81:2 124:6
**Holdings** 1:9 153:25
**home** 15:16,21 91:3 93:8
**honest** 21:22 60:20 169:2
**honestly** 11:1 61:6 97:24 120:10
**honesty** 109:3
**hope** 65:25 87:22,23 88:7
**hoping** 79:24
**hospital** 191:23 191:24
**hour** 193:3
**hourly** 135:20 135:21
**hours** 37:25 183:2
**housekeeping** 4:22
**Hub** 3:23 156:22 158:25 165:10
**human** 91:22 143:15
**hundred** 92:25 101:9 120:17 131:14
**hybrid** 92:9,12 92:14
**hyphen** 157:19

**I**

**idea** 120:6,18,19 120:22 139:14 172:12
**identification** 75:2 78:5,15 81:24 91:7,12 98:22 99:15 105:3 134:7 149:7 153:16 156:15 165:2 165:13 184:18
**identified** 75:16 99:1 107:5 134:21 152:23
**Identity** 7:10
**III** 75:22
**Illinois** 89:14
**imagine** 102:3
**immediate** 95:13
**impact** 55:16
**impacted** 104:21
**impacting** 89:5
**impair** 6:5
**impartial** 152:17
**important** 89:4
**in-office** 92:3,21 93:4
**in-person** 43:23 44:5
**incentive** 127:24
**include** 124:13 153:8
**included** 104:8 128:18 137:18 137:21 153:6 180:18 191:8
**income** 63:22,23 64:13 65:3 136:2
**increased** 68:16 160:25
**incredible** 64:4 64:5
**indemnification** 154:20 155:4,8
**independent** 146:24 148:19 148:24 151:12 151:16 152:18 152:21 154:24 161:14 162:10 162:24 167:19 169:7,14,16,23 177:8 189:17
**independently** 174:10,13
**INDEX** 3:1
**indicate** 113:23
**indications** 166:13
**indicator** 33:7
**indicators** 53:23
**individual** 19:17 20:21 109:24 129:2 137:15 146:15 159:3 180:2
**individual's** 109:25
**individually** 1:3
**individuals** 1:5 19:15 103:5,13 103:21 107:11 115:17 116:16 117:6,18 118:15,19 123:21 124:20 125:10 129:9 131:7 132:18 137:14 147:14 147:20,23 166:9 174:23 175:10,12,22 179:16 187:25 190:10
**inflation** 64:11 65:4
**information** 8:3 96:22 104:17 111:24 133:14 135:25 136:3 143:21
**informed** 168:14 168:17 169:17
**initiatives** 79:14 79:18,23 80:3 87:16,21
**insert** 35:24
**installed** 166:25 170:5
**institution** 72:3

72:12,14
**institutions** 41:1 72:6 73:7,22
**instructed** 91:2
**insurance** 118:5 118:17,20,23 119:5,14 120:9 120:24 121:7 122:12,17,19 123:8 125:12 132:16 165:20 190:21 191:11 191:19,25 193:14
**insured** 167:5
**intent** 145:2
**interact** 48:6
**interacting** 170:24
**interaction** 170:14,21 189:5,22
**interest** 58:1,15 70:21 71:7,9 151:13 152:9 152:25
**interests** 65:19
**interim** 137:6
**interject** 192:11
**internal** 34:9,10 61:17
**internally** 34:23
**International** 3:23 156:22 159:1 165:10
**interpretation** 169:20 181:6
**interpreting** 186:5
**interrupt** 5:3,14
**introduce** 74:24 78:2 81:20 90:24 91:4 98:16 99:10,12 104:23,25 133:16 134:2 148:22 149:4 153:13 156:9 164:23 184:15
**introduced** 147:7 156:19 163:9 165:8
**inventory** 48:25 49:4 50:24 51:2 54:4 61:10 143:24
**investment** 173:1
**investor** 44:22
**invoice** 3:22,23 153:24 156:22 157:4,9,12 159:1 162:20 163:11,16
**invoiced** 164:4 164:14
**invoking** 179:7
**involve** 59:18 79:20 183:25
**involved** 19:15 23:19 24:16 38:15 40:11,13 40:17,24 41:21 41:25 42:18,19 43:1,3 165:25 168:1
**involvement** 25:15 26:1,2 26:12,12 41:6 42:19 51:14
**issue** 62:12,13 62:14,20 83:15 87:18
**issued** 83:10 124:1
**issues** 17:10 62:8,23 66:3,3 66:6 68:22 69:4,9 70:1,8 80:18 87:19 123:25 171:15 171:17
**issuing** 83:17
**items** 58:13

**J**

**J** 2:3 116:18,21
**JAMES** 2:7
**James@gmla...** 2:9
**January** 1:17 11:25 17:17 32:13 75:23 145:15,22,24
**Jared** 128:2
**Jason** 2:16 188:10 192:18 192:22 193:15
**JCabrera@co...** 2:18
**Jersey** 1:1 2:4 2:22 13:24,25 14:4,16,21,25 90:2,18 148:16 177:22 178:1,1 178:3,8,13 181:11
**job** 38:7 107:9 107:10
**Joe** 19:17 21:18 78:18 189:6
**joined** 27:11
**joining** 156:2
**joke** 11:3
**JR** 2:3
**Juan** 29:1 45:4 128:2
**July** 11:12 27:14
**jumping** 73:20
**June** 70:4 72:1 90:20,25 91:25 92:1,4 93:14 93:14 103:5 112:25 113:24 114:12 115:9 115:18 117:25 118:25 119:3 126:20 136:18 142:15 143:1 146:1 153:7 162:6 172:4 175:8 176:8 177:19 178:9 178:14 180:13 183:14,15 185:2 187:24 189:12 190:24 191:2,6,6,6,7 191:22,23,24 192:2,11 193:22
**Junior** 4:15

**K**

**K** 112:19,24 113:8,13,21 116:20
**K-E-L-L-E-R** 156:13
**Karen** 127:7,11
**Kasavage** 110:5 110:7
**Katherine** 1:21 195:3,14
**Kathy** 97:1
**keep** 57:22 96:8 128:3,6,12 182:14
**Keller** 1:11 2:24 146:15,18,22 146:23 147:8 148:3,12,15,18 148:25 150:19 151:9 156:13 157:19 161:10 162:9,12 163:3 164:4 165:7 166:24 167:6,8 167:18,24 168:9,19 169:11,13,22 170:5,12,14 171:4,11,20 176:9 178:24 179:2,9,15 180:6 184:24 185:1 189:16
**Keller's** 156:2 156:11 165:6 166:21
**Keller-00017** 165:15
**Keller-00149** 184:22
**Kessler** 24:16 161:17,18,19 175:1
**Kevin** 1:14 3:4 4:9,19 114:8 132:10 165:11 166:11 177:3 187:15
**Kevin's** 185:11
**key** 42:3
**KILMARTIN** 2:21 192:17,22
**kind** 5:2 11:2,23 20:3 36:17 38:4,15 63:15 69:8 79:23 85:23 86:5 98:7 107:17 111:22 122:19 176:4 184:6 186:25 189:23
**knew** 12:22 26:20 169:4,5 182:13
**know** 4:23,24 5:11 7:15,15 7:23 8:2,15 12:3,13,25 14:9 15:2,7,19 15:22 16:8,19 18:5,6,8,18,24 19:6 20:1 21:12,13 22:2 22:9,18 23:17 23:19 24:4,5 24:14,17 25:3

25:10 27:9
28:2,8,12,14
28:23 29:4
30:10 31:1,3
31:11 32:14,16
33:3,6,13,19
33:24 35:12
36:6,20 37:22
37:25 38:5,6,7
38:8,12 40:25
43:1 45:3,5,14
45:16 47:7,16
48:17,24 49:4
49:9 51:13,24
53:2,9 54:4,18
55:8,8,15,19
56:1 57:5,5
58:7,10 60:15
60:17 61:8,14
62:11,24 63:2
63:24 64:18
65:6,7,22 66:2
66:13 67:11,20
68:1,2,18 70:1
70:16 71:1,4
71:15 72:7,17
72:24 73:10,23
76:20 77:5,5
77:24 79:20,21
80:10,20 81:9
82:22 84:6,7,8
84:10,11,21
85:15 86:3
87:5,6,15,21
87:22 88:2,6,9
88:11 89:1,23
92:10,21 94:10
95:5 96:5,6
97:13,18,23
98:2 100:20
101:2,8 102:14
104:7,17
105:17 107:15
108:7,20,25
109:5,7 110:7
110:18,19,22
111:12,15,21
111:21,22,23
114:23 118:24
119:25 120:16
121:4 122:2,19
123:5,7,19,25
124:5 125:15
125:17 128:8
129:14,15
131:17,21,22
132:25 133:5
134:10 135:25
136:10 137:22
138:4 139:8,15
139:22 141:16
141:17,18,19
142:8 146:18
147:12 150:18
151:1,8,20
152:2,5,15,19
153:1 154:16
158:2,18
159:13,14
160:23 161:16
162:16,19,22
163:6 164:4
166:7 168:10
168:24 169:8
169:15,18
170:16,18
172:14 173:6,7
173:8,9 174:16
175:2,4 176:1
176:5 178:3
179:14 182:15
182:19 184:3,4
184:6,12 186:8
187:14,16
191:3
**Knowing** 87:15
**knowledge**
46:25 62:22
86:13 88:21
109:23 111:2
114:10 115:17
138:11 148:14
150:22 154:13
154:14 160:11
163:22
**known** 50:10
**KPIs** 18:8 33:4,6
**Kvitko** 12:20,21
12:22 13:1,15
24:14 26:19
27:4,10,16
28:7 29:20
31:12 44:20
93:23 95:24
96:2,16 98:12
102:23 127:14
127:16,17
160:2,9,16
168:2 174:12
174:19 175:15
176:21 185:1
**Kvitko's** 27:5

**L**

**L** 112:17,20
115:1,4
**labeled** 107:4
**labor** 79:23
186:7,9
**land** 12:9
**large** 63:25
**largely** 92:12
**lasting** 76:23
**late** 13:3 15:10
43:25 52:22
62:25 77:1,2
172:23
**Lattman** 28:25
45:4 127:15,16
128:2 138:18
138:20
**lawyer** 180:23
181:3
**lay** 61:22 181:4
**laying** 180:7
**Lead** 157:18
165:20,23
**leaders** 125:15
**leadership** 28:3
34:10 45:22
**leading** 23:25
100:21 173:17
**learn** 167:22
**learning** 11:2,4
**lease** 38:20,22
38:25 39:12,25
**leases** 61:6
**leave** 15:15,19
107:15,17,20
109:8 111:5
145:3
**Lebron** 29:1
45:4 128:2
**led** 66:12 69:25
70:2 93:24
**left** 14:1 15:14
18:21 19:4
20:25 27:13
60:7 133:13
**left-hand** 101:13
105:10
**legal** 19:8
147:18 161:24
173:2 178:16
178:18 179:1
179:12
**lender** 47:23,25
48:2,5 54:9
**lender's** 58:19
**lenders** 47:12,13
47:22 48:7
53:3,10,14,17
53:24 68:14
74:3
**lending** 49:2
56:2,7,11 61:2
71:22
**lengthy** 126:5
**let's** 17:1,6,24
19:2,15,21
21:9 23:3,7
24:21 27:18
28:18,18 30:5
32:18 37:9
40:2 41:4
43:13 44:8,12
44:15 46:22
53:4,17,20
56:4 67:2
68:23 71:20
74:12 75:9
78:8 85:11,12
85:19,20 87:4
88:20 90:20
95:17 96:9
98:12 108:16
119:2,3 120:23
120:25 123:11
125:21 126:12
130:2,22 135:5
138:17 149:3
155:17 185:25
186:17,17,18
193:3
**letter** 28:6 83:8
83:11,17 104:7
112:14 113:16
**letting** 186:10
**level** 9:16 38:3
42:19 61:22
62:2,18 69:13
95:7 126:4
128:12,16
172:15 189:5
189:22
**leverage** 57:3,7
58:5 61:25
**liability** 39:14
160:25
**Liberty** 2:7,16
**light** 102:15
**lights** 181:17,17
**Lillian** 110:17
**limit** 67:19
**limitation** 14:10
**limited** 85:7
156:23
**limits** 36:13
160:25
**line** 48:4,23

49:21,22 50:2 50:5 67:23,25 70:17 128:11 172:18
**lines** 13:11
**link** 45:11
**liquidation** 166:6
**liquidity** 17:10 18:7,15 33:13 62:8,12,13,14 62:20,23 64:23 66:2,3,6 67:9 67:13,17 68:9 68:11,22,25 69:6,13 70:5,8 70:19 74:23 76:5,10 80:8 80:11,16,20 85:3 87:18,19 88:4
**liquidity's** 85:24
**list** 91:18 99:23 100:1 104:3,8 106:15 126:5 128:19,22 130:8 135:10 137:8 138:11
**listed** 9:8 108:17
**lists** 136:15
**litigation** 18:21 19:5,8
**little** 16:24 18:4 21:15 32:14 52:25 63:11,15 63:16 71:13,16 86:12 88:10 92:13 100:14 105:14 120:5 128:5 140:16 142:6 145:10 166:2 172:8 186:5,21 190:17
**Liu** 108:17 179:25
**live** 13:21 14:5
**lived** 13:25 14:15
**LLC** 1:8,9,10 2:6 16:2 19:16 75:23 153:25
**loan** 55:15 67:24
**located** 14:20 89:12 90:17
**location** 14:17 15:7 44:9 92:8
**lockbox** 49:17 49:18 172:16
**long** 27:9 60:7 150:9 180:4
**long-term** 89:6
**longer** 116:6 172:9
**look** 28:18 77:13 119:2 129:1 140:25 141:1 157:15 164:10 187:19
**looked** 140:8 141:4
**looking** 72:15 128:25 137:2,9 137:13 140:11 140:22 142:17 161:8 163:15 163:18 185:20 186:2,11
**looks** 75:22 78:17,22 80:5 91:17 100:1 101:15 104:4 106:5,15 108:5 111:25 112:19 113:15 116:25 129:3,5 135:8 142:23 143:3,6 144:16 154:1 156:21 158:1 164:25 165:17 166:16 187:2
**loss** 144:2 188:4
190:13
**lot** 64:13 70:1 80:15 82:18,24 86:18 97:12 110:16 123:15 131:14 162:1 192:23
**low** 62:17 63:22 63:23
**lower** 68:2,3
**lunch** 132:24

**M**

**M** 105:17 117:14 118:14 121:5
**M&A** 166:5
**Main** 2:22
**maintain** 57:9 61:8
**maintained** 158:9
**maintaining** 89:2
**majority** 83:13
**making** 24:23 25:1 41:8 57:22 69:4,14 161:2,4 181:5
**Manage** 88:12
**management** 10:4 24:25 25:3 27:23 29:5,5,9 33:25 34:3,7,10 36:9 36:24 37:11 39:5,9,10 45:13 59:20,25 60:1,4,9,10,12 60:15 127:23 171:10
**management-l...** 38:5
**manager** 143:13 143:24
**managers** 123:15
**managing** 87:6
**mandatory** 36:25 37:17
**March** 11:10 17:17,20 18:22 41:24 67:11 69:2,11 76:21 77:1 81:18
**marching** 152:3
**margin** 88:3
**marital** 119:19
**marked** 75:2 78:5 81:24 91:7 98:22 99:15 105:3 134:7 149:7 153:16 156:15 165:2 184:18
**market** 2:8,17 76:15,15
**marketing** 33:12 45:17 79:22 144:6
**Marlton** 2:4
**married** 119:18 119:25 120:1
**Maryland** 89:14
**Masse** 140:1,2
**match** 121:10,13 122:3,8,14 123:10 136:4
**matching** 122:9
**materials** 8:12 86:24
**matter** 4:17 39:22 195:8
**matters** 30:12
**maximum** 121:23 131:18 131:25
**MBA** 9:21,23 10:16
**MCCARTHY** 2:6
**mean** 5:13 23:6 25:11 31:4,11 31:25 33:5 41:17 48:3 53:19 59:4 74:17 76:22,22 86:18 92:24 93:5,24 95:10 107:4 112:24 115:7 122:23 163:5 168:23 175:24 182:2 182:20 185:19
**meaningful** 39:16
**means** 47:16 107:14,15 167:11,13 185:17
**meant** 111:13
**measure** 57:11 58:4
**medication** 6:4 6:9
**meet** 57:5 148:3 148:11 173:14
**meeting** 20:5 32:1,5,9,11 35:12,13,16 43:23 44:1,4,5 44:12,16 45:10 47:19 69:1 93:13,17,22 94:2,5 95:16 96:1,2 98:4
**meetings** 16:21 17:3,5 20:6 21:13,17 22:2 22:6,16 23:1,4 23:18,21 24:4 33:2,3 42:1,7 43:11,16,18 44:7,15,25 45:2,6,9 46:24 47:6,13 68:21 170:10 171:4,7
**member** 46:5,7

46:10,15 150:20 151:5 154:8,12 170:6 189:17 191:3
**members** 46:3 46:13,18,18 47:17 98:12 148:20 150:18 150:23 152:16 154:25 155:4 155:10,22 170:3
**memory** 119:23
**memory's** 21:1 21:15 32:14
**mentioned** 26:19 43:5 45:23,24,25 47:21 57:24 66:4 96:10 120:11 190:10
**merchandise** 37:24 86:15
**merchandising** 28:16
**merchant** 28:2 28:15 29:1 45:3
**merchants** 128:17
**met** 31:21,22,23 148:13 170:2
**metrics** 18:8 53:22
**Michael** 127:3
**Michigan** 89:14
**micromanage...** 25:8,15 26:2
**mid-** 62:25 172:23
**mid-April** 69:21
**mid-March** 15:14
**mid-May** 150:1
**midwest** 15:23
**Mike** 12:20,21 12:22 13:1 24:14 26:19 27:16 28:7,24 31:12 44:20 94:14 95:24 101:8 102:4,23 102:25 103:1 127:14,16,17 160:2,9 161:16 168:1 169:8 170:16,17 174:12,19,25 175:15 184:25 185:21
**Mike/Kevin** 79:13
**million** 85:16,17 174:3,5 186:9
**Mills** 1:8 2:14 4:18 6:25 7:2 8:17 11:8,11 11:16,22,24 12:10 14:2,17 15:25 16:8,14 21:7,10,25 23:24 27:5,6 27:10,13,18 34:24 41:7 43:7 47:22 49:14,16,20 50:18 51:6,16 51:18,22 52:6 53:4,19 56:4 58:20 59:25 60:9,11 61:23 62:7,22 63:22 65:2 66:6,12 68:23 69:9,18 70:9,22 71:22 76:9,9,16 77:1 77:4,22 78:14 79:1,6 80:8 83:14 84:1,20 85:20 86:2 87:17 89:9 90:7,14,16,20 92:7 99:4 105:11 106:14 112:6 116:14 117:4 121:7,24 145:1 146:13 146:19,24 148:25 151:18 153:25,25 154:7,11,23 155:2,13,14 157:12 158:5,9 160:12,15,18 160:21 175:19 177:10,14,17 177:21,25 178:7,12 180:11,16 182:3,12 183:12 186:4 187:25 190:7 190:22
**Mills'** 33:25 34:3,7 68:8 79:8 116:5 171:10 181:23
**Mills's** 8:12
**mind** 25:21 63:14 103:13 147:25 182:15
**MINGIONE** 2:11 26:23 37:3 52:7 55:2 96:9,17 97:4,7 100:7 102:17 103:7,15,23 104:10 113:2 114:2,13 115:11,22 116:8 126:9 132:22 145:17 145:21 146:4 149:14 162:13 176:14,23 177:3 180:19 180:22 181:2 181:16 188:17 192:25 193:7 193:18
**minute** 71:25 157:16 164:18 164:21
**minutes** 182:21 187:12,18,19
**missed** 138:19
**mistake** 57:22
**mistaken** 71:19
**moment** 81:16 97:20 190:9
**Mondays** 35:8
**money** 42:11 50:17 64:4 67:2 77:19,21 130:24 172:17 172:19
**Monique** 128:9 128:10
**Monroe** 47:15 47:18,20 48:1 48:9,13 49:9 53:3,18 54:9 54:14 57:17 61:2 63:6 65:11,23 68:15 69:17 70:23 72:10,11,17 73:12,17 84:2
**month** 32:22,25 32:25 60:18 61:17 117:20 117:21,24,25 118:25 124:22 150:14,24 151:6,10 153:11 190:24 191:12,14,16 191:20
**month's** 191:14
**monthly** 17:14 17:19,21,24 54:11,16 55:1 61:16 120:23 123:20 150:11 150:13 163:7
**months** 11:20 12:4,16 32:1,3 32:20 35:12,16
**Morgan** 2:2 4:16
**morning** 4:14 189:3,21
**mortgage** 48:14
**motoring** 68:17
**mouth** 68:6
**move** 15:16,21
**moved** 14:1,2 15:5,8
**movies** 7:10
**multiple** 84:11 170:19

**N**

**name** 4:14 46:16 106:9,10 107:9 107:9 109:7 134:13 135:8 136:22,23 161:25 179:23
**named** 16:17 19:17 46:18 166:9 175:11 175:22
**naturally** 38:14
**nature** 22:17 36:7,19,21 38:13 39:18 54:5 61:8 80:1 84:8 169:19
**NDR016** 91:13
**NDR031** 99:19
**NDR032** 99:19
**necessarily** 22:11 33:19 73:4
**necessary** 39:11 144:25 155:9 162:11 169:10 169:21
**need** 5:20 14:9

30:1,8 37:17 37:20 38:9,10 40:4 126:16,16 169:2,3,6
**needed** 12:14 30:17 35:14 102:10 151:11 151:16 152:17 171:8 172:18
**needs** 62:16 133:1,8
**negative** 56:20 60:24 61:1
**neglect** 133:8
**neglected** 14:7
**negligible** 70:18
**negotiate** 88:15
**negotiation** 161:13
**negotiations** 88:19
**neither** 141:14
**never** 122:8 138:4 145:7
**new** 1:1 2:4,12 2:22 13:24 14:4,16,20,24 30:10 38:19 44:2 72:13,14 72:25 86:11,11 89:13 90:2,18 133:16 148:16 177:22,25 178:1,2,8,13 181:11
**niche** 80:1
**nine** 71:17
**nodding** 115:14
**nods** 5:18
**NOELL** 1:2
**noncash** 58:13 59:14
**nonperforming** 30:5 39:20
**nonverbal** 5:17
**Nope** 140:13
**normal** 37:25 60:5 86:5 118:25 187:1 193:23
**normally** 38:22 47:6
**North** 2:3
**Northeast** 156:22
**Notary** 1:23 195:4,15
**notes** 48:16 49:9 65:16 74:12 187:19 190:17 192:24 195:7
**notice** 1:15 8:24 9:3,8,13 191:22
**noticed** 141:3
**November** 32:16
**number** 3:11 9:4 11:19 12:16 37:20 66:21 68:2 75:7 78:15 82:9,16 82:23,25 91:12 91:12 93:19 100:5 105:8,15 105:21 116:24 133:16,18 134:5,12,14,18 138:17 140:14 140:18 142:15 149:5,10 150:6 156:12,19 158:18 164:25 165:9,14 173:25 179:19 179:21 184:16 184:21
**numbers** 68:18 68:20 82:3 99:1 134:16
**NY** 2:12

**O**

**o'clock** 95:21
**O'Connor** 2:15 161:23
**oath** 6:13
**object** 5:11
**objected** 23:16
**objection** 23:10 25:17 26:4,16 35:20,24 37:3 41:9 42:22 52:7 55:2 96:17 97:4 100:7 103:7,15 103:23 113:2 114:2,13 115:11,22 116:8 145:17 146:4 162:13 176:14,23 180:19 181:1 192:5 193:18
**objections** 4:5
**obligate** 38:25
**obligated** 117:23
**obligation** 116:5 177:18 182:13
**obligations** 177:15 178:8 180:12,17 182:6
**observe** 44:24 45:1
**observer** 47:15
**observers** 44:23 45:5,7 47:8,11
**observing** 47:18
**obviously** 71:1 77:11 131:13
**occasional** 17:4
**occupied** 107:11
**occur** 32:2,11 168:13
**occurred** 83:21 93:18 176:8 178:12
**October** 161:6
**Oddi** 16:17,25 17:8,25 18:12 20:1,3,12,19 21:13,19,24 22:13,20 23:19 23:24 24:7,12 24:22 30:22 31:9 35:17 41:17,21 42:3 42:17 43:2 44:19 45:24 46:4 147:24 189:6
**Oddi's** 26:2,11 41:6
**offered** 137:4 138:2 190:22
**office** 14:20 44:2 90:2,11,17,20 92:10,14,18 93:7 105:11,25 106:14,16 109:16 115:10 115:20 117:13 122:15 123:11 125:10 126:2 132:18 134:22 142:14 144:17 144:19 145:6,7 148:16 154:2 169:1 184:1 185:14,18,24 190:20
**officer** 11:7 27:25 28:1,8,9 28:10,16 159:25 160:2 160:19 174:16
**officers** 28:15 158:21 161:1
**offices** 100:2 104:4,9
**Oh** 129:19
**Ohio** 10:9,10,13 13:8,8,22 14:3 15:17,22 89:14 188:25
**okay** 4:19,21 6:3 6:8,17,20,22 7:1,4,7 8:15,19 8:24 9:3,11,15 9:19 10:5,12 10:15,22,25 11:6,18 12:5,9 12:21,24 13:4 13:21 14:7,14 14:19,23 15:4 15:12,15,25 16:7,11,16,23 17:6,12,22 18:10,20 19:10 19:13,21 20:8 20:14,21 21:4 21:20,23 22:8 22:12,24 24:21 25:13,23 27:9 29:12,16,20,24 30:4 31:24 32:17,21 33:16 33:21 34:2,15 34:19 35:4,11 36:1,5,12 38:24 39:4,8 40:2,7,18,21 41:4 42:17 43:5,11,20,22 44:7,11 46:9 46:12,22 47:8 47:20 48:9,14 50:8,11,14 51:1 52:24 53:1,8,17 54:12,25 55:17 56:1,19,23 57:20 59:1 60:3,21 62:10 62:21 63:7,20 65:21,24 66:15 66:21,25 67:16 68:13 69:5,8 70:5 74:1,6,10 74:24 75:15,18

76:11 78:2,10 78:17,19,25 79:11 80:4,7 80:12 81:2,14 82:6,7,13 83:4 83:6,19 87:3 87:14 89:11,17 89:25 90:12,16 91:16,23 92:7 93:3,17,22 94:1,4,20 95:9 95:21,24 96:23 98:11,16,18 99:3 100:4,15 100:22 101:2 101:11,19,24 103:3,12 104:3 104:7,16,22 105:1 106:2,7 106:21,25 107:8,13 108:22 109:25 111:8,19,23 112:3,8,23 113:12 114:19 114:22 115:2 115:16 116:13 117:9,12 118:7 119:12 120:6 120:11,22 121:4 122:7 124:25 125:8 125:19,24 126:12,18 127:3,14,14 130:2,10,21 131:4,20 132:2 132:10,14,21 133:10 134:25 135:5,19 136:9 136:20 137:12 137:20 138:6,9 138:15,25 139:24 141:21 142:8,12,23 143:20 144:19 144:22 145:5 146:11,18 147:7,16,19,22 148:11,14,18 148:22 149:25 150:5,17,22 151:1,8 153:10 153:13,21 154:7,11,15 155:12,20,25 156:21 157:11 157:15 158:1,4 158:13,23 159:8,11,24 160:5,11,15,23 161:9,22 162:4 162:7 163:19 164:15,23 165:8,19 166:10,23 167:3,15,16,21 169:22 170:5,9 171:3,19 172:10 173:24 174:6,12,22 175:7,19 176:2 176:12 177:13 177:17,21 178:11,17,25 179:6,13,13 180:10 181:14 183:13,18 184:15,24 185:4,10 186:13,20,20 186:21,22 187:3,8,20 188:7,19 189:10

**once** 5:7 35:4 52:3 64:7,16 77:9 98:6 159:3,13 164:9

**One-on-one** 179:17

**ongoing** 183:19

**only/solely** 167:6

**opened** 38:19

**openings** 36:17 38:13 45:18,19 79:20

**operate** 92:9 144:25 145:4

**operating** 28:8 28:10

**operation** 144:16

**operational** 33:13

**operations** 45:18 65:8 70:13 90:7

**opportunity** 96:1

**opposed** 72:25

**opposite** 64:8

**option** 59:16

**options** 38:23 71:23 72:8,20 74:2

**Oral** 1:14

**order** 26:25 30:9 102:11 113:10 173:12 174:22

**ordered** 113:12

**organize** 74:11

**original** 107:23 108:22

**outside** 23:21 83:18 125:11 132:14,15 163:25 178:11 178:18 179:2 179:18

**overall** 79:21

**overhead** 88:12 88:24 173:7 184:11

**oversight** 25:2 169:15

**owed** 42:11 184:10

**owner** 52:3 183:9

**P**

**P.C** 2:2,20 4:16

**p.m** 194:4

**package** 20:4

**Padgett** 129:3

**PAGE** 3:2,11

**paid** 59:21,25 60:4 117:21 118:24 119:23 122:25 125:17 125:20 139:10 151:9 154:7,11 157:7,12,13 188:6 192:15

**panic** 89:1

**paragraph** 83:1 83:19 150:7

**paragraphs** 150:6

**parameters** 142:4

**Pardon** 15:1

**part** 41:18 42:3 88:7 92:24 125:14,15 127:22 129:10 129:22 130:8 136:16 137:4 148:2 161:12 173:19 190:25

**partial** 164:2

**participants** 189:18

**participate** 19:1 47:12

**participated** 101:25 102:2 123:4

**participating** 23:25

**participation** 45:21 188:10

**particular** 23:20 191:21

**particulars** 169:9

**parties** 4:3 151:13 152:9 152:12,15,24 175:4

**Partners** 1:8 16:2,4,13 19:16 25:14 34:16 36:10 40:23 46:15 47:4 51:22 52:4 60:1 75:21 76:4 151:14,15,18 167:17

**Partners'** 44:2

**party** 152:19

**PASHMAN** 2:20

**paths** 152:3

**pause** 5:10

**pay** 49:18 50:1 60:11 61:5,6,7 72:12 84:19 87:5 116:5 117:5,17,24 119:8,13 150:11 172:17 180:18 181:22 182:8,12,13 187:25 188:4 191:12

**payable** 142:25 184:9

**payables** 47:25

**paydown** 49:23

**paying** 60:8 70:22 71:9 85:22 158:15 173:16,16

**payments** 65:15 85:21

**payout** 132:7

**payroll** 50:3 69:1,4,8,14,24 112:6 117:4 141:8 144:9,10 173:13,21 188:3 190:12 192:13,14
**pending** 14:11
**Pennsauken** 14:20,24 44:9 90:2,18,23 92:8 109:17 115:21 148:16
**Pennsylvania** 2:8,17 89:13
**people** 5:2,6 36:10 95:6 104:14,21 107:5 110:25 114:11,20 115:8 116:3,4 125:7,14 126:5 126:14,17,19 128:22,23 129:2,8 130:7 130:23 135:10 136:15 142:13 142:16,18,20 142:20,25 143:7 144:2,12 144:17,23 145:14,25 153:6 175:25 175:25 176:1,3 176:3,7 179:20 180:7 186:10 187:23 189:24
**people's** 76:14
**percent** 92:23 93:1 101:10 117:11 119:8 120:14,15,15 120:19,19,20 121:18,18,19 122:3 130:17 131:1,3,13,15 131:17,18,18 131:23 132:1
**percentage** 63:25 71:1 119:24 120:4 120:12,13 121:22 131:12
**percentages** 120:14
**percents** 121:20
**perform** 144:24
**performance** 18:2,4,9 33:7 33:14 61:23 64:6,18,22
**period** 9:22 16:6 21:3 24:15 26:15 27:19 28:17,21,25 37:5 41:13,19 41:25 54:12,15 60:7 63:6 76:19,20,23 77:7,20,20 111:15 117:22 137:6 141:16 188:3 190:12
**periodic** 53:21
**periods** 121:15
**permanently** 12:17
**permitted** 59:19 59:23,23 96:16
**person** 44:8 107:19 108:5 108:17,20 109:19 110:5 112:23 120:25 129:4,25 130:3 139:25,25 144:6 148:12 159:9 175:4 179:23
**person/executi...** 167:5
**personal** 8:20
**personally** 19:5 182:3
**personnel** 123:17 143:16
**persons** 113:24
**pertains** 20:17 76:25
**phase** 69:9 77:3 77:10,12,16,17 133:2
**phases** 77:14
**Philadelphia** 2:8 2:17
**phrase** 163:1
**phrases** 63:9
**physically** 90:22
**piece** 123:1
**PKF** 161:20,22 161:23,23
**place** 2:7,16 21:6 51:7 67:4 68:5,7 69:22 74:17,18 89:19 89:22 155:21 158:20 160:7 160:24 169:24
**plaintiff** 2:5 99:18
**plaintiffs** 1:6 4:17
**plaintiffs'** 189:4
**plan** 79:1,6,8 84:24 87:15 117:24 119:24 120:2 121:8,16 130:15,21 185:12 191:3 192:1
**planned** 171:3 171:24 172:2
**planning** 143:13 172:6 185:17
**Plaza** 2:21
**please** 4:20 96:22
**pledge** 75:12,20
**pledged** 48:25
**plunged** 64:9
**plus** 57:13 124:21
**PNC** 71:15
**point** 14:8 21:2 52:13 62:7 63:3 69:12 71:20 74:10 80:7,17 132:23 168:18 170:9 170:10,12 172:23
**points** 166:14,15 167:4
**policies** 158:9,10 159:2,3,11,12 161:3
**policy** 155:5,7 155:14,16,20 155:25 157:17 157:22 158:6 158:14,19 159:4,6,8 160:6,13,16,19 160:24 161:3,7 161:10 162:11 162:18 163:8 165:20,24 166:1,23
**pool** 127:23 129:10 130:11 130:12,23 131:4,7
**pop** 126:13 133:20
**popping** 65:10
**PortCo** 16:3
**portfolio** 16:1
**portion** 77:24 117:19 119:11 123:9 163:21
**position** 11:15 12:10 13:19 15:20 26:21 27:6 29:16 53:15 61:9 126:24,25 127:17 137:7 137:10 138:3 151:2
**positions** 27:18 27:23 28:3 130:14,16
**positive** 56:20 56:23 57:24 60:23
**possibility** 182:15
**possible** 33:17
**Post-COVID** 43:15,17 44:12 44:14
**potential** 166:6 171:12 179:16
**potentially** 72:17
**PowerPoint** 45:11
**pre** 45:11 119:3
**pre-COVID** 43:24 44:8 64:10,14
**precarious** 67:12
**predecessor** 27:20,22 44:20 46:1 51:13 72:4 73:5
**premium** 70:24 71:4,13,16 119:9 120:24 120:24 123:9 158:14 159:20 166:13
**premiums** 159:15 191:4 191:13,15
**preparation** 8:9 137:24 171:14
**prepare** 7:18 173:3

**prepared** 9:11 101:3
**preparing** 97:22 152:5
**present** 31:2 40:25 47:4,13 54:13 94:1
**presentation** 33:12 45:12
**presentations** 163:7
**presented** 100:11 163:14
**presenters** 45:8
**presenting** 79:14
**pressure's** 192:21
**presume** 95:19
**pretty** 55:7,12 64:19 95:3 164:12
**prevent** 6:9
**prevention** 144:2
**previous** 52:3 154:10 159:6 192:12
**previously** 12:12 51:8 109:12
**primarily** 12:2
**principal** 65:15 65:18
**prior** 11:10,20 12:22 16:7 26:20 60:13 69:3 74:8 82:14 84:13 90:22 125:24 133:24 138:1 150:19 158:6 158:20,25 166:15 169:22 170:10,21 177:18 178:9 178:14 180:13 183:14,15 184:13
**private** 25:2,5 59:21
**privilege** 179:8
**privileged** 8:2 94:22 179:10
**probably** 17:18 18:18 27:14 43:2,24 44:6 44:23 60:12 62:25 86:2,3 96:6 101:22 102:4 112:1,4 116:18 133:3 148:4 157:1 159:18 172:7 186:2 190:18
**problems** 68:25
**process** 12:2 40:14 86:5 161:21
**processed** 192:13
**produced** 75:6 78:14 82:4 91:11 98:18 99:18 105:7 133:19 153:20 156:10 165:6 184:22
**producing** 19:2
**product** 83:13 83:14 86:7,11
**professional** 1:23 163:25 195:4
**profit** 58:10,11 58:12,16
**profitability** 18:8 70:12 130:20
**program** 9:21 10:17 125:16 128:18 129:23 190:21
**programs** 118:23 122:19
**prompted** 33:16
**pronouns** 33:18
**proper** 78:23
**proposal** 166:12
**prorated** 150:12 150:14
**provide** 53:20 96:21 166:7
**provided** 8:25 48:10,13,22 49:5 53:25 83:8 134:3 155:4
**providing** 77:8 86:15
**provision** 181:12
**proximity** 89:23
**PTO** 122:21
**Public** 1:25 195:5,15
**published** 102:6
**pull** 73:2 104:24 138:17 153:20 156:5 164:19
**pulling** 19:6 77:25
**purpose** 49:12 173:17
**purposes** 179:7
**pursuant** 1:15
**purview** 23:21
**pushing** 173:22 173:23
**put** 22:2,3 33:11 68:5 69:21 74:16,18,20 76:4 82:2,3 112:1 133:17 133:22 164:16 166:11
**putting** 73:16,17

**Q**

**Q1** 32:8,11 68:24 69:10 88:20 189:6
**Q2** 24:20 32:8 68:24 69:10 189:7,10,24
**Q3** 32:8
**Q4** 32:8
**qualify** 62:20
**quarter** 17:7,13 17:16 18:11 20:15,16 22:14 22:21 25:23,24 25:25 26:14 28:19,20 32:2 32:6 41:5,15 41:22 42:20,20 42:25 43:2,14 46:23 47:1 53:6 85:13,18 85:20 86:16,17 89:8 90:12 155:18
**quarterly** 31:23 31:25 33:2 35:13 43:12 60:6 61:18 132:12 170:3 170:11,25
**quarters** 87:7 189:13
**question** 4:6 5:10,12 8:2 14:11,12 19:11 20:15 21:5 22:19 23:11 31:6 35:25 37:5 73:12 87:9 90:6 96:12,24 97:2 102:22 103:19 136:25 137:22 151:22 180:5 182:25 193:13
**questionable** 69:15
**questions** 16:5 20:9 68:21 94:18 96:3,4 99:24 100:14 111:9 141:1 187:14,15,17 188:9,11 189:5 192:18 193:3,8
**quick** 189:1
**quite** 15:17

**R**

**raise** 110:21
**raises** 141:16
**range** 85:16 142:6
**rate** 71:3,7,9 135:21
**rates** 49:3 70:21 70:25 71:1,5
**ratio** 57:4 61:4
**ratios** 57:3,9
**reached** 12:19
**read** 82:25 94:15,16,21 95:1,24 97:1,3 100:15 186:21
**reading** 4:3
**ready** 173:10
**real** 88:18
**really** 4:24 11:1 20:1 21:21 31:10 35:15 36:20 46:4 54:19 72:18 87:1 109:2,9 123:14 162:21 169:2 171:22 183:1
**reason** 55:1 140:22
**reasonable** 89:23
**reasons** 15:24
**recall** 6:5 9:5 17:20,22 19:4

19:5 21:14 22:3 34:18 41:20 43:22 44:1 47:2,9,11 47:16 60:25 62:3 71:8,12 72:6 79:4,17 80:2,19 85:11 86:18,21 87:17 87:20 88:17,18 94:4,25 95:19 98:6,15 101:5 120:10 121:1 121:13 129:13 129:17 158:13 158:15 161:2,6 164:2 167:20 168:2 172:20 178:15,20 180:9 184:3
**recap** 72:23
**recapitalization** 72:22,24 73:9 73:11
**receipts** 49:24
**receivables** 51:2 54:5
**receive** 9:19 118:4,16,19 123:11 151:5
**received** 9:18 103:21 119:4 122:16 125:11 140:20 150:23 165:18
**receiving** 132:19
**Recess** 74:13 133:11 187:21
**recollection** 33:1 35:10 156:4
**record** 5:6 26:23 27:1 33:23 62:11 75:7 97:3 156:12
**record-high** 65:4
**recorded** 5:18
**recruited** 13:15 26:22 27:4
**reduce** 173:23
**reduction** 3:17 95:10,11,12,14 99:5 101:3 116:2 136:16 185:12,17,23
**reference** 55:19
**referenced** 77:19 124:20
**references** 185:5
**referral** 147:17
**referring** 55:13 55:24 63:12,13 79:9 95:13 133:24 163:11 178:4 179:11 185:22 189:25
**refinance** 51:15 72:3,6,9,13,21
**refinanced** 40:22 51:9 52:13,20
**refinancing** 36:19 40:3 72:16 73:1,6 73:22 74:2
**reflect** 106:12 186:24
**reflecting** 124:2
**refund** 164:2
**refunded** 163:21
**refunds** 164:1
**regarding** 167:18
**regardless** 119:1 190:24
**regroup** 187:13
**regular** 16:20,23 19:23 22:2 58:18
**regularly** 16:16 48:7 170:18
**rehired** 188:2,4
190:11 192:14
**related** 57:3 59:14 171:13
**relates** 77:3
**relationship** 50:8 51:5 52:1 52:5
**relative** 129:7
**relay** 25:4
**relied** 178:20
**relocate** 13:22
**relying** 70:14
**remained** 115:8 126:15 128:24 144:23
**remaining** 39:24 112:17 113:17 114:23 115:19 142:16,18,20 142:25 143:7 143:13,16,22 143:25 144:7 144:10,12,17
**remains** 150:10
**remember** 21:21 33:17 46:16 65:13 70:25 71:3 76:6 81:16,17 85:14 94:6 95:2 98:9 100:23 116:19 121:3 124:10 125:4 128:8 147:5 150:2 157:1,9 158:17 161:4 163:23 165:15 169:7 174:4 189:7
**reminder** 177:4
**remote** 43:16,18 92:23 93:1
**rendered** 150:8
**renegotiate** 88:15
**renegotiation** 63:5
**renewal** 38:23 161:5
**renewals** 161:5
**rent** 59:15,16 64:12 84:20 173:13
**rents** 61:5,7
**repeat** 25:20 114:7 145:11 145:25
**rephrase** 37:7 37:12 52:10 102:22
**replaced** 167:24 168:9,18
**report** 43:8 54:3 142:9
**reported** 55:20 103:1 124:15 124:24 139:16
**reporter** 1:23 4:25 5:6 23:9 133:1 195:4
**reporting** 61:15
**reports** 53:21 54:1,2,8,13 142:7
**represent** 4:16 105:24 109:10 138:5 151:12 152:9,22,24 153:2
**representative** 8:17
**Representing** 2:5,13,19,24
**represents** 109:1 110:19,24
**request** 49:20 50:4 55:5 173:20
**requested** 65:16
**requests** 18:25
**required** 53:20 53:24 54:7,9 54:11 92:17
**requirement** 62:2 181:22
**requirements** 61:5,11,15 161:14 173:14
**Resale** 88:17
**reserved** 4:6
**reserves** 69:22 74:16,18,21
**resigned** 147:14 147:20,23 148:20 151:15 164:10 189:19 190:1,3
**resigning** 167:23 168:5,7,15 169:5
**resolve** 87:18
**resources** 91:22 143:15
**respect** 19:2 21:6
**respective** 4:3
**responded** 96:6
**response** 5:21 5:23 63:7
**responsible** 146:8
**restate** 181:1
**restricted** 80:13
**restructure** 42:12
**restructured** 162:2
**restructuring** 161:25
**result** 83:21 87:2 142:4
**resulted** 66:16 116:4
**retailer** 13:11 84:21
**retainer** 154:4,8 154:12 163:16 163:20,21 164:5

**retainers** 163:24
**retroactive** 192:15
**revenue** 39:15
**review** 8:8,13 30:13 34:17 35:5 41:2
**reviewed** 9:7
**reviews** 22:9
**revolver** 48:5,13 48:18,21 49:13 49:13 50:14 70:10,17
**revolving** 48:10 48:23 50:5 51:18 52:18 54:8 67:19 69:22 70:17 72:16,19
**Rick** 51:23 52:2 52:15
**rid** 134:10
**RIF** 95:4,9 100:5 101:12 102:1 112:10 137:4,15,16 138:2,23 139:2 171:22,24,25 172:2,3,4,6,12 173:18,19 186:12,19,25 187:4,7 190:11 190:25 191:8 191:22 193:20
**RIFs** 3:19,20 134:15
**right** 4:21 7:10 10:15 13:19 14:7,15 16:2 18:24 20:3 25:1 26:22 27:14 28:1,7 28:23 29:6,7 29:18 30:15,19 30:25 32:3,9 32:10,22 33:7 34:21,24 36:14 36:16 37:9,23 38:3,8,12 39:2 39:22,23 40:25 43:6,9 47:21 48:11,15,19 49:17 50:6,14 50:22 51:19 52:9,13,19 53:11 56:7,8 56:21 58:1,11 60:1,25 62:18 64:14,25 66:17 66:23 67:4,14 67:18 68:4,13 68:19 69:15 70:10,15,19 71:5 72:1,14 72:21,25 73:2 73:7 74:19 75:10 76:6,7 76:12,16 77:8 77:17 79:2,23 80:5,22 81:5,6 81:20 82:8,21 83:8,22 84:14 84:17,19,23,24 85:4,9 86:8,11 86:19 87:25 89:3 90:2,18 91:18,24 92:1 92:17,18,20,22 93:11 94:7,14 94:15 95:10,22 95:23 97:14,19 99:4,12,24 100:11,25 101:12,17,24 102:12 103:6 105:6 106:9 107:6,8,20,21 108:11 109:12 109:14,17,21 110:1,3,10,17 111:4,19 112:14,17,21 113:1 116:7 117:3,3,20 119:2,2,5,12 119:18 122:4 122:11,11 123:2,2,22 124:8,10,15,16 124:18,18 125:3 127:18 127:19,24,25 128:21 130:10 131:12,15,16 131:16 132:3,5 133:22 134:1 134:23 136:7 136:10,12,16 137:5,9,12,18 138:15 139:6 139:11,12 140:10 142:2 142:12 143:9 143:10,18 144:6,11 145:5 145:15,16 146:2 147:4,6 147:20 148:20 150:1,7,20 151:2 152:2,10 152:14,17,25 153:3 154:2,5 154:16 155:6 155:14,23 156:2,5 157:11 158:2,3,6,21 159:22 160:7,9 161:8 162:21 163:7,20 164:8 164:22,23 165:7 166:18 167:1,6,9,10 169:25 170:3,7 170:22 171:1 172:16,19 174:4,6,9,19 175:4,16,17 180:2,14,18 181:24 182:24 183:4,4,20 184:10,25 185:8 186:25 187:10 188:1 189:19 192:3 193:2 194:1
**right-hand** 75:17 78:16 165:14
**rinse** 86:1
**Robin** 127:9
**role** 11:21 12:15 12:22,25 74:4
**ROME** 2:11
**Rooks** 2:2,3 3:6 4:13,15,16 23:12 25:19 26:9,18 27:3 36:4 37:7,8 41:14 43:4 52:23 55:10 74:14 75:4 78:7 82:1 91:9 96:14,25 97:5 98:3,24 99:17 100:12 102:21 103:11,20 104:2,15 105:5 113:6 114:6,18 115:13 116:1 116:12 126:11 133:3,7,12 134:9 145:19 145:23 146:7 149:9,18 153:18 156:17 162:25 165:4 176:20 177:7 180:25 181:7,9 181:20 184:20 187:22 188:8 192:5 193:12 194:1
**rope** 87:5,10
**Rosa** 91:16,20 101:7,20,23 102:4,7,24 103:1 112:1 142:11
**Rosario** 91:16 91:20
**ROSSI** 1:2
**Roster** 105:11
**roughly** 85:18 90:23 117:1,2 117:11,11 120:7
**Route** 2:3
**row** 106:25 107:2,3 113:16 113:20,21 115:2,3,4
**rows** 106:19,21 106:24
**rule** 93:2
**run** 139:20 141:10,11,22
**runs** 50:3
**Rutgers** 10:20
**Ryan** 29:2 45:4

S

**safe** 71:14 93:9 121:16
**salaries** 124:17 129:1,7
**salary** 3:20 116:6 117:8 124:8,9,10,12 124:21 125:13 129:3,5,18 130:17 131:2,3 131:19 133:14 134:15 135:2 135:15,16,17 135:22 137:13 138:21,21,22 139:1,13,16 140:4,12,15 174:2
**sale** 27:13 42:3,4

42:9,13 60:8 60:13 74:7,9 164:11 171:12
**sales** 18:7 33:12 64:6,18 65:7 66:10 87:24 88:5,13 144:12
**Sam** 184:13 185:22
**Sammy** 185:6,7 185:13
**save** 186:7,9
**savings** 79:24 116:14 118:10 174:1
**saw** 64:21 67:8 100:19,24 111:11 115:14 136:17 157:2 173:24
**saying** 24:11 50:12 65:10 94:12 104:19 141:21 186:14
**says** 75:19,21 79:13 82:9 91:23,25 92:3 93:4 99:4,5,19 105:10,20,20 106:9 107:2,23 108:9,22 110:9 112:17 117:15 134:15,20 139:3,4 150:8 157:17,19 166:11 167:4,5 185:11
**scale** 131:21,25
**scenario** 85:23
**scenarios** 38:16 41:3
**screen** 75:9 78:9 78:9 98:17
**script** 94:15,20 94:21,24 95:25 97:11
**scroll** 106:7,17 106:25 115:1 116:23 135:23 136:7 186:20
**scrolling** 128:7
**sealing** 4:4
**search** 136:22
**seats** 46:19
**second** 18:10 20:16 22:21 25:25 26:13 28:20 41:5,15 41:22 42:20 43:2,14 53:6 81:2 82:3 87:7 90:25 104:24 124:6 128:4 133:21,21 153:21 155:17 156:7 164:17 185:12 193:3
**section** 45:14,17 45:17,20 154:20
**security** 3:13 75:12,20
**see** 72:19 75:9 75:10,24 78:9 79:1,15 82:11 83:22 91:13,19 91:23,24 92:5 99:6,11,19,23 100:2,16 101:13 104:5 104:24 105:12 105:17,21 106:18 107:14 107:23 108:3 108:12 110:13 112:10,12,14 112:18 113:10 113:12,17,21 115:5 126:12 128:18 129:24 130:2 134:20 135:2,9 136:2 136:4,23 140:22 149:3 149:25 150:14 154:20 156:18 156:20,23 157:10,20,23 165:11 166:18 185:2,25
**seeing** 65:6 100:5 165:15
**seeking** 36:22
**seen** 8:24 75:13 78:20 99:8 102:5 106:3 149:13,22,24 153:22 156:25 157:6
**self-interest** 169:18
**sell** 23:22 97:21 152:4 173:1 182:23
**selling** 152:2
**send** 33:3 102:7 102:15,24
**senior** 27:23 28:3 29:5 45:12,21 47:24 57:3,7 58:5 61:24 125:15
**seniors** 73:19 128:9
**sense** 109:3 138:9
**sent** 33:15 35:6 35:8 91:16 100:6 101:21 103:4
**separate** 20:5 28:14 155:25 160:12,16,19 161:10
**separated** 126:18,19 142:14,21
**September** 11:9 11:12 27:21 53:5 65:14 195:17
**sequential** 82:17
**serve** 49:14 146:19
**served** 18:24 76:16 155:10 184:23
**serves** 119:23
**service** 57:12,13 141:8 154:13
**services** 150:8 163:25
**serving** 155:22
**set** 51:4 52:18 61:22 63:16 65:5 141:18
**Seth** 129:6
**setting** 179:18
**settled** 162:19
**seven** 123:16 144:16
**severance** 180:18 181:11 181:23 182:8 182:12 188:1,6
**share** 75:9 78:8 82:5 91:13 98:17 149:16 184:24
**shared** 34:8,9 126:8 149:17
**sharing** 84:15 104:22 153:12 155:12 164:15 167:15 187:6
**sheet** 42:10
**Sherri** 129:19 129:20,22
**ship** 86:10
**shock** 94:17
**Shoppers** 183:9 186:3
**short** 94:15 95:3 95:8,24 96:8 97:12 164:12
**Shorthand** 195:4
**should've** 137:20 142:1
**shows** 185:13
**shrinking** 85:24
**shrugs** 5:18
**shrunk** 69:13 70:18
**shut** 144:20 145:7
**side** 91:11 157:18 165:20 165:24
**signed** 38:21
**significance** 39:22 76:2
**significant** 36:20,21 39:13 39:17 87:1
**signing** 4:3
**signs** 63:4,10,13 65:10
**similar** 13:13 106:4
**similarly** 29:20 39:19
**similarly-situa...** 1:4
**simplicity** 178:2
**simultaneously** 152:3
**single** 119:17,25 120:25
**sir** 7:17 9:6,10 10:1 12:8 34:5
**site** 105:20 134:19,21
**sitting** 181:18
**situation** 31:18 62:19 86:6 92:15 151:20 151:23 152:6 166:5,6 171:6
**situations** 40:16

40:22 66:12
**six** 89:21 123:16 125:7 137:25 144:16
**six-year** 167:9 167:12
**skeleton** 145:3
**skim** 79:12
**skimming** 185:18
**skinny** 185:14
**skip** 112:10
**slides** 33:14
**sliding** 131:21
**slower** 128:5
**small** 134:5
**Smith** 128:11
**sold** 51:22 164:9
**sole** 146:12,20 150:19 166:25 167:18 169:23 170:6
**Solleder** 29:3 45:4
**somebody** 44:21 46:1 47:14,18 102:11 146:8 148:1 169:16 174:23
**someone's** 119:19
**somewhat** 38:11 86:4
**son's** 15:23
**soon** 26:8
**sorry** 5:17 12:24 13:4 21:8 25:20,24 27:1 33:11 34:12 35:22,23 40:21 43:17 53:6 59:3 67:10,21 76:14 93:14 96:11,25 101:5 103:4,18 109:9 114:7 121:3 126:15 128:10 129:21 132:10 133:15 134:16 135:12 145:10 145:20,24 149:19 150:13 163:15 170:9 180:25 181:19 185:5 192:22
**sort** 106:22 113:7,10,11,12 114:25 189:3 189:14
**sorted** 136:15
**sought** 30:1
**sound** 91:18 95:22,23 107:6 147:3
**sounds** 114:16 147:6
**source** 140:24 141:7,24 142:2 177:8
**South** 2:21
**space** 63:24
**speak** 16:20,25 19:25 44:17 52:15 98:5,14 162:21
**speaking** 98:10
**special** 36:3 46:24 162:17 163:2,3
**specific** 41:20 87:21 157:9
**specifically** 157:2
**specifics** 97:13
**speculating** 110:23 111:20 142:5
**spend** 79:22
**split** 119:10 121:17
**spoke** 7:24 26:7 94:9 170:15
**spoken** 5:23 7:20 94:6
**spouse** 120:1
**spreadsheet** 105:9,16 111:12 124:7 126:13 134:20
**staff** 19:7 108:18 185:14
**staffing** 171:20 171:22 184:1 185:12,17
**stage** 63:16 65:5
**stakeholders** 152:14,22 153:2,4,5,9
**stamps** 75:16
**standard** 155:6
**standing** 80:24
**stands** 58:7
**start** 62:23 67:9 88:14 108:2,10 108:24
**started** 4:23 11:25 52:12 62:7 76:21 77:25 110:9
**starting** 11:15
**starts** 99:2,24 113:15
**state** 100:1 104:4,8 177:22 178:4 180:13 195:5
**statements** 54:10,11 59:8 61:16 97:17 184:9
**states** 1:1 89:12 166:10
**static** 33:1
**status** 107:13 108:2,10,24 119:20
**statutory** 181:6 181:22
**stay** 12:17
**stayed** 143:10
**STEIN** 2:20
**stenographic** 195:7
**Stephanie** 165:10
**stepping** 152:7
**stimulus** 64:3,8 64:16 77:8,9 77:19,21,25
**stipulated** 4:1
**stop** 84:14 88:5 93:11 104:22 153:12 155:12 164:15 167:15
**stopped** 60:8 64:8,16
**store** 18:9 30:6 36:14 37:25 38:19 39:20 45:17,19 61:6 61:6 79:20 87:24 88:5,13 144:16
**stores** 18:2 27:24 28:2 29:3 30:11,11 45:3 79:24 84:18 89:9,11 89:12,21,25 90:1,10
**straight** 58:21 59:7 64:17
**strategic** 36:21 38:12 89:2
**strategies** 85:25
**Street** 2:8,17,22
**stretch** 86:3,9
**stretching** 85:21 88:9
**strike** 31:19 37:12 38:17 44:13 117:13 125:25 131:5 158:18,23 183:21 187:11
**string** 84:17
**strings** 172:24 172:25 173:5
**structure** 51:7 52:16 121:21 184:11
**structured** 37:22
**struggling** 46:16
**Stu** 24:16
**Stuart** 161:16 161:18,19 175:1
**stuff** 38:5 68:21
**subject** 67:5 75:18 78:25 79:5
**subjective** 38:11
**submitted** 153:24
**subordinated** 47:25 48:17 49:10 71:6
**subpoena** 184:23
**subsequent** 74:7
**subsequently** 164:6
**substance** 17:23 88:19 106:22
**substantially** 48:24 64:20
**success** 89:7
**successful** 73:24
**sucked** 65:4
**Sugarman** 129:6
**suggest** 82:14 97:17
**suggested** 190:11
**suggesting** 96:7
**suite** 2:3,8,17,22 98:13
**Sullivan** 44:21 46:1 72:4 73:6

73:21
**summary** 18:6
**supplies** 86:24
**support** 57:15
**supporting** 54:6
**supposed** 109:10
**sure** 15:11 17:18 17:20 23:7,7 31:3 46:3 60:19 62:4 70:7 71:12 80:11 81:6 83:2 101:10 102:2,5 129:17 155:19 157:2 157:10 159:17 165:17 167:25 171:21,25 179:6 192:24
**surprised** 84:10
**suspect** 31:11 87:22
**sweeps** 50:1
**sweet** 96:8 97:12
**swept** 49:18 172:17
**sworn** 4:10
**system** 112:6

**T**

**tail** 167:9,9,11 167:12
**take** 14:9,12 40:8,12 74:11 74:12 93:5 133:10 141:5 158:23 159:1 160:12,15,18 162:11 187:19
**taken** 1:15,17 6:3,8 156:1 161:11 195:7
**talk** 5:2,14 17:12 30:15 46:2 65:11 76:18,23 96:9 121:4 178:25 179:3 186:17,17,18 193:3
**talked** 35:11 36:12 60:22 65:18 81:3 84:23 85:1,2 110:25 121:6 129:10 172:16 189:15,16
**talking** 5:6 21:7 31:14 33:10,20 57:17,23 66:2 72:10 80:1 126:23 133:13 150:3 152:12 172:3 179:4 186:15 189:22
**target** 24:2
**tax** 117:1,3
**taxes** 58:1,14 61:7 117:4
**team** 28:22 29:5 29:9,14 30:1,7 34:1,3,7,10 36:9,24 37:12 37:14,24 39:5 39:9,10 43:8 45:8,13,23 92:13,13,19 94:19 98:14 171:10 177:9 177:14 178:18 179:9 180:11
**teams** 92:20
**technology** 143:22 156:8
**tell** 9:15 36:22 37:2 41:4 74:17 76:1 79:4 93:6 94:24 116:13 116:18 125:20 127:13 130:10 136:24 137:1 162:7 167:11 182:10 185:16
**telling** 182:7
**ten** 130:23,24
**ten-minute** 74:12
**ten-year** 38:22 38:25 39:12
**tends** 25:3
**tenure** 40:16,19 74:1
**term** 25:7 38:20 39:24 43:6 48:13,14,15,16 56:5,10 65:12 157:22
**terminate** 145:15 146:2 174:8,13,23
**terminated** 99:25 103:5,14 103:22 112:25 113:24 115:18 136:18 146:1 153:6
**terminating** 116:15 146:9
**termination** 93:20 114:11 115:9 116:3 119:1 145:14 175:7 176:7 179:16 187:24
**terminology** 59:9
**terms** 40:2 41:2 46:17 61:25 62:16 73:11 81:10 88:16,19 122:22 137:22 141:18 161:13 162:17 183:16 187:10 192:1
**testified** 4:10 43:7 52:12 76:11 85:6 109:11 145:6 150:17 158:4 179:22 180:10 183:5
**testify** 9:11
**testifying** 8:20 10:13
**testimony** 6:14 172:14
**thank** 19:12 52:14,24 79:13 133:9 188:9,24 193:5
**theoretically** 122:5
**they'd** 40:12 45:14
**thing** 7:21 132:12,12 138:16 141:9 141:13
**things** 4:22 5:3 5:19,24 16:21 18:14 19:3 22:17 36:18 37:10,10 38:12 38:13 49:5 50:25 52:25 53:23 54:5 55:15 61:7 66:5 77:16,17 96:15 97:8,13 97:17,18 136:1 157:17 169:19 171:9 184:6 189:1
**think** 7:6,7,10 9:24 13:14 15:9 18:22 21:2 22:6 23:14 27:6 28:11,15 31:10 32:15 43:7 44:2,4 46:14 50:15 52:8,9 52:10,11,11 60:13,17 61:12 62:19 65:14 69:20 71:11,25 73:23 77:2 80:23,25 84:6 88:6 89:10,15 90:15 92:25 93:9 100:14 101:25 103:2 103:25 106:2 118:8 120:3,20 121:2,16 122:25 123:16 124:25 125:1 130:11 132:8 135:6 138:7,13 141:9,13 142:18 152:8 155:24 157:5 161:23 163:5 168:3 171:5 173:25 175:21 179:22,23 181:21 183:4,6 185:7,21 186:11,12,15 187:5 192:10 192:12
**Thinking** 161:20,22
**third** 28:19 82:25 108:16
**Thomas** 15:3
**thousand** 131:14
**thread** 7:5,6
**Threadstone** 7:3 7:4,5
**threat** 67:4
**threatening** 86:14
**threats** 86:14
**three** 32:3,16,20 35:16 46:12,13 57:6 77:14 83:19 106:20

112:12 143:3 143:15,21 144:4,15
**thresholds** 37:19
**throw** 80:16
**tied** 86:12
**tiered** 121:21
**tight** 80:11,20 85:24 87:5,10 87:16
**tightened** 74:22
**tightening** 80:17 85:3
**time** 4:7 7:8 9:22 12:12 14:8 15:18,18 16:4 16:6 18:2,14 21:3 25:6 26:15,25 27:19 28:21 37:5 41:12,19,25 42:2,10 52:21 54:13,16 60:7 62:7 63:6 66:10 67:9 69:3 71:20 72:2 74:20 75:1 78:4 80:7 80:13,21,25 81:1,16,23 84:12 85:22 88:11,13 91:6 92:11 97:20 98:21 99:14 100:18 105:2 106:6 109:20 122:21 134:6 135:18 138:23 139:2 141:6,16 149:6 150:2 153:15 155:21 156:14 157:3 157:10 160:7 160:20,24 161:17 162:6 163:24 164:12 165:1 168:11 168:14 171:24 176:6,18 180:4 184:17 188:24 191:20 192:13
**times** 135:21 189:25
**timing** 168:12
**title** 28:5,10 107:11
**titles** 142:24
**Tobias** 1:10 2:24 146:15 157:19 167:6
**Toby** 175:1 176:9 189:16
**today** 4:18 6:10 8:16 10:13 188:10,25
**today's** 7:19
**told** 168:2,5,7,8 182:11
**tomorrow** 92:4
**top** 75:18 82:8 84:7 99:3 106:25 113:20 115:1 116:19 117:10
**top-line** 64:22
**topics** 9:4,8,12 132:23 171:6 189:8
**total** 49:6 64:23 67:8,17 90:19 139:14
**totaled** 124:9
**touched** 167:21
**traction** 88:14
**traditional** 70:24 71:4,14 122:21
**transaction** 58:17
**transcribed** 4:25 5:16
**transcript** 195:6
**transit** 49:5 50:25
**transitional** 133:2
**traveled** 123:15
**Tread** 7:7
**Treadstone** 7:5 7:6,9
**trial** 4:7
**trick** 111:9
**tried** 98:7
**troubled** 162:2,3
**true** 97:18 195:6
**truthfully** 6:10
**try** 65:11 72:6 98:8 136:11 149:19
**trying** 23:21,22 42:11 65:22 88:24 89:4 97:15,21 111:8 111:11 121:2 152:4 182:23
**Tuesday** 92:4
**two** 5:6 7:11 30:25 42:15 57:6 60:12,13 63:8 112:12 141:3 142:7,25 143:7,15,20 144:4,9,9,12 144:15 147:25 148:9 185:5 186:15
**type** 6:8 30:8 50:16 53:23 60:24,25 70:21 71:9 93:12 118:4,16 120:3 120:12 124:1 124:13 132:17 155:3,8 171:17
**typical** 38:20
**typically** 30:10 33:14 36:15 40:17 45:1,5 45:13 56:14 59:12,14 158:12

**U**

**Uh-huh** 8:7 10:18 32:4 33:8 83:23
**uh-huhs** 5:24,24
**ultimate** 141:24
**ultimately** 70:2
**understand** 5:25 6:12 8:19 15:5 31:4 51:21 56:19 57:25 94:11,11,14 103:19 109:9 118:1,8 162:8 181:10 186:14
**understanding** 19:14 48:20 118:15 178:24 181:4
**Understood** 6:2 39:19 94:23 122:11 131:20 138:15 179:4 179:11 181:7,8 182:4
**underwritings** 166:1
**unemployment** 100:2 104:4,9 104:18
**unfolding** 171:6
**unfortunately** 158:16 175:24
**UNITED** 1:1
**University** 10:7
**unlimited** 29:17 29:22
**Unsustainable** 62:18
**unusual** 151:4
**upcoming** 69:24
**update** 22:16
**upper** 101:13 105:10
**urban** 63:23
**use** 56:11 112:6
**usually** 57:5 59:19,23 85:25
**utilities** 64:12
**utilize** 70:10

**V**

**v** 7:2
**vacuum** 174:18 174:20
**value** 11:4 49:6 55:15 89:2
**values** 54:3
**variance** 141:20
**varied** 92:12,19 120:5
**various** 27:23 48:7 53:10 121:15
**vendor** 86:14,22 86:23 87:1 88:19
**vendors** 83:13 85:21 86:3,7 86:19 88:10,16 89:1
**verbal** 5:16,21 5:22
**verify** 118:18
**versus** 36:25 37:17 141:23
**viability** 89:6
**Videoconfere...** 1:17
**View** 106:24
**violate** 66:7
**violating** 66:12
**violation** 66:15
**Virginia** 128:11
**virtually** 44:13 148:13
**visibility** 55:8 68:20

**vision** 119:6 122:18
**visit** 191:24
**Visitacion** 3:22
**vs** 1:7

W

**W-2** 124:2,15
**W-2s** 124:1
**wait** 35:15 71:24 188:18
**Waiting** 181:16
**waived** 4:5
**waiver** 66:19 82:9
**WALDER** 2:20
**walking** 87:4,10
**Walton** 129:20 129:22
**want** 5:11 7:23 13:14 33:22 35:15 37:10 38:14 39:17 51:10 52:9,21 60:18 68:5 70:7 71:17 74:11 81:6 82:3 83:12 86:10 94:10 97:16 98:16 99:10 104:23 106:18,20 118:17 133:8 133:14 134:2 135:1,23 138:16 141:5 148:22 149:3 150:6 156:5 157:15 178:22 179:6 184:15 187:13 188:15 190:16 192:24
**wanted** 15:16 30:5 55:7,21 153:1 166:12 172:24 189:2
**wanting** 15:21
**wants** 175:25
**WARN** 176:13 176:18,22 177:2,10,15,18 177:22 178:2,3 178:5,8,13,13 178:19 180:13 181:11
**warning** 63:4,10 63:13 65:10
**wasn't** 11:2 20:4 21:17 22:10 31:3 37:21 63:2 67:3 118:9 119:22 122:18 130:19 138:8 155:9
**way** 27:24 89:18 106:17,23 107:1 126:16 136:12 181:19 191:10,11
**we'll** 74:25 78:3 78:12 81:21 91:5 140:5 166:11
**we're** 20:5 31:14 65:6 68:17 79:24 98:19 113:19 115:3 137:2,9,13 139:24 161:7 172:3 173:7 179:7
**we've** 35:7 53:2 107:8,22 114:22,25 122:11,13 123:7,9 124:8 142:13 143:12 143:20 153:10 173:20
**week** 64:19,19 64:19 148:5,6 148:7,9 170:19 172:8 185:15
**weekly** 17:14,19 17:21,24 18:17 22:4,11 33:4 33:11,15 34:14 34:15,16 35:9 54:14,17,18,22 54:24 55:1,8 55:21
**weeks** 137:25 138:1,10 173:17 187:2
**weighing** 176:2 176:5
**welcome** 188:13
**welcomed** 5:20
**went** 14:16 38:2 54:17,18,21,24 91:1 109:7 121:22 170:24 172:15,19 181:17
**weren't** 35:9 37:19 47:17 69:4,17 70:11 70:12 92:22 125:23
**west** 13:8
**whatever's** 39:15
**whatnot** 33:4 50:1 71:15 77:6
**wheel** 181:18
**wife** 26:24
**window** 148:10 164:12
**Wisconsin** 89:16 89:18,22
**witness** 3:2 26:7 26:17 35:22 36:1 41:12 42:24 52:14 55:5 57:21 96:11,23 97:10 100:9 103:10 103:18,25 104:13 113:5 114:5,16 115:25 116:11 126:10 149:16 162:16 176:17 177:1,6 180:21 188:13 192:7 193:20
**word** 33:5
**words** 5:23 63:9 68:5
**work** 14:16 91:3 92:18 162:1 171:14
**worked** 12:3,12 13:2 42:6 90:19 109:16 109:24 110:8 137:24 179:19 180:1 185:6
**working** 49:15 62:16 72:5 80:15 93:8 180:4
**works** 191:11
**worksheet** 185:20
**World** 183:9 186:3
**worries** 57:20
**worse** 64:10
**worst** 68:19
**wouldn't** 25:21 25:22 39:9 40:12 67:7 84:9 104:11 142:3 165:21 174:17 175:15
**write** 149:12
**wrong** 81:19 113:11 115:8

X

**X** 37:20 57:13 67:18,20,21 79:21 122:3 173:9

Y

**Y** 112:14,20,23 113:16,20 115:3 116:20 173:9
**yada** 191:4,4,4
**yeah** 4:20 7:11 7:14 13:25 16:3,18,23 19:25 21:8,11 22:1 28:24 29:15 31:3 32:20,24 33:5 33:11 35:8,19 36:17 43:21 45:10,20 47:5 47:23 48:4,4 48:16,16,22 50:23 52:14 56:15 58:9 59:6 61:3 63:14 66:1,18 66:24 68:11 70:11 75:14 76:25 78:23 79:12 80:11 82:12,17 83:4 87:1,12,20 89:20 90:3 91:15 95:2,23 96:4,11 97:10 100:17 104:20 107:17 108:12 109:8 110:2,14 110:17 111:8 111:10,14 116:24 117:1,7 118:9 119:6 124:23 125:4,5 126:6 128:6,21 129:22 130:6,7 130:13 131:10 133:7,7,10

135:14,17 137:1 140:3,11 140:25 141:7 145:24 147:5 148:9 153:9 155:6,19,24 156:3,3,24 159:23,23 163:13,17 175:3,21 179:11,22,25 180:1,3,4,23 188:6,17 189:13 191:10
**year** 6:21 15:10 19:22,22 54:20 54:21 60:12 61:13 64:24 68:1,3,12,18 123:24 139:20 141:10,11
**years** 12:13 60:14 71:2 82:21,23,25 125:24
**yesterday** 79:15
**York** 2:12 44:2 89:14
**Ys** 112:13 113:8 113:13,16 114:24,25 116:17

**Z**

**Z** 173:9
**Zacek** 1:21 195:3,14
**Zachary** 129:2
**zero** 120:15,17
**Zoom** 1:15 43:21 93:13,18 93:22 94:2,5 95:16,25 96:2 98:4

**0**

**00011** 156:13
**00017** 165:7
**07601** 2:22
**08053** 2:4

**1**

**1** 3:13 74:25 75:3 120:14
**1.1** 57:5,11
**1/2** 117:11
**1:00** 132:24
**1:24-CV-09478** 1:7
**10** 3:22 71:11,17 121:19 131:2 131:13,15,17 131:23 153:14 153:17
**10:00** 1:19
**100** 3:18 92:22 119:8 120:15
**10020** 2:12
**104** 2:3
**105** 3:19
**1070** 15:3
**1099** 124:2,24
**11** 3:23 156:12 156:16,19
**11/1/2018** 108:23
**12** 3:24 164:25 165:3,9
**123** 134:16
**124** 107:5
**125** 107:4
**1271** 2:12
**13** 3:25 82:14 184:16,19
**132490592.1** 134:17
**135** 3:20
**139,000** 130:3
**14** 3:15 82:10,16 82:19
**150** 3:21
**154** 3:22
**156** 3:23
**15th** 75:23 191:6
**161** 140:20
**161,000** 140:4
**161,159.96** 140:4
**164** 140:21
**165** 3:24
**1650** 2:8,17
**18** 11:25 13:25
**180,000** 129:5
**185** 3:25
**185,000** 129:4
**188** 3:7
**19** 21:11
**19103** 2:8,17
**193** 3:6
**1994** 9:20,25
**1st** 191:2

**2**

**2** 3:14 78:3,6,13 85:16,17
**2,080** 135:21
**2,200** 90:15 176:3
**2/6/2023** 3:14
**20** 9:22 21:12 63:20 67:11 131:17
**200** 2:22
**2016** 16:9 51:23
**2017** 27:12
**2018** 11:12 21:11 25:13 53:5 109:20
**2019** 9:22 24:22 25:13 43:25 51:10 52:22
**2020** 24:22 25:13 43:25 44:6 51:10 76:21 77:1,23 111:15,17 136:1
**2021** 24:22 25:14 37:9,13 43:13 44:3 75:24 132:6,8 132:9 136:2
**2022** 17:1,2 19:22 20:23 21:10,23 22:1 27:19 28:19 43:13 44:3,15 44:18 54:23 65:6 68:23 69:7 70:6 71:21,21 72:2 109:5 111:18 130:18 132:4 136:2
**2023** 17:7,13,16 18:11 20:16,16 20:25 22:14,15 22:21 24:19,20 25:24,25 26:14 27:19 28:20 41:5,16,23 42:21 43:14 46:23 53:6 67:12 68:24 69:10 79:1,6,8 79:10,14,17 80:5 81:11 82:11 84:24 85:13,20 86:15 86:17 87:7,15 88:20 89:8 90:13,21 92:1 92:4 93:14 103:6 112:25 113:24 114:12 115:9,18 120:23 126:20 130:18 132:2 135:16 139:5 139:11 142:15 146:1,13,25 147:3 153:7 155:18 170:6 172:4 175:8 176:8 177:19 178:9,14 180:13 183:14 185:2 187:24 189:7,7,10,12 189:18,24 190:1,4
**2024** 15:14 18:22 166:17
**2026** 1:19
**2028** 195:17
**21** 2:22 21:12 63:21 77:2,24
**210** 129:19
**210,000** 129:18
**215** 2:9,18
**216** 129:19
**22** 11:9,13 17:5 21:16 27:22 28:11 62:25 64:16,20 71:24 71:25 73:15 87:23 126:6
**2233** 82:5
**23** 17:11,17 27:14 28:12 47:1 66:14 69:3 70:16 73:15 74:20 87:23 121:17 125:17 126:6
**24** 11:10 183:2
**24th** 147:3 148:8 166:17 170:6 189:17 190:1
**24th-ish** 190:4
**25** 153:11
**25,000** 60:18 150:12,13,24 151:5,9
**27th** 82:11
**2800** 2:17
**295-0828** 2:23
**2nd** 185:2 191:6

**3**

**3** 3:15 81:22,25 85:16
**3:16** 194:4
**30** 1:19 61:16 131:3,18,25 195:17
**300,000** 131:15
**30th** 191:7
**31** 115:8,19 142:19
**316,000** 138:21
**316,200.40** 139:5
**32** 115:4
**325,686.41** 139:4
**3600** 2:8
**394-0541** 2:9

**4**

**4** 3:6,16 85:17 91:5,8 95:21 121:18
**4/17/2023** 108:9 108:11
**401(k)** 121:8,11 121:25 122:13 122:20 123:10 125:13 132:16 136:3
**45** 61:18 89:10 89:11,25 90:1 158:2,10 159:21
**48** 158:2

**5**

**5** 3:17 98:20,23 99:23 100:15 124:21
**5-million-dollar** 83:11
**5/8/2022** 108:25 110:12,16
**50** 120:19,20 121:18
**52** 120:21
**525** 2:3
**5330** 75:8,17
**551** 2:23
**5th** 90:21,25 91:25 92:1 93:14

**6**

**6** 3:18 99:13,16 100:5 101:11
**6.23** 134:15
**6/15/2023** 3:24 157:23
**6/2/2023** 3:25
**6/5/2023** 3:16
**6/6/2023** 3:18
**60** 90:23
**600** 124:21
**600.00** 123:22
**665-7267** 2:18
**6th** 80:5 92:4 93:4,14 95:18 103:6 112:25 113:24 114:12 115:9,18 119:3 126:20 136:18 142:15 143:1 145:15 146:1 153:7 172:4 175:8 176:8 177:19 178:9 178:14 180:13 183:14,15 187:24 191:22 192:2,11

**7**

**7** 3:19 105:1,4 133:17,25 136:14 138:17 174:1,3 186:9
**7,000,000** 124:9
**7,788,430.28** 116:25
**7.8** 174:5
**7/15** 110:17
**70** 90:23
**73** 2:3
**75** 3:13 120:18
**78** 3:14
**7th** 191:6

**8**

**8** 3:20 117:11 134:5,8,12 136:21
**8/1/2023** 157:23
**82** 3:15
**842** 59:15
**85,000** 154:4,9 159:19
**89** 113:23 114:11,20 115:17 116:2,3 116:15 142:13 142:20 145:13 145:25 153:6 174:2 175:7 176:1,3,7 186:10 187:23
**89,000** 157:5 159:16
**89,250** 157:5
**8th** 109:5 191:23 191:24

**9**

**9** 3:21 149:5,8 154:19
**9,000** 139:16,19 139:22
**90** 61:13,19 113:21
**90s** 13:3
**91** 3:16 113:16
**95** 128:11
**97** 110:9
**99** 3:17
**999** 134:21
**9999** 105:21