# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 1:24-CV-09478

\- - - - - - - - -

NOELL DEL ROSSI and DAWN BARBER, :
individually and on behalf of all :
similarly-situated individuals, :
Plaintiffs :
\- VS - :
FORMAN MILLS, INC., GOODE PARTNERS, :
LLC, GOODE FORMAN HOLDINGS, LLC, :
GOODE HEAVYWEIGHT COINVEST, LLC :
and TOBIAS KELLER, :
Defendants :

\- - - - - - - - -

Oral deposition of TOBIAS KELLER, taken at the law offices of Pashman Stein Walder Hayden, P.C., Court Plaza South, 21 Main Street, Suite 200, Hackensack, New Jersey before Latitisa Russell, RPR, CCR #30XI00234100 and Notary Public of the State of New Jersey, taken on April 14, 2026, commencing at 10:05 a.m.

\- - -

KAPLAN, LEAMAN AND WOLFE
230 South Broad Street, Suite 602
Philadelphia, Pennsylvania 1910

A P P E A R A N C E S :

MORGAN ROOKS, P.C.
BY: FRANKLIN J. ROOKS, JR., ESQUIRE
525 Route 73 North, Suite 104
Marlton, New Jersey 08053
fjrooks@morganrooks.com
Counsel for the Plaintiffs

PASHMAN STEIN WALDER HAYDEN, P.C.
BY: KEITH McDONALD, ESQUIRE
Court Plaza South
21 Main Street, #200
Hackensack, New Jersey 07601
kmcdonald@pashmanstein.com
Counsel for Defendant, Tobias Keller

COZEN O'CONNOR
BY: JASON CABRERA, ESQUIRE
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
jcabrera@cozen.com
Counsel for Defendant, Goode Partners, LLC

A P P E A R A N C E S (continued):

BLANK ROME, LLC
BY: ANTHONY A. MINGIONE, ESQUIRE
1271 Avenue of the Americas
New York, New York 10020
anthony.mingione@blankrome.com
Counsel for Defendant, Forman Mills

- - -

I N D E X

- - -

| WITNESS | DIRECT | CROSS |
|---|---|---|
| TOBIAS KELLER | | |
| By Mr. Rooks | 6 | |

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Keller-1 | Declaration of Defendant Tobias S. Keller in Support of Motion to Dismiss | 13 |
| Keller-2 | Independent Director Agreement | 24 |
| Keller-3 | E-mails Bates Stamped Keller-00549, 00548, 00547, 00530, 00542 and 00545 | 33 |
| Keller-4 | E-mails Bates Stamped Keller-00149 | 56 |

EXHIBITS RETAINED BY REPORTER

LITIGATION SUPPORT INDEX

Request For Production Of Documents

Page Line

(None)

Pages Marked Confidential

Page Line

(None)

Direction To Witness Not To Answer

Page Line

(None)

Stipulations

Page Line

(None)

Questions Marked

Page Line

(None)

\- - -

T O B I A S K E L L E R, after having been duly sworn, was examined and testified as follows:

\- - -

DIRECT EXAMINATION

BY MR. ROOKS

\- - -

Q. Good morning, Mr. Keller.
A. Good morning.
Q. I'm an attorney and I represent the plaintiffs in this matter against the defendants. I generally go over some instructions, but I suspect that you've been through a deposition before, but I will ask you. Have you taken any medication that might impair your ability to recall events in the past?
A. I have not.
Q. Have you taken any medication that might affect your ability to tell the truth?
A. I have not.
Q. I don't know if there is any such medication. I don't expect us to be terribly long today, so I just have some basic questions. My understanding is you flew in from California to visit the great State of New Jersey?

A. I did.
Q. Have you made it to the beaches yet?
A. I have not made it to the beaches.
Q. Are you planning on it?
A. I am not.
Q. So you are a California native?
A. I am. Actually, I was born in Ohio, but moved to California when I was very young.
Q. There's a lot of pedigrees in your educational history. You're a graduate of Harvard University?
A. That's right.
Q. 1985-ish?
A. 1985.
Q. Then you went on to law school?
A. I worked for a couple years and then went to law school.
Q. What you did do between graduating Harvard and law school?
A. I worked for a couple financial service firms, including an investment bank as an analyst, a very junior person.
Q. Then you went to Stanford University and that's in California?
A. Correct.

Q. You currently reside in San Francisco?
A. In San Francisco.
Q. You are a partner in a firm that bears your name. It's Keller Benvenutti, LLP?
A. Correct.
Q. Tell me what does that firm do?
A. It is a law firm and it is a restructuring and bankruptcy boutique, as it were.
Q. And then you are also a member of another, I'll say, LLC, limited liability company. Visitacion Group?
A. Visitacion Group. It's the Spanish spelling of visitation.
Q. When was Visitacion Group formed?
A. 2013.
Q. How many employees does Visitacion Group have?
A. Zero.
Q. Who provides the services for Visitacion Group?
A. Visitacion Group is a single member limited liability corporation. I am a single member and it is sort of the umbrella organization for my activities that are not practicing law.
Q. So what's your role with Visitacion Group?

A. Again, Visitacion is a legal entity and depending on what I'm using Visitacion for, it's been an investment vehicle. But most commonly, it is a contracting organization when I'm acting as an independent fiduciary.

Q. Tell me what that means to be an independent fiduciary?

A. The subject case is a fairly typical circumstance where I am asked to play a role as a fiduciary. Sometimes it's as a managing member of a limited liability corporation, sometimes as an independent director. There are other variations, but in all cases, if I'm called, it's typically because there's a restructuring aspect, perhaps, an insolvency aspect. And for one reason or another the constituencies believe that I can add value as a fiduciary.

Q. You have a tremendous amount of experience working with companies that are in financial distress, right?

A. True.

Q. Have you ever worked with, let's say, any publicly traded companies that were in financial distress?

A. I have.

Q. Approximately, how many?
A. I'd say something on the order of a dozen.
Q. Would that be with your law firm or with the Visitacion Group?
A. Purely as a lawyer. Some at my law firm, some at predecessor law firms.
Q. How about, you know, with private equity firms or private equity portfolio companies, have you worked with those prior to your experience working with Forman Mills?
A. Yes, I have.
Q. Approximately, how many?
A. I would guess prior to working with Forman Mills, it could still be mid-double digits 20, 30, 40, something like that.
Q. Just still sticking with your background, have you authored any publications?
A. There are a handful of articles that I wrote mostly as a younger lawyer. I don't think I've written anything in the last couple of years. The last thing I can remember would have been early 2000s about a bankruptcy statute and no, these are all articles, no books, no treatises.
Q. How about speaking engagements, have you had any speaking engagements?

A. Yes. Again, more that I did as a young lawyer and I had listed them on my law firm website and while it's not totally up-to-date, I have not done anything in the last six or 12 months.

Q. Prior to this litigation have you ever served on the board of directors for any publicly traded company?

A. I have never served on the board of directors of a publicly traded company.

Q. How about with respect to a privately backed portfolio company, prior to this litigation, served on the board of directors for any private equity portfolio company?

A. I have.

Q. And when you served on the board for a private equity portfolio company, would you have been a sole board member or were you a board member along with other individuals?

MR. McDONALD: Objection. You can answer.

A. Both.

Q. Approximately, how many times have you served as a board member on a private equity backed company where you were a board member along with other board members?

A. I'm now guessing, but I would guess on the order of a half dozen.
Q. How many times have you been the sole board member for a privately backed company?
A. I would also guess on the order of a half dozen.
Q. So just for general information purposes, what's the function of a board of directors?
MR. McDONALD: Objection.
A. Generally speaking, it is to set policy and strategy for a corporate organization and to review and assist in the selection of the senior managers of that entity.
Q. Is there typical times that a board would meet?
MR. McDONALD: Objection. You can answer.
A. I can't speak to typicality.
Q. So in what situations would you expect to see a private equity portfolio company have just a single board member?
A. Again, that calls for insights that I don't have. I deal with a fairly narrow spectrum of private equity companies in which there is this financial distress, so I don't know that I can answer that

question generally.
Q. Fair enough. Let me ask you a few questions about directors and officers insurance. You're familiar with that, obviously, right?
A. I am.
Q. What is directors and officer insurance?
A. Directors and officer insurance is insurance typically procured by a company that benefits both the directors and officers in the company in the event that the directors or officers are sued for any number of alleged civil liabilities.
Q. Forman Mills, they had directors and officers insurance, right, to your knowledge?
A. They did.
MR. McDONALD: As far as timeframe, are we talking about at any time in the history or when?
MR. ROOKS: I can get more specific. Let me introduce a document. We're going to be referring to it back and forth. We'll call it for identification purposes, Keller-1 and this is a declaration that you had signed.
\- - -
(At which time, Declaration of Defendant Tobias S. Keller in Support of Motion to Dismiss was marked as Keller-1 for identification.)

- - -

Q. This is a declaration that was signed in connection with a motion to dismiss that was filed by your attorneys.
A. Counsel, I note that there are some markings on this version that may be yours.
Q. You are familiar with this document, correct?
A. I am.
Q. At the very end of that document there should be a signature.
A. Yes, there is.
Q. And that's your signature, right?
A. It appears to be so.
Q. We'll go back to the directors and officer insurance question. Let's just go to page three, paragraph eight and paragraph eight says, that in mid May of 2023 you were contacted by David Oddi, the founder of Goode Partners, regarding a potential engagement by Goode Partners' subsidiary, Forman Mills. Do you see that?
A. I do.
Q. Have you worked with Mr. Oddi prior to this engagement?
A. I had worked on a matter in which Mr. Oddi was involved, yes.

Q. So your declaration goes on to say that Mr. Oddi explained that Forman Mills was in distress and required the appointment of a fiduciary familiar with restructurings to assist with a potential distressed acquisition. Do you see that?
A. I do.
Q. Do you recall the conversation that you had with Mr. Oddi, the initial conversation?
A. I do not.
Q. Do you recall what you and Mr. Oddi talked about with respect to you being engaged by Forman Mills?
A. Nothing more specific than the sentence that you just read.
Q. Do you recall how many conversations that you had with Mr. Oddi?
A. I don't.
Q. How did the engagement come about?
A. So I did receive the contact from Mr. Oddi. I also have a vague recollection of having a conversation with one of his lawyers at the time who is at Jones Day, a firm that I had been affiliated with and I believe that I've also gotten a contact from a representative of Monroe Capital, which is one of the lenders to Forman Mills at the time.

Q. At the time that you were discussing your potential engagement with Forman Mills, what was your understanding of the financial situation of Forman Mills?
A. I proceeded by saying that any time I get a call about being a fiduciary, I presume it involves financial distress and restructuring. That's the reason that I get these calls. In this specific instance, I don't think I had a lot of detail about exactly what was going on at Forman Mills, other than I knew there's financial distress and probably would have surmised either by inquiry or having volunteered that there were defaults under the lending arrangement. But again, I don't specifically recall any of that as I sit here today.
Q. Prior to making your decision to be engaged with the Forman Mills, did you receive any documents, financials, anything like that to evaluate?
A. I'm sure that I did. It is normal in the course of my becoming retained that I will do some diligence before I commence the retention. You mentioned director and officer liability insurance. I will review the existing insurance. Sometimes I will require as a condition of coming on that there's actually a special insurance policy put in place to

cover me. I will review articles or bylaws to see the indemnity provisions and in this case, I'm obviously aware that I actually asked for a special indemnity from Goode Partners.
Q. What other types of diligence? You just said you looked into potential bylaws here and the existing D&O policy. What other diligence did you do prior to accepting an engagement with Forman Mills?
A. I don't recall. It's now several years ago. I would typically, the things that I've just reviewed, are the minimum diligence that I would do before taking on an assignment. Very frequently, I will be interested in a general assessment of what the circumstances are, I might review financials, but that's not really the due diligence that I require before taking on the matter. It's really understanding my own personal liability exposure if I'm going to take on the role.
Q. If we can stay with this exhibit and go down to paragraph ten and I want to go to the second sentence, it says, I did not and could not engage in any decision making on behalf of Goode Partners. Do you see where it says that?
A. I do.
Q. First of all, did you make any decisions on

behalf of anybody in connection with your engagement?
MR. McDONALD: Objection.
A. Yes.
Q. On whose behalf did you make decisions?
A. I would need the names of the legal entities, but functionally Forman Mills.
Q. So there's a Forman Mills, Inc. Would you say you made decisions on behalf of Forman Mills, Inc.?
MR. CABRERA: Objection.
A. I would need to look at the documentation as to who I was appointed over, but I believe Forman Mills, Inc. was -- I think there were two entities and I think Forman Mills, Inc. was one of them.
Q. Forman Mills Holdings, LLC, does that sound like the other one?
A. That sounds about right.
Q. So you would be making decisions on behalf of the entities that engaged you?
MR. McDONALD: Objection.
A. That's correct.
Q. And what type of decisions would you be making?
A. Most significantly there are any number of corporate actions specifically here making decisions

about authorizing financings or authorizing corporate transactions.
Q. Let's skip down to paragraph 11. It says, on May 18, 2023, after obtaining preliminary information about the terms of my proposed engagement by Forman Mills, I forwarded Visitacion's engagement letter for Forman Mills' review and consideration. Do you see that?
A. I do.
Q. Do you know if your engagement letter was provided with the subpoena that you responded to?
A. I believe that it was.
MR. ROOKS: Off the record.
\- - -
(At which time a discussion was held off the record.)
\- - -
Q. In that same paragraph 11 of your declaration, it says that you had requested a copy of the D&O policy. Do you see that?
A. I do.
Q. Did you investigate and review the existing D&O policy?
A. I don't specifically recall. It would have been my practice to do so, yes.

Q. And then if we skip down to paragraph 12, it says, later that day, I learned that Forman Mills had received a tentative offer for the potential sale of the company to a third-party strategic buyer. Who was that buyer?
A. My recollection is that it was a company called Shoppers World.
Q. So you were, in fact, subsequently engaged as the sole director of Forman Mills' board, correct?
A. Correct.
Q. Your engagement began on May 24, 2023, correct?
A. That's what the declaration says and it sounds right.
Q. Prior to you committing to accept that role, what conversations did you have with David Oddi as to what your responsibilities would be in serving as the sole independent director?
A. I don't recall today.
Q. I understand you say you don't recall. Do you remember anything like, hey, Mr. Keller, do what it is that you do, was it open-ended the instructions that you may have given for your engagement or was it anything specified, even if you don't know what was specified?

MR. McDONALD: Objection. You can answer.
MR. CABRERA: Objection. You can answer.
A. In reviewing the declaration, I believe I looked at some of the mail before I executed the declaration. It sounds as though I was aware that there was a distressed acquisition and I was also aware that Goode Partners in addition to being equity holder, had some participation in or role relating to the death that Forman Mills owed that put Goode Partners in a conflicted position, both as an owner and as a creditor and that, I believe, formed my understanding of why Goode Partners needed to step off the board and find a new fiduciary.
Q. When you say conflicted position, what's the basis of that conflict? Are you saying it's because there's lenders, right, Monroe Capital, for example, and Forman Mills subsequently infused their own money into the platform, right?
A. You said Forman Mills.
MR. McDONALD: Objection.
A. I believe you meant Goode.
MR. CABRERA: Objection.
Q. I did.

A. As I sit here, I don't recall. Could have been that they guaranteed some of the debt or they put in their own funds. I just don't recall as I sit here.
Q. Immediately prior to your engagement and installation as the sole board member, there was an existing board of directors, right?
A. Correct.
Q. Those board members all resigned, correct?
A. That's my recollection.
Q. And then you were installed?
A. I don't remember if it was exactly contemporaneously, but yes, roughly contemporaneously.
Q. What would the reasons for removing the board and installing you as the sole independent director as opposed to you joining them?
MR. McDONALD: Objection. If you know the answer.
A. So those would be reasons governed by Goode and Goode's decision making. I don't know why Goode chose to do that. Although, it's common to see it happen in a situation like this.
Q. Why would that be? Why would it be common to see something like that in a situation like this?
A. The conflict that I described before, a board

member is a fiduciary for the company. In a distressed transaction where there has to be a negotiation of the debt, the terms have to be renegotiated or perhaps, the holder of the debt is going to take less of the debt. The question is, how does the board discharge its duties to the company as a fiduciary at the same time as it acts on its own behalf as a debt holder. That was the conflict, I believe, Goode Partners was dealing with at that time.

Q. And you as the sole shareholder, you had no equity interest in any of the companies, Forman Mills Holding, Inc.; Forman Mills Holdings, LLC, the investment vehicle that's owned that platform?

A. You said, I, as the shareholder. I was not a shareholder.

Q. Thank you. I'm sorry. You as the sole board member, you had no equity interests in Forman Mills Holding, Inc.; Forman Mills Holdings, LLC or Goode Consumer Fund III?

A. That is accurate.

Q. So as the sole board member, what was the parameters or scope or confines of the authority that you had?

A. I would have to look at the independent director agreement to see if it was limited in any

way.
Q. I will let you look at that.
MR. ROOKS: We'll call this exhibit Keller-2.
\- - -
(At which time, Independent Director Agreement was marked as Keller-2 for identification.)
\- - -
Q. I just introduced for the record Exhibit Keller-2, which is the independent director agreement. Mr. Keller, have you seen this agreement before?
A. I have.
Q. If we flip to the next to last page which is identified as Forman Mills 006275, there is a signature on that page. Is that your signature?
A. That is my signature.
Q. Do you want to the take a few minutes to review that agreement?
A. I've skimmed it.
Q. I believe the question that I asked is, in your role as independent director, what were the parameters, scope or confines of your authority?
A. First, you didn't ask, but there are some highlighting on the document that I don't recognize. Otherwise, I recognize the document and it is the

agreement that I had originally sent as a proposal to Forman Mills after it was negotiated.

Q. I'm sorry. Repeat that last part.

A. There was the agreement that I sent to Forman Mills at the outset as my proposal for an agreement.

Q. So this Independent Director Agreement, this is an agreement you drafted?

A. In the first instance, this is off of my form, correct.

Q. And this was an agreement that was negotiated with Forman Mills?

A. I don't recall if it was heavily negotiated or if they accepted it as it was, but yes.

Q. So what would you say that the limits of the authority were?

A. So I'm reading from the document, but performing the duties consistent with such a position pursuant to the company's respective organizational documents and the laws of Delaware and Pennsylvania, so it was sort of -- it went back with reference to what an independent manager and/or independent director does under state law.

MR. ROOKS: Let's go off the record.

\- - -

(At which time a discussion was held

off the record.)

- - -

Q. Basically, we talked about the scope of the authority and your conversations with Mr. Oddi. Did Mr. Oddi ever give you any specific direction, this is what I want to happen, this is what needs to happen, this is what shouldn't happen, anything like that?

A. I don't believe that he did.

Q. How long did you serve as the lead independent director for Forman Mills?

A. I'd have to consult the documents, but it was, approximately, a month.

Q. I'd ask you about conversations with Mr. Oddi. Did you have any conversations with anyone else at Goode Capital Partners regarding your involvement as the sole independent director?

A. I don't recall any such conversations.

Q. Did you have any discussions with Mr. Oddi about staff changes at Forman Mills?

A. I don't recall any such conversations.

Q. When you engaged as independent director, what objectives did you have for your role?

A. I did not have independent objectives. The polestar for a person in this role is to maximize the value of the entity given the circumstances.

Q. When we say objectives there was, I believe, some talk about a wind down and dissolution and there was, I guess, some talk about the acquisition to a strategic buyer. So when I say objectives, I mean, if you look at the possible outcomes, on one hand, it's sold. On the other hand, it's closed. I mean, what objectives did you have with respect to that?

MR. McDONALD: Objection.

A. The two things that you said are both vehicles towards the single objective of maximizing value.

Q. When you say maximizing value, are you talking about maximizing enterprise value, maximizing exit value? What's the definition of the value that you're trying to maximize?

A. I would have to think about the context to be precise, but generally speaking, I think total enterprise value is a Goode proxy for what I'm talking about.

Q. And how is enterprise value determined? I know there's EBITDA. There's other evaluation formulas. What is your, I guess, definition of the value?

A. It depends on the type of transaction that one is doing. If it is a sale, it's a total

consideration in the sale. If it's refinancing, one has to look at other metrics to determine value.

Q. If we can just go to paragraph 13 of your declaration. Can we take a look at the first sentence. It says, I familiarized myself with Forman Mills' business and discussed with its stakeholders the alternatives available to Forman Mills, including its potential acquisition. The word stakeholders, who were the stakeholders here?

A. I couldn't be comprehensive here, but it would be managers. It would be creditors. It would be equity holders. It would possibly be prospective financiers or prospective purchasers.

Q. Do you recall discussions you had with the executive team at Forman Mills?

MR. McDONALD: Objection. Are you talking about at his retention or any time?

MR. ROOKS: With respect to the sentence you discussed about stakeholders.

MR. McDONALD: That's fine. I just wanted clarification.

A. I believe I met the CEO very early in the process. I think I met at least one or two other members of the management later in the process. When I say met, this is all virtually.

Q. And that CEO would have been Mike Kvitko?
A. Correct.
Q. Other members of the management team, Kevin Hess, does that sound familiar?
A. Yes, he was the chief financial officer.
Q. Anyone else?
A. There was a contracted chief restructuring officer, whose name was Stuart Kessler and he had a team, but he was not an employee.
Q. Did you see the guy with PKF Clear Thinking?
A. Correct.
Q. Have you worked with Mr. Kessler before?
A. I believe that I had worked with the organization or was exposed to the organization, but I don't believe I had worked with Mr. Kessler.
Q. So we talked about you being installed as the sole director on May 24, 2023. How was your appointment communicated to the executive team at Forman Mills?
A. I don't know.
Q. Did you have any conversations with the executive team introducing yourself as the new board member, the new director?
A. I would expect so, but I don't recall.
Q. In terms of a board of directors, the board

of directors is accountable to whom? Is it the shareholders?

MR. McDONALD: Objection.

A. That's a legal question and it's complicated somewhat because you have two different entities incorporated into the limited liability corporation. But generally speaking, the obligation is to the entity, although the equity holders can assert those rights.

Q. You were the sole independent director and then there's an executive team, Kevin Hess, Mike Kvitko. Would you agree that there are some actions that they cannot take on their own?

MR. McDONALD: Objection.

A. I would agree.

Q. There are some actions that they would need to have board approval for?

A. I would also agree with that.

Q. So apologize if I asked this, but in your appointment what was their understanding of your role and what needs to be run by you before they could take any type of action?

MR. McDONALD: Objection to the extent that you're asking for a third party's understanding. If he knows, if they told him.

MR. CABRERA: Objection.

MR. McDONALD: Your question asks for what was the management team's understanding of his role. If he know the answer and they told them. He can answer.

A. Even without the speaking objection, I would have told you I don't know what they were thinking.

Q. So let me ask you another way. Did you tell them what your role was, hey, before you guys make any decisions, you need to run it by me? Did you speak with the executive team to let them know that you are here and what your role is?

A. Again, I don't recall. It wouldn't have been my style to do that.

Q. How would you have communicated your arrival and your appointment to the executive team?

A. So that would differ from time to time. I did have an opportunity to review some documents and it refreshed my recollection that I wanted to have a regular call simply to check in and make sure that we were all on the same page with a multiple set of issues going on the at the time.

Q. But you would agree that they would need to know that you were appointed, correct?

A. I would.

Q. I think you said you had regular conversations with them?
A. The documents refresh my recollection that I asked for a regular call, yes.
Q. Do you recall what you would you have discussed on those regular calls?
MR. McDONALD: Objection.
A. I don't specifically recall. The documents that I reviewed flagged a number of issues, including watching cash flow carefully, monitoring the sale process, dealing with lenders and liquidity.
Q. At the time that you were appointed did Mike Kvitko and Kevin Hess report to you?
A. I'm struggling with the phrase report to me.
Q. Were you in charge?
MR. McDONALD: Objection.
A. This goes back to our earlier conversation about what is the role of the independent fiduciary. There were some items typically set out in the operating agreement or bylaws or state law that specifically required the board's approval. On those, obviously, management would need to obtain my approval. On other items I don't think -- there are many items where I didn't expect them to get my approval. It really depended on the actual action.

Q. So if Mike Kvitko were terminating a single employee, that would not need your approval, correct?
A. I agree.
MR. McDONALD: Objection.
Q. If 89 people were being terminated, that would have required your approval, correct?
MR. McDONALD: Objection.
A. I don't know the answer to that question.
Q. We'll come back to that in a little bit.
MR. ROOKS: So I want to introduce another document. We'll call this Keller-3 and Keller-3 is going to be a series of documents. We'll call it one exhibit and before I distribute it, I'll say it's documents that have been Bates stamped Keller-00459, 00548, 00547, 00530, 00542 and 00545 and all of these documents were produced by Mr. Cabrera in connection with the subpoena.
- - -
(At which time, e-mails Bates stamped Keller 00459, 00548, 00547, 00530, 00542 and 00545 were marked as Keller-3 for identification.)
- - -
Q. So if there are any highlights on these documents, just ignore them. Mr. Keller, take a minute or two to take a look at these documents, which

are all e-mails, which were either sent to you or sent by you. So you would agree that you would exchange e-mails with Mr. Oddi?
A. I do agree.
Q. Did you exchange any e-mails with Mr. Oddi concerning any potential violations of the Fair Labor Standards Act?
A. I don't recall any.
Q. How about any e-mails with Mr. Oddi regarding potential violations of the Family Medical Act?
A. I don't believe there are any such e-mails.
Q. But you would agree that you did exchange a number of e-mails with Mr. Oddi concerning the WARN Act?
A. I did.
Q. If we can just go to the first page of what's been called Exhibit Keller-3, there's an e-mail from you on that page dated May 19, 2023.
A. I see that.
Q. It says, thanks, David. One point I want to drill down in is the WARN point. Probably a conversation, but what is the potential exposure. Do you see that?
A. I do.
Q. And we're going to then go to 548, another

e-mail from you. It's dated May 22nd. It's to David Oddi. It says, pretty much there; hoping to get WARN info will ping Dan Moss. Do you see that?
A. I do.
Q. And then there's 547. There's another e-mail from you sent to David Oddi dated May 23rd. I'm largely free after two p.m. eastern time. Mostly re WARN.
A. I see that.
Q. And the next one, this is from David Oddi to you on May 24th. It says, Toby, I'd like to limit the indemnity strictly to WARN liabilities as you should be otherwise covered under the D&O policy. Do you see that?
A. I do.
Q. If you go to 542, this is an e-mail from Stuart Kessler to you. It says, I certainly understand your concern around the WARN issue. Do you see that?
A. I do.
Q. The last page of that exhibit, Keller 545, there is an e-mail from you to Mr. Oddi on May 23rd at 4:55 p.m. It says, David, I want to reiterate that I appreciate your flagging this issue. And there is an e-mail below that have where you state, I understand

that a shutdown of the various stores remains a possibility of WARN statutes. In general, WARN is referenced several times in that e-mail. Do you see that?

A. I do.

Q. So if we go back to the first page -- before we get to that, tell me, you're an attorney and you obviously have knowledge about the WARN Act, correct?

A. That is true.

Q. So you are aware of the Federal WARN Act, right?

MR. McDONALD: Objection.

A. Yes.

Q. You are also aware of the state counterparts in the New Jersey WARN Act, correct?

A. I profess no expertise, but I'm aware of it, yes.

Q. I'm asking about awareness. Would you agree that the Federal WARN Act requires notice to employees prior to plant closings and mass layoffs?

MR. McDONALD: Objection. You're calling for a legal conclusion.

MR. ROOKS: He's a lawyer.

MR. McDONALD: He's not here as a lawyer.

MR. ROOKS: I understand.

MR. McDONALD: It calls for a legal conclusion and you're making a very simple statement about a statute that also has exceptions, exemptions and other issues. So if you want to make a general statement, I think you need to rephrase the question.

Q. Would you agree generally the WARN Act requires notice before plants are closed or there's mass layoffs?

A. Consistent with my counsel's objection, I am generally aware of those things, although I do not profess expertise.

Q. Would you agree that if there is no loss of employment, WARN isn't triggered?

MR. McDONALD: Same objection. You can answer.

A. That is my understanding.

Q. Meaning if no plants shutdown and no one loses their job, WARN would not be triggered, correct?

A. Same answer.

Q. So I guess, why did you have concerns about WARN potentially being violated?

MR. McDONALD: Objection. You can answer.

A. So I explained at the beginning of any of

these assignments, I undergo a diligence process that involves making sure I've looked at my personal liability before I undertake any responsibilities. Director and officer liability insurance usually and I believe in this case, specifically excludes various types of indemnity. One of those is liability for WARN violations. I clearly was aware that Forman Mills was distressed, that it was working on a transaction that may have obviated the need for any discussion of WARN, but that if the transaction failed that there was a potential liability under the WARN Act and I wanted to be sure that I had coverage for that.

Q. If we go to the first e-mail in Exhibit Keller-3 on this that you sent on David Oddi, one point I want to drill down is the WARN point. Probably a conversation, but what is the potential exposure. Did you receive an answer to that?

MR. McDONALD: I'm going to object and just caution the witness not to reveal any potential attorney-client communications he may have had with respect to that. Subject to that objection, you can answer.

A. I don't recall.

Q. Second page of that exhibit, pretty much

there; hoping to get WARN info, will ping Dan Moss. Is Dan Moss an attorney?

A. I believe Dan Moss was an attorney at Jones Day that was representing Forman Mills at the time.

Q. I don't want to know the conversation you had with Mr. Moss, but did you receive WARN information?

MR. McDONALD: Objection. Again, I'm going to caution you not to reveal any attorney-client communication. If you can answer without doing that, that's fine.

A. I do not believe that I received written information. I do believe that there were conversations that contained general information.

Q. Those conversations with were counsel?

A. That I don't specifically recall.

Q. Then the next page, it's an e-mail between you and David Oddi. It says, I'm largely free after two p.m. mostly regarding WARN. You guys had a conversation about WARN then?

A. So I just need to throw into the context here, I believe looking at these documents that much of what this was doing was flagging to Mr. Oddi that I was concerned about not having coverage for WARN and setting up a conversation about requiring indemnity from a third party, most likely Goode Partners.

Q. Going to the next page, I think this is what in reference to what you just said. This is Mr. Oddi saying to you that he wants to limit the indemnity strictly to WARN liabilities?
A. Yes.
Q. You were indemnified, right? There's an indemnification agreement in place?
A. That's correct.
Q. Let's skip to the last page of that exhibit, Keller-3. So this is an e-mail from you to Stuart Kessler. There says, I'm reaching out to you at the suggestion of David Oddi. I've run the traps and subject to the following, am ready to proceed as an independent director for Forman Mills. Do you see that?
A. I do.
Q. What's traps?
A. I think that was a vernacular way of saying I've completed my due diligence.
Q. I understand that a shutdown of the various stores remains a possibility and that the various WARN statutes, including most notably the New Jersey version create a meaningful risk of personal liability to the director. What did you mean when you say, meaningful risk of personal liability?

MR. McDONALD: I'm going to object to the extent not to reveal any attorney-client privilege information. Subject to that, he can answer.
A. I don't mean to be difficult, but I don't have much to add to the phrase, itself.
Q. And then you go on to say, you know, I'm not prepared to proceed without some means of protecting against this risk. Do you see that?
A. I do.
Q. In that e-mail risk is used looks like four times. You said meaningful risk. You said, in order to assume my responsibilities as an independent director, I need the risk covered. You also state, I'm not prepared to proceed without some means of protecting against this risk. And then you say, if there are other candidates willing to assume this risk, I am happy to stand down. So what is this risk?
A. The risk was that there would be a failed transaction, there would need to be significant reductions in force and it would trigger WARN liability.
Q. When you say reduction in force, you mean the risk would materialize if those terminations were without any type of notice?
MR. McDONALD: Objection.

A. You're getting to the question of what triggers WARN liability and I didn't try to delve very deeply into it. I simply knew that there was a risk and that I needed to know that I would have some protection against that if I were to take on this obligation.

Q. Did you have an understanding as to what would trigger that risk?

A. I had an understanding at the highest level and it was essentially consistent to what you previously asked.

Q. Paragraph 14 of Exhibit Keller-1 you say, mindful of the fact that any plant shutdowns, if ultimately implemented, could expose me to liability for actions outside the scope of the company's D&O policy. Do you see that?

A. I do.

Q. What actions were outside of the company's D&O policy?

A. I would have to reference the D&O policy. Many D&O policies have an expressed exclusion for coverage for WARN violations.

Q. So if we can go to paragraph 16 of the Exhibit Keller-1. Just read that paragraph.

A. Yes, I've read it.

Q. It says you engage with professionals to monitor Forman Mills' sale and financing efforts with potential buyers and other third parties, right?
A. Correct.
Q. And I think you had just testified that if the potential sale did not happen, the alternative would have been to potentially wind down the company and close?
A. That's too simple. There were many, many variations on what could happen. Ranging from in the best circumstance a sale not very different from what actually occurred to the worse case scenario, an absolute shutdown and liquidation of all the assets of Forman Mills and there are a lot of interim variations of that where some piece of Forman Mills could have been taken, assets could have been taken, various stores, selected stores could have been taken. So it was not binary. There were a number of potential outcomes.
Q. Now, you said earlier that you were engaged as a fiduciary, right?
A. That's a general term as engaged as a manager and director, but yes.
Q. As a fiduciary, you have obligations to who?
A. To the entities that retained me.

Q. So a lot of the conversation we've had with respect to WARN and the indemnification agreement and Independent Director Agreement and I believe you said so yourself, you were concerned about your personal liability or personal risk?
A. Correct.
Q. And you worried about the risk to you in the event there was a WARN violation, right?
A. That was one of the concerns, yes.
Q. You mitigated your own risk through this indemnification agreement, correct?
A. Correct.
Q. And mitigated your own risk through the procurement of a D&O policy that named you, correct?
A. Correct.
Q. What did you do to mitigate the company's risk in the event of a WARN violation?
MR. McDONALD: Objection. You can answer.
A. I'm struggling with the question. In a restructuring situation there are dozens of risks that are being balanced against one another. Liability for WARN violations would have been among those risks, but I can't answer the question as phrased because I did not look at the risk in isolation.

Q. Let me see if I can rephrase it and maybe, you can answer. But I understand that there are risks, but my question so solely focused on the WARN risk. We discussed that you took steps to mitigate your own risk for WARN violations and that was done through the D&O policy and done through the indemnification agreement.

Now, we also talked in very general terms that if there is no loss of employment, no plant shutdown, there is no WARN liability, correct?

A. That's my understanding of the law.

Q. WARN is only triggered if there is a mass layoff or plant closure generally involving 50 or more people or 33 percent of the workforce?

A. Whether there's WARN liability is a legal issue. I don't know the answers.

Q. In general, if there is no loss of employment, there would not be a need to send out any WARN notices, correct?

A. That is my understanding.

Q. I'm trying to frame this question about, I understand what you did to minimize your own personal liability for WARN violations and I understand that you said that there's other risks involved. I'm not concerned about those other risks. I'm just asking,

what steps were taken to minimize the company's risk for potential WARN violation?

MR. McDONALD: I'm going to object. To the extent that it requires you to reveal any attorney-client privilege communications, do not. You can answer it otherwise.

A. So I don't know that this answers your question directly, but I'm going to give my best shot which is, I was in regular contact with counsel for the company about compliance issues, obligations, liabilities. I was also in contact with financial advisors about liquidity and the ability to pay payroll and other operational costs and I was in contact with managers about the consequences, both of giving a WARN notice and not giving a WARN notice and those all went into the overall monitoring of the question of WARN noticing and employee relations.

Q. So you just said that you were in contact with the managers about the consequences of giving WARN notice and not given WARN notice?

A. Correct.

Q. So tell me what were the consequences that you discussed with the management team about not giving WARN notice?

A. So I don't specifically recall the

conversations. This is a conversation that I frequently have with managers in distress circumstances and the concern is that giving a full WARN notice, one has to assume is publicly available and it could lead to competitors poaching employees. It could lead to vendors freezing credit lines. It could lead to sometimes defaults under agreements. So those are among the things that I would want to address with management, but I don't specifically recall having that conversation with Mr. Kvitko or Mr. Hess.

Q. That was a consequence of giving notice?

A. Correct.

Q. My question was of not giving notice?

A. That tends to be more in the wherewithal of the legal advisors, but there's also the question of how many employees are there. Depending on what state, what are the consequences within that state. Again, it's just being aware of what the legal consequences are.

Q. So let me ask it this way. In terms of WARN and not giving notice and the conversation that you had with the management team, what were the practical consequences of not giving notice?

MR. McDONALD: Objection. You can

answer.
A. I can't answer the question only because this was not a decision made in isolation. These are decisions that are constantly being evaluated and being considered, in this case, literally on a day-to-day basis.
Q. So you said the decision was not made in isolation. Now, what decision are you referring to, the decision to not give notice or to --
A. Your question, I believe, asked about giving WARN notices. So the decision to give or not to give WARN notices is something one constantly monitors.
Q. Now here, you would agree that notice was not given to the affected employees at the corporate location, correct?
MR. McDONALD: Objection. I don't think you defined affected employees.
MR. ROOKS: Okay.
Q. Let me give you a little foundation. So on June 6th, there was a termination event at Forman Mills corporate headquarters in Pennsauken, New Jersey, correct? You are aware of that?
A. You used a phrase, termination event. In the most general sense I'm aware that there was an event in which people were told not come to the office.

Q. Let me go to the declaration paragraph 17 of Keller-1. I'll read this. It's the second sentence, it is my understanding that on or about June 6, 2023 Forman Mills notified employees at the Pennsauken location via e-mail that their employment would be terminated effective immediately. Do you see that?

A. I do.

MR. ROOKS: Can you read my question before the objection?

\- - -

(The court reporter read the record as requested.)

\- - -

Q. You would agree that these employees that are referenced in paragraph 17 of your declaration were not given advanced notice of their termination?

A. It is my understanding that no WARN notices were ever issued. Full stop.

Q. Do you know why WARN notices were not given?

MR. McDONALD: Objection. I'm going to instruct you not to answer if it would require you to divulge any attorney-client privilege information. Otherwise, you can answer.

A. My hesitation is, I don't specifically recall making a decision or not making a decision around WARN

noticing.
Q. You're saying you personally don't recall whether a directive was given to say, hey, give these people notice or don't give these people notice?
A. Correct.
Q. So a decision was made to terminate all these people, right?
A. I remember --
Q. I mean, they didn't fire themselves, right? So a decision was made?
A. I understand people were terminated on or about that date that you offered up.
Q. So prior to that decision, prior to the termination of those individuals, what if any alternatives were explored, you know, before that decision was made?
A. So harkening back to my comment about this was not a decision made in isolation, the company was struggling to assure that it had adequate cash flow to in continue operations and this instance, to pay payroll. There were several parties. Eclipse Business Credit, The Secured Creditor, Shoppers World, I believe Goode and Monroe all engaged in conversations about how to bridge the company to a sale so that it had adequate liquidity to get to a

sale to Shoppers World and that had immediate implications for what we were doing about staffing and payroll.
Q. So you said the decision was not made in isolation, right?
A. Correct.
Q. You identified some parties. You identified Shoppers World?
A. Correct.
Q. Did you say Eclipse?
A. Eclipse Business Credit, I believe is the name.
Q. Did you say Monroe?
A. Monroe Capital. And I'd add one other to that list, which is Tiger. I don't know it's full name, but Tiger was also involved at the time of discussion of finding bridge financing.
Q. Tiger is a lender?
A. Tiger was looking at putting in financing. I don't think they are a bank, but I believe they were going to provide financing or looking at providing financing and there's yet another one. Maybe, White Oak. There were several lenders that were trying to find us a way to make sure that we get to bridge financing.

Q. On one hand, we've got these people, lenders, right. We've got Shoppers World, Eclipse, Monroe, Tiger, White Oak, whoever, right? None of whom are directors of the company, none of whom are employees of the company?
A. Correct.
Q. None of whom --
MR. McDONALD: Objection to the question. I didn't know if he was finished, but I don't think he said all of those entities were lenders or financers. You categorized them all as that.
Q. Or acquirers. Other entities on one side, none of whom are on the board?
A. They were all third parties.
Q. All third parties, okay. And then, that's on one hand. On the other hand, there's who? There's you. Who else is involved?
A. Our legal advisors, management. I don't know if -- it doesn't sound as if you included PKF and Mr. Kessler, but his organization and there was an investment banker, Threadstone, that was also deeply involved in these conversations.
Q. Of all the parties you've identified, who has the authority to make decisions on behalf of the company?

A. Management and the board.
Q. So you said that the decision was not made in isolation, but the decision was made to terminate these people?
A. Yes, a decision was made.
Q. Did you make that decision to terminate those employees?
MR. McDONALD: Objection. You can answer.
A. I genuinely don't recall whether I did. I was certainly part of the process.
Q. I think you testified earlier that Mike Kvitko can terminate one person without board involvement?
A. Correct.
Q. But to terminate 89 individuals, that is not something that he could do on his own, correct?
MR. McDONALD: Objection. That's not what he testified to, but you can answer the question.
A. That wasn't my testimony. My testimony was, I actually don't know the answer to that question.
Q. My apologies for mischaracterizing your testimony. So this decision to terminate these individuals at the corporate center in Pennsauken, the mass termination that occurred on June 6th, that was a

decision that you were part of, correct?
MR. McDONALD: Objection to your use of mass termination, but you can answer otherwise.
A. Correct.
Q. Let me rephrase the question without the word mass?
MR. McDONALD: I think that's what you said. You kind of said it under your breath. Maybe, you didn't.
Q. The termination of the affected individuals at the Pennsauken corporate location, I believe there were 89 individuals who were terminated on June 6th, you were part of that decision to terminate their employment?
A. So I've choked on the term terminate. I was part of the conversation. But the reason I choked on the term terminate, we were still hoping to get to a Shoppers World transaction that would result in preserving those jobs.
Q. I say terminate because that's the word you used in your declaration.
A. Correct.
Q. Did you write your declaration or someone else?
A. I'm sure it was done in the first instance by

counsel.
Q. But you reviewed it before you signed it, right?
A. I did.
MR. McDONALD: Just for clarity, I believe that was paragraph...
MR. ROOKS: 17, I think.
MR. McDONALD: 17. It does say that it is his understanding that on June 6, 2023 that occurred.
Q. Do you doubt that those people were terminated?
A. I doubt it in the sense that my understanding was that they actually never missed a paycheck. So one gets to a legal academic question that I'm not qualified to answer is, if somebody loses their job, but is reinstated with full benefits, is that a termination? I leave that to you all to argue and figure out.
MR. ROOKS: Let's take a ten-minute break.
\- - -
(At which time a short recess was taken.)
\- - -

Q. We were talking about the termination of the employees at the corporate center in Pennsauken. Prior to that happening, were there any analyses that you did or the company did that you are aware of as to the impact that those terminations were had?

MR. McDONALD: Objection. Just do not disclose any attorney-client communications. Otherwise, you can answer.

A. I sought advice. I don't remember whether I received advice and what their advice was as I sit here today.

MR. ROOKS: Let me just Keller-4.

\- - -

(At which time, e-mails Bates stamped Keller-00149 were marked as Keller-4 for identification.)

\- - -

Q. This is an e-mail that was produced in connection with the subpoena that was sent to you. It's stamped Keller 00149. It's an e-mail from Mike Kvitko to you. Subject forward, FW, would you agree that FW is forward?

A. I would.

Q. SW CF. I don't know what SW means, but I would think it means Shoppers World?

A. That's what I think it means.
Q. Would you say that CF means cash flow?
A. I would also agree with that.
Q. So looks like there was four week cash flow that was potentially sent to you?
A. I'm reading the same thing, yes.
Q. It says that Kevin's assumptions are listed below and that would be Kevin Hess, right?
A. I believe so.
Q. And second is a staffing plan reduction that Sammy asked me for that shows how we'd skinny down the office and DC staff. Do you see that?
A. I do.
Q. DC means distribution center?
A. That's usually what it means in this context.
Q. And then office, would that be the Pennsauken office where the corporate employees were?
A. I read it as Pennsauken office, yes.
Q. What's your recollection about a staffing plan reduction as used in this e-mail?
A. I'm reading this in context. As I sit here, I don't have a specific recollection, but as I read this, I see as a fairly typical request from a prospective buyer as to whether there can be cost savings by reducing administrative staff and

importantly here, I think it's distinct from a significant reduction in force.
Q. You said distinct?
A. Correct.
Q. Can you explain that? You said it's distinct from a significant reduction in force?
A. Correct.
Q. What do you mean by that?
A. If you look at the preceding e-mail, it talks about the cash flow and that it's normal course and does not reflect any contemplated RIF, which I believe is reduction in force. I believe that the staffing plan reduction that's described here would be ways of reducing general corporate overhead that would improve the economics for Shoppers World, but would not necessarily be the type of reduction in force that brings on a WARN analysis.
Q. So with the termination of the employees on June 6, 2023, would you agree that was a decision that was not an off-the-cuff, on-the-whim decision that it was planned and thought out?
MR. McDONALD: Objection. You can answer.
A. I would agree that it was not an off-the-cuff decision, yes.

Q. How much planning went into that decision to terminate those employees?
A. I'm just going to note on a standing basis my discomfort with the term termination, but it was used in the declaration. Again, it's impossible for me to tease out the thread of that issue from, you know, the fog of the overall distressed transaction and the cash flow issues that we were dealing with on a daily basis at that point.
Q. So you would agree that the, I'll use the word termination for lack of a better word, the termination of those employees would reduce costs, right?
MR. McDONALD: Objection.
Q. I'll rephrase. The termination of those employees would reduce payroll expense, agreed?
A. Again, I'm hesitating. I believe that the issues that were presented at the time were that we, being myself, management, our advisors, could not get comfort that if payroll that was being paid on an accrual basis was, in fact, accrued that any of our financing sources would deliver cash sufficient to pay those obligations. My recollection was that it was a short-term decision that was intended to help us bridge to get to the Shoppers World transaction with

the major caveat that we did not have certainty that we were going to get to the Shoppers World transaction.

Q. But my question was, if those people are no longer worker, there is no ongoing payroll obligation to them, correct?

MR. McDONALD: Objection.

A. Definitionally, that's true.

Q. What other changes happened around the time that those employees were terminated that reduced expenses for Forman Mills?

A. So most of what was going on was not being done at the board level, but there was intense management of payables. There were intense negotiations around financing and the borrowing base to make liquidity available and there were intense negotiations around finding alternative financing and getting to a closing with Shoppers World. All that was happening concurrently.

Q. So the Shoppers World transaction, if we go to paragraph 16 of Exhibit Keller-1, the last sentence to paragraph 16 says, ultimately, those efforts were successful and Forman Mills was acquired by a third-world buyer in mid June 2023. Do you see that?

A. You said third-world buyer. I believe you

meant third-party buyer.
Q. Yes, third-party buyer. That would have been Shoppers World, right?
A. Correct.
Q. To your knowledge, was that an asset sale or stock sale?
A. That was a stock sale.
Q. Was any consideration paid for the stock of Forman Mills?
A. I would have to consult the stock purchase agreement itself. My recollection was that the liabilities of Forman Mills road through and stayed with the buyer, but that the financiers made very significant concessions and I don't specifically recall the concessions as I sit here today.
Q. You said that the liability stayed?
A. With the buyer.
Q. And there was some concessions made by the lenders, right?
A. Correct.
Q. Did any money change hands? Did Shoppers World pay Goode? I'll just call them Goode defendants, Goode Consumer Fund III, the owner of the platform, Forman Mills, did Shoppers World pay any money or was it just an assumption of debt?

A. As I sit here, I don't recall. I didn't actually review the stock purchase agreement in anticipation of this deposition. I know that there was consideration. I don't recall whether there was any cash consideration. My guess is there was very little, if any.

Q. If you know, was EBITDA used in the determination of any type of cash consideration that was paid by Shoppers World?

MR. CABRERA: Objection. You can answer.

A. So EBITDA is one of the metrics that is used by buyers and prospective buyers to determine value. I am certain that when Threadstone was going through its process that was a metric that was carefully reviewed and shared with prospective buyers. I don't recall it being a significant issue in the last days preceding the negotiation and signing of the Shoppers World deal.

Q. If you know, to the extent that EBITDA was used, was the termination of those employees at the corporate center, did that have any affect on the EBITDA?

A. I expect that it had no effect on the EBITDA. My understanding of the Shoppers World transaction was

that they needed the corporate staff to be functioning and therefore, that their employment costs would be built into the Shoppers World model.
Q. You said that they needed them to be functioning. The corporate staff needed to be functioning, correct?
A. Correct.
Q. Let's jump to paragraph 17 of Keller-1. You say in that statement, in connection with the acquisition, Forman Mills was required to temporarily cease operations in several states, including but not limited to its operations in Pennsauken, New Jersey.
A. I see that.
Q. You just testified that Shoppers World needed that staff to be in place?
A. Correct.
Q. So when you say Forman Mills was required to temporarily cease operations in several states, who required Forman Mills to cease operations in several states, including the Pennsauken office?
A. Circumstances required. Most specifically, liquidity and financial resources.
Q. The last sentence in paragraph 17 it says, around the same time, it is also my understanding that Forman Mills notified employees located in other

states that their employment would be terminated. You see that?
A. I do.
Q. Were employees in other states terminated on or about, let's say, June 6, 2023?
A. My understanding is that they were not.
Q. Now, we jump to paragraph 18. In the course of my duties as an independent director, I communicated with Mr. Kvitko and other executives regarding the cessation of operations required as a consequence of Forman Mills' acquisition.
So I guess I'm not really clear. You said as a consequence of the acquisition. How is that a consequence of the acquisition when you said that the acquirer needed that staff?
A. In reading all of paragraph 18, I believe that the point was, we had this short-term cash problem and that we functionally needed to make sure that we could survive to get to a Shoppers World transaction. I believe that was the cessation alluded to there. As the rest of the paragraphs indicates, the hope was that they would not be permanent employment terminations and that people would be hired, rehired or keep their jobs, however one characterizes it.

MR. ROOKS: Can you read back the answer?

- - -

(The court reporter read the record as requested.)

- - -

Q. When you say that the hope, the hope was that they were not going to be permanently terminated?
A. Correct.
Q. Did Forman Mills do anything to communicate that hope to those employees?
MR. McDONALD: Objection. You can answer.
A. I don't know the answer to that.
Q. Did you have any conversations with Shoppers World about terminating those employees in connection with this acquisition?
A. I had very view, if any, direct communications with Shoppers World and I'm almost certain that I did not.
Q. I don't think I asked this, but did you have any conversations with Mr. Oddi regarding the actions that you guys were going to take with respect to the employees at the corporate office?
A. I don't believe that I did.

Q. What were your conversations with Mike Kvitko regarding the disposition of those employees at the corporate office?

A. I don't specifically recall the conversations. I recall both being concerned that, obviously, I didn't want to let anybody go, that I equally was unwilling to keep people on if we could not be sure that we would be able to pay them and I do think that I communicated that I had hoped that the communications include some sort of statement about the pendency of the Shoppers World transaction because I was hopeful that the Shoppers World transaction would close.

Q. You said that you had hoped that those communications would have included something about the pendency of the Shoppers World acquisition?

A. Correct.

Q. And those communications would have been the communications that were sent to the employees?

A. Correct.

Q. Did you have an opportunity to see any of those communications that were sent to the employees prior to them being sent to them?

A. I asked this morning to see the communication specifically on this point and it was the first time

that I saw, I believe that I saw, that there was no such communication.
Q. There was a communication, though, right?
A. Right.
Q. Are you saying that the communication did not convey the hope that you discussed?
A. Correct.
Q. You are aware that the communications that were sent to the employees at the corporate location contained information as to how to file for unemployment?
A. So I saw a single document. I believe it was called FAQs for frequently asked questions and that did contain that information, yes.
Q. You would agree that by sending somebody information as to how to apply for unemployment that probably wouldn't reflect the hope that you're talking about?
MR. McDONALD: Objection.
A. The document that I saw in isolation did not communicate the hope that I talked about.
Q. Let me ask a few questions about the staff members and I use that word disposition.
A. Understood.
Q. But in terms of the disposition of the those

people what, I guess, forecasts did you guys run, I say you guys meaning, collectively management and the board run to look at the financial impacts because obviously, there's going to be savings, right, of payroll if these terminations are made, right?

MR. McDONALD: Objection. Asked and answered, but you can answer.

A. I don't think I considered them savings. My thinking at the time was that it is both unlawful and unethical to keep someone employed if you cannot -- if you don't have adequate certainty that you'll be able to pay them for the time that they worked. So your reference to savings implies a longer term horizon that I don't think was front of mind.

Q. Well, it would have eliminated an obligation to pay, a go-forward obligation to pay, correct?

A. During that bridge period, absolutely.

Q. I believe there were, approximately, 89 individuals their employment was disposed of on that date, June 6th. Were any spreadsheets, et cetera, created to look at the financial impact as to what the cost of what it would be?

A. I believe we were slavishly attending to cash flow projections. I don't recall how they addressed payroll and payroll obligations, but they certainly

would have been in the spreadsheets.
Q. Are you aware of how those individuals were identified or targeted, let's say, for the disposition of their employment?
MR. McDONALD: Objection. You can answer.
A. Not as I sit here today.
MR. ROOKS: Let's take ten minutes.
- - -
(At which time a short recess was taken.)
- - -
Q. With respect to the hope that you were talking about earlier, was it just that, that it was hope that these individuals would be rehired? Were there any plans in place at the time of their disposition that would have materialized? Was there a planned, like, callback or anything that you could point to that says, yeah, this was and truly, in fact, temporary. We had this whole plan in place to let these people go for two weeks and then bring them back?
A. I would refer you to drafts of the Shoppers World stock purchase agreement. I don't know that they were produced, but they were drafts that were

extent at the time.
Q. That would have been Shoppers World bringing them back?
MR. McDONALD: Objection. Because you're misstating the transaction. Remember, he established it was a stock sale not, an asset sale.
MR. ROOKS: Fine distinction. Understood.
Q. It would have been a different shareholder in place bringing them back?
A. I can't say much more. It would be the closing of the Shoppers World transaction and the reengagement, as it were, of the corporate staff.
Q. Were any of the actions that you took with respect to the disposition of the employees at the corporate location put to a shareholder vote?
A. No.
Q. Were any of the actions that you took at all in your tenure as the sole independent director put to any type of shareholder vote?
A. I'm hesitating. I would expect that the Shoppers World transaction would have required shareholder approval, but in fact, because it was a stock purchase agreement, I don't specifically recall.
MR. ROOKS: I don't have anything else.

MR. CABRERA: I have no questions for the witness.
MR. MINGIONE: I have no questions for the witness.
MR. McDONALD: No questions.
MR. CABRERA: Do you wish to read and sign?
MR. McDONALD: I think he should.
COURT REPORTER: Would counsel like to order the transcript?
MR. CABRERA: Yes.
MR. MINGIONE: Yes.

\- - -

(Witness excused.)

(Deposition concluded at 12:10 p.m.)

\- - -

C E R T I F I C A T E

I hereby certify that the proceedings and evidence noted are contained fully and accurately in the notes taken by me on the deposition of the above matter, and that this is a correct transcript of the same.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

LATITISA RUSSELL, RPR
CCR #30XI00234100
APRIL 28, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

LAWYER'S NOTES

LINE PAGE

___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________

**A**

**a.m** 1:22
**ability** 6:15,19 46:12
**able** 66:8 68:11
**absolute** 43:13
**absolutely** 68:17
**academic** 55:15
**accept** 20:15
**accepted** 25:13
**accepting** 17:8
**accountable** 30:1
**accrual** 59:21
**accrued** 59:21
**accurate** 23:20
**accurately** 72:5
**acquired** 60:23
**acquirer** 64:15
**acquirers** 52:12
**acquisition** 15:5 21:8 27:3 28:8 63:10 64:11,13 64:14 65:17 66:16
**Act** 34:7,10,14 36:8,10,15,19 37:7 38:12
**acting** 9:4
**action** 1:3 30:22 32:25
**actions** 18:25 30:12,16 42:15 42:18 65:22 70:14,18
**activities** 8:23
**acts** 23:7
**actual** 32:25
**add** 9:16 41:5 51:14
**addition** 21:9
**address** 47:9
**addressed** 68:24
**adequate** 50:19 50:25 68:11
**administrative** 57:25
**advanced** 49:16
**advice** 56:9,10 56:10
**advisors** 46:12 47:16 52:18 59:19
**affect** 6:19 62:22
**affiliated** 15:22
**ago** 17:9
**agree** 30:12,15 30:18 31:23 33:3 34:2,4,12 36:18 37:7,13 48:13 49:14 56:21 57:3 58:19,24 59:10 67:15
**agreed** 59:16
**agreement** 4:16 23:25 24:7,10 24:11,18 25:1 25:4,5,6,7,10 32:20 40:7 44:2,3,11 45:7 61:11 62:2 69:24 70:24
**agreements** 47:7
**alleged** 13:11
**alluded** 64:20
**alternative** 43:6 60:17
**alternatives** 28:7 50:15
**Americas** 3:6
**amount** 9:18
**analyses** 56:3
**analysis** 58:17
**analyst** 7:21
**and/or** 25:21 72:18
**answer** 5:13 11:20 12:17,25 21:2,4 22:18 31:4,5 33:8 37:16,20,24 38:18,23 39:9 41:3 44:19,24 45:2 46:6 48:1 48:2 49:21,23 53:9,19,21 54:3 55:16 56:8 58:23 62:11 65:2,13 65:14 68:7 69:6
**answered** 68:7
**answers** 45:16 46:7
**ANTHONY** 3:5
**anthony.ming...** 3:8
**anticipation** 62:3
**anybody** 18:1 66:6
**apologies** 53:22
**apologize** 30:19
**appears** 14:13
**apply** 67:16 72:17
**appointed** 18:12 31:24 32:12
**appointment** 15:3 29:18 30:20 31:16
**appreciate** 35:24
**approval** 30:17 32:21,23,25 33:2,6 70:23
**approximately** 10:1,12 11:22 26:12 68:18
**April** 1:21 72:13
**argue** 55:18
**arrangement** 16:14
**arrival** 31:15
**articles** 10:18,23 17:1
**asked** 9:9 17:3 24:20 30:19 32:4 42:11 48:10 57:11 65:21 66:24 67:13 68:6
**asking** 30:24 36:18 45:25
**asks** 31:2
**aspect** 9:14,15
**assert** 30:8
**assessment** 17:13
**asset** 61:5 70:6
**assets** 43:13,16
**assignment** 17:12
**assignments** 38:1
**assist** 12:12 15:4
**assume** 41:12,16 47:4
**assumption** 61:25
**assumptions** 57:7
**assure** 50:19
**attending** 68:23
**attorney** 6:10 36:7 39:2,3
**attorney-client** 38:21 39:8 41:2 46:5 49:22 56:7
**attorneys** 14:4
**authored** 10:17
**authority** 23:22 24:22 25:15 26:4 52:24
**authorizing** 19:1 19:1
**available** 28:7 47:4 60:16
**Avenue** 3:6
**aware** 17:3 21:7 21:9 36:10,14 36:16 37:11 38:7 47:19 48:22,24 56:4 67:8 69:2
**awareness** 36:18

**B**

**B** 4:11 6:2
**back** 13:19 14:14 25:20 32:17 33:9 36:6 50:17 65:1 69:22 70:3,10
**backed** 11:10,23 12:4
**background** 10:16
**balanced** 44:22
**bank** 7:21 51:20
**banker** 52:21
**bankruptcy** 8:8 10:22
**BARBER** 1:5
**base** 60:15
**basic** 6:23
**Basically** 26:3
**basis** 21:17 48:6 59:3,8,21
**Bates** 4:17,19 33:14,19 56:14
**beaches** 7:2,3
**bears** 8:3
**becoming** 16:20
**began** 20:11
**beginning** 37:25
**behalf** 1:6 17:22 18:1,4,8,18 23:8 52:24
**believe** 9:16 15:23 18:12 19:12 21:5,13 21:23 23:9 24:20 26:8 27:1 28:22 29:13,15 34:11 38:5 39:3,11

39:12,21 44:3 48:10 50:23 51:11,20 54:11 55:6 57:9 58:11,12 59:17 60:25 64:16,20 65:25 67:1,12 68:18,23
**benefits** 13:8 55:17
**Benvenutti** 8:4
**best** 43:11 46:8
**better** 59:11
**binary** 43:18
**bit** 33:9
**BLANK** 3:4
**board** 11:6,8,12 11:15,17,17,23 11:24,24 12:3 12:8,14,21 20:9 21:15 22:6,7,9,14,25 23:6,16,21 29:22,25,25 30:17 52:13 53:1,13 60:13 68:3
**board's** 32:21
**books** 10:23
**born** 7:7
**borrowing** 60:15
**boutique** 8:8
**break** 55:21
**breath** 54:8
**bridge** 50:24 51:17,24 59:25 68:17
**bring** 69:21
**bringing** 70:2,10
**brings** 58:17
**Broad** 1:24
**built** 63:3
**business** 28:6 50:22 51:11
**buyer** 20:4,5 27:4 57:24
60:24,25 61:1 61:2,13,17
**buyers** 43:3 62:13,13,16
**bylaws** 17:1,6 32:20

**C**

**C** 2:1 3:1 72:1,1
**Cabrera** 2:21 18:10 21:3,24 31:1 33:16 62:10 71:1,6 71:11
**California** 6:24 7:6,8,24
**call** 13:19 16:6 24:3 31:20 32:4 33:11,13 61:22
**callback** 69:18
**called** 9:13 20:7 34:17 67:13
**calling** 36:22
**calls** 12:22 16:8 32:6 37:2
**candidates** 41:16
**Capital** 15:24 21:18 26:15 51:14
**carefully** 32:10 62:15
**case** 9:8 17:2 38:5 43:12 48:5
**cases** 9:13
**cash** 32:10 50:19 57:2,4 58:10 59:7,22 62:5,8 64:17 68:23
**categorized** 52:11
**caution** 38:20 39:8
**caveat** 60:1
**CCR** 1:20 72:12
**cease** 63:11,18 63:19
**center** 53:24 56:2 57:14 62:22
**CEO** 28:22 29:1
**certain** 62:14 65:20
**certainly** 35:17 53:11 68:25
**certainty** 60:1 68:11
**certification** 72:16
**certify** 72:4
**certifying** 72:19
**cessation** 64:10 64:20
**cetera** 68:20
**CF** 56:24 57:2
**change** 61:21
**changes** 26:19 60:9
**characterizes** 64:25
**charge** 32:15
**check** 31:20
**chief** 29:5,7
**choked** 54:15,16
**chose** 22:21
**circumstance** 9:9 43:11
**circumstances** 17:14 26:25 47:3 63:21
**civil** 1:3 13:11
**clarification** 28:21
**clarity** 55:5
**clear** 29:10 64:12
**clearly** 38:7
**close** 43:8 66:13
**closed** 27:6 37:8
**closing** 60:18
70:12
**closings** 36:20
**closure** 45:13
**COINVEST** 1:12
**collectively** 68:2
**come** 15:18 33:9 48:25
**comfort** 59:20
**coming** 16:24
**commence** 16:21
**commencing** 1:22
**comment** 50:17
**committing** 20:15
**common** 22:21 22:23
**commonly** 9:3
**communicate** 65:10 67:21
**communicated** 29:18 31:15 64:9 66:9
**communication** 39:9 66:24 67:2,3,5
**communicatio...** 38:21 46:5 56:7 65:19 66:10,15,18,19 66:22 67:8
**companies** 9:19 9:23 10:8 12:24 23:11
**company** 8:10 11:7,9,11,13 11:16,23 12:4 12:20 13:8,9 20:4,6 23:1,6 43:7 46:10 50:18,24 52:4 52:5,25 56:4
**company's** 25:18 42:15,18 44:16 46:1
**competitors** 47:5
**completed** 40:19
**compliance** 46:10
**complicated** 30:4
**comprehensive** 28:10
**concern** 35:18 47:3
**concerned** 39:23 44:4 45:25 66:5
**concerning** 34:6 34:13
**concerns** 37:21 44:9
**concessions** 61:14,15,18
**concluded** 71:15
**conclusion** 36:22 37:3
**concurrently** 60:19
**condition** 16:24
**Confidential** 5:8
**confines** 23:22 24:22
**conflict** 21:17 22:25 23:8
**conflicted** 21:12 21:16
**connection** 14:3 18:1 33:17 56:19 63:9 65:16
**consequence** 47:12 64:11,13 64:14
**consequences** 46:14,19,22 47:18,20,24
**consideration** 19:7 28:1 61:8 62:4,5,8

**considered** 48:5 68:8
**consistent** 25:17 37:10 42:10
**constantly** 48:4 48:12
**constituencies** 9:16
**consult** 26:11 61:10
**Consumer** 23:19 61:23
**contact** 15:19,23 46:9,11,14,18
**contacted** 14:17
**contain** 67:14
**contained** 39:13 67:10 72:5
**contemplated** 58:11
**contemporane...** 22:13,13
**context** 27:16 39:20 57:15,21
**continue** 50:20
**continued** 3:1
**contracted** 29:7
**contracting** 9:4
**control** 72:18
**conversation** 15:7,8,21 32:17 34:22 38:17 39:5,19 39:24 44:1 47:1,10,22 54:16
**conversations** 15:15 20:16 26:4,13,14,17 26:20 29:21 32:2 39:13,14 47:1 50:24 52:22 65:15,22 66:1,5
**convey** 67:6
**copy** 19:19
**corporate** 12:11 18:25 19:1 48:14,21 53:24 54:11 56:2 57:17 58:14 62:22 63:1,5 65:24 66:3 67:9 70:13,16
**corporation** 8:22 9:11 30:6
**correct** 7:25 8:5 14:7 18:21 20:9,10,12 22:8,9 25:9 29:2,11 31:24 33:2,6 36:8,15 37:19 40:8 43:4 44:6,11 44:12,14,15 45:10,19 46:21 47:13 48:15,22 50:5 51:6,9 52:6 53:15,17 54:1,4,22 58:4 58:7 60:6 61:4 61:20 63:6,7 63:16 65:9 66:17,20 67:7 68:16 72:7
**cost** 57:24 68:22
**costs** 46:13 59:12 63:2
**counsel** 2:8,17 2:25 3:9 14:5 39:14 46:9 55:1 71:9
**counsel's** 37:10
**counterparts** 36:14
**couple** 7:16,20 10:20
**course** 16:20 58:10 64:7
**court** 1:1,18 2:13 49:11 65:4 71:9
**cover** 17:1
**coverage** 38:12 39:23 42:22
**covered** 35:13 41:13
**COZEN** 2:20
**create** 40:23
**created** 68:21
**credit** 47:6 50:22 51:11
**creditor** 21:13 50:22
**creditors** 28:11
**CROSS** 4:4
**currently** 8:1

**D**

**D** 4:2
**D&O** 17:7 19:20 19:23 35:13 42:15,19,20,21 44:14 45:6
**daily** 59:8
**Dan** 35:3 39:1,2 39:3
**date** 50:12 68:20
**dated** 34:18 35:1 35:6
**David** 14:17 20:16 34:20 35:1,6,10,23 38:15 39:17 40:12
**DAWN** 1:5
**day** 15:22 20:2 39:4
**day-to-day** 48:6
**days** 62:17
**DC** 57:12,14
**deal** 12:23 62:19
**dealing** 23:9 32:11 59:8
**death** 21:11
**debt** 22:2 23:3,4 23:5,8 61:25
**decision** 16:16 17:22 22:20 48:3,7,8,9,11 49:25,25 50:6 50:10,13,16,18 51:4 53:2,3,5,6 53:23 54:1,13 58:19,20,25 59:1,24
**decisions** 17:25 18:4,8,18,22 18:25 31:10 48:4 52:24
**declaration** 4:14 13:21,23 14:2 15:1 19:19 20:13 21:5,7 28:4 49:1,15 54:21,23 59:5
**deeply** 42:3 52:21
**defaults** 16:13 47:7
**Defendant** 2:17 2:25 3:9 4:14 13:24
**defendants** 1:14 6:11 61:23
**defined** 48:17
**definition** 27:14 27:22
**Definitionally** 60:8
**DEL** 1:5
**Delaware** 25:19
**deliver** 59:22
**delve** 42:2
**depended** 32:25
**depending** 9:2 47:17
**depends** 27:24
**deposition** 1:16 6:13 62:3 71:15 72:6
**described** 22:25 58:13
**DESCRIPTION** 4:13
**detail** 16:9
**determination** 62:8
**determine** 28:2 62:13
**determined** 27:20
**differ** 31:17
**different** 30:5 43:11 70:9
**difficult** 41:4
**digits** 10:14
**diligence** 16:21 17:5,7,11,15 38:1 40:19
**direct** 4:4 6:5 65:18 72:18
**direction** 5:13 26:5
**directive** 50:3
**directly** 46:8
**director** 4:16 9:12 16:22 20:9,18 22:15 23:25 24:6,10 24:21 25:6,22 26:10,16,21 29:17,23 30:10 38:4 40:14,24 41:13 43:23 44:3 64:8 70:19
**directors** 11:6,8 11:12 12:8 13:3,6,7,9,10 13:12 14:14 22:7 29:25 30:1 52:4
**discharge** 23:6
**disclose** 56:7
**discomfort** 59:4
**discussed** 28:6 28:19 32:6 45:4 46:23 67:6

**discussing** 16:1
**discussion** 19:15 25:25 38:10 51:17
**discussions** 26:18 28:14
**dismiss** 4:15 13:25 14:3
**disposed** 68:19
**disposition** 66:2 67:23,25 69:3 69:17 70:15
**dissolution** 27:2
**distinct** 58:1,3,5
**distinction** 70:7
**distress** 9:19,24 12:25 15:2 16:7,11 47:2
**distressed** 15:4 21:8 23:2 38:8 59:7
**distribute** 33:13
**distribution** 57:14
**DISTRICT** 1:1 1:2
**divulge** 49:22
**document** 13:18 14:7,9 24:24 24:25 25:16 33:11 67:12,20
**documentation** 18:11
**documents** 5:3 16:17 25:19 26:11 31:18 32:3,8 33:12 33:14,16,24,25 39:21
**doing** 27:25 39:9 39:22 51:2
**doubt** 55:11,13
**dozen** 10:2 12:2 12:6
**dozens** 44:21
**drafted** 25:7
**drafts** 69:23,25
**drill** 34:21 38:16
**due** 17:15 40:19
**duly** 6:3
**duties** 23:6 25:17 64:8

**E**

**E** 2:1,1 3:1,1 4:2 4:11 6:2,2 72:1 72:1
**e-mail** 34:17 35:1,5,16,22 35:25 36:3 38:14 39:16 40:10 41:10 49:5 56:18,20 57:20 58:9
**e-mails** 4:17,19 33:19 34:1,3,5 34:9,11,13 56:14
**earlier** 32:17 43:20 53:12 69:14
**early** 10:21 28:22
**eastern** 35:7
**EBITDA** 27:21 62:7,12,20,23 62:24
**Eclipse** 50:21 51:10,11 52:2
**economics** 58:15
**educational** 7:10
**effect** 62:24
**effective** 49:6
**efforts** 43:2 60:22
**eight** 14:16,16
**either** 16:12 34:1
**eliminated** 68:15
**employed** 68:10
**employee** 29:9 33:2 46:17
**employees** 8:16 36:19 47:5,17 48:14,17 49:4 49:14 52:4 53:7 56:2 57:17 58:18 59:2,12,16 60:10 62:21 63:25 64:4 65:11,16,24 66:2,19,22 67:9 70:15
**employment** 37:14 45:9,18 49:5 54:14 63:2 64:1,23 68:19 69:4
**engage** 17:21 43:1
**engaged** 15:11 16:16 18:19 20:8 26:21 43:20,22 50:23
**engagement** 14:19,23 15:18 16:2 17:8 18:1 19:5,6,10 20:11,23 22:5
**engagements** 10:24,25
**enterprise** 27:13 27:18,20
**entities** 18:5,13 18:19 30:5 43:25 52:10,12
**entity** 9:1 12:13 26:25 30:8
**equally** 66:7
**equity** 10:7,8 11:12,16,23 12:20,24 21:9 23:11,17 28:12 30:8
**ESQUIRE** 2:4 2:12,21 3:5
**essentially** 42:10
**established** 70:6
**et** 68:20
**evaluate** 16:18
**evaluated** 48:4
**evaluation** 27:21
**event** 13:9 44:8 44:17 48:20,23 48:24
**events** 6:15
**evidence** 72:5
**exactly** 16:10 22:12
**EXAMINATI...** 6:5
**examined** 6:3
**example** 21:18
**exceptions** 37:4
**exchange** 34:2,5 34:12
**excludes** 38:5
**exclusion** 42:21
**excused** 71:14
**executed** 21:6
**executive** 28:15 29:18,22 30:11 31:11,16
**executives** 64:9
**exemptions** 37:4
**exhibit** 17:19 24:3,9 33:13 34:17 35:21 38:14,25 40:9 42:12,24 60:21
**EXHIBITS** 4:24
**existing** 16:23 17:6 19:22 22:7
**exit** 27:14
**expect** 6:22 12:19 29:24 32:24 62:24 70:21
**expense** 59:16
**expenses** 60:11
**experience** 9:18 10:9
**expertise** 36:16 37:12
**explain** 58:5
**explained** 15:2 37:25
**explored** 50:15
**expose** 42:14
**exposed** 29:14
**exposure** 17:17 34:22 38:18
**expressed** 42:21
**extent** 30:23 41:2 46:4 62:20 70:1

**F**

**F** 72:1
**fact** 20:8 42:13 59:21 69:19 70:23
**failed** 38:10 41:18
**Fair** 13:2 34:6
**fairly** 9:8 12:23 57:23
**familiar** 13:4 14:7 15:3 29:4
**familiarized** 28:5
**Family** 34:10
**FAQs** 67:13
**far** 13:15
**Federal** 36:10 36:19
**fiduciary** 9:5,7 9:10,17 15:3 16:6 21:15 23:1,7 32:18 43:21,24
**figure** 55:19
**file** 67:10
**filed** 14:3
**financers** 52:11
**financial** 7:20 9:19,23 12:24

16:3,7,11 29:5 46:11 63:22 68:3,21
**financials** 16:18 17:14
**financiers** 28:13 61:13
**financing** 43:2 51:17,19,21,22 51:25 59:22 60:15,17
**financings** 19:1
**find** 21:15 51:24
**finding** 51:17 60:17
**fine** 28:20 39:10 70:7
**finished** 52:9
**fire** 50:9
**firm** 8:3,6,7 10:3 10:5 11:2 15:22
**firms** 7:21 10:6 10:8
**first** 17:25 24:23 25:8 28:4 34:16 36:6 38:14 54:25 66:25
**fjrooks@mor...** 2:7
**flagged** 32:9
**flagging** 35:24 39:22
**flew** 6:24
**flip** 24:13
**flow** 32:10 50:19 57:2,4 58:10 59:8 68:24
**focused** 45:3
**fog** 59:7
**following** 40:13
**follows** 6:3
**force** 41:20,22 58:2,6,12,16
**forecasts** 68:1
**foregoing** 72:16
**form** 25:9
**Forman** 1:10,11 3:9 10:10,13 13:12 14:19 15:2,11,25 16:2,3,10,17 17:8 18:6,7,8 18:12,14,15 19:5,7 20:2,9 21:11,19,21 23:11,12,17,18 24:14 25:2,4 25:11 26:10,19 28:5,7,15 29:19 38:7 39:4 40:14 43:2,14,15 48:20 49:4 60:11,23 61:9 61:12,24 63:10 63:17,19,25 64:11 65:10
**formed** 8:14 21:13
**formulas** 27:22
**forth** 13:19
**forward** 56:21 56:22
**forwarded** 19:6
**foundation** 48:19
**founder** 14:18
**four** 41:10 57:4
**frame** 45:21
**Francisco** 8:1,2
**FRANKLIN** 2:4
**free** 35:7 39:17
**freezing** 47:6
**frequently** 17:12 47:2 67:13
**front** 68:14
**full** 47:3 49:18 51:15 55:17
**fully** 72:5
**function** 12:8
**functionally** 18:6 64:18
**functioning** 63:1 63:5,6
**Fund** 23:19 61:23
**funds** 22:3
**FW** 56:21,22

**G**

**general** 12:7 17:13 36:2 37:5 39:13 43:22 45:8,17 48:24 58:14
**generally** 6:12 12:10 13:1 27:17 30:7 37:7,11 45:13
**genuinely** 53:10
**getting** 42:1 60:18
**give** 26:5 46:8 48:9,11,11,19 50:3,4
**given** 20:23 26:25 46:20 48:14 49:16,19 50:3
**giving** 46:15,15 46:19,24 47:3 47:12,14,22,24 48:10
**go** 6:12 14:14,15 17:19,20 25:23 28:3 34:16,25 35:16 36:6 38:14 41:6 42:23 49:1 60:20 66:6 69:21
**go-forward** 68:16
**goes** 15:1 32:17
**going** 13:18 16:10 17:18
23:5 31:22 33:12 34:25 38:19 39:8 40:1 41:1 46:3 46:8 49:20 51:21 59:3 60:2,12 62:14 65:8,23 68:4
**Good** 6:8,9
**Goode** 1:10,11 1:12 2:25 14:18,19 17:4 17:22 21:9,11 21:14,23 22:19 22:20 23:9,18 26:15 27:18 39:25 50:23 61:22,22,23
**Goode's** 22:20
**gotten** 15:23
**governed** 22:19
**graduate** 7:10
**graduating** 7:18
**great** 6:24
**Group** 8:11,12 8:14,16,20,21 8:25 10:4
**guaranteed** 22:2
**guess** 10:13 12:1 12:5 27:3,22 37:21 62:5 64:12 68:1
**guessing** 12:1
**guy** 29:10
**guys** 31:9 39:18 65:23 68:1,2

**H**

**H** 4:11
**Hackensack** 1:19 2:15
**half** 12:2,5
**hand** 27:5,6 52:1,16,16
**handful** 10:18
**hands** 61:21
**happen** 22:22 26:6,6,7 43:6 43:10
**happened** 60:9
**happening** 56:3 60:19
**happy** 41:17
**harkening** 50:17
**Harvard** 7:10,18
**Hayden** 1:17 2:11
**headquarters** 48:21
**heavily** 25:12
**HEAVYWEI...** 1:12
**held** 19:15 25:25
**help** 59:24
**hesitating** 59:17 70:21
**hesitation** 49:24
**Hess** 29:4 30:11 32:13 47:11 57:8
**hey** 20:21 31:9 50:3
**highest** 42:9
**highlighting** 24:24
**highlights** 33:23
**hired** 64:24
**history** 7:10 13:16
**holder** 21:10 23:4,8
**holders** 28:12 30:8
**Holding** 23:12 23:18
**Holdings** 1:11 18:15 23:12,18
**hope** 64:22 65:7 65:7,11 67:6 67:17,21 69:13 69:15
**hoped** 66:9,14

**hopeful** 66:12
**hoping** 35:2 39:1 54:17
**horizon** 68:13

**I**

**identification** 13:20,25 24:7 33:21 56:16
**identified** 24:14 51:7,7 52:23 69:3
**ignore** 33:24
**III** 23:19 61:23
**immediate** 51:1
**immediately** 22:5 49:6
**impact** 56:5 68:21
**impacts** 68:3
**impair** 6:15
**implemented** 42:14
**implications** 51:2
**implies** 68:13
**importantly** 58:1
**impossible** 59:5
**improve** 58:14
**include** 66:10
**included** 52:19 66:15
**including** 7:21 28:7 32:9 40:22 63:11,20
**incorporated** 30:6
**indemnification** 40:7 44:2,11 45:7
**indemnified** 40:6
**indemnity** 17:2 17:3 35:12 38:6 39:24 40:3
**independent** 4:16 9:5,6,12 20:18 22:15 23:24 24:6,10 24:21 25:6,21 25:21 26:10,16 26:21,23 30:10 32:18 40:14 41:12 44:3 64:8 70:19
**INDEX** 5:1
**indicates** 64:21
**individually** 1:6
**individuals** 1:7 11:18 50:14 53:16,24 54:10 54:12 68:19 69:2,15
**info** 35:3 39:1
**information** 12:7 19:4 39:6 39:12,13 41:3 49:22 67:10,14 67:16
**infused** 21:19
**initial** 15:8
**inquiry** 16:12
**insights** 12:22
**insolvency** 9:14
**installation** 22:6
**installed** 22:11 29:16
**installing** 22:15
**instance** 16:9 25:8 50:20 54:25
**instruct** 49:21
**instructions** 6:12 20:22
**insurance** 13:3,6 13:7,7,13 14:15 16:22,23 16:25 38:4
**intended** 59:24
**intense** 60:13,14 60:16
**interest** 23:11
**interested** 17:13
**interests** 23:17
**interim** 43:14
**introduce** 13:18 33:10
**introduced** 24:9
**introducing** 29:22
**investigate** 19:22
**investment** 7:21 9:3 23:13 52:21
**involved** 14:25 45:24 51:16 52:17,22
**involvement** 26:15 53:14
**involves** 16:6 38:2
**involving** 45:13
**isolation** 44:25 48:3,8 50:18 51:5 53:3 67:20
**issue** 35:18,24 45:16 59:6 62:17
**issued** 49:18
**issues** 31:22 32:9 37:5 46:10 59:8,18
**items** 32:19,23 32:24

**J**

**J** 2:4
**JASON** 2:21
**jcabrera@coz...** 2:24
**Jersey** 1:2,19,21 2:6,15 6:25 36:15 40:22 48:22 63:12
**job** 37:19 55:16
**jobs** 54:19 64:24
**joining** 22:16
**Jones** 15:22 39:3
**JR** 2:4
**jump** 63:8 64:7
**June** 48:20 49:3 53:25 54:12 55:9 58:19 60:24 64:5 68:20
**junior** 7:22

**K**

**K** 6:2
**KAPLAN** 1:24
**keep** 64:24 66:7 68:10
**KEITH** 2:12
**Keller** 1:13,16 2:17 4:5,14 6:8 8:4 13:24 20:21 24:11 33:20,24 35:21 56:20
**Keller-00149** 4:19 56:15
**Keller-00459** 33:15
**Keller-00549** 4:17
**Keller-1** 4:14 13:20,25 42:12 42:24 49:2 60:21 63:8
**Keller-2** 4:16 24:4,7,10
**Keller-3** 4:17 33:11,12,21 34:17 38:15 40:10
**Keller-4** 4:19 56:12,15
**Kessler** 29:8,12 29:15 35:17 40:11 52:20
**Kevin** 29:3 30:11 32:13 57:8
**Kevin's** 57:7
**kind** 54:8
**kmcdonald@...** 2:16
**knew** 16:11 42:3
**know** 6:21 10:7 12:25 19:10 20:24 22:17,20 27:21 29:20 31:4,7,11,24 33:8 39:5 41:6 42:4 45:16 46:7 49:19 50:15 51:15 52:9,18 53:21 56:24 59:6 62:3,7,20 65:14 69:24
**knowledge** 13:13 36:8 61:5
**knows** 30:25
**Kvitko** 29:1 30:12 32:13 33:1 47:10 53:13 56:21 64:9 66:1

**L**

**L** 6:2,2
**Labor** 34:6
**lack** 59:11
**largely** 35:7 39:17
**Latitisa** 1:19 72:11
**law** 1:17 7:15,17 7:19 8:7,24 10:3,5,6 11:2 25:22 32:20 45:11
**laws** 25:19
**lawyer** 10:5,19

11:2 36:23,25
**LAWYER'S** 73:1
**lawyers** 15:21
**layoff** 45:13
**layoffs** 36:20 37:9
**lead** 26:9 47:5,6 47:7
**LEAMAN** 1:24
**learned** 20:2
**leave** 55:18
**legal** 9:1 18:5 30:4 36:22 37:2 45:15 47:16,19 52:18 55:15
**lender** 51:18
**lenders** 15:25 21:18 32:11 51:23 52:1,10 61:19
**lending** 16:13
**let's** 9:22 14:15 19:3 25:23 40:9 55:20 63:8 64:5 69:3 69:8
**letter** 19:6,10
**level** 42:9 60:13
**liabilities** 13:11 35:12 40:4 46:11 61:12
**liability** 8:10,22 9:11 16:22 17:17 30:6 38:3,4,6,11 40:23,25 41:21 42:2,14 44:5 44:22 45:10,15 45:23 61:16
**limit** 35:11 40:3
**limited** 8:10,21 9:11 23:25 30:6 63:12
**limits** 25:14
**Line** 5:4,9,14,19 5:24 73:2
**lines** 47:6
**liquidation** 43:13
**liquidity** 32:11 46:12 50:25 60:16 63:22
**list** 51:15
**listed** 11:2 57:7
**literally** 48:5
**litigation** 5:1 11:5,11
**little** 33:9 48:19 62:6
**LLC** 1:11,11,12 2:25 3:4 8:10 18:15 23:12,18
**LLP** 8:4
**located** 63:25
**location** 48:15 49:5 54:11 67:9 70:16
**long** 6:22 26:9
**longer** 60:5 68:13
**look** 18:11 23:24 24:2 27:5 28:2 28:4 33:25 44:25 58:9 68:3,21
**looked** 17:6 21:6 38:2
**looking** 39:21 51:19,21
**looks** 41:10 57:4
**loses** 37:19 55:16
**loss** 37:13 45:9 45:17
**lot** 7:9 16:9 43:14 44:1

**M**

**mail** 21:6
**Main** 1:18 2:14
**major** 60:1
**making** 16:16 17:22 18:18,23 18:25 22:20 37:3 38:2 49:25,25
**management** 28:24 29:3 31:3 32:22 46:23 47:9,23 52:18 53:1 59:19 60:14 68:2
**manager** 25:21 43:22
**managers** 12:12 28:11 46:14,19 47:2
**managing** 9:10
**marked** 5:8,23 13:25 24:7 33:21 56:15
**Market** 2:22
**markings** 14:5
**Marlton** 2:6
**mass** 36:20 37:9 45:12 53:25 54:3,6
**materialize** 41:23
**materialized** 69:17
**matter** 6:11 14:24 17:16 72:7
**maximize** 26:24 27:15
**maximizing** 27:10,12,13,13
**McDONALD** 2:12 11:19 12:9,16 13:15 18:2,20 21:1 21:22 22:17 27:8 28:16,20 30:3,14,23 31:2 32:7,16 33:4,7 36:12 36:21,24 37:2 37:15,23 38:19 39:7 41:1,25 44:18 46:3 47:25 48:16 49:20 52:8 53:8,18 54:2,7 55:5,8 56:6 58:22 59:14 60:7 65:12 67:19 68:6 69:5 70:4 71:5 71:8
**mean** 27:4,6 40:24 41:4,22 50:9 58:8
**meaning** 37:18 68:2
**meaningful** 40:23,25 41:11
**means** 9:6 41:7 41:14 56:24,25 57:1,2,14,15 72:18
**meant** 21:23 61:1
**Medical** 34:10
**medication** 6:14 6:18,21
**meet** 12:15
**member** 8:9,21 8:22 9:10 11:17,17,23,24 12:4,21 22:6 23:1,17,21 29:23
**members** 11:25 22:9 28:24 29:3 67:23
**mentioned** 16:22
**met** 28:22,23,25
**metric** 62:15
**metrics** 28:2
62:12
**mid** 14:16 60:24
**mid-double** 10:14
**Mike** 29:1 30:11 32:12 33:1 53:12 56:20 66:1
**Mills** 1:10 3:9 10:10,14 13:12 14:20 15:2,12 15:25 16:2,4 16:10,17 17:8 18:6,7,8,13,14 18:15 19:6 20:2 21:11,19 21:21 23:11,12 23:17,18 24:14 25:2,5,11 26:10,19 28:7 28:15 29:19 38:8 39:4 40:14 43:14,15 48:21 49:4 60:11,23 61:9 61:12,24 63:10 63:17,19,25 65:10
**Mills'** 19:7 20:9 28:6 43:2 64:11
**mind** 68:14
**mindful** 42:13
**MINGIONE** 3:5 71:3,12
**minimize** 45:22 46:1
**minimum** 17:11
**minute** 33:25
**minutes** 24:17 69:8
**mischaracteri...** 53:22
**missed** 55:14
**misstating** 70:5
**mitigate** 44:16

45:4
**mitigated** 44:10 44:13
**model** 63:3
**money** 21:19 61:21,25
**monitor** 43:2
**monitoring** 32:10 46:16
**monitors** 48:12
**Monroe** 15:24 21:18 50:23 51:13,14 52:2
**month** 26:12
**months** 11:4
**MORGAN** 2:3
**morning** 6:8,9 66:24
**Moss** 35:3 39:1 39:2,3,6
**motion** 4:14 13:24 14:3
**moved** 7:8
**multiple** 31:21

**N**

**N** 2:1 3:1 4:2
**name** 8:4 29:8 51:12,16
**named** 44:14
**names** 18:5
**narrow** 12:23
**native** 7:6
**necessarily** 58:16
**need** 18:5,11 30:16 31:10,23 32:22 33:2 37:6 38:9 39:20 41:13,19 45:18
**needed** 21:14 42:4 63:1,4,5 63:14 64:15,18
**needs** 26:6 30:21
**negotiated** 25:2 25:10,12
**negotiation** 23:3 62:18
**negotiations** 60:15,17
**never** 11:8 55:14
**new** 1:2,19,21 2:6,15 3:7,7 6:25 21:15 29:22,23 36:15 40:22 48:21 63:12
**NOELL** 1:5
**normal** 16:19 58:10
**North** 2:5
**notably** 40:22
**Notary** 1:20
**note** 14:5 59:3
**noted** 72:5
**notes** 72:6 73:1
**notice** 36:19 37:8 41:24 46:15,15,20,20 46:24 47:4,12 47:14,22,24 48:9,13 49:16 50:4,4
**notices** 45:19 48:11,12 49:17 49:19
**noticing** 46:17 50:1
**notified** 49:4 63:25
**number** 13:10 18:24 32:9 34:13 43:18

**O**

**O** 6:2
**O'CONNOR** 2:20
**Oak** 51:23 52:3
**object** 38:19 41:1 46:3
**objection** 11:19 12:9,16 18:2 18:10,20 21:1 21:3,22,24 22:17 27:8 28:16 30:3,14 30:23 31:1,6 32:7,16 33:4,7 36:12,21 37:10 37:15,23 38:22 39:7 41:25 44:18 47:25 48:16 49:9,20 52:8 53:8,18 54:2 56:6 58:22 59:14 60:7 62:10 65:12 67:19 68:6 69:5 70:4
**objective** 27:10
**objectives** 26:22 26:23 27:1,4,7
**obligation** 30:7 42:6 60:5 68:15,16
**obligations** 43:24 46:10 59:23 68:25
**obtain** 32:22
**obtaining** 19:4
**obviated** 38:9
**obviously** 13:4 17:2 32:22 36:8 66:6 68:4
**occurred** 43:12 53:25 55:10
**Oddi** 14:17,22 14:24 15:2,8 15:10,16,19 20:16 26:4,5 26:14,18 34:3 34:5,9,13 35:2 35:6,10,22 38:15 39:17,22 40:2,12 65:22
**off-the-cuff** 58:20,24
**offer** 20:3
**offered** 50:12
**office** 48:25 57:12,16,17,18 63:20 65:24 66:3
**officer** 13:6,7 14:14 16:22 29:5,8 38:4
**officers** 13:3,9 13:10,12
**offices** 1:17
**Ohio** 7:7
**okay** 48:18 52:15
**on-the-whim** 58:20
**ongoing** 60:5
**open-ended** 20:22
**operating** 32:20
**operational** 46:13
**operations** 50:20 63:11,12 63:18,19 64:10
**opportunity** 31:18 66:21
**opposed** 22:16
**Oral** 1:16
**order** 10:2 12:2 12:5 41:11 71:10
**organization** 8:23 9:4 12:11 29:14,14 52:20
**organizational** 25:18
**originally** 25:1
**outcomes** 27:5 43:19
**outset** 25:5
**outside** 42:15,18
**overall** 46:16 59:7
**overhead** 58:14
**owed** 21:11
**owned** 23:13
**owner** 21:12 61:23

**P**

**P** 2:1,1 3:1,1
**P.C** 1:17 2:3,11
**p.m** 35:7,23 39:18 71:15
**page** 4:13 5:4,9 5:14,19,24 14:15 24:13,15 31:21 34:16,18 35:21 36:6 38:25 39:16 40:1,9 73:2
**Pages** 5:8
**paid** 59:20 61:8 62:9
**paragraph** 14:16,16 17:20 19:3,18 20:1 28:3 42:12,23 42:24 49:1,15 55:6 60:21,22 63:8,23 64:7 64:16
**paragraphs** 64:21
**parameters** 23:22 24:22
**part** 25:3 53:11 54:1,13,16
**participation** 21:10
**parties** 43:3 50:21 51:7 52:14,15,23
**partner** 8:3
**Partners** 1:10 2:25 14:18 17:4,22 21:9 21:12,14 23:9 26:15 39:25

**Partners'** 14:19
**party** 39:25
**party's** 30:24
**Pashman** 1:17 2:11
**pay** 46:12 50:20 59:22 61:22,24 66:8 68:12,16 68:16
**payables** 60:14
**paycheck** 55:14
**payroll** 46:13 50:21 51:3 59:16,20 60:5 68:5,25,25
**pedigrees** 7:9
**pendency** 66:11 66:16
**Pennsauken** 48:21 49:4 53:24 54:11 56:2 57:16,18 63:12,20
**Pennsylvania** 1:25 2:23 25:19
**people** 33:5 45:14 48:25 50:4,4,7,11 52:1 53:4 55:11 60:4 64:23 66:7 68:1 69:21
**percent** 45:14
**performing** 25:17
**period** 68:17
**permanent** 64:22
**permanently** 65:8
**person** 7:22 26:24 53:13
**personal** 17:17 38:2 40:23,25 44:4,5 45:22
**personally** 50:2
**Philadelphia** 1:25 2:23
**phrase** 32:14 41:5 48:23
**phrased** 44:24
**piece** 43:15
**ping** 35:3 39:1
**PKF** 29:10 52:19
**place** 16:25 40:7 63:15 69:16,20 70:10
**plaintiffs** 1:8 2:8 6:11
**plan** 57:10,20 58:13 69:20
**planned** 58:21 69:18
**planning** 7:4 59:1
**plans** 69:16
**plant** 36:20 42:13 45:9,13
**plants** 37:8,18
**platform** 21:20 23:13 61:24
**play** 9:9
**Plaza** 1:18 2:13
**poaching** 47:5
**point** 34:20,21 38:16,16 59:9 64:17 66:25 69:19
**polestar** 26:24
**policies** 42:21
**policy** 12:10 16:25 17:7 19:20,23 35:13 42:16,19,20 44:14 45:6
**portfolio** 10:8 11:11,13,16 12:20
**position** 21:12 21:16 25:17
**possibility** 36:2 40:21
**possible** 27:5
**possibly** 28:12
**potential** 14:18 15:4 16:2 17:6 20:3 28:8 34:6 34:10,22 38:11 38:17,20 43:3 43:6,18 46:2
**potentially** 37:22 43:7 57:5
**practical** 47:23
**practice** 19:25
**practicing** 8:24
**preceding** 58:9 62:18
**precise** 27:17
**predecessor** 10:6
**preliminary** 19:4
**prepared** 41:7 41:14
**presented** 59:18
**preserving** 54:19
**presume** 16:6
**pretty** 35:2 38:25
**previously** 42:11
**prior** 10:9,13 11:5,11 14:22 16:16 17:7 20:15 22:5 36:20 50:13,13 56:3 66:23
**private** 10:7,8 11:12,16,23 12:20,23
**privately** 11:10 12:4
**privilege** 41:2 46:5 49:22
**probably** 16:11 34:21 38:17 67:17
**problem** 64:18
**proceed** 40:13 41:7,14
**proceeded** 16:5
**proceedings** 72:4
**process** 28:23,24 32:11 38:1 53:11 62:15
**procured** 13:8
**procurement** 44:14
**produced** 33:16 56:18 69:25
**Production** 5:3
**profess** 36:16 37:12
**professionals** 43:1
**projections** 68:24
**proposal** 25:1,5
**proposed** 19:5
**prospective** 28:12,13 57:24 62:13,16
**protecting** 41:7 41:15
**protection** 42:5
**provide** 51:21
**provided** 19:11
**provides** 8:19
**providing** 51:21
**provisions** 17:2
**proxy** 27:18
**Public** 1:20
**publications** 10:17
**publicly** 9:23 11:6,9 47:4
**purchase** 61:10 62:2 69:24 70:24
**purchasers** 28:13
**Purely** 10:5
**purposes** 12:7 13:20
**pursuant** 25:18
**put** 16:25 21:11 22:2 70:16,19
**putting** 51:19

**Q**

**qualified** 55:16
**question** 13:1 14:15 23:5 24:20 30:4 31:2 33:8 37:6 42:1 44:20,24 45:3,21 46:8 46:17 47:14,16 48:2,10 49:8 52:9 53:19,21 54:5 55:15 60:4
**questions** 5:23 6:23 13:2 67:13,22 71:1 71:3,5

**R**

**R** 2:1 3:1 6:2 72:1
**Ranging** 43:10
**reaching** 40:11
**read** 15:14 42:24 42:25 49:2,8 49:11 57:18,22 65:1,4 71:6
**reading** 25:16 57:6,21 64:16
**ready** 40:13
**really** 17:15,16 32:25 64:12
**reason** 9:15 16:8 54:16
**reasons** 22:14,19
**recall** 6:15 15:7 15:10,15 16:14

17:9 19:24 20:19,20 22:1 22:3 25:12 26:17,20 28:14 29:24 31:13 32:5,8 34:8 38:24 39:15 46:25 47:10 49:24 50:2 53:10 61:15 62:1,4,17 66:4 66:5 68:24 70:24
**receive** 15:19 16:17 38:18 39:6
**received** 20:3 39:11 56:10
**recess** 55:23 69:10
**recognize** 24:24 24:25
**recollection** 15:20 20:6 22:10 31:19 32:3 57:19,22 59:23 61:11
**record** 19:13,16 24:9 25:23 26:1 49:11 65:4
**reduce** 59:12,16
**reduced** 60:10
**reducing** 57:25 58:14
**reduction** 41:22 57:10,20 58:2 58:6,12,13,16
**reductions** 41:20
**reengagement** 70:13
**refer** 69:23
**reference** 25:20 40:2 42:20 68:13
**referenced** 36:3 49:15
**referring** 13:19 48:8
**refinancing** 28:1
**reflect** 58:11 67:17
**refresh** 32:3
**refreshed** 31:19
**regarding** 14:18 26:15 34:9 39:18 64:10 65:22 66:2
**regular** 31:20 32:1,4,6 46:9
**rehired** 64:24 69:15
**reinstated** 55:17
**reiterate** 35:23
**relating** 21:10
**relations** 46:17
**remains** 36:1 40:21
**remember** 10:21 20:21 22:12 50:8 56:9 70:5
**removing** 22:14
**renegotiated** 23:4
**Repeat** 25:3
**rephrase** 37:6 45:1 54:5 59:15
**report** 32:13,14
**reporter** 4:24 49:11 65:4 71:9 72:19
**represent** 6:10
**representative** 15:24
**representing** 39:4
**reproduction** 72:17
**request** 5:3 57:23
**requested** 19:19 49:12 65:5
**require** 16:24 17:15 49:21
**required** 15:3 32:21 33:6 63:10,17,19,21 64:10 70:22
**requires** 36:19 37:8 46:4
**requiring** 39:24
**reside** 8:1
**resigned** 22:9
**resources** 63:22
**respect** 11:10 15:11 27:7 28:18 38:22 44:2 65:23 69:13 70:15
**respective** 25:18
**responded** 19:11
**responsibilities** 20:17 38:3 41:12
**rest** 64:21
**restructuring** 8:7 9:14 16:7 29:7 44:21
**restructurings** 15:4
**result** 54:18
**retained** 4:24 16:20 43:25
**retention** 16:21 28:17
**reveal** 38:20 39:8 41:2 46:4
**review** 12:11 16:23 17:1,14 19:7,22 24:18 31:18 62:2
**reviewed** 17:10 32:9 55:2 62:16
**reviewing** 21:5
**RIF** 58:11
**right** 7:12 9:20 13:4,13 14:12 18:17 20:14 21:18,20 22:7 36:11 40:6 43:3,21 44:8 50:7,9 51:5 52:2,3 55:3 57:8 59:13 61:3,19 67:3,4 68:4,5
**rights** 30:9
**risk** 40:23,25 41:8,10,11,13 41:15,17,17,18 41:23 42:3,8 44:5,7,10,13 44:17,25 45:4 45:5 46:1
**risks** 44:21,23 45:3,24,25
**road** 61:12
**role** 8:25 9:9 17:18 20:15 21:10 24:21 26:22,24 30:20 31:4,9,12 32:18
**ROME** 3:4
**Rooks** 2:3,4 4:6 6:6 13:17 19:13 24:3 25:23 28:18 33:10 36:23 37:1 48:18 49:8 55:7,20 56:12 65:1 69:8 70:7,25
**ROSSI** 1:5
**roughly** 22:13
**Route** 2:5
**RPR** 1:20 72:11
**run** 30:21 31:10 40:12 68:1,3
**Russell** 1:19 72:11

**S**

**S** 2:1 3:1 4:11,14 6:2 13:24
**sale** 20:3 27:25 28:1 32:10 43:2,6,11 50:25 51:1 61:5,6,7 70:6,6
**Sammy** 57:11
**San** 8:1,2
**savings** 57:25 68:4,8,13
**saw** 67:1,1,12,20
**saying** 16:5 21:17 40:3,18 50:2 67:5
**says** 14:16 17:21 17:23 19:3,19 20:2,13 28:5 34:20 35:2,11 35:17,23 39:17 40:11 43:1 57:7 60:22 63:23 69:19
**scenario** 43:12
**school** 7:15,17 7:19
**scope** 23:22 24:22 26:3 42:15
**second** 17:20 38:25 49:2 57:10
**Secured** 50:22
**see** 12:19 14:20 15:5 17:1,23 19:7,20 22:21 22:24 23:25 29:10 34:19,23 35:3,9,13,19 36:3 40:14 41:8 42:16 45:1 49:6 57:12,23 60:24 63:13 64:2 66:21,24

**seen** 24:11
**selected** 43:17
**selection** 12:12
**send** 45:18
**sending** 67:15
**senior** 12:12
**sense** 48:24 55:13
**sent** 25:1,4 34:1 34:1 35:6 38:15 56:19 57:5 66:19,22 66:23 67:9
**sentence** 15:13 17:21 28:5,19 49:2 60:21 63:23
**series** 33:12
**serve** 26:9
**served** 11:5,8,11 11:15,22
**service** 7:20
**services** 8:19
**serving** 20:17
**set** 12:10 31:21 32:19
**setting** 39:24
**shared** 62:16
**shareholder** 23:10,14,15 70:9,16,20,23
**shareholders** 30:2
**Shoppers** 20:7 50:22 51:1,8 52:2 54:18 56:25 58:15 59:25 60:2,18 60:20 61:3,21 61:24 62:9,18 62:25 63:3,14 64:19 65:15,19 66:11,12,16 69:23 70:2,12 70:22
**short** 55:23 69:10
**short-term** 59:24 64:17
**shot** 46:8
**shows** 57:11
**shutdown** 36:1 37:18 40:20 43:13 45:10
**shutdowns** 42:13
**side** 52:12
**sign** 71:7
**signature** 14:10 14:12 24:15,15 24:16
**signed** 13:21 14:2 55:2
**significant** 41:19 58:2,6 61:14 62:17
**significantly** 18:24
**signing** 62:18
**similarly-situa...** 1:7
**simple** 37:3 43:9
**simply** 31:20 42:3
**single** 8:21,22 12:20 27:10 33:1 67:12
**sit** 16:15 22:1,3 56:10 57:21 61:15 62:1 69:7
**situation** 16:3 22:22,24 44:21
**situations** 12:19
**six** 11:4
**skimmed** 24:19
**skinny** 57:11
**skip** 19:3 20:1 40:9
**slavishly** 68:23
**sold** 27:6
**sole** 11:17 12:3 20:9,18 22:6 22:15 23:10,16 23:21 26:16 29:17 30:10 70:19
**solely** 45:3
**somebody** 55:16 67:15
**somewhat** 30:5
**sorry** 23:16 25:3
**sort** 8:23 25:20 66:10
**sought** 56:9
**sound** 18:15 29:4 52:19
**sounds** 18:17 20:14 21:7
**sources** 59:22
**South** 1:18,24 2:13
**Spanish** 8:12
**speak** 12:18 31:10
**speaking** 10:24 10:25 12:10 27:17 30:7 31:6
**special** 16:25 17:3
**specific** 13:17 15:13 16:8 26:5 57:22
**specifically** 16:14 18:25 19:24 32:8,21 38:5 39:15 46:25 47:9 49:24 61:14 63:21 66:4,25 70:24
**specified** 20:24 20:25
**spectrum** 12:23
**spelling** 8:12
**spreadsheets** 68:20 69:1
**staff** 26:19 57:12 57:25 63:1,5 63:15 64:15 67:22 70:13
**staffing** 51:2 57:10,19 58:12
**stakeholders** 28:6,8,9,19
**stamped** 4:17,19 33:14,19 56:14 56:20
**stand** 41:17
**Standards** 34:7
**standing** 59:3
**Stanford** 7:23
**state** 1:21 6:24 25:22 32:20 35:25 36:14 41:13 47:18,18
**statement** 37:3,6 63:9 66:10
**states** 1:1 63:11 63:18,20 64:1 64:4
**statute** 10:22 37:4
**statutes** 36:2 40:22
**stay** 17:19
**stayed** 61:12,16
**Stein** 1:17 2:11
**step** 21:14
**steps** 45:4 46:1
**sticking** 10:16
**Stipulations** 5:18
**stock** 61:6,7,8 61:10 62:2 69:24 70:6,24
**stop** 49:18
**stores** 36:1 40:21 43:17,17
**strategic** 20:4 27:4
**strategy** 12:11
**Street** 1:18,24 2:14,22
**strictly** 35:12 40:4
**struggling** 32:14 44:20 50:19
**Stuart** 29:8 35:17 40:10
**style** 31:14
**subject** 9:8 38:22 40:13 41:3 56:21
**subpoena** 19:11 33:17 56:19
**subsequently** 20:8 21:19
**subsidiary** 14:19
**successful** 60:23
**sued** 13:10
**sufficient** 59:22
**suggestion** 40:12
**Suite** 1:18,24 2:5,22
**supervision** 72:19
**Support** 4:14 5:1 13:24
**sure** 16:19 31:20 38:2,12 51:24 54:25 64:18 66:8
**surmised** 16:12
**survive** 64:19
**suspect** 6:12
**SW** 56:24,24
**sworn** 6:3

**T**

**T** 4:11 6:2 72:1 72:1
**take** 17:18 23:5 24:17 28:4 30:13,21 33:24 33:25 42:5 55:20 65:23 69:8
**taken** 1:16,21

6:14,18 43:16 43:16,17 46:1 55:24 69:11 72:6
**talk** 27:2,3
**talked** 15:10 26:3 29:16 45:8 67:21
**talking** 13:16 27:13,18 28:17 56:1 67:17 69:14
**talks** 58:9
**targeted** 69:3
**team** 28:15 29:3 29:9,18,22 30:11 31:11,16 46:23 47:23
**team's** 31:3
**tease** 59:6
**tell** 6:19 8:6 9:6 31:8 36:7 46:22
**temporarily** 63:10,18
**temporary** 69:20
**ten** 17:20 69:8
**ten-minute** 55:20
**tends** 47:15
**tentative** 20:3
**tenure** 70:19
**term** 43:22 54:15,17 59:4 68:13
**terminate** 50:6 53:3,6,13,16 53:23 54:13,15 54:17,20 59:2
**terminated** 33:5 49:6 50:11 54:12 55:12 60:10 64:1,4 65:8
**terminating** 33:1 65:16
**termination** 48:20,23 49:16 50:14 53:25 54:3,10 55:18 56:1 58:18 59:4,11,12,15 62:21
**terminations** 41:23 56:5 64:23 68:5
**terms** 19:5 23:3 29:25 45:9 47:21 67:25
**terribly** 6:22
**testified** 6:3 43:5 53:12,19 63:14
**testimony** 53:20 53:20,23
**Thank** 23:16
**thanks** 34:20
**thing** 10:21 57:6
**things** 17:10 27:9 37:11 47:8
**think** 10:19 16:9 18:13,14 27:16 27:17 28:23 32:1,23 37:6 40:1,18 43:5 48:17 51:20 52:10 53:12 54:7 55:7 56:25 57:1 58:1 65:21 66:9 68:8,14 71:8
**thinking** 29:10 31:7 68:9
**third** 30:24 39:25 43:3 52:14,15
**third-party** 20:4 61:1,2
**third-world** 60:24,25
**thought** 58:21
**thread** 59:6
**Threadstone** 52:21 62:14
**three** 14:15
**throw** 39:20
**Tiger** 51:15,16 51:18,19 52:3
**time** 13:16,23 15:21,25 16:1 16:5 19:15 23:7,9 24:6 25:25 28:17 31:17,17,22 32:12 33:19 35:7 39:4 51:16 55:23 56:14 59:18 60:9 63:24 66:25 68:9,12 69:10,16 70:1
**timeframe** 13:15
**times** 11:22 12:3 12:14 36:3 41:11
**Tobias** 1:13,16 2:17 4:5,14 13:24
**Toby** 35:11
**today** 6:22 16:15 20:19 56:11 61:15 69:7
**told** 30:25 31:4,7 48:25
**total** 27:17,25
**totally** 11:3
**traded** 9:23 11:6 11:9
**transaction** 23:2 27:24 38:9,10 41:19 54:18 59:7,25 60:3 60:20 62:25 64:20 66:11,12 70:5,12,22
**transactions** 19:2
**transcript** 71:10 72:7,16
**traps** 40:12,17
**treatises** 10:23
**tremendous** 9:18
**trigger** 41:20 42:8
**triggered** 37:14 37:19 45:12
**triggers** 42:2
**true** 9:21 36:9 60:8
**truly** 69:19
**truth** 6:19
**try** 42:2
**trying** 27:15 45:21 51:23
**two** 18:13 27:9 28:23 30:5 33:25 35:7 39:18 69:21
**type** 18:22 27:24 30:22 41:24 58:16 62:8 70:20
**types** 17:5 38:6
**typical** 9:8 12:14 57:23
**typicality** 12:18
**typically** 9:13 13:8 17:10 32:19

**U**

**ultimately** 42:14 60:22
**umbrella** 8:23
**undergo** 38:1
**understand** 20:20 35:18,25 37:1 40:20 45:2,22,23 50:11
**understanding** 6:23 16:3 17:17 21:14 30:20,24 31:3 37:17 42:7,9 45:11,20 49:3 49:17 55:9,13 62:25 63:24 64:6
**Understood** 67:24 70:8
**undertake** 38:3
**unemployment** 67:11,16
**unethical** 68:10
**UNITED** 1:1
**University** 7:11 7:23
**unlawful** 68:9
**unwilling** 66:7
**up-to-date** 11:3
**use** 54:2 59:10 67:23
**usually** 38:4 57:15

**V**

**vague** 15:20
**value** 9:16 26:25 27:11,12,13,14 27:14,18,20,23 28:2 62:13
**variations** 9:12 43:10,14
**various** 36:1 38:5 40:20,21 43:16
**vehicle** 9:3 23:13
**vehicles** 27:10
**vendors** 47:6
**vernacular** 40:18
**version** 14:6 40:23
**view** 65:18
**violated** 37:22
**violation** 44:8

44:17 46:2
**violations** 34:6 34:10 38:7 42:22 44:23 45:5,23
**virtually** 28:25
**visit** 6:24
**Visitacion** 8:10 8:12,14,16,19 8:21,25 9:1,2 10:4
**Visitacion's** 19:6
**visitation** 8:13
**volunteered** 16:12
**vote** 70:16,20
**VS** 1:9

**W**

**Walder** 1:17 2:11
**want** 17:20 24:17 26:6 33:10 34:20 35:23 37:5 38:16 39:5 47:8 66:6
**wanted** 28:21 31:19 38:12
**wants** 40:3
**WARN** 34:13,21 35:2,8,12,18 36:2,2,8,10,15 36:19 37:7,14 37:19,22 38:7 38:10,11,16 39:1,6,18,19 39:23 40:4,21 41:20 42:2,22 44:2,8,17,23 45:3,5,10,12 45:15,19,23 46:2,15,15,17 46:20,20,24 47:4,21 48:11 48:12 49:17,19 49:25 58:17
**wasn't** 53:20
**watching** 32:10
**way** 24:1 31:8 40:18 47:21 51:24
**ways** 58:13
**We'll** 13:19 14:14 24:3 33:9,11,12
**we're** 13:18 34:25
**we've** 44:1 52:1 52:2
**website** 11:2
**week** 57:4
**weeks** 69:21
**went** 7:15,16,23 25:20 46:16 59:1
**wherewithal** 47:15
**White** 51:22 52:3
**willing** 41:16
**wind** 27:2 43:7
**wish** 71:6
**witness** 4:4 5:13 38:20 71:2,4 71:14
**WOLFE** 1:24
**word** 28:8 54:5 54:20 59:11,11 67:23
**worked** 7:16,20 9:22 10:9 14:22,24 29:12 29:13,15 68:12
**worker** 60:5
**workforce** 45:14
**working** 9:19 10:9,13 38:8
**World** 20:7 50:22 51:1,8 52:2 54:18 56:25 58:15 59:25 60:2,18 60:20 61:3,22 61:24 62:9,19 62:25 63:3,14 64:19 65:16,19 66:11,12,16 69:24 70:2,12 70:22
**worried** 44:7
**worse** 43:12
**wouldn't** 31:13 67:17
**write** 54:23
**written** 10:20 39:11
**wrote** 10:18

**X**

**X** 4:2,11

**Y**

**yeah** 69:19
**years** 7:16 10:20 17:9
**York** 3:7,7
**young** 7:8 11:1
**younger** 10:19

**Z**

**Zero** 8:18

**0**

**00149** 56:20
**00459** 33:20
**00530** 4:17 33:15,20
**00542** 4:17 33:15,20
**00545** 4:18 33:15,20
**00547** 4:17 33:15,20
**00548** 4:17 33:15,20
**006275** 24:14
**07601** 2:15
**08053** 2:6

**1**

**1:24-CV-09478** 1:3
**10:05** 1:22
**10020** 3:7
**104** 2:5
**11** 19:3,18
**12** 11:4 20:1
**12:10** 71:15
**1271** 3:6
**13** 4:14 28:3
**14** 1:21 42:12
**16** 42:23 60:21 60:22
**1650** 2:22
**17** 49:1,15 55:7 55:8 63:8,23
**18** 19:4 64:7,16
**19** 34:18
**1910** 1:25
**19103** 2:23
**1985** 7:14
**1985-ish** 7:13

**2**

**20** 10:14
**200** 1:18 2:14
**2000s** 10:21
**2013** 8:15
**2023** 14:17 19:4 20:11 29:17 34:18 49:3 55:9 58:19 60:24 64:5
**2026** 1:21 72:13
**21** 1:18 2:14
**22nd** 35:1
**230** 1:24
**23rd** 35:6,22
**24** 4:16 20:11 29:17
**24th** 35:11
**28** 72:13
**2800** 2:22

**3**

**30** 10:14
**30XI00234100** 1:20 72:12
**33** 4:17 45:14

**4**

**4:55** 35:23
**40** 10:14

**5**

**50** 45:13
**525** 2:5
**542** 35:16
**545** 35:21
**547** 35:5
**548** 34:25
**56** 4:19

**6**

**6** 4:6 49:3 55:9 58:19 64:5
**602** 1:24
**6th** 48:20 53:25 54:12 68:20

**7**

**73** 2:5

**8**

**89** 33:5 53:16 54:12 68:18