**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| NOELL DEL ROSSI and DAWN BARBER, individually and on behalf of all similarly-situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORMAN MILLS, INC.; GOODE PARTNERS LLC; GOODE FORMAN HOLDINGS LLC; GOODE HEAVYWEIGHT COINVEST LLC; and TOBIAS KELLER,<br><br>Defendants. | : | Civil Action No. 1:23-cv-03136 (CPO) (AMD)<br><br>**Civil Action**<br><br>**Filed Electronically** |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FORMAN MILLS, INC.'S MOTION FOR SUMMARY JUDGMENT**

---

**BLANK ROME LLP**
A Pennsylvania LLP
Jonathan M. Korn
New Jersey Resident Partner
Anthony A. Mingione
Michael R. Darbee
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Tel.: (609) 750-2649
Jonathan.Korn@BlankRome.com
Anthony.Mingione@BlankRome.com
Michael.Darbee@BlankRome.com
*Attorneys for Defendant Forman Mills, Inc.*

Dated: October 30, 2026

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS AND PROCEDURAL HISTORY ........ 3

A. The Parties ........ 3

B. The Company's Credit Facilities and Financial Background ........ 4

C. The June 6, 2023 Announcement ........ 7

D. The Sale of the Company and the Recall of All Affected Employees ........ 8

E. Plaintiffs' Subsequent Resignations ........ 9

F. Procedural History ........ 9

LEGAL STANDARD ........ 11

LEGAL ARGUMENT ........ 12

POINT I THE UNDISPUTED RECORD SHOWS A FOURTEEN-DAY LAYOFF, NOT AN "EMPLOYMENT TERMINATION," AND A LAYOFF OF LESS THAN SIX MONTHS IS NOT AN EMPLOYMENT LOSS ........ 12

A. The WARN Act Distinguishes a "Termination," Which Is a Permanent Cessation of Employment, From a "Layoff," Which Is a Temporary One ........ 13

B. Actuality, Not Labels, Controls, and the Seventh Circuit's Contrary Rule in *Leeper* Is Not the Law of This Circuit ........ 16

C. The Third Circuit's Practical, Effects-Driven Analysis Compels the Same Result ........ 17

D. Section 2101(b)(1) and *Phason* Do Not Govern a Stock Sale in Which the Same Employer Recalled Its Own Employees ........ 21

E. Applied to the Undisputed Record, Either Analysis Requires Summary Judgment in Favor of Forman Mills ........ 23

POINT II THE NJ WARN ACT CLAIM FAILS BECAUSE FORMAN MILLS OFFERED EVERY AFFECTED EMPLOYEE THE SAME JOB AT THE

SAME LOCATION, AND FOR THE SAME REASONS THE FEDERAL CLAIM FAILS....26

A. The NJ WARN Act Excludes "Any Situation" in Which the Employer Offers the Same Employment Within Fifty Miles....26

B. If Federal Law Applies, the Infirmities of Plaintiffs' Federal Claims Apply to Their State Claims with Equal Force....27

POINT III IN THE ALTERNATIVE, ANY FEDERAL WARN ACT LIABILITY IS OFFSET BY FORMAN MILLS' VOLUNTARY PAYMENTS AND SHOULD BE REDUCED FOR GOOD FAITH....28

POINT IV IN THE ALTERNATIVE, NO NJ WARN ACT SEVERANCE IS OWED, AND ANY RESIDUAL IS LIMITED BY THE STATUTORY CREDIT....30

CONCLUSION....31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alter v. SCM Office Supplies, Inc.*, 906 F. Supp. 1243 (N.D. Ind. 1995) ....14, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....11

*Baker v. Washington Grp. Int'l, Inc.*, No. 1:06-CV-1874, 2008 WL 719258 (M.D. Pa. Mar. 14, 2008) ....13, 19, 21, 24, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....11, 13

*Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074 (3d Cir. 1995) ....12

*DeRosa v. Accredited Home Lenders, Inc.*, 22 A.3d 27 (N.J. Super. Ct. App. Div. 2011) ....27

*Dingle v. Union City Chair Co.*, 134 F. Supp. 2d 441 (W.D. Pa. 2000) ....18, 19, 21

*Dupree v. Younger*, 598 U.S. 729 (2023) ....12

*Headrick v. Rockwell International Corp.*, 24 F.3d 1272 (10th Cir. 1994) ....20

*Heinz v. Dubell Lumber Co.*, No. 19-8778 (RBK/KMW), 2020 WL 6938351 (D.N.J. Nov. 25, 2020) ....27

*In re Yellow Corp.*, 668 B.R. 337 (Bankr. D. Del. Feb. 26, 2025) ....29

*International Alliance of Theatrical & Stage Employees v. Compact Video Services, Inc.*, 50 F.3d 1464 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995) ....20, 21

*International Oil, Chemical & Atomic Workers v. Uno-Ven Co.*, 170 F.3d 779 (7th Cir. 1999) ..20

*Karim v. RB Health (US), LLC*, No. 25-14829, 2026 WL 578753 (D.N.J. Mar. 2, 2026) ....26

*Kildea v. Electro Wire Products*, 775 F. Supp. 1014 (E.D. Mich. 1991) ....16

*Krueger Associates, Inc. v. American Dist. Telegraph Co. of Pennsylvania*, 247 F.3d 61 (3d Cir. 2001) ....12

*Lassoff v. New Jersey*, No. 05–2261, 2007 WL 2156360 (D.N.J. July 25, 2007) ....11

*Leeper v. Hamilton County Coal, LLC*, 939 F.3d 866 (7th Cir. 2019) ....16, 17

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001) ....29

*Martin v. AMR Services Corp.*, 877 F. Supp. 108 (E.D.N.Y. 1995), *aff'd sub nom. Gonzalez v. AMR Services Corp.*, 68 F.3d 1529 (2d Cir. 1995)............................15, 16, 17, 20, 21, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................11

*Moore v. Warehouse Club, Inc.*, 992 F.2d 27 (3d Cir. 1993) ..............................16, 17, 18, 19, 21

*Oil, Chemical & Atomic Workers v. American Home Products*, 790 F. Supp. 1441 (N.D. Ind. 1992) ..........................................................................................................16

*Orsatti v. N.J. State Police*, 71 F.3d 480 (3d Cir. 1995)...............................................................11

*Phason v. Meridian Rail Corp.*, 479 F.3d 527 (7th Cir. 2007).........................................21, 22, 23

*Platt v. Freedom Mortgage Corp.*, No. 10-968 (RBK/KMW), 2013 WL 6499252 (D.N.J. Dec. 11, 2013) ..........................................................................................................27

*Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277 (8th Cir. 1996) ................................15, 16, 25

*Rivera-Pina v. Luxury Hotels Int'l of P.R.*, 100 F.4th 325 (1st Cir. 2024)...................................28

*Schultz v. Onan Corp.*, 737 F.2d 339 (3d Cir. 1984) ....................................................................12

*Smullin v. Mity Enterprises, Inc.*, 420 F.3d 836 (8th Cir. 2005).............................................20, 21

*United Mine Workers, Dist. 2 v. Helen Mining Co.*, No. 93-1131, 1994 WL 287611 (W.D. Pa. Apr. 18, 1994)..........................................................................................15, 16, 21

*United Mine Workers of Am., Int'l Union v. Eighty-Four Mining Co.*, 159 F. App'x 345 (3d Cir. 2005) ..........................................................................................................29

*United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017)............................12

*United Steelworkers of America v. North Star Steel Co.*, 5 F.3d 39 (3d Cir. 1993) ..........29, 30, 31

*Williams v. Runyon*, 130 F.3d 568 (3d Cir. 1997) .......................................................................12

*Wiltz v. M/G Transport Services, Inc.*, 128 F.3d 957 (6th Cir. 1997)..........................................20

**Statutes**

29 U.S.C. § 2101(a)(3)...................................................................................................................13

29 U.S.C. § 2101(a)(6)...................................................................................................1, 13, 21, 22

29 U.S.C. § 2101(b)(1) ...........................................................................................................21, 22

29 U.S.C. § 2101(b)(2) ..................................................................................................................14

29 U.S.C. § 2102 ....................13

29 U.S.C. § 2102(c) ....................14

29 U.S.C. § 2104(a)(1) ....................13, 28

29 U.S.C. § 2104(a)(2) ....................2, 28, 29

29 U.S.C. § 2104(a)(4) ....................2, 29, 30

N.J.S.A. 34:21-1 ....................26

N.J.S.A. 34:21-2 ....................26

N.J.S.A. 34:21-2(b) ....................30, 31

P.L. 2019, c. 423 ....................26

**Regulations**

20 C.F.R. § 639.1 ....................13

20 C.F.R. § 639.6 ....................14, 22

Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042 (Apr. 20, 1989) ....................14

**Rules**

Fed. R. Civ. P. 12(d) ....................10

Fed. R. Civ. P. 54(b) ....................12

Fed. R. Civ. P. 56(a) ....................11

L. Civ. R. 56.1 ....................3

## PRELIMINARY STATEMENT

This motion presents a question the Court has not yet decided on a full record: whether a fourteen-day cessation of work, followed by recall to the same jobs, at the same employer, at the same rate of pay, with every day of the interval paid and every benefit and day of seniority preserved, is an "employment termination" or a "layoff" under 29 U.S.C. § 2101(a)(6). Discovery has now closed, and three-plus years of document exchanges, depositions, and motion practice have produced a complete record on that question.

In June 2023, Forman Mills was in the midst of a liquidity crisis. The Company was simultaneously running a sale process and preparing for a possible bankruptcy filing because its lenders had exercised certain remedies to restrict Forman Mills' ability to use cash to fund operations, including payroll.

On June 6, 2023, with its lender controlling the Company's access to cash and faced with the prospect of being unable to make payroll, the Company's then-Chief Executive Officer convened employees assigned to the Company's Pennsauken, New Jersey corporate office and announced a reduction-in-force. Fourteen days later, on June 20, 2023, the Company's stock was sold to Shoppers World, an unrelated third party that wanted to—and indeed did—acquire Forman Mills as a going concern.

Plaintiffs' jobs were saved, along with the jobs of all of the employees from the corporate office. No one missed a paycheck, including the plaintiffs. No one had a lapse in benefits, including the plaintiffs. No one lost seniority, including the plaintiffs. Although the plaintiffs have since voluntarily resigned their employment with Forman Mills, 35 of the employees who participated in that call on June 6, 2023, are still employed with the Company today, nearly three-and-a-half years later. This is a story about jobs saved, not jobs lost.

Under the Department of Labor's construction of the WARN Act, a "termination" is a "permanent cessation" of the employment relationship, and a "layoff" is a "temporary" one. A layoff is an employment loss only if it exceeds six months. This one lasted fourteen days. Independently, Plaintiffs' New Jersey claim fails under a statutory clause the Court has not previously addressed: the NJ WARN Act provides that "termination of employment" shall not "refer to any situation" in which the employer offers the same employment within fifty miles—exactly what occurred on June 20, 2023. And if any federal liability could exist, the payments Forman Mills made for days on which Plaintiffs performed no work are "voluntary and unconditional payment[s]" creditable under 29 U.S.C. § 2104(a)(2)(B), and the undisputed record of the Company's good-faith conduct warrants a reduction under 29 U.S.C. § 2104(a)(4).

A contrary ruling would also disincentivize buyers from acquiring distressed companies and retaining their workforces when they do—a result neither Congress nor the New Jersey Legislature could have intended.

Accordingly, summary judgment should be granted in favor of Forman Mills, and the case should be dismissed with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS AND PROCEDURAL HISTORY

The material facts set forth below are drawn from the Defendants' Common Statement of Undisputed Material Facts in Support of their Motions for Summary Judgment ("DCUF") and Forman Mills, Inc.'s Additional Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SUMF"), submitted herewith, and the evidentiary records cited therein.[1]

### A. The Parties

Forman Mills, Inc. ("Forman Mills" or the "Company") is a retail company. (DCUF ¶ 1.) In the first quarter of 2023, Forman Mills operated approximately 45 retail stores located around the country, as well as a corporate office in Pennsauken, New Jersey, and a distribution center in Cinnaminson, New Jersey. (DCUF ¶ 2.) Goode Partners, LLC ("Goode Partners") acquired Forman Mills in or around October 2016, and the Company was a Goode Partners portfolio company until June 20, 2023. (DCUF ¶¶ 3-7; SUMF ¶¶ 13-14.)[2]

As of the first quarter of 2023, the Company had approximately 2,200 employees company-wide. (SUMF ¶ 25.)

Until June 30, 2025, Forman Mills maintained its corporate office at 1070 Thomas Busch Memorial Highway, Pennsauken, New Jersey (the "Corporate Office"). (DCUF ¶ 2.) On June 30, 2025, Forman Mills relocated the Corporate Office to 3000 Cindel Drive, Cinnaminson, New Jersey. (SUMF ¶ 15.)

---

[1] Citations to "Ex. __" refer to the exhibits attached to the Certification of Anthony A. Mingione, Esq., dated October 30, 2026. Citations to "Hess Dep." refer to the deposition of Kevin Hess, Forman Mills' Rule 30(b)(6) corporate designee (Ex. A); citations to "Oddi Dep." refer to the deposition of David Oddi, the corporate representative of Goode Partners, LLC (Ex. B); and citations to "Rosario Cert." refer to the Certification of Rosa Rosario dated October 29, 2026, all submitted herewith.

[2] David Oddi is a co-founder and partner of Goode Partners and testified as the corporate representative of Goode Partners. (SUMF ¶ 14.)

Kevin Hess ("Hess") served as Forman Mills' Controller from approximately July 2018 until September 2022, and as its Chief Financial Officer from approximately September 2022 until March 2024. (SUMF ¶16.)[3] Defendant Tobias Keller ("Keller") served as the Independent Director of Forman Mills from May 24, 2023, through June 20, 2023. (DCUF ¶ 9.)

Plaintiff Noell Del Rossi ("Del Rossi") was hired by Forman Mills on or about September 13, 2021. (SUMF ¶ 18; DCUF ¶ 10.) Del Rossi was employed at the Corporate Office in the Merchandising department, first as a Merchandise Assistant and later as an Assistant Buyer. (SUMF ¶ 19; DCUF ¶ 10.) Plaintiff Dawn Barber ("Barber," and together with Del Rossi, "Plaintiffs") was hired by Forman Mills in July 2013. (SUMF ¶ 20; DCUF ¶ 10.) Barber was employed at the Corporate Office in the Planning department in the position of Merchandise Data Entry. (SUMF ¶ 21; DCUF ¶ 10.) In 2023, Del Rossi was paid $21.3416 per hour, and Barber was paid $17.50 per hour. (SUMF ¶ 22; DCUF ¶ 10.)

## B. The Company's Credit Facilities and Financial Background

The Company had a revolving, asset-based line of credit with Encina Business Credit, LLC, which later became known as Eclipse Business Capital ("Encina" or "Eclipse"), and term debt from Monroe Capital ("Monroe") that was subordinated to the Eclipse revolver. (SUMF ¶ 26.) The amount the Company could borrow under the Eclipse revolver was determined by a borrowing base calculated from the Company's inventory and receivables. (SUMF ¶ 27.) Under a lockbox arrangement, the Company's cash receipts were swept daily to pay down the Eclipse revolver, and the Company submitted draw requests against the revolver to fund payroll and other disbursements. (SUMF ¶ 28.) Under the credit agreement, cash that came into the Company was "immediately effectively secured by Encina and not available to Forman Mills, itself, without

[3] Hess testified as the designated representative of Forman Mills. (SUMF ¶ 17.)

Encina's consent." (SUMF ¶ 29.) The Company's credit agreements contained a cross-default provision under which a default under the Monroe agreement would trigger a default under the Encina agreement. (SUMF ¶ 30.)

During 2020 and part of 2021, while government stimulus payments were being made, the Company's business performance was strong. (SUMF ¶ 31.) After the stimulus payments ended, the Company's sales declined over the course of 2022, and its total available liquidity decreased over the course of that year. (SUMF ¶ 32.)

Hess testified that in mid- to late 2022 there were "some challenges," but that the Company "still had availability," such that "it wasn't a crisis at that point." (SUMF ¶ 33.) During the first quarter of 2023, the Company had approximately $2 million to $4 million of availability under its credit facility. (SUMF ¶ 36.) By February 6, 2023, the Company's liquidity was "tight," but there "hadn't been a default or issues with Eclipse," and the Company was "in good standing" with Eclipse. (SUMF ¶ 35.) The Company did not then have issues making payroll. (SUMF ¶ 37.)

Around the end of March / early April 2023, the Company sought additional capital from Goode Partners, Monroe, and Eclipse, but was not able to obtain it. (SUMF ¶ 38.) Eclipse/Encina then imposed additional reserves on the Company's borrowing base, which, according to Hess, "further tightened [the Company's] available liquidity." (SUMF ¶ 39.)

Oddi testified that the Company's financial status as of April 27, 2023 was "very precarious because Encina was unwilling to allow the company to drawdown under its credit agreement." (SUMF ¶ 40.) That same day, Forman Mills entered into Waiver and Amendment No. 14 to its credit agreement with Monroe ("Amendment No. 14"). (SUMF ¶ 41.) Amendment No. 14 included a covenant that required the Company to engage an investment banker to conduct a sale process, and the Company engaged the investment bank Threadstone at or around that time for that purpose.

(SUMF ¶ 42.) The Company was also required to engage a financial advisor, and Forman Mills engaged the Clear Thinking Group for that role in April 2023. (SUMF ¶ 43.)

Under a process managed by the Clear Thinking Group, certain expenditures, including payroll, were submitted to Eclipse for approval. (SUMF ¶ 44.) Eclipse imposed a limit on how much cash it would allow Forman Mills to use each week, whether for payroll, other expenses, or merchandise purchases. (SUMF ¶ 45.)

Oddi testified that, as of May 2023, the Company had a sufficient borrowing base available to fund its cash needs, but that funding was "effectively at the discretion of Encina," which "made planning fairly difficult as to whether or not we were going to have cash to fund the company's needs." (SUMF ¶ 47.) Encina "unexpectedly refused to allow Forman Mills to drawdown under its revolving credit agreement that it had expected to be able to access." (SUMF ¶ 46.) During this period, the Company monitored its latest sales trends and expenditures on a daily basis to ensure that it would be able to continue to operate. (SUMF ¶ 48.)

In mid-May 2023, the Company received a notice of events of default and reservation of rights imposing the default interest rate under the Eclipse credit agreement, effective May 15, 2023. (SUMF ¶ 49.) Oddi testified that the cash-access issue occurred "because Encina was determining what cash they would provide the company access to." (SUMF ¶ 50.) The lenders were "very unpredictable as to . . . whether or not they were going to provide cash" and with a buyer that was "extremely difficult to deal with," and that "until the ink met the paper, we were unclear as to whether that deal was going to be consummate[d]." (SUMF ¶ 51.)

Effective on or about May 24, 2023, the Goode Partners-affiliated members of Forman Mills' board resigned, and Keller became Forman Mills' sole, independent director. (SUMF ¶ 52.)

In late May and early June 2023, Forman Mills was simultaneously attempting to sell the Company and preparing for a potential bankruptcy filing, and it did not know which direction things would go. (SUMF ¶ 53.) About a week before June 6, 2023, the Company first considered the possibility of a large-scale reduction in force ("RIF"). (SUMF ¶ 54.) The potential RIF was "driven by" the Company's need to request a draw to cover payroll, and that the lender was "pushing [the Company] to file bankruptcy" and "pushing [the Company] to reduce costs to get funding." (SUMF ¶ 55.)

### C. <u>The June 6, 2023 Announcement</u>

The decision to implement the RIF was discussed among Mike Kvitko, Forman Mills' then-Chief Executive Officer, Hess, Keller, and Stuart Kessler of the Clear Thinking Group, and was "driven by . . . the bank and then bank funding." (SUMF ¶ 56.) On June 6, 2023, Kvitko conducted a Zoom meeting with Corporate Office employees and announced that the Company would be conducting a RIF. (SUMF ¶ 57.)

Approximately 86 Corporate Office employees, including Plaintiffs, were included in the RIF. (SUMF ¶ 58.) Approximately 31 employees assigned to the Corporate Office were not included. (SUMF ¶ 59.)[4] At the time of the announcement, Forman Mills was hopeful that there would not be any permanent loss of employment for the workers. (SUMF ¶ 60.) Hess testified that, nevertheless, the Company could not "assure employees of anything" because "there was a possibility that the very next day we could have filed bankruptcy." (SUMF ¶ 61.)

Affected employees received a written document titled "Reduction-In-Workforce (RIF) FAQs," which stated, among other things, that "the Company has not made any decisions related

---

[4] The Court's May 13, 2024 Opinion, decided on the pre-discovery submissions, recited that approximately 120 people attended the June 6, 2023 video conference. [ECF No. 31 at 3.] The figures stated in the text reflect the complete discovery record. (SUMF ¶¶ 58-59.)

to a bankruptcy filing," that employees would receive their last paycheck "on the following Friday payroll cycle," and that employees would "remain covered by the Company sponsored health plan effective end date June 30, 2023." (SUMF ¶ 62.) The FAQs also stated that positions were being eliminated "[b]ased on the economic circumstances and operational needs of the business," that no severance would be paid, and how to apply for unemployment benefits. [ECF No. 31 at 3.]

### D. The Sale of the Company and the Recall of All Affected Employees

On June 20, 2023, the stock of Forman Mills was sold to an entity affiliated with Shoppers World, an unrelated third party. (SUMF ¶ 64.) Shoppers World sought to acquire Forman Mills as a going concern with its employees, including its Corporate Office employees. (SUMF ¶ 65.)

Immediately upon the closing of the sale, all employees who received the June 6, 2023 RIF notification, including Del Rossi and Barber, were recalled. (SUMF ¶ 66.) Plaintiffs returned to work on June 21, 2023, without having to reapply. (SUMF ¶ 69.)

Forman Mills pays employees on a bi-weekly basis. Plaintiffs' last pay date before June 6, 2023 was June 9, 2023, covering the pay period May 21, 2023 through June 3, 2023. (SUMF ¶ 71.) By June 23, 2023, the date Forman Mills processed its next payroll, all affected employees had been retained and paid from June 6, 2023 forward. (SUMF ¶ 72.)

On June 23, 2023, Forman Mills paid Del Rossi her regular wages for the pay period June 4, 2023 through June 17, 2023, consisting of 80.9833 regular hours at $21.3416 per hour, for gross earnings of $1,728.31. (SUMF ¶ 73.) On June 23, 2023, Forman Mills paid Barber her wages for the pay period June 4, 2023 through June 17, 2023, at her regular rate of $17.50 per hour. (SUMF ¶ 74.) On July 7, 2023, Forman Mills paid Plaintiffs their wages for the following pay period, June 18, 2023 through July 1, 2023. (SUMF ¶ 75.)

Plaintiffs experienced no gap in pay or benefits before, on, or after June 6, 2023, and experienced no loss of seniority. (SUMF ¶ 76.) Plaintiffs continued to be paid at the same hourly rates after June 6, 2023: $21.3416 per hour for Del Rossi and $17.50 per hour for Barber. (SUMF ¶ 78.) Corporate Office employees enrolled in the Company's health insurance program, including Plaintiffs, retained the same health coverage for all of June 2023, and beyond. (SUMF ¶ 77.)

**E. <u>Plaintiffs' Subsequent Resignations</u>**

Del Rossi began maternity leave on December 7, 2023, and remained an employee of Forman Mills during her leave. (SUMF ¶ 78.) Del Rossi voluntarily resigned from Forman Mills, and her last day of employment was August 8, 2024. (SUMF ¶ 79.) Barber voluntarily resigned from Forman Mills effective August 2, 2024. (SUMF ¶ 80.)

Of the approximately 86 individuals who received notice of the RIF on June 6, 2023, 35 remain employed by Forman Mills today. (SUMF ¶ 81.)

**F. <u>Procedural History</u>**

Del Rossi commenced this action on June 7, 2023—one day after the June 6, 2023 meeting—by filing a Complaint against Forman Mills asserting claims under the WARN Act and the NJ WARN Act. [ECF No. 1.] On August 21, 2023, Forman Mills moved to dismiss the Complaint. [ECF No. 16.] In response, on September 8, 2023, Plaintiffs filed a First Amended Complaint (the "FAC"), which added Barber as a Plaintiff and attached the June 6, 2023 notification as an exhibit. [ECF No. 20.]

On September 22, 2023, Forman Mills moved to dismiss the FAC. [ECF Nos. 21, 22.] On February 14, 2024, the Court converted the motion to dismiss into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). [ECF No. 27.] The converted motion was fully briefed on March 18, 2024. [ECF No. 29.] At that time, no discovery had been taken. The Court

denied the converted motion on May 13, 2024. [ECF No. 31.] On July 8, 2024, Forman Mills filed an Answer with Separate Defenses to the FAC. [ECF No. 40.]

On July 10, 2024, Plaintiffs filed a Second Amended Complaint ("SAC"), which added Goode Partners LLC, Goode Forman Holdings LLC, and Goode Heavyweight Coinvest LLC, as defendants. [ECF No. 41.] On July 25, 2024, Forman Mills filed an Answer with Separate Defenses to the SAC. [ECF No. 42.]

On April 2, 2025, Plaintiffs filed a Third Amended Complaint ("TAC"), which added Tobias Keller as a defendant. [ECF No. 73.] On April 30, 2025, Forman Mills filed an Answer with Separate Defenses to the TAC. [ECF No. 78.]

Discovery has now closed.

## LEGAL STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under the governing law," and a dispute is genuine only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the nonmovant bears the burden of proof on an essential element, the movant may carry its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmovant then must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "Bald assertions in briefs are not facts and will not defeat summary judgment." *Lassoff v. New Jersey*, No. 05–2261, 2007 WL 2156360, at *2 (D.N.J. July 25, 2007). Summary judgment is "not a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327.

The material facts were undisputed on the limited record before the Court in 2024, *see* ECF No. 31 at 6, and they remain undisputed on the complete record developed through discovery. Whether those facts constitute an "employment termination," a "layoff," or a "termination of employment" under the federal and New Jersey statutes is a question of statutory construction, and therefore a question of law appropriate for resolution on summary judgment.

The Court's May 13, 2024 Opinion denying Forman Mills' converted motion is an interlocutory order. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023). "Interlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017); *see also Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997); Fed. R. Civ. P. 54(b) (any order adjudicating fewer than all claims "may be revised at any time before the entry of a judgment"). The Third Circuit has specifically held that a district court's "denial of [a party's] initial summary judgment motion [does] not create any bar to the court's later reconsideration of the renewed motion" after discovery. *Krueger Assocs., Inc. v. Am. Dist. Tel. Co. of Pa.*, 247 F.3d 61, 65–66 (3d Cir. 2001) (citing *Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1086 n.20 (3d Cir. 1995), and *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir. 1984)).

The converted motion was decided on two declarations, a two-page certification, and earning statements, before any discovery had been requested or taken. [ECF No. 31 at 2.] In the intervening years, the parties have served hundreds of requests, exchanged thousands of documents, deposed multiple witnesses—including Forman Mills' Rule 30(b)(6) designee and Goode Partners' corporate representative—and engaged in multiple rounds of motion practice, developing a record that did not exist in 2024. This motion presents that record, and legal questions the Court has not previously decided.

## LEGAL ARGUMENT

## POINT I

### THE UNDISPUTED RECORD SHOWS A FOURTEEN-DAY LAYOFF, NOT AN "EMPLOYMENT TERMINATION," AND A LAYOFF OF LESS THAN SIX MONTHS IS NOT AN EMPLOYMENT LOSS

The undisputed material facts establish that Plaintiffs experienced, at most, a fourteen-day layoff, and not an "employment termination." Because an "employment loss" is an essential

element of their claim, and because Plaintiffs bear the burden of proving it, its absence entitles Forman Mills to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

## A. <u>The WARN Act Distinguishes a "Termination," Which Is a Permanent Cessation of Employment, From a "Layoff," Which Is a Temporary One</u>

An employer covered by the WARN Act that orders a "mass layoff" must provide sixty days' advance written notice to the affected employees. 29 U.S.C. § 2102. The notice requirement exists for a specific and practical reason: to give "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." *Baker v. Washington Grp. Int'l, Inc.*, No. 1:06-CV-1874, 2008 WL 719258, at *2 (M.D. Pa. Mar. 14, 2008) (quoting 20 C.F.R. § 639.1).

An employer that fails to give required notice is liable for back pay and benefits "for each day of violation," for up to sixty days, reduced by "any wages paid by the employer to the employee for the period of the violation" and by payments to third parties, such as health premiums, made on the employee's behalf for that period. 29 U.S.C. §§ 2104(a)(1) and 2104(a)(2)(A), (C).

The statutory trigger is an employment loss. A "mass layoff" is a reduction in force that results in an "employment loss" for a threshold number of full-time employees at a single site of employment. 29 U.S.C. § 2101(a)(3). The Act defines "employment loss," as: "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period[.]" 29 U.S.C. § 2101(a)(6).

The Department of Labor has explained what "termination" means in this context: "for the purposes of defining 'employment loss', the term 'termination' means the *permanent cessation* of

the employment relationship and the term 'layoff' means the *temporary cessation* of that relationship." Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042 (Apr. 20, 1989) (emphasis added). Here, there was no "termination," because there was no permanent cessation of Plaintiffs' employment on June 6, 2023. Any cessation was temporary, and Plaintiffs were paid, insured, and credited with continuous service throughout it. Plaintiffs point to the kind of "technical termination" that 20 C.F.R. § 639.6 makes clear does not suffice: WARN notice "is only required where the employees, in fact, experience a covered employment loss." 20 C.F.R. § 639.6. The WARN Act asks whether employees were actually, durably put out of work.

Congress drew the same distinction elsewhere in the statute. Section 2102(c) separately addresses a layoff "announced to be a layoff of 6 months or less" that is later extended, confirming that Congress built a duration-based framework for temporary separations. 29 U.S.C. § 2102(c). And under 29 U.S.C. § 2101(b)(2), an employee "may not be considered to have experienced an employment loss" where a layoff results from the relocation or consolidation of the employer's business and the employer offers a transfer "with no more than a 6-month break in employment." Neither provision governs here, but both reflect the same statutory judgment: the WARN Act is concerned with whether employees are actually, durably put out of work—not with whether a technical, paper-only termination can be identified somewhere in the sequence of events.

Plaintiffs did not suffer a termination sufficient to create an employment loss because there was never a permanent cessation of their employment relationship with Forman Mills. (*See Alter v. SCM Office Supplies, Inc.*, 906 F. Supp. 1243, 1250 (N.D. Ind. 1995) (holding that employees who were laid off before a business sale and rehired after it closed "did not suffer an 'employment loss' as defined in the WARN Act" because, "[a]s a matter of law, these . . . employees did not

suffer an 'employment termination' (i.e. a permanent cessation of the employment relationship), nor did they suffer a 'layoff exceeding 6 months.'"). The same is true of Plaintiffs.

The distinction is clear. An employment loss by termination occurs when there is a permanent cessation of the employment relationship. The undisputed facts show that there was not. Any cessation of employment here was temporary. A temporary cessation of employment is a layoff. A layoff is not an employment loss unless it exceeds six months. 29 U.S.C. § 2101(a)(6)(B). This one lasted fourteen days.

In 2024, on a record consisting of Plaintiffs' declarations, the Court declined to rely on *United Mine Workers* and *Martin* because those cases involved layoffs rather than terminations, and Plaintiffs alleged that they were terminated. [ECF No. 31 at 11–12 & nn.4–5.] The full record now permits the Court to decide which category this case falls into. That is a question of law. Neither the employee's characterization of a separation nor the employer's makes it a termination; the question is what the separation actually was.

The Eighth Circuit's decision in *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277 (8th Cir. 1996), is instructive. There, the employer's notice told employees they were being laid off as part of a reduction in force and that the layoff was "expected to be permanent." *Id.* at 1279, 1282. The plaintiffs argued that this rendered their separations "terminations," and that their subsequent rehiring was irrelevant. The Eighth Circuit disagreed: "A common sense reading of the statute indicates it is the *actuality* of a termination which controls and not the expectations of the employees. An employee cannot be defined as 'terminated' if he or she is, in fact, rehired in the same position." *Id*. at 1282. The court added that the Department of Labor's "comments indicate it is actuality and not expectations or terminology which control whether or not an employment loss has occurred." *Id.*

*Rifkin* also tied its holding to the fundamental purpose of the WARN Act, the same purpose the Third Circuit identified in *Moore*: workers who are *actually* retained need no retraining or alternative jobs. Employees rehired within six months therefore did not suffer an employment termination.

Several district courts have reached the same result. In *Oil, Chemical & Atomic Workers v. American Home Products*, 790 F. Supp. 1441 (N.D. Ind. 1992), employees laid off in November and recalled within months suffered no employment loss, because their layoffs did not exceed six months. In *Kildea v. Electro Wire Products*, 775 F. Supp. 1014 (E.D. Mich. 1991), the court held that workers laid off within a 30-day window and recalled in under six months suffered no employment loss. In *United Mine Workers, Dist. 2 v. Helen Mining Co.*, No. 93-1131, 1994 WL 287611, at *8 (W.D. Pa. Apr. 18, 1994), employees who were laid off but continued to receive pay for months were not found to have suffered an employment loss during that period. And in *Martin v. AMR Services*, 877 F. Supp. 108 (E.D.N.Y. 1995), *aff'd*, 68 F.3d 1529 (2d Cir. 1995), the court explained that the "practical, effects-driven" test requires courts to ask whether a break in employment actually occurred—and for how long.

**B. <u>Actuality, Not Labels, Controls, and the Seventh Circuit's Contrary Rule in *Leeper* Is Not the Law of This Circuit</u>**

Plaintiffs will likely rely on *Leeper v. Hamilton County Coal, LLC*, 939 F.3d 866 (7th Cir. 2019), in which the Seventh Circuit declined to follow *Rifkin* and held that whether a separation is permanent is judged by how an objective observer would understand the employer's communication at the time, such that a later offer of the employee's old job "cannot retroactively transform" a permanent firing into a temporary layoff. *Id. Leeper* reflects one side of an acknowledged division among the circuits, and it is inconsistent with the "practical, effects-driven analysis" the Third Circuit articulated in *Moore* and that other courts have adopted from

*Moore*. *See Gonzalez v. AMR Servs. Corp.*, 68 F.3d 1529 (2d Cir. 1995) (affirming "substantially for the reasons stated in" *Martin*, 877 F. Supp. at 113, which relied primarily on *Moore* in applying a "practical, effects-driven analysis of whether a break in employment actually occurred"). The Third Circuit has never adopted *Leeper*'s *ex ante* test, and this Court should not adopt it here.

Moreover, even under *Leeper*, the June 6 communications did not announce an unconditional, permanent end to the employment relationship. The RIF FAQs told employees that "the Company has not made any decisions related to a bankruptcy filing" and that they would "remain covered by the Company sponsored health plan" through June 30, 2023. [SUMF ¶ 62.] The Company's then-Chief Financial Officer testified that the Company could not "assure employees of anything" because "there was a possibility that the very next day we could have filed bankruptcy." [SUMF ¶ 61.] That is the language of a contingent measure taken while a sale was pending, not of a permanent severance.

### C. <u>The Third Circuit's Practical, Effects-Driven Analysis Compels the Same Result</u>

The Third Circuit has expressly rejected the notion that a technical termination implicates the WARN Act where the practical reality is otherwise. In *Moore v. Warehouse Club, Inc.*, employees arrived at the store where they worked and discovered, without prior notice, that it had been permanently closed. 992 F.2d 27, 28 (3d Cir. 1993). They were offered the option of continuing their employment at another location. *Id.* They nonetheless sued, contending that they had suffered an "employment loss" because they had not received the WARN Act's notice. *Id.* at 29. The Third Circuit disagreed. Focusing on the statutory term itself, the court held that "termination" must be given its "ordinary, contemporary, common meaning," which is "[t]o discontinue the employment of." *Id.* at 28–29. Because the employees were offered immediate reemployment with no loss of pay or benefits, their situation did not create "a need to ensure

adequate opportunities (by way of notice of imminent employment loss) for retraining and/or reemployment," and WARN's "notice provisions had no application as to them." *Id.* at 30. The court affirmed summary judgment for the employer. *Id.*

The rationale of *Moore* is straightforward and directly applicable here. Plaintiffs were returned to their exact same jobs, at the exact same location, before the end of the very next pay period—and with no loss of pay, benefits, or seniority. [SUMF ¶¶ 66-78.] If the *Moore* plaintiffs, who had to change work locations, suffered no employment loss, then Plaintiffs, who changed nothing at all, plainly suffered none. Plaintiffs have previously responded that the facts of *Moore* differ, and that *Moore* "dealt with an employment loss exclusion not at issue here." [ECF No. 28 at 11.] But no two cases have identical facts, and the distinction does not change the guiding principle: apply the ordinary meaning of "termination" and ask whether these employees actually needed notice, retraining, or alternative jobs. They did not.

District courts within this Circuit have consistently followed *Moore*. In *Dingle v. Union City Chair Co.*, an asset seller terminated its workforce on the day of the sale, and the buyer rehired a large majority of the employees afterward. 134 F. Supp. 2d 441, 442 (W.D. Pa. 2000). The court explained that although there had technically been a termination, those employees "who were rehired [did] not fall within the purview of the Act since there [was] no need for retraining or alternative jobs." *Id.* at 444. Accordingly, "there was no employment loss contemplated by the Act," and "no WARN Act notice was required." *Id.* at 444–45 & n.2 (granting the employer's motion for summary judgment and observing that "Congress meant 'employment loss' to cover only employees truly idled or deprived of income"). *Dingle* differs from this case in two respects, and both cut in Forman Mills' favor: *Dingle* involved an asset sale, and some *Dingle* workers were never rehired and did experience a gap in pay. Here, there was no missing pay, Plaintiffs were

never "idled or deprived of income," and every affected employee was recalled to the same nominal employer. [SUMF ¶¶ 66-78.]

The situation in *Baker* is closer still. There, the seller verbally advised a large number of employees that the business was being transferred and that their employment would end; the successor rehired 104 of them, and those employees were placed back on the payroll within the same week. 2008 WL 719258, at *1. Applying "the practical, effects-driven analysis utilized by the Third Circuit in *Moore*," the court held that "the 104 employees who were re-hired . . . were not terminated for purposes of the WARN Act." *Id.* at *3–4. Those employees had experienced "the most minimal gap in employment" from their technical termination, which "d[id] not rise to the level of an employment loss." *Id.* at *4. The court emphasized that the remedial purposes of the WARN Act would not be served by requiring notice to "individuals who did not suffer any appreciable break in employment and had no practical need to receive such notice." *Id.* Summary judgment was granted to the employer on the WARN claims. *Id.* The Court previously distinguished *Baker* and similar cases because they involved shorter intervals. [ECF No. 31 at 10–11.] That distinction matters, however, only if the June 6 event was a termination. Once it is recognized as a layoff, the governing line is six months, and *Baker*'s focus on whether employees had any "practical need to receive such notice" applies with full force to employees who were paid for every day of a fourteen-day interval. [SUMF ¶¶ 66-78.]

This approach is not peculiar to the Third Circuit. The overwhelming weight of federal authority holds that the WARN Act does not elevate form over substance in determining whether an employment loss has occurred, and courts have repeatedly granted or affirmed summary judgment for employers on this ground. (*E.g.*, *Smullin v. Mity Enterprises, Inc.*, 420 F.3d 836, 841 (8th Cir. 2005) (affirming the grant of summary judgment and holding that, as a matter of law, no

WARN Act notice was required where the buyer rehired forty-four of the plant's sixty-eight employees); *International Oil, Chemical & Atomic Workers v. Uno-Ven Co.*, 170 F.3d 779 (7th Cir. 1999) (affirming the grant of summary judgment where the purchaser hired the employees back at the same wage with no break in payment, such that there was no employment loss and no WARN notice was required); *Wiltz v. M/G Transport Services, Inc.*, 128 F.3d 957, 964–65 (6th Cir. 1997) (affirming the grant of summary judgment on the WARN Act claims and explaining that federal courts "have all applied a practical, effects-driven analysis of whether a break in employment actually occurred," and do not find WARN violations where a termination is "at best technical" and the employees were offered continued employment after the sale); *International Alliance of Theatrical & Stage Employees v. Compact Video Services, Inc.*, 50 F.3d 1464, 1467–68 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995) (affirming the grant of summary judgment where the buyer offered to rehire 309 of 314 employees after the seller terminated them without notice); *Headrick v. Rockwell International Corp.*, 24 F.3d 1272, 1279 (10th Cir. 1994) (affirming the grant of summary judgment and holding that the employee could not succeed on a federal WARN Act claim because she did not suffer an "employment loss" even though she was technically terminated, having been rehired at full pay shortly thereafter); *Martin v. AMR Services Corp.*, 877 F. Supp. 108, 114, 117 (E.D.N.Y. 1995) (granting the employer's motion for summary judgment and holding that, as a matter of law, employees who remained on the payroll with no loss of pay, seniority, or benefits "did not experience an employment loss as defined under WARN"), *aff'd sub nom. Gonzalez v. AMR Services Corp.*, 68 F.3d 1529 (2d Cir. 1995) (affirming substantially for the reasons stated by the district court, which relied primarily on *Moore*); and *Alter*, 906 F. Supp. at 1250 (granting the employer's motion for summary judgment and holding that workers who

briefly lose their jobs and are quickly rehired have not suffered an employment loss under the WARN Act).

Although each of these decisions involved an interval shorter than fourteen days, it bears emphasis that in every one of them the employer's conduct was less protective of employees than Forman Mills' conduct was here. In *Smullin*, twenty-four of sixty-eight employees were never rehired. In *Compact Video*, five employees were not offered reemployment. In *Dingle*, twenty-two were not rehired and the rehired workers experienced an actual gap in pay. In *Baker*, the rehired employees were off the payroll, if only briefly. In each case the employer prevailed as a matter of law.

D. **Section 2101(b)(1) and *Phason* Do Not Govern a Stock Sale in Which the Same Employer Recalled Its Own Employees**

Whether an employee has suffered an "employment loss" under 29 U.S.C. § 2101(a)(6) is a separate and distinct question from the nature of the transaction through which control of an employer changes hands under 29 U.S.C. § 2101(b)(1). Forman Mills does not contend that the sale-of-business provision is a catch-all concept designed to relieve employers of all WARN liability. Rather, Forman Mills contends that Plaintiffs did not experience an employment loss. That question "is determined by examining the experience of the employees, not the text of the transaction documents." *See Baker*, 2008 WL 719258, at *3.

The point is confirmed by the authorities themselves, several of which involved no sale at all: *Moore* involved a transfer of employees to a different location; *Martin* involved a closed department; *United Mine Workers* involved a plant closure; and *Baker* involved a service contract that was transferred to Manpower, Inc. The principle is thus plainly not limited to asset sales. If anything, the stock sale here makes Forman Mills' position stronger, not weaker: because the stock of Forman Mills was sold, the employing entity—Forman Mills itself—never changed. [SUMF ¶

64.] Plaintiffs' employer on June 5, 2023 was Forman Mills; their employer on June 21, 2023 was Forman Mills; and their employer in August 2024, when they resigned, was Forman Mills. There was no new employer for them to be hired by, and no old employer that disappeared.

*Phason v. Meridian Rail Corp.*, 479 F.3d 527 (7th Cir. 2007), does not compel a different result. Section 2101(b)(1) allocates notice duties between "the seller" and "the purchaser" of "part or all of an employer's business." It deems the seller's employees to be the purchaser's employees immediately after a sale. The implementing regulations add that this provision preserves notice rights, but creates no other employment rights. 20 C.F.R. § 639.6. The regulations also provide that although a "technical termination" may occur upon the sale, WARN notice is required only where employees in fact suffer a covered employment loss. 20 C.F.R. § 639.6. A technical termination at sale is not counted as an employment loss if the workers keep their jobs.

The rationale of Section 2101(b)(1), along with its implementing regulations and agency guidance provide instruction, but that statute answers a question this case does not present: which of two employers owes WARN notice. In a stock sale, which was the case here, the employer before and after the sale is the same legal entity, so there is no seller-to-purchaser transfer of employees such that a court must determine which of two entities must give the notice. The question of employment loss turns entirely on Section 2101(a)(6).

In *Phason*, the employer closed its plant and invited workers to apply to a *new company* buying the assets, and the deal closed nine days later. 479 F.3d at 528–29. *Phason* also stated that "'You're fired, but you have prospects of catching on with someone else real soon now' is a 'termination,'" *id.* at 529, but that statement addressed employees who had been taken off the payroll and invited to seek work with a different company. Here, there was no "someone else": the same legal entity recalled its own employees to their own jobs and paid them for every day of the

interval. [SUMF ¶¶ 64-76.] And because Forman Mills absorbed the entire cost of the interval, the risk-allocation concern that animated *Phason*—that employees should not be made to bear business risks, *id*. at 530—does not apply here.

**E. Applied to the Undisputed Record, Either Analysis Requires Summary Judgment in Favor of Forman Mills**

In the second quarter of 2023, Forman Mills was in genuine financial distress. Its revolving lender had placed additional reserves on the borrowing base, restricting liquidity. Its term lender required the Company to retain an investment banker and run a sale process. [SUMF ¶ 42.] Its entire Board of Directors resigned, leaving a sole independent director. [SUMF ¶ 52.] By late May and early June 2023, the Company was simultaneously trying to sell itself and preparing for a possible bankruptcy filing. [SUMF ¶ 53.] Faced with the reality that it would no longer be able to make payroll, the Company announced a RIF of the majority of its Corporate Office employees, Plaintiffs among them [SUMF ¶¶ 60-62].

But attempts to reverse course continued. The Corporate Office was not shut down. Approximately 31 Corporate Office employees were not included in the RIF and continued to work, while the Company performed the basic functions necessary to operate and continued to pursue a sale transaction that would save Forman Mills—and all of their jobs. [SUMF ¶ 59.] Indeed the RIF FAQs themselves contemplated continued pay and continued benefits: employees were told that they would receive their last paycheck "on the following Friday payroll cycle" and that they would "remain covered by the Company sponsored health plan effective end date June 30, 2023." [SUMF ¶ 62.]

And their efforts succeeded. Fourteen days later, on June 20, 2023, Forman Mills' stock was sold to an entity affiliated with Shoppers World. [SUMF ¶ 64.] Shoppers World wanted the Company as a going concern, with its employees—including its Corporate Office employees.

[SUMF ¶ 65.] Immediately upon closing, every employee who had received the RIF notification was recalled—Plaintiffs included. [SUMF ¶ 66.] And Plaintiffs indeed did return to work the following morning on June 21, 2023 without any need to reapply. [SUMF ¶ 69.]

The WARN Act asks the question of what affected individuals, like Plaintiffs, actually experienced. Their last pre-RIF pay date was June 9, 2023. The paycheck covered the period from May 21 through June 3, 2023. By the time Forman Mills ran its next payroll on June 23, 2023, every affected employee that wanted to stay was still on the payroll and received full pay and benefits. Del Rossi was paid for 80.9833 regular hours at $21.3416 per hour—$1,728.31 gross—for the pay period June 4 through June 17, 2023, the period that wholly encompasses the alleged termination. Barber was paid for the identical period at her regular $17.50 hourly rate. On July 7, 2023, both were paid for June 18 through July 1, 2023. Their health coverage for the entire month of June 2023 was exactly what it would have been had the RIF never occurred. They lost no seniority. They continued to be paid at the same hourly rates after their return. And because every affected employee was offered a return before the next payroll period with no loss of pay or benefits, no severance was paid—because none was owed. [SUMF ¶¶ 66-78.]

The "last paycheck" the RIF FAQs described never came. Plaintiffs never needed the transition time, alternative jobs, or retraining that WARN notice exists to provide. *See Baker*, 2008 WL 719258, at *2. All they needed to do was come back to work on June 21, which is what they did. On this record, a "practical, effects-driven analysis of whether a break in employment actually occurred," *id.* at *3, yields a single answer: any break in employment was a temporary, fully paid layoff of fourteen days, and no employment loss occurred.

It is difficult to argue that one has lost something one never ceased to possess. The *Martin* court declined even to reach a "reasonable expectations" theory absent evidence of a bad-faith

scheme to lay off and then terminate employees in order to evade the statute. 877 F. Supp. at 114. The undisputed material facts here show just the opposite. The record shows a company fighting for survival that sold itself to a buyer who wanted the workforce.

Plaintiffs will rely on the RIF FAQs' references to eliminated positions, a "last paycheck," and unemployment benefits. But under *Rifkin*, the label attached to a separation does not control, and the FAQs are in any event only one factor in the practical, effects-driven analysis the Court must perform. *See Baker*, 2008 WL 719258, at *3–4. Considered as a whole, they favor Forman Mills: the RIF FAQs told employees they would be paid through the following Friday payroll cycle and would remain covered by the Company's health plan through June 30, 2023—and Forman Mills delivered more than it promised, paying Plaintiffs for the entire period and maintaining their coverage for all of June 2023. [SUMF ¶¶ 62, 77.] And the uncontroverted testimony shows that the Company did not treat the June 6, 2023 announcement as a permanent employment loss. [SUMF ¶¶ 60-61.]

The undisputed material facts of this case support one logical and practical outcome. Plaintiffs did not suffer an employment loss as that term is contemplated by the WARN Act, Forman Mills therefore had no obligation to provide WARN notice, and Forman Mills is entitled to summary judgment on Plaintiffs' federal claim. A contrary result would be nonsensical, because the law is designed to protect those who lose their jobs, not those who keep them.

## POINT II

## THE NJ WARN ACT CLAIM FAILS BECAUSE FORMAN MILLS OFFERED EVERY AFFECTED EMPLOYEE THE SAME JOB AT THE SAME LOCATION, AND FOR THE SAME REASONS THE FEDERAL CLAIM FAILS

Plaintiffs' NJ WARN Act claim fails for two independent reasons. The statute's plain text excludes it, and it fails for the same reasons the federal claim fails.

A. **The NJ WARN Act Excludes "Any Situation" in Which the Employer Offers the Same Employment Within Fifty Miles**

Under the definition of "termination of employment" in force on June 6, 2023—which took effect with the amendments enacted by P.L. 2019, c. 423, on April 10, 2023—a "termination of employment" shall not "refer to any situation in which an employer offers to an employee, at a location inside the State and not more than 50 miles from the previous place of employment, the same employment or a position with equivalent status, benefits, pay and other terms and conditions of employment." N.J.S.A. 34:21-1; *see also Karim v. RB Health (US), LLC*, No. 25-14829, 2026 WL 578753, at *2 (D.N.J. Mar. 2, 2026) (quoting N.J.S.A. 34:21-1).

On June 20, 2023, Forman Mills offered every affected employee the same job at the same Pennsauken office, and Plaintiffs accepted. [SUMF ¶¶ 66, 69.] The express terms of the statutory exclusion cover "any situation" in which such an offer is made. N.J.S.A. 34:21-1. Unlike the federal transfer exclusion, which the Court's May 13, 2024 Opinion described as applying to offers made prior to the closing or layoff [ECF No. 31 at 8], the New Jersey statute contains no stated timing limit. N.J.S.A. 34:21-1.[5] Because no affected employee suffered a "termination of employment," there was likewise no "mass layoff," which requires the termination of employment of 50 or more employees. N.J.S.A. 34:21-1, -2. *Karim* is not to the contrary: the employer there lost a motion to dismiss because it was "unclear whether Defendant offered her a comparable position." 2026 WL 578753, at *2. Here, the offer of the identical position is undisputed, and it was accepted.

[5] Even assuming Forman Mills made no commitment on June 6, 2023, to reinstate employees within six months, *see* N.J.S.A. 34:21-1, the offer clause is an independent exclusion: it removes from the definition "any situation" in which the qualifying offer is made, without regard to whether a commitment preceded it.

B. **<u>If Federal Law Applies, the Infirmities of Plaintiffs' Federal Claims Apply to Their State Claims with Equal Force</u>**

Although the NJ WARN Act does not itself define "employment loss," it was "modeled after its federal counterpart, and the two statutes share the same purpose of protecting workers and communities by requiring employers to provide notice of plant closings and mass layoffs." *DeRosa v. Accredited Home Lenders, Inc.*, 22 A.3d 27, 36 (N.J. Super. Ct. App. Div. 2011). Accordingly, "in the absence of case law interpreting the [NJ WARN] Act," courts "look to federal WARN Act regulations and case law for guidance in interpreting the New Jersey WARN Act." *Id.*; *see also Heinz v. Dubell Lumber Co.*, No. 19-8778 (RBK/KMW), 2020 WL 6938351, at *3 (D.N.J. Nov. 25, 2020) ("New Jersey courts often look to the federal WARN Act regulations and case law for guidance in interpret[ing] the New Jersey Act."); *Platt v. Freedom Mortgage Corp.*, No. 10-968 (RBK/KMW), 2013 WL 6499252, at *4 (D.N.J. Dec. 11, 2013) (noting that "for purposes of determining the applicability of the statutory notice requirement, the analysis is the same under both the [federal] WARN Act and the NJ WARN Act," and dismissing both claims as a matter of law).

Because federal law is clear that the WARN Act requires an actual employment loss, the NJ WARN Act must be interpreted to require one as well. Plaintiffs kept their jobs. They returned to the same positions at the same Corporate Office on June 21, 2023, without reapplying; they were paid for every day of the intervening period; their benefits and seniority were never interrupted; and they continued working at their same rates of pay for more than a year before resigning of their own accord. On those undisputed facts, there was no "termination of employment," no NJ WARN Act notice obligation, and no NJ WARN Act violation.

The contrary reading would also produce an anomaly. If the June 2023 events were a "termination of employment," Plaintiffs' June 21, 2023 return would be a *rehire*, and the years of

service by which NJ WARN Act severance is measured would arguably restart—depriving the 35 affected employees who remain with the Company of the very protection the statute confers. The offer clause avoids that result.

Accordingly, summary judgment should be entered dismissing Plaintiffs' NJ WARN Act claim with prejudice.

## POINT III

## IN THE ALTERNATIVE, ANY FEDERAL WARN ACT LIABILITY IS OFFSET BY FORMAN MILLS' VOLUNTARY PAYMENTS AND SHOULD BE REDUCED FOR GOOD FAITH

Even if Plaintiffs could establish an employment loss—and they cannot—their recovery would be sharply limited, and the Court should so hold as a matter of law.

The WARN Act's damages provision is compensatory. Liability is limited to back pay and benefits for each day of violation, for up to sixty days, 29 U.S.C. § 2104(a)(1), and "shall be reduced by" three categories of payments: "(A) any wages paid by the employer to the employee for the period of the violation; (B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and (C) any payment by the employer to a third party or trustee (such as premiums for health benefits . . . ) on behalf of and attributable to the employee for the period of the violation*." 29 U.S.C.* § 2104(a)(2).

If Plaintiffs were terminated on June 6, as they contend, Forman Mills had no legal obligation to pay them for June 6 through June 20, 2023—days on which they performed no work. Forman Mills paid them anyway, in full and without condition. [SUMF ¶¶ 72-74.] Those payments are "voluntary and unconditional payment[s] . . . not required by any legal obligation," 29 U.S.C. § 2104(a)(2)(B), and they reduce any liability dollar for dollar. *See Rivera-Pina v. Luxury Hotels Int'l of P.R.*, 100 F.4th 325 (1st Cir. 2024) (affirming summary judgment on the alternative ground that voluntary payments would completely offset any WARN Act liability); *cf. Local Joint Exec.*

*Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1159 (9th Cir. 2001) (payments conditioned on employees remaining until closure were not "unconditional"). Wages paid for work Plaintiffs performed after their June 21, 2023, return are further credited under § 2104(a)(2)(A) for the period of the violation, and Forman Mills' health-premium payments are credited under § 2104(a)(2)(C).

Any residual liability should also be reduced under 29 U.S.C. § 2104(a)(4), which authorizes the Court to reduce liability where the employer proves that its act or omission "was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the Act. Courts within this Circuit have applied that provision to reduce WARN liability where an employer acted in genuine financial distress. *See In re Yellow Corp.*, 668 B.R. 337 (Bankr. D. Del. 2025) (reducing any liability to 14 days of back pay and benefits). The undisputed record establishes both subjective good faith and objective reasonableness: the RIF was "driven by . . . the bank and then bank funding" [SUMF ¶ 56]; the Company was hopeful that there would be no permanent loss of employment [SUMF ¶ 60]; and Forman Mills paid every affected employee for every day of the interval. [SUMF ¶¶ 72-76.]

Forman Mills recognizes that this Court is bound by *United Steelworkers of America v. North Star Steel Co.*, 5 F.3d 39 (3d Cir. 1993), which measures back pay for hourly employees by the calendar days within the violation period. *See United Mine Workers of Am., Int'l Union v. Eighty-Four Mining Co.*, 159 F. App'x 345, 346 (3d Cir. 2005) (acknowledging the contrary "majority view of our sister courts of appeals"). But even under *North Star Steel*, the credits described above account for the substantial majority of any back-pay calculation, and any remainder should be reduced under § 2104(a)(4). At a minimum, the Court should enter partial

summary judgment fixing the maximum amount recoverable by each Plaintiff under the federal WARN Act.

## POINT IV

## IN THE ALTERNATIVE, NO NJ WARN ACT SEVERANCE IS OWED, AND ANY RESIDUAL IS LIMITED BY THE STATUTORY CREDIT

NJ WARN Act severance is owed only "to each employee whose employment is terminated," N.J.S.A. 34:21-2(b), and is "regarded as compensation due to an employee for back pay and losses associated with the termination of the employment relationship." *Id.* For the reasons set forth in Point II, Plaintiffs did not suffer a "termination of employment": they were offered, and accepted, the same employment at the same location. They returned to work on June 21, 2023 without reapplying; their pay, benefits, and seniority were never interrupted; and they continued working at the same hourly rates for more than a year, leaving only when they chose to resign in August 2024. [SUMF ¶¶ 66-80.] No severance was paid because none was owed.

Alternatively, even if some severance obligation could be imagined, the NJ WARN Act's own credit provision limits it: any back pay an employer provides under the federal WARN Act's damages provision is credited toward the NJ WARN Act's severance requirement. N.J.S.A. 34:21-2(b).[6] Plaintiffs have previously conceded that, because of this credit, employees with fewer than five years of service, such as Del Rossi, may not be entitled to any NJ WARN Act recovery. [ECF No. 31 at 19.] Forman Mills paid Plaintiffs in full for the entire alleged violation period, and they experienced no loss of benefits.[7]

---

[6] The provision states: "Any back pay provided by the employer to the employee pursuant to section 5 of the 'Worker Adjustment and Retraining Notification Act,' Pub. L. 100-379 (29 U.S.C. § 2104), because of a violation of section 3 of that act (29 U.S.C. § 2102) shall be credited toward meeting the severance pay requirements of this subsection b." N.J.S.A. 34:21-2(b).

[7] Alternatively, should the Court find that some severance is owed to Barber under the NJ WARN Act, it should not be the windfall Plaintiffs seek. At most—and as to Barber exclusively—Barber would be owed thirteen weeks of severance pay (one week for each of her nine full years of service

Accordingly, neither Plaintiff can establish any recoverable damages under the NJ WARN Act, and their state-law claims should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Defendant Forman Mills, Inc. respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor dismissing Plaintiffs' claims against it with prejudice or, in the alternative, enter partial summary judgment limiting any recovery as set forth in Points III and IV, together with such other and further relief as the Court deems just and proper.

Dated: October 30, 2026

Respectfully submitted,

**BLANK ROME LLP**
A Pennsylvania LLP

By: */s/ Anthony A. Mingione*
Jonathan M. Korn
New Jersey Resident Partner
Anthony A. Mingione
Michael R. Darbee
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Tel.: (609) 750-2649
Jonathan.Korn@BlankRome.com
Anthony.Mingione@BlankRome.com
Michael.Darbee@BlankRome.com

*Attorneys for Defendant, Forman Mills, Inc.*

---

plus four weeks), less the federal WARN Act back pay credited under N.J.S.A. 34:21-2(b). Measured in calendar days under *North Star*, that back pay equals sixty days at Barber's daily rate, or approximately twelve weeks of pay, leaving a residual of no more than approximately one week. For all of the reasons set forth above, however, Plaintiffs, including Barber, are not entitled to any damages, severance included, for jobs they never lost.