# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:24-CV-09478

\- - - - - - - - - -

NOELL DEL ROSSI and DAWN BARBER, :
individually and on behalf of all :
similarly-situated individuals, :
Plaintiffs :
\- VS - :
FORMAN MILLS, INC., GOODE PARTNERS,:
LLC, GOODE FORMAN HOLDINGS, LLC, :
GOODE HEAVYWEIGHT COINVEST, LLC :
and TOBIAS KELLER, :
Defendants :

\- - - - - - - - - -

Videoconference deposition of DAVID ODDI, taken via Zoom before Latitisa Russell,RPR, CCR #30XI00234100 and Notary Public of the State of New Jersey, taken on December 23, 2025, commencing at 9:05 a.m.

\- - -

KAPLAN, LEAMAN AND WOLFE
230 South Broad Street, Suite 602
Philadelphia, Pennsylvania 1910
(215) 922-7112

Any reproduction of this transcript is prohibited.



A P P E A R A N C E S :

MORGAN ROOKS, P.C.
BY: FRANKLIN J. ROOKS, JR., ESQUIRE
525 Route 73 North, Suite 104
Marlton, New Jersey 08053
fjrooks@morganrooks.com
Counsel for the Plaintiffs

GOODLEY McCARTHY, LLC
BY: JAMES E. GOODLEY, ESQUIRE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
james@gmlaborlaw.com
Co-Counsel for the Plaintiffs

COZEN O'CONNOR
BY: JASON CABRERA, ESQUIRE
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
jcabrera@cozen.com
Counsel for Defendant Goode Partners, LLC



A P P E A R A N C E S (continued):

PASHMAN STEIN WALDER HAYDEN, P.C.
BY: KEITH McDONALD, ESQUIRE
Court Plaza South
21 Main Street, #200
Hackensack, New Jersey 07601
kmcdonald@pashmanstein.com
Counsel for Defendant Tobias Keller

BLANK ROME, LLC
BY: ANTHONY A. MINGIONE, ESQUIRE
1271 Avenue of the Americas
New York, New York 10020
anthony.mingione@blankrome.com
Counsel for Defendant Forman Mills



\- - -
I N D E X
\- - -


| WITNESS | DIRECT | CROSS |
|---|---|---|
| DAVID ODDI | | |
| By Mr. Rooks | 7 | |


\- - -
E X H I B I T S
\- - -


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Goode Partners, LLC Webpage | 29 |
| 2 | Two Stock Certificates Bates Stamped FM002943 and FM002962 | 37 |
| 3 | Amendment to Credit Agreement Bates Stamped FM001852 to FM001859 | 37 |
| 4 | Amendment to the Merger Agreement | 42 |
| 5 | Amendment to the Amended Restated Limited Liability Company Agreement Bates Stamped FM003042 through FM003044 | 45 |
| 6 | Press Release from the Goode Partners Website | 47 |
| 7 | Deposit Control Agreement Bates Stamped FM005342 through FM005352 | 55 |
| 8 | Cash Pledge and Security Agreement Bates Stamped FM005324 through FM005330 | 62 |

Page 5

- - -
EXHIBITS
- - -

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 9 | 3/31/25 Form ADV Part 2 Brochure | 84 |
| 10 | Loan and Security Agreement | 114 |
| 11 | Waiver & Amendment #14 to the Credit Agreement Bates Stamped FM002218 through FM002232 | 119 |
| 12 | E-mail from Joe Ferreira to Nathan Harrell of Monroe Capital Bates Stamped FM006214 | 134 |
| 13 | 5/15/23 Letter Bates Stamped FM002904 through FM002906 | 138 |
| 14 | E-mail Exchange Between Joe Ferreira & Mike Kvitko Bates Stamped FM005904 through FM005906 | 147 |
| 15 | Document Bates Stamped FM003128 through FM003129 | 149 |
| 16 | Indemnification Agreement Bates Stamped Keller-00489 through Keller-00496 | 160 |
| 17 | E-mail from Stuart Kessler to Toby Keller Bates Stamped FM006292 | 164 |
| 18 | E-mails Bates Stamped Keller-00530, Keller-00542 and Keller-00548 | 168 |
| 19 | E-mail Bates Stamped FM006282 | 184 |

EXHIBITS RETAINED BY COUNSEL

Page 6

LITIGATION SUPPORT INDEX

Request For Production Of Documents

| Page | Line |
| --- | --- |
| 42 | 9 |

Pages Marked Confidential

| Page | Line |
| --- | --- |
| (None) | |

Direction To Witness Not To Answer

| Page | Line |
| --- | --- |
| (None) | |

Stipulations

| Page | Line |
| --- | --- |
| (None) | |

Questions Marked

| Page | Line |
| --- | --- |
| (None) | |

Page 7

- - -

D A V I D O D D I, after having been duly sworn, was examined and testified as follows:

- - -

DIRECT EXAMINATION
BY MR. ROOKS

- - -

Q. Good morning, Mr. Oddi. My name is Franklin Rooks, Jr. and I represent plaintiffs, Noelle Del Rossi and Dawn Barber in this litigation. It's my understanding that you are appearing today here as the corporate representative for the defendants this matter, which are Goode Partners, LLC and several other Goode entities. I have their names. I'll just pull them up in a second here.

MR. CABRERA: Counsel, the notice just had him as the designee for Goode Partners, LLC. So he's here in that capacity.

MR. ROOKS: Jason, say that again.

MR. CABRERA: Sure. The deposition notice requested a corporate representative of Goode Partners, LLC and so, Mr. Oddi is here in that capacity as the corporate representative of Goode Partners, LLC.

MR. ROOKS: Just give me a second.

Page 8

- - -

(At which time a discussion was held off the record.)

- - -

Q. Mr. Oddi or David, do you have a preference?

A. Feel free to call me David.

Q. Okay. So you're appearing here on behalf of defendant, Goode Partners, LLC, correct?

A. Yes.

Q. Prior to this deposition we had sent a notice of deposition with a list of topics upon which we expect you to be able to provide testimony. Have you seen that notice of deposition?

A. I have.

Q. Okay. And are you prepared to answer questions about those topics that were identified in the deposition?

A. I am.

Q. Great. So when you answer today, I am going to assume that you are answering in your capacity as the corporate representative. If you are not answering in your capacity as the corporate representative, I will need you to indicate so. Are you clear with that?

A. Understood.

Page 9

Q. Okay. Mr. Oddi, had you ever been in a deposition before?
A. I have.
Q. Okay. So I just want to go over some ground rules. This is being transcribed by the court reporter and the court reporter cannot take testimony of two people talking at once. So I would just ask that when I'm asking a question, even if you can anticipate the answer, let me finish the question and also, you may want to pause before responding in case your attorney wants to make an objection. On my side, I'll do my best not to interrupt you when you are answering a question. Are you okay with that?
A. I am.
Q. A lot of times during conversation we tend to make gestures, nods of the head, things like that, which is fine. However, the court reporter cannot transcribe shakes of the head and nods and things like that. So if you are going to make gestures, I would just ask that it's accompanied by spoken word. Okay?
A. Understood.
Q. The court reporter I don't think is really able to transcribe uh-huhs and um-hmms. So if you can avoid making those answers in those types of formats. Okay?

Page 10

A. Okay.
Q. You said that you received a notice of deposition. Did you do anything to prepare for today's deposition?
A. I reviewed some information that was previously provided to you.
Q. None of the questions that I'm going to ask today will ask for any conversations that you had with your attorney. So if you believe that I've asked that, I mean I think your attorney will object, but just so you know, I don't want to know any conversations that you had with counsel. Okay?
A. Okay.
Q. So you said you reviewed some of the documents and the documents that would have been the production that you guys gave in response to the discovery requests?
A. I reviewed I believe it's called the interrogatories that were sent over to you previously.
Q. Beyond that, did you do anything else to prepare for today?
A. I requested some information from our CFO that was responsive to certain of the questions. That was it.
Q. As we sit here today, do you have anything on

Page 11

your desk or anything up on your screen that you might be using to assist you with responses?
A. I just have some printouts of the documents that I referenced previously.
Q. Are they stamped in the bottom right-hand corner?
A. No.
Q. Are these documents that were produced to your attorney and sent to us?
A. They were filed with the court as a response to your information requests and then the separate was a list of financial transactions between Goode Partners and Forman Mills that was responsive to one of the questions in the deposition form.
Q. But those documents that you're talking about, were those documents produced, as well?
A. The documents that are responsive that are responses to the interrogatories were filed with the court. The financial information related to advisory fees and expenses, I know we responded to the question about when certain fees and expenses and provided, I believe, the advisory agreement. I don't remember whether or not we provided the financial details behind it.
Q. So after the deposition, can you consult with

Page 12

your attorney to see if those documents were, if fact produced.
MR. ROOKS: And Jason, I'll say if they were responsive, will you please produce them, if you haven't already done so?
MR. CABRERA: Yes.
MR. ROOKS: Thank you.
Q. Mr. Oddi, what is your position with Goode Partners, LLC?
A. Co-founder and partner.
Q. When was Goode Partners founded?
A. 2004.
Q. If you had to describe Goode Partners, would you say Goode Partners is a private equity form?
A. Correct.
Q. What is a private equity firm?
A. Private equity firm is an investment fund that typically raises capital from outside investors, identifies companies for investment, makes investments, helps grow those investments and then ultimately exits those investments to ultimately provide a return to its investors.
Q. You said that you were one of the founders of Goode Partners. Who else was a founding partner of Goode?

A. Joe Ferreira and Ron Beegle.
Q. What is the second name?
A. Beegle. B-E-E-G-L-E.
Q. Is Mr. Beegle still with the firm?
A. No, Mr. Beegle left the firm prior to the investment in Forman Mills. I don't remember the exact date.
Q. Now you are a principal owner of the firm, correct?
A. I am a member of the firm.
Q. How about the Mr. Daniel Bonoff, who is he?
A. Daniel Bonoff is also a member of the firm and a partner.
Q. You also mentioned Mr. Ferreira. Am I saying that right?
A. Correct.
Q. Are there any other partners at the firm?
A. Keith Miller.
Q. When did Mr. Miller join the firm?
A. Keith Miller joined the firm at its inception and was promoted to partner sometime thereafter. I don't remember the exact date, but prior to the investment at Forman Mills.
Q. Mr. Oddi, do you have a title? I understand you are partner, but is there a formal title that you



have with Goode Partners?
A. I think the official title is managing member.
Q. In your capacity as a managing member, are you an employee of Goode Partners?
A. Correct.
Q. And you would receive your earnings report, some of your earnings reported on IRS form W-2?
A. Actually it's a K-1.
Q. Do you receive any W-2 earnings?
A. I'd have to go back and check. I'm not positive.
Q. The schedule K-1 that you referenced, would that be to report what's called carried interest?
A. No.
Q. Do you receive carried interest?
A. Not from Goode Partners.
Q. Who did you receive carried interest from?
A. We have various investment funds and other vehicles in which we've made investments that provide the carried interest.
Q. We'll get into carried interest in a little bit, but moving along, you referenced that Mr. Bonoff is also a partner. What is Mr. Bonoff's title?
A. He is a member and partner.



Q. Like yourself, Mr. Bonoff receives earnings on a K-1?
A. I believe so, yes.
Q. Mr. Ferreira, what's his title?
A. Member and partner. Actually, and co-founder.
Q. To the best of your knowledge, does Mr. Ferreira receive his earnings reported on a K-1?
A. I believe so.
Q. So you said earlier that you raise capital for investors, right. Would these be high net worth individuals?
A. They are a combination of institutional and corporate pension funds, as well as a small number of high net worth individuals.
Q. So when Goode Partners receives money from investors, high net worth individuals, institutional investors, that money is placed into a fund vehicle; is that correct?
A. Just make sure we have the nomenclature correct, the underlying fund vehicle is what receives a commitment from its investors, whether they be high net worth or institutional partners. There is actually no money placed in that fund. We have the right to call capital from those investors when



needed. The capital that is received from those investors to Goode Partners is actually not for investments. It's actually a management fee for managing the capital in the underlying investment vehicles.
Q. So the money that people invest, that's through what you would call a subscription agreement?
A. Yes.
Q. An subscription agreement, that individual would commit a certain amount of capital?
A. That's correct.
Q. And as the, let's say, the investment fund purchases assets, that capital would be called, correct?
A. That's correct.
Q. And the investment vehicle, for lack of a better word, that would be a limited partnership, correct?
A. Correct.
Q. And there would be a general partner, correct?
A. Correct.
Q. And there would also be limited partners?
A. Correct.
Q. And the investors, the high net worth

individuals and the institutional investors, they would be the limited partners, correct?
A. Correct.
Q. With the Forman Mills investment, correct me if I'm wrong, but that was purchased through the Goode Partners Consumer Fund III, Limited Partnership, correct?
A. Goode Partners Consumer Fund III, LP was an indirect investor in Forman Mills, correct.
Q. When you say indirect investor, can you clarify what you mean by indirect investor?
A. Goode Partners Consumer Fund III purchased a membership interest in Goode Forman Holdings. Goode Forman Holdings purchased a membership interest in, I believe it's called, Forman Mills, Inc. and that is the process under which Goode Partners Consumer Fund III made an indirect investment in Forman Mills.
Q. We're going to talk about those entities in a minute. Now the Goode Partners Consumer Fund III, LP was a limited partnership that had limited partners and a general partner, right?
A. Correct.
Q. And at the end of each year, did Goode Partners Consumer Fund III, LP issue any W-2 forms?
A. I don't believe they issued any W-2s.



Q. Was anybody directly employed by Goode Partners Consumer Fund III, LP?
A. No.
Q. You said that Goode Partners Consumer Fund III purchased membership in Goode Forman Holdings, is that what you said?
A. Correct.
Q. So Goode Forman Holdings was than an Inc., an LLC, what was that?
A. I believe Goode Forman Holdings was an LLC.
Q. Who were the members of the Goode Forman Holdings, LLC?
A. It was Goode Partners Consumer Fund III and then two entities associated with Cohesive Capital Partners. It was Cohesive Capital Partners, LP and Cohesive Capital Partners II, LP.
Q. In terms of membership interests, sounds like you said there were three members of the Goode Forman Holdings, LLC, correct?
A. Correct.
Q. What proportion of the membership units, 50 percent, 75 percent, something like that, did Goode Consumer Fund III hold?
A. It was roughly 50 percent.
Q. Then the remaining 50 percent would have been



allocated between the Cohesive entities, correct?
A. Correct.
Q. Now, the Goode Partners Consumer Fund III, Limited Partnership, again, had a general partner and limited partners. Who was the general partner of the Goode Partners Consumer Fund III, LP?
A. Goode Investors III.
Q. Goode Investors III and that would be Goode Investors III, LLC?
A. LP.
Q. Who were the members of the Goode Investors III, LP?
A. The investors of Goode Investors III were myself, Joe Ferreira, Daniel Bonoff, Keith Miller and then various employees, various employees of Goode Partners.
Q. What were the proportions of, let's say, ownership of Goode Investors III, LP for yourself, Mr. Ferreira and Mr. Bonoff?
A. I don't remember the exact splits, but I had the largest number. Not a majority, but the largest number of those individuals.
Q. Between the three of you, yourself, Mr. Bonoff and Mr. Ferreira and let's say, Mr. Miller, what percentage did the four of you own in Goode



Investors, LP?
A. I don't know exactly, but I'm going to assume 90 percent.
Q. And that would leave the 10 percent to the employees of Goode Partners, LLC?
A. Correct.
Q. With the Goode Investors III, LP was any one of you, Mr. Miller, Mr. Bonoff, Mr. Ferreira, a manager of that entity?
A. I believe we were all -- we were all members of that entity. I may have been a manager of that entity.
Q. Okay. And the Goode Investors III, LP, again, that was the general partner of the Goode Consumer Fund III, LP. What purpose or what function did Goode Investors III, LP serve?
A. The typical structure in a private equity fund requires the general partner, who are the individuals associated with investing the fund to make a commitment of capital alongside the investors in the fund, the limited partners.
So the role of Goode Investors was two fold. Number one, for the vehicle to aggregate the general partners' commitment to the fund and then number two, was the vehicle under which any carried

Page 21

interest would ultimately be distributed or would receive the carried interest.
Q. So Goode Investors III, LP, that was controlled by whom?
A. I believe I was the managing member.
Q. Did Goode Investors III, LP as the general partner of Goode Partners Consumer Fund III run the investment strategy for that fund?
A. The general partner makes all ultimate investment decisions on behalf of the fund.
Q. So the general partner has the authority to act on behalf of the limited partnership?
A. Correct. Pursuant to the limited partnership agreement.
Q. And then the general partner would also determine how the capital is deployed, correct?
A. The approval of the general partner is required to make any investment.
Q. So the general partner and so I don't have to keep saying this long name, when I say general partner for this next series of questions, we're going to be talking about Goode Investors III, LP. Okay?
A. Okay.
Q. So the general partner would determine how the capital will be used, correct?

Page 22

A. It would need to authorize any investment.
Q. That would determine what companies that fund would acquire, correct?
A. Correct.
Q. It would also determine when a company would be sold, right?
A. To the extent to have that ability to control that, yes.
Q. The general partner would also decide when capital would be called from the limited partners, right?
A. Correct.
Q. Now the limited partners, do they have any voting rights?
A. They do.
Q. What are the limited partners' voting rights?
A. There are a number of items under the limited partnership agreement that would require the consent of the limited partners before the general partner could take any action.
Q. Could you give me an example of some of the things that the limited partners would be required to vote on?
A. An example would be if the fund wanted to alter its diversification requirements to put more

Page 23

than the pre-allowed limit in any one investment.
Q. So this Goode Consumer Fund III, LP, correct me if I'm wrong, it would have an investment thesis; is that right?
A. Correct.
Q. And it would be specific to a certain, maybe, industry or industry sector; is that correct?
A. That is correct for Goode Partners. That's not necessarily correct for every --
Q. And the deployment of capital in this Goode Partners Consumer Fund III would have to be consistent with the subscription agreement, right?
A. Consistent with the terms of the limited partner agreement.
Q. You reference that the limited partners have votes, they are able to vote on certain things, correct?
A. Correct.
Q. Would you consider them to be a minority interest?
A. I don't think that's the appropriate terminology. It depends upon how you're defining minority interest. They, obviously, put up a majority of the capital.
Q. But in terms of voting power, would it be

Page 24

correct to say that the general partner has more of a vote than the limited partners?
A. The general partner has very specific powers articulated under the limited partnership agreement that does not need the consent of the limited partners and the limited partners have the right to -- or have the right to veto any actions that the general partner wants to take that are not permitted by the partnership agreement.
Q. You referenced earlier or actually, I brought up the term carried interest. Can you just explain what carried interest is?
A. Carried interest is a feature in many alternative asset vehicles under which the general partner is paid for achieving certain performance returns that refers to a percentage of the gains realized by the limited partners.
Q. So in order to receive the carried interest, there is a hurdle that has to be achieved, right?
A. In certain funds, including Goode Partners Consumer Fund III.
Q. That's what I'm talking about. With respect to Goode Partners Consumer Fund III, there would have been some hurdle that needed to be achieved in order for Goode Partners III, LP to received the carried

interest, correct?
A. Yes, there is a hurdle rate in the fund documentation that would need to be hit for Goode Investors III to receive any carried interest.
Q. And the only entity that would receive the carried in the Goode Partners Consumer Fund III would have been the general partner, correct?
A. Correct.
Q. The carried is taxed at a long-term capital gains rate as opposed to ordinary income, correct?
A. There are certain regulations and time requirements that need to be achieved, but assuming those are passed, then yes, it is achieved at long-term capital gains rates.
Q. Earlier you said that, I think you referenced a management fee. Does Goode Partners, LLC receive a management fee from Goode Partners Consumer Fund III?
A. Correct.
Q. Now that management fee, is it paid directly by Goode Partners Consumer Fund III or is it paid by the companies that Goode Partners Consumer Fund III owns?
A. Goode Partners Consumer Fund III pays -- well, the limited partners of Goode Partners Consumer Fund III pay a management fee to Goode Partners, LLC.



Q. So the limited partners make a capital commitment through the subscription agreement, right?
A. Can you repeat that?
Q. The limited partners make a capital commitment through the subscription agreement; is that correct?
A. That's correct.
Q. And when the capital is called, the limited partners contribute their amount of capital that's called, right?
A. Correct.
Q. And from that, the management fee is taken; is that correct?
A. There are specific capital calls for management fees and there are specific calls for investments or any other specific purpose, but they are specifically articulated in the actual capital call from the limited partner.
Q. When a capital call is made to the limited partner for management fees, what does that management fee pay for?
A. That management fee pays for Goode Partners to manage certain of its investments, specifically everything from out-of-pocket expenses, rent, compensation to employees, transaction expenses.



Basically, any expense that comes up in the operation of the business.
Q. So with the management fee, we just talked about the limited partners, the companies that are owned by the Goode Partners Consumer Fund III, would you describe them or term them as portfolio companies?
A. That's a fair term, correct.
Q. Goode Partners Consumer Fund III owned Forman Mills, Inc., correct?
A. Well, indirectly through the various entities that I discussed before.
Q. Right. Right. But the Forman Mills, Inc. was a portfolio company of Goode Partners Consumer Fund III?
A. Correct.
Q. And Goode Partners Consumer Fund III, did it own any other companies?
A. Yes.
Q. Do you know, approximately, how many other companies they owned?
A. Roughly ten.
Q. Were there any day-to-day decisions to be made on behalf of Goode Partners Consumer Fund III?
A. There typically would not be a day-to-day decision made by Goode Partners Consumer Fund III.



Q. Again, any decision that needed to be made on behalf of the Goode Partners Consumer Fund III would be made by that general partner?
A. Correct.
Q. So when Goode Partners takes in capital from the investor, the obvious objective I would think would be to generate a positive return, correct?
A. Correct.
Q. And the value of that Goode Partners Consumer Fund III depends on the performance of the portfolio companies, would you agree?
A. Agreed.
Q. So when we talk about Forman Mills, the objective I would think, and you tell me if I'm wrong, but to grow the value of Forman Mills, correct?
A. Correct.
Q. When Goode Partners Consumer Fund III purchases a company, is it looking for undervalued assets, distressed assets? What type of companies would Goode Partners Consumer Fund III be looking for?
A. Goode Partners Consumer Fund III was focused on profitable proven high potential companies in the consumer sector.
Q. Is Goode Partners Consumer Fund III ongoing? Does it still own companies or has that fund closed?

A. The fund is no longer making investments, but the fund still exists.
Q. Now you are, I would think, familiar with the Goode Partners website?
A. Yes.
Q. I just want to introduce a document. I'm going to share my screen in a second. I'll call this Exhibit One. This is from the webpage, Goode Partners, LLC.
- - -
(At which time, Goode Partners, LLC webpage was marked as Exhibit One for identification.)
- - -
Q. You're familiar with this, correct?
A. I am.
Q. So on the website it says that the Goode Partners creates significant shareholder value by bringing combination of operational and financial resources into active partnerships with owners and management teams with high growth potential consumer oriented companies. Do you see that?
A. I do.
Q. That's a true statement, correct?
A. Correct.
Q. So can you tell me when you say active



partnerships, what does that mean, an active partnership?
A. We consider ourselves to be active members of the board to allow our management teams and entrepreneurial partners to have the benefits of some of our prior experiences, both successes that we've had, as well as failures, as well as relationships that we can bring to bear for the benefit of the company.
Q. So what operational resources does Goode Partners bring to a portfolio company?
A. Well, two of our partners are former operating executives. So, for example, Joe Ferreira was the chief operating officer of Avon. At the end of a 20-year career there, he was a member of the board. He ran various regional operations for Avon, including Europe and Asia Pacific before ultimately becoming chief operating officer through his role at Avon. Avon also had a portfolio of other investments, including Tiffany and Mallinckrodt Chemical, as well as a number of other companies. So he's pretty much been through every rung of the operational ladder and obviously, learned a lot of things from them.
Q. What financial resources does Goode Partners bring to one of its portfolio companies?



A. We have the ability to actually invest capital. We have relationships with lenders and the partners of the firm have experience in the capital markets, as well as raising other private capital.
Q. When the Goode Partners Consumer Fund III would create a partnership with a company, would it acquire a majority interest or complete control or 100 percent of the company?
MR. CABRERA: Objection to form. You can answer the question, David.
A. 50 percent of the investments that Goode Partners in general across our three funds have made have been more than 50 percent. We've actually done a 50/50 partnership. The other half roughly is minority ownership interest. I don't believe we've made any investment where Goode Partners owns 100 percent.
Q. So when Goode Partners, let's say Consumer Fund III acquires a company, if it acquires 75 percent of the company, the seller would receive, I guess, what you would term rollover equity; is that correct?
A. It could be.
Q. What else would happen if Goode Partners purchased 75 percent of a company, what would the seller have?
A. Well, we may have a co-investor in the



transaction that also owns ownership and the seller may not have anything.
Q. Is it typical that you would buy a company where the seller doesn't retain any equity?
A. That would be an exception.
Q. So in those instances, you would say the seller does retain some sort of equity?
A. Correct.
Q. And in the case of Forman Mills what ownership interest was sold?
A. 100 percent.
Q. He sold 100 percent. So did he have no rollover equity?
A. Correct.
Q. So Forman Mills was one of those rare exceptions?
A. Correct.
Q. If at any time you need to take a break, just let me know. The only, I guess, limitation is that if there is a pending question, we want you to finish the question before taking the break. Okay?
A. Understood.
Q. Forman Mills, the owner was Rick Forman; is that correct?
A. Correct.

Page 33

Q. And Mr. Forman sold 100 percent of Forman Mills, right?
A. Correct.
Q. I believe you said earlier that there were three entities involved with the purchase. You mentioned there was Cohesive Capital, correct?
A. Correct.
Q. And the Goode Investor III; is that right?
A. Correct.
Q. And Forman Mills, Inc. was the company that was purchased and the sole shareholder of Forman Mills, Inc. was a company called Forman Mills Holdings, LLC; is that accurate?
A. Correct.
Q. And the members of Forman Mills Holdings, LLC were who?
A. I'm sorry. Could you just repeat which entity you're referencing?
Q. So we said that for Forman Mills, Inc., Forman Mills Holdings, LLC was the sole shareholder?
A. Correct.
Q. And my question was, who were the members of that LLC, the Forman Mills Holdings, LLC?
A. So the members there would be Goode Forman Holdings. It would be Goode Heavyweight Coinvest. I

Page 34

believe, Mike Kvitko and then various members of the management that would have been option holders.
Q. You said members of management option holders?
A. That would have received incentive equity.
Q. But incentive equity, that's not the same as holding membership units, correct?
A. It entitles the recipient upon investing to receive membership interest.
Q. Would you describe that as synthetic equity? How would you describe it?
A. No, it's truly an equity incentive plan that entitles them to actual equity in the business upon the achievement of certain requirements.
Q. So when you say achievement of certain requirements, would that be financial goals or?
A. No, typically investing. So the employee would need to stay with the company through a period of time, actually exercise their equity incentives. But the typical requirement is that they need to stay under the employment of the company during the vesting period.
Q. And if those options did not vest, then the membership units would, I guess, go to Mike Kvitko, Coinvest and Forman Holdings?

Page 35

A. They wouldn't be issued to those individuals, but all existing members would get the benefit of the fact that there was a smaller denominator of number of units outstanding.
Q. Of those, I guess, I'll say, four entities, right, the Goode Forman Holdings, Goode Heavyweight Coinvest, Mike Kvitko and the various members of management, who were the members of Goode Forman Holdings?
A. Goode Forman Holdings were the three entities that we discussed previously, Goode Partners Consumer Fund III, Cohesive Capital Partners and Cohesive Capital Partners II.
Q. Goode Heavyweight Coinvest, who were the members of that?
A. Members there were primarily employees of Goode Partners, LLC.
Q. In terms of number of membership units or percentage of membership units, what percentage did Goode Forman Holdings have?
A. I don't remember the exact number, but it was a substantial majority.
Q. Then we've got the Goode Partners III, LLP?
A. LLC.
Q. I'm sorry. Goode Partners --

Page 36

A. Goode Partners Consumer Fund III LP.
Q. Then there's a company, Heavyweight Acquisition Sub, Inc. What is that?
A. That was an entity that was setup for the purpose of completing the acquisition that I believe was then merged into either Forman Mills, Inc. or Forman Mills Holdings.
Q. Heavyweight Acquisition Sub, Inc. was that C Corp. S Corp., if you know?
A. I don't remember.
Q. And there were shareholders of Heavyweight Acquisition Sub, right?
A. I believe it was the entities that now own Forman Mills Holdings.
Q. I'm going to introduce another document here. You've seen this document before?
A. Yes.
Q. This is Heavyweight Acquisition Sub, Inc. and that says that Forman Mills Holdings, LLC owns 100 percent of Heavyweight Acquisition Sub, right?
A. Correct.
Q. You are the president of Heavyweight Acquisition Sub?
A. Yes.
Q. And Mr. Bonoff was the secretary, right?

Page 37

A. Correct.
MR. ROOKS: I'll call that Exhibit 2.
- - -
(At which time, two stock certificates Bates stamped FM002943 and FM002962 were marked as Exhibit 2 for identification.)
- - -
Q. Were you at any point in time president of Forman Mills, Inc.?
A. I don't believe so.
MR. ROOKS: I'm going to introduce another document. This will be Exhibit 3.
- - -
(At which time, Amendment to Credit Agreement Bates stamped FM001852 to FM001859 was marked as Exhibit 3 for identification.)
- - -
Q. This is a document that was produced in discovery. Have you seen this document before?
A. I have.
Q. This says, Amendment to Credit Agreement, right?
A. Correct.
Q. Is this a document that you would have an attorney review before putting any signatures to?

Page 38

A. Yes.
Q. To make sure everything is accurate?
A. Correct.
Q. Scroll down to the bottom here and here this identifies you as the president of Forman Mills, Inc. and also, president of Forman Mills Holdings, LLC. Are those titles accurate?
A. They would be accurate.
Q. What period of time were you president of Forman Mills, Inc.?
A. Again, I didn't remember that I was, so I can't answer that question conclusively.
Q. Is there any document that you could review to help determine the time period in which you were president for Forman Mills, Inc.?
A. I would assume I would have to go back through my resignation letters to see if that included resignation as an officer or as a member of the board.
Q. You said resignation letter?
A. Correct.
Q. When you say resignation letter, you said resignation from the board?
A. I believe I submitted a resignation letter from the board and I don't remember whether or not that included resignation as president.

Page 39

Q. Do you know when you would have submitted a resignation letter to the board?
A. I don't remember the date off the top of my head.
Q. Do you know why you would have submitted a resignation letter to the board?
A. At that point in time, all existing board members resigned from the board because the general conclusion was that the company needed a completely independent director given certain events that were going on at the company.
Q. If you resigned from the Forman Mills, Inc., would that be sometime around May of 2023?
A. I don't remember the date.
Q. Would it have coincided with appointment of a new board member like you referenced?
A. It would have preceded the appointment of a new director.
Q. Would there be a period of time which Forman Mills, Inc. was without a board? Meaning, if you resigned from the board on, let's say, May 22nd, would there have been a replacement installed on the 23rd?
A. I don't remember the exact dates.
Q. Would Forman Mills have always had during the ownership by, say the Consumer Fund, a board in place?

Page 40

A. I believe so, correct.
Q. There wouldn't have been a period of time in which there was no board?
A. Not to my knowledge.
Q. Let me stop sharing.
A. You did stop sharing.
Q. The prior document that we had introduced, it was a credit agreement, right? We had identified your signature in two spots, Forman Mills, Inc. and Forman Mills Holdings, LLC. You testified that you were president for a period of time of Forman Mills, Inc. What would your role have been as president of Forman Mills, Inc.?
A. My role was fairly limited to executing certain documentation that was required and any other corporate actions that would require the signature of the president.
Q. Any other responsibilities as president of Forman Mills, Inc. that you would have had?
A. Just as required under the company's bylaws and required as a fiduciary as an officer of the company.
Q. You said that you signed things, right. This was a document that we just introduced was an amendment to a credit agreement. Can you give me some

Page 41

representative examples of documents that you would have had to have signed in your capacity as president of Forman Mills?
A. Credit agreement amendment, credit agreement. We issued various rounds of equity. We changed lenders that required new credit agreements. Those are the ones that come to mind.
Q. Anything else that you can think of?
A. Not off the top of my head.
Q. And the document that was introduced as Exhibit 3, again, had two signatories for you. The second signatory for you was president of Forman Mills Holdings, LLC. It says, the guarantor and I can pull that up. Do you want to see that document again?
A. Nope. Not necessary.
Q. The document identified the borrower as Forman Mills with you as president and then Forman Mills Holdings, LLC was identified as a guarantor and you were listed as president for Forman Mills Holdings, LLC. How long were you president of Forman Mills Holdings, LLC?
A. My guessing through its inception through my resignation.
Q. And again, the resignation that you are talking about would have been your resignation when

Page 42

the new director was installed for Forman Mills?
A. It would be -- again, to the extent it is included in my resignation letter, it would be through that date of the resignation.
Q. Do you know if the resignation letter that you are referencing was produced in the documents that were requested?
A. I believe so, but I'm not 100 percent sure.
MR. ROOKS: We'll check, also, but I would say, Jason, to the extent that resignation letter or letters, plural, was not produced, can you make sure that it is?
MR. CABRERA: I believe it was.
MR. ROOKS: I don't have it in front of me. So to the extent that it wasn't, we would just ask that you do that. What I'm going to do is another document. I'll call this one Exhibit 4.
\- - -
(At which time, Amendment to the Merger Agreement was marked as Exhibit 4 for identification.)
\- - -
Q. This is Exhibit 4, which is an Amendment to the Merger Agreement, amended and restated merger agreement. I'm going to scroll down. So this signature page, again, identifies you as president of

Page 43

Forman Mills Holdings, LLC. Do you see that?
A. I do.
Q. That's accurate, correct?
A. Correct.
Q. Heavyweight Acquisition Sub, Inc. also identifies you as president, correct?
A. Correct.
Q. I'm going to stop sharing that. So far you've been identified as president of a number of the difference entities. Do you know as we sit here today the entities related to Forman Mills that you served as president for? We know that it was Forman Mills Holdings, LLC. We know that it was Heavyweight Acquisition Sub, Inc., Forman Mills, Inc. Were you also president of Goode Forman Holdings, LLC?
A. I do not recall with certainty.
MR. ROOKS: Let's take a five-minute break.
\- - -
(At which time a short recess was taken.)
\- - -
MR. ROOKS: Exhibit Number One was the website. There's no Bates number for that. That was just taken off the Goode Partners website.

Page 44

Exhibit Number 2 was the stock certificate and I'll give you the Bates number on that. That was FM002943 and FM002962. The two stock certificates were represented by those Bates numbers.
Exhibit 3 was the amendment --
MR. CABRERA: I'm sorry. There were two stock certificates? I thought it was just one page. Exhibit 2 was just one page. Was there a second page? It was only one page presented to the witness.
MR. ROOKS: Let me just share it for a second, so we can see. I know we talked about the Heavyweight Acquisition Sub and then Forman Mills Holdings, LLC. So there's --
MR. CABRERA: I thought the witness only had the first page, not the second page.
MR. ROOKS: No problem. Exhibit 2 is two pages, FM002943 and Forman Mills FM002962.
Exhibit 3, which is the Amendment to the Credit Agreement, that starts at FM001852 through FM001859.
Exhibit 4, which was the Restated Merger Agreement, that is FM002964 through FM003041.
I want to introduce another document. This will be Exhibit 5 and it's called the Amendment

Page 45

to the Amended Restated Limited Liability Company Agreement and it has Bates numbers FM003042 through FM003044.

- - -

(At which time, Amendment to the Amended Restated Limited Liability Company Agreement Bates stamped FM003042 through FM003044 was marked as Exhibit 5 for identification.)

- - -

Q. Mr. Oddi, have you seen this document before?
A. Would you mind just scrolling down? I believe so, but...
Q. This is the signature page that I'm looking at. It's got two of your signatures, correct?
A. Correct.
Q. One signature is for Goode Forman Holdings, LLC and other one is the Goode Heavyweight Coinvest, LLC. Do you see that?
A. Correct.
Q. It identifies a title. It says manager for both of those, right?
A. Correct.
Q. We were talking earlier about another document identified you as the president of Forman Mills Holdings, LLC, but this document, which is two

Page 46

different LLCs has you identified as manager. Is there any distinction between the term president or manager to your knowledge?
A. I don't understand what the difference would be candidly.
Q. So when Forman Mills was acquired, would there have been some type of strategic plan in place for that company?
A. Yes.
Q. And who would have been the architect or the designer, if you will, of that strategic plan?
A. When we acquired the business we had an interim CEO that would have taken the lead on that while we were searching for a full-time replacement.
Q. When you say we were searching, who is the we that were searching for a full-time replacement?
A. The board.
Q. The board of what? What board?
A. It would have been the board of, I believe, Forman Mills, Inc. or Forman Mills Holdings.
Q. The board of Forman Mills Holdings or Forman Mills, Inc. was searching for a CEO, is that what you said?
A. A permanent CEO.
Q. Prior to the acquisition was Rick Forman the

Page 47

CEO?
A. To my knowledge.
Q. And upon the acquisition, I think you said that you installed an interim CEO?
A. Correct.
Q. Who was the interim CEO?
A. I knew you were going to ask that question and I can't recall his name.

MR. ROOKS: I'm going introduce another document called Exhibit 6 and there is no Bates number on this.

- - -

(At which time, press release from the Goode Partners website was marked as Exhibit 6 for identification.)

- - -

Q. This is a press release from the Goode Partners website. Have you seen this before?
A. Yes.
Q. So here it's got some quotes from you which says, we are delighted to be acquiring Forman Mills from Richard Forman. Richard and his management team have built a great company that has a long history of providing family apparel with great style selection and value to its customers, said David Oddi, partner

Page 48

of Goode.

Down the road here it says, the management transition team will consist of Allen Weinstein. And it looks like Mr. Weinstein would have been the chief executive officer. Does that sound about right?
A. Correct.
Q. Who is Mr. Weinstein?
A. Mr. Weinstein was a former retail executive that we had gotten to know previously through another one of our portfolio investments in a company called Villa, which is also articulated in the press release.
Q. One thing about, I guess, I didn't give this instruction at the beginning of the deposition, if possible, could you avoid the use of pronounce. Because when you say, we or us or them, I don't always know who you're referring to. You just mentioned Mr. Weinstein is someone that we had gotten to know. When you say we had gotten to know, who is the we that you're talking about?
A. Goode Partners.
Q. Goode Partners, LLC had, I guess, an existing relationship with Mr. Weinstein; is that correct?
A. Goode Partners had been introduced to Mr. Weinstein and had recruited him to be on the board of

Page 49

Villa.
Q. And from there based on that knowledge of Mr. Weinstein, he was selected by Goode Partners, LLC to be the interim chief executive officer of Forman Mills Inc.; is that correct?
A. He was approved by the board.
Q. When you say approved by the board, that would be the board of Forman Mills, Inc.?
A. It was either Forman Mills, Inc. or Forman Mills Holdings.
Q. When you say Forman Mills, Inc. or Forman Mills Holdings, would you say those are two synonymous, interchangeable, they mean the same thing?
A. Forman Mills Holdings holds 100 percent of Forman Mills, Inc.
Q. I know that I had asked about a strategic plan and then you had referenced that the strategic plan was done in conjunction with Mr. Weinstein, correct?
A. Correct.
Q. What role did you have with designing or developing a strategic plan for Forman Mills with Mr. Weinstein?
MR. CABRERA: Objection. Is this asking the witness in his personal capacity or is this

Page 50

asking what Goode Partners' role was?
MR. ROOKS: I'm asking him as a partner of Goode Partners, LLC?
MR. CABRERA: Okay.
A. So Goode Partners worked with Allen to, again, prior to the investment understand what the opportunity was that he saw with the business and then to work with him to layout a high level plan for initiatives that you would implement or like to implement and execute to grow the business and transition from Rick Forman.
Q. Would you have any role in approving or disapproving the strategic plan that Mr. Weinstein wanted to execute?
A. As part of that interview process as to what he thought the opportunity was, yes, we would have had various conversations about what we thought made sense and what didn't make sense.
Q. This press release also says, Oddi continued, we plan to continue to expand geographically over the next several years and invest in the company's infrastructure. Our first priority is to improve the shopping experience for our customers, by investing in our people and supporting them with additional resources, including an upgraded point-of-sale system.

Page 51

What was the plan for the geographic expansion of Forman Mills?
A. Prior to our investment the company had pursued a fairly-limited growth plan that was focused on a small number of geographic areas. Our belief -- Goode Partners belief was that the Forman Mills concept had the opportunity to exist in other new geographic areas that it could expand into.
Q. Before I take this down, you had testified that you had introduced and placed Mr. Weinstein in the interim position of chief executive officer and it also says here that Mr. Weinstein would be supported by Michael Moore and Dennis Tompkins. Do you see that?
A. I do.
Q. Who is Michael Moore?
A. Michael Moore and Dennis Tompkins were two individuals that Allen had a relationship that he intended to bring on board to help him in the operation of Forman Mills.
Q. Did you know them prior to them coming aboard?
A. I believe only through introduction through Allen.
Q. I'm going to stop sharing that. In order for

Page 52

Forman Mills to grow, you would agree that it would need capital, correct?
A. Actually, the -- what do you mean by capital?
Q. Money.
A. We did not expect that it would need outside investment following our investment, if that's what the question is.
Q. No. When Goode Partners or Goode Partners Funds purchases a company, I think you testified earlier that the plan is to increase value, correct?
A. Correct.
Q. And value can increase, I guess, maybe, based on changed market conditions and that would be passive. But I believe that the purpose of acquiring these companies is to actively grow them, is that correct, as opposed to passive?
MR. CABRERA: Objection to form. You can answer the question.
A. Yes.
Q. And when you actively grow a company, do you agree that there would be an infusion of capital?
A. Typically, we do not contemplate the infusion of additional equity capital following our investment.
Q. Let me reword that. I'm not talking about additional equity. I'm talking about leveraging,

Page 53

debt, debt financing to grow the company. Would you agree that in order to grow Forman Mills a certain amount of debt had to be taken on to finance the company's growth?
A. There was a debt facility that was put in place to fund any capital needs above and beyond the internally generated cash flow of the business.
Q. So Forman Mills had earnings, obviously and those earnings funded growth, correct?
A. Correct.
Q. And outside money through credit facilities was also used to fund Forman Mills growth, correct?
A. Correct.
Q. And the credit facilities that were obtained, were they obtained with the assistance of Goode Partners, LLC?
A. Yes.
Q. When we talk about credit or leverage debt financing with the Forman Mills, Inc., who or what entities provided the capital to grow Forman Mills?
A. It was Monroe Capital and I believe, the original lender was Wells Fargo.
Q. Monroe Capital, okay.
A. I'm sorry. It was CIT, not Wells Fargo. It was CIT.

Page 54

Q. And then you also said Monroe Capital?
A. Correct.
Q. What did Monroe Capital provide?
A. Monroe Capital provided a term loan and a revolving credit facility, I believe.
Q. Did Forman Mills, Inc., to your knowledge, have any relationship with Monroe Capital prior to Goode Partners' involvement?
A. Not that I know of.
Q. Monroe Capital would have been a lending relationship that Goode Partners had established, correct?
A. Correct.
Q. And Goode Partners, I think, you testified earlier has other investments, different funds, correct?
A. Goode Partners doesn't have any investments. It's an advisor.
Q. Goode Partners raises capital, correct?
A. No. Goode Partners is the manager of, you know, various entities. It does not raise capital. The capital is from general partner and the limited partners.
Q. There's Goode Partners Consumer Fund III, LP, correct?

Page 55

A. Correct.
Q. And capital is put into that, correct?
A. From our limited partners, correct.
Q. And Goode Partners, LLC has a relationship with Monroe Capital, correct?
A. Correct.
Q. And Goode Partners Consumer Fund III utilized Monroe Capital with respect to Forman Mills, Inc., correct?
A. Correct.
Q. Were there any other investments of Goode Partners Consumer Fund III that also utilized Monroe Capital?
A. I'm trying to think through our various investment in Fund III and I do not believe so. Actually, yes, there would have been a company called Incipio Holdings that would have had Monroe Capital as a lender.
MR. ROOKS: I want to introduce another document. This will be Exhibit 7.
\- - -
(At which time, Deposit Control Agreement Bates stamped FM005342 through FM005352 was marked as Exhibit 7 for identification.)
\- - -

Page 56

Q. This is document seven. It's called a Deposit Control Agreement FM005342 through FM005352. Mr. Oddi, have you seen this document before?
A. Yes.
Q. This is what's called a Deposit Control Agreement, right?
A. Correct.
Q. What is a Deposit Control Agreement?
A. CIT is what's called an asset-based lender. As part of that, they have a first lien on many of the assets of the company, including its cash and asset-based lenders typically require a control agreement to be put in place such that in the event of the occurrence of certain events, they have the ability to control the company's cash bank accounts.
Q. When you say they have a lien on the company, are you referring to Goode Partners Consumer Fund III, LP?
A. No, I'm referencing Forman Mills, Inc.
Q. Because in this agreement you'll see that it identifies three parties at the top. It says, depository bank and that's CIT Bank, NA, right?
A. Yes, correct.
Q. Then it says, company, Goode Partners Consumer Fund III, LP, correct?

Page 57

A. Yes.
Q. And then it says, secured party, Encina Business Credit, LLC, right?
A. Correct.
Q. So I'm clear, you said the Deposit Control Agreement puts a lien on the company and the company that you're referring to is not Goode Partners Consumer Fund III, LP, it is Forman Mills, Inc., right?
A. Sorry, I gave you -- I thought this was a different document. I would have to review the document as to exactly what this is.
Q. Okay. But you have seen this before, right?
A. Yes.
Q. Now it says, the depository bank, CIT Bank, NA, would that mean that Forman Mills, Inc. would be required to make its banking deposits at CIT Bank?
A. No, I don't believe that is the case. I believe that CIT did not have local bank that could take all the deposits from the company's locations. So I believe that there was an arrangement put in place that allowed the company to utilize other third-party banks pursuant to a contractual agreement with CIT. I believe this actual account related to when Goode Partners Consumer Fund III actually funded

Page 58

the investment.
Q. When would that would have been?
A. That would have been around this date, if I'm not mistaken.
Q. What date? You said this date. You're talking about October 4, 2016?
A. Correct.
Q. You said that Goode Partners Consumer Fund III would have fund it?
A. That's what it looks like.
Q. So there is another entity here. It says, Encina Business Credit. Who is that?
A. Encina Business Credit was ultimately also a lender to the company. I don't remember if it's affiliated with CIT or if it is a third party.
Q. But Encina Business Credit is different than Monroe Capital, right?
A. Correct, unaffiliated.
Q. Now, it says here that Forman Mills, Inc. is the borrower. Do you see that?
A. Correct.
Q. It also identifies a parent as Forman Mills Holdings, LLC, right?
A. Yes.
Q. What does it mean to be a parent in this

Page 59

context?
A. Parent is a corporate entity that effectively owns or controls the subsidiary entity.
Q. Now, this agreement identifies an agent. It says, the secured party is acting as the agent. Again, the secured party is Encina Business Credit, it says, for the lenders. Who are the lenders in this agreement? Because when we go down to the signature page, there is no signatory and I can let you go through this. There is no signatory for the lenders. I don't see in this agreement where the lenders are identified. So maybe, I'm missing something. But to the best of your knowledge, who is the lender in the situation?
A. I believe the term lender is defined in the actual credit agreement. If you stop scrolling for a second. That's articulated here, which I'm guessing this definition of lender specifically references CIT and potentially Encina, just to explain what this document, what I believe this is, is we had a -- my memory was there was a delay in closing for either a tax reason for Rick Forman or some other reason, which I'm not exactly remembering, but there was a delay between actually signing the document and actually closing and funding the transaction. In during that

Page 60

interim period of time, all of the investors needed to fund their investments that sat in this controlled account prior to actually being transferred to Rick Forman at the closing. So this, again, was prior to the closing of Goode Partners Consumer Fund III's indirect investment into Forman Mills.
Q. This says name on the account, Goode Partners Consumer Fund III and also identifies company, Goode Partners Consumer Fund III. Would this document have been reviewed by attorneys representing Goode Partners, LLC?
A. It would have been reviewed by the funds, Goode Partners Consumer Fund III's attorneys.
Q. Would Goode Partners Consumer Fund III's attorneys be different than any attorney representing Goode Partners, LLC?
A. No.
Q. They would have been the same attorneys, correct?
A. Correct.
Q. Scrolling down to the bottom. Again, we're looking at the signatures. This is your signature, correct?
A. Correct.
Q. It's Goode Partners Consumer Fund III, LP,

correct?
A. Correct.
Q. Care of Goode Partners, LLC, correct?
A. Correct.
Q. Does Goode Partners Consumer Fund III, LP share the same address as Goode Partners, LLC?
A. Goode Partners Consumer Fund III doesn't have a physical office, per se. It doesn't have any employees.
Q. Where would it get mail, for example?
A. It would either be someone, like, CSC. That's a Delaware recipient of corporate notices or care of Goode Partners.
Q. The other entities that we talked about, Goode Investors III, LP, would that have the same address as Goode Partners, LLC?
A. Again, it would have either had a corporate recipient in Delaware or care of Goode Partners.
Q. How about Goode Forman Holdings, LLC, would that use the same address as Goode Partners, LLC?
A. I'm not positive, but that would make sense.
Q. So I guess one question I have here with this document, the borrower here is identified as, again, Forman Mills, Inc. But if we scroll down to the bottom of this document, the signatory pages, there is



no signature spot for the borrower. So i guess my question is, if you know, if Forman Mills was a borrower -- strike that.
Deposit Control Agreement is relative to Forman Mills, Inc.; is it not?
MR. CABRERA: Objection. I don't know what you mean by relative to Forman Mills, Inc.
Q. This Deposit Control Agreement pertains to Forman Mills, Inc.; does it not?
A. Again, this pertains to CIT holding Goode's investment, Goode Partners Consumer Fund III's equity investment, until the actual closing. So I believe the answer to your prior question is to why Forman Mills would not be a party to this agreement was because we were not an investor in Forman Mills at that time.
MR. ROOKS: I'm going to bring up another document. This will be Exhibit 8.
\- - -
(At which time, Cash Pledge and Security Agreement Bates numbers FM005324 through FM005330 was marked as Exhibit 8 for identification.)
\- - -
Q. This document, Exhibit 8 states, Cash Pledge and Security Agreement executed version is referenced



by Bates numbers FM005324 through FM005330. Mr. Oddi, have you seen this document before?
A. Yes.
Q. Can you tell me what this document is?
A. Forman Mills needed additional liquidity to operate its business and Goode Partners Consumer Fund III together with Cohesive Capital Partners agreed to provide collateral to Encina Business Credit to facilitate their lending of additional capital to Forman Mills. This documents outlines -- provides for that agreement.
Q. I believe you said that Forman Mills needed additional liquidity. Is that the phrase you used, additional liquidity?
A. Correct.
Q. Tell me what you mean by that additional liquidity?
A. The Forman Mills had an asset-based credit facility where availability was driven by a formula tied to a percentage of accounts receivable and inventory that Encina Business Credit was willing to lend. Under the terms of that calculation, the company had a need for additional capital above and beyond what formula would beyond and so, Goode Partners Consumer Fund III and Cohesive Capital were



willing to pledge additional collateral that would be included in that formula so that Encina Business Credit would extend additional credit to the company.
Q. So when you say formula, were there covenants that Forman Mills had with its lending agreements?
A. The formula does not relate to have the covenants, but there also were covenants in the credit agreement.
Q. With respect to the liquidity, was this necessitated by Forman Mills' business condition being different than what was anticipated?
A. Correct.
Q. And when we say that it was different than anticipated, would you say that it was worse than anticipated?
A. Correct.
Q. So in agreeing that it was worse than anticipated, can you tell me actually what was going on at this time?
A. I don't remember exactly as of January 15, 2021, but I'm just trying to put this in context. This was right around the time, I believe, when COVID began to come around and the company had underperformed its expectations that were laid out in the credit agreement.

Page 65

Q. When you say expectations, were there expectations for gross revenues?
A. The credit agreement did not have an expectation for gross revenue. It was really an EBITDA and leverage test.
Q. Was there a lender's EBITDA that was referenced in the agreement?
A. Yes.
Q. Can you tell me what that is or what that was?
A. In terms of the definition or the amount?
Q. Yes, what is the definition lender's EBITDA?
A. It's a fairly extensive definition of EBITDA, but it ultimately starts with the company's net income and adds back interest, expense, depreciation, amortization and a number of other very specific items or subtract a number of specific items laid out in that definition.
Q. Lender's EBITDA is different than a regular EBITDA, correct?
A. EBITDA is not a term defined by generally accepted accounting principles, so there is no set definition of what EBITDA is, but the credit agreement provided for a very specific definition defining EBITDA.

Page 66

Q. Do you have a definition of EBITDA that is different than a lender's definition of EBITDA?
A. As it relates to Forman Mills?
Q. Yes, as it relates to Forman Mills, for example.
A. It could be. There could be certain one-time items that may be required to be reported under the credit agreement that we do not -- that I do not believe is an indicator of -- that's indicative of true steady state performance, so it is possible.
Q. So this cash pledge security agreement was put into place because of liquidity issues that Forman Mills, Inc. was facing, right?
A. Correct.
Q. How long was this agreement in place for, if you know?
A. A version of this agreement is still in place.
Q. So when Forman Mills was acquired through the Goode Partners Consumer Investment Fund III, was there a cash pledge and security agreement in place?
A. No.
Q. So this is dated January 15, 2021, correct?
A. Correct.
Q. And Forman Mills was acquired in October of,

Page 67

I think it was 2016, is that about right?
A. Around that date, correct.
Q. So between the acquisition in October of 2016 until January 15, 2021, were there any cash pledge and security agreements in place or was this the first one?
A. This would have been the first cash pledge agreement put in place, to my recollection.
Q. So several years had gone by from October 2016 up until January 15, 2021 until this was put into place, right?
A. That's correct.
Q. So Forman Mills operated during that period of time without a cash pledge and security agreement, right?
A. Correct.
Q. So is there a point in time at which this could have gone away?
A. That the cash pledge and security agreement could have gone away?
Q. Yes.
A. There would have been conditions provided for in the credit agreement or in this agreement that would have laid out when it could have gone away.
Q. The reason I asked that is because it

Page 68

operated for a period of time without any cash pledge and security agreement. So my question is that, you know, since the operated without a cash pledge and security agreement, it then had a cash pledge and security agreement which driven by problems with liquidity, right?
A. I guess you'd have to reframe that question. I'm not understanding it.
Q. Sure. I'm saying, Forman Mills was operated from, let's say, October of 2016 through up until January 15, 2021 without a cash pledge and security agreement, right?
A. That is correct.
Q. And liquidity issues that Forman Mills was experiencing triggered the lender to require this cash pledge and security agreement?
A. That is correct.
Q. So I'm saying, since Forman Mills was able to operate for a period of time without it, this cash pledge and security agreement, if Forman Mills improved its liquidity, could this cash pledge and security agreement have gone away?
A. It's possible.
Q. But I think you testified that it did not?
A. That's correct.

Page 69

Q. So was this cash pledge and security agreement in place from January 15, 2021 up until present because Forman Mills continued to experience liquidity issues?
A. The company had not satisfied the requirements for repayment or the discharge of the cash pledge.
Q. I'm sorry. You said that the company had not satisfied?
A. Any requirements that would allow for this cash pledge to be discharged.
Q. What would those requirements have been?
A. Either the consent of the lenders or the achievement of -- actually, I believe it was just consent of the lenders.
Q. To your knowledge, when you say consent of the lenders, if you know, would they have given consent if Forman Mills had improved its liquidity position and sustained that improvement?
MR. CABRERA: Objection. You can answer the question.
A. I don't believe so because they didn't allow us to release it when we sold the company.
Q. The company was sold when?
A. I think it would have been sometime in 2023.

Page 70

I don't remember the exact date.
Q. So I believe it was in, if I say June of 2023, does that sound about right?
A. It's about right, correct.
Q. So if we say from January 15, 2021 through June of 2023, in that time period, did Forman Mills improve its liquidity position?
MR. CABRERA: Objection. You can answer the question.
A. There were many events that went on during the course of Goode's investment in Forman Mills that I think is overly-simplistic for me to answer succinctly. So for example, there were several additional infusions of capital by the company shareholders both prior to January 15, 2021 and following January 15, 2021 that played a role in the company's liquidity.
Q. So Mr. Oddi, you said and I want to make sure I understand this. You said that there was an infusion of capital by the shareholders of the company?
A. By the members, correct.
Q. So I just want to make sure I understand this. From point in time of January 15, 2021, sometime after January 15, 2021 there was an infusion

Page 71

of capital from shareholders?
A. I believe so.
Q. And that infusion of capital, what shareholders are we talking about?
A. That would have been primarily Goode Partners Consumer Fund III and the two Cohesive entities and potentially certain members of Goode Heavyweight.
Q. You said Goode Partners Consumer Fund III, correct?
A. Correct.
Q. That infusion of capital, would that have come from an additional capital call?
A. Correct.
Q. Was that additional infusion of capital by the Goode Partners Consumer Fund III anticipated at the time of Forman Mills being acquired?
A. No.
Q. Do you know the magnitude of the additional capital contributions from the shareholders that occurred after January 15, 2021?
A. I can try and pull that up as we're talking. I don't remember off the top of my head.
Q. Okay. Would you be able to pull that up?
A. I'm attempting to. We can continue.
Q. With that additional infusion of capital from

Page 72

the shareholders, was it one time that additional was called? Was it two times? Do you know how many times additional capital was called?
A. I would venture that it was more than twice.
Q. You had just testified that it was not anticipated that additional capital would have been called, correct?
A. Correct.
Q. So it wasn't anticipated that additional capital would have been called one time, right?
A. Correct.
Q. And it was not anticipated that additional capital would have been called for a second time, correct?
A. Correct.
Q. And again, that anticipation is relative to the time of the initial acquisition?
A. Any point in which we made an investment of capital or Goode Partners Consumer Fund III made an investment in capital, it was not anticipated that there would be further requirement for further injections of capital.
Q. You used the word injection, right. To me, injection of capital sounds like a lifeline is being thrown to the company. Would that be an accurate

Page 73

characterization of injection?
A. No.
Q. Tell me what you mean when you say injection?
A. Injection was investment of additional capital in the business to enhance the company's liquidity or to provide an amendment to the company's credit agreements.
Q. When you say additional capital was injected, was it injected because you realized it was new growth opportunities for the company?
A. It could have been that there were stores that wanted to be open or it could be that there was requirement from the company's lenders.
Q. Were you able to see how much additional capital was?
A. I'm still pulling it up.
Q. This cash pledge and security agreement, I'm on page two of the agreement at FM005325, it identifies a number here, $3,079,275.48. Do you see that?
A. One second. I was doing two things at once. So yes, understood. I see it.
Q. So is this the amount of cash that was pledged as collateral?
A. From Goode Partners Consumer Fund III.

Page 74

Q. That money was pledged as collateral from Goode Partners Consumer Fund III in this agreement, right?
A. I believe so, correct.
Q. And that amount was required to be kept on deposit; is that accurate?
A. There is a deposit account that serves as the collateral, correct.
Q. And it says here, the pledgor covenants and agrees that it shall have no right to access or withdraw any portion of that pledged sum, right?
A. That's correct.
Q. Was that pledged sum earning interest, if you know?
A. I believe it earns interest.
Q. But that $3,079,000, this amount was not deployed for growth, right? It was deployed for capital, for collateral, correct?
A. Well, just to come back, Franklin, cash is fungible. So whether we're spending capital to open new stores or to repay the bank or to provide additional liquidity for capital, it's a little difficult to tease out specifically this $3 million versus $3 million of earnings from the company.
Q. This was $3 million that you could not use,

Page 75

correct, because it had to be pledged as collateral?
A. Goode Partners Consumer Fund III could not use it, but the company had effective access to it because of an additional borrowing base provided by Encina Capital.
Q. You required this $3,079,000 was required to be on deposit at all time with no access or right of withdrawal, correct?
A. Well, Goode Partners Consumer Fund III had no access or right of withdrawal. The company had access to it an additional $3 million of liquidity because this served as collateral under that borrowing base that they were allowed to borrow under.
Q. Right, they could borrow monday, but this money needed to remain there at all times?
A. That is correct.
Q. Who is the pledgor here in this agreement? Goode Partners Consumer Fund III, LP, that's who the pledgor is?
A. That's correct.
Q. And the address given for Goode Consumer for the pledgor is Goode Partners, LLC, correct?
A. Correct.
MR. CABRERA: Could you go back up to that page to pledgor, care of Goode Partners. Okay.

Page 76

Thank you.
Q. And then if we go down, there is your signature again, right?
A. Right.
Q. Goode Partners it says, Goode Partners Consumer Fund III, LP and then it says Goode Investors III, LLC, the general partner, correct?
A. That's correct.
Q. Again, that's your signature. Then Encina Business Credit at the bottom.
A. To go back to the other question that you asked, now these numbers are specific to Goode Partners. They exclude the two Cohesive entities, which also had a pledge. The original investment pledge was made on October 16th. On January 18th Goode Partners --
MR. CABRERA: January what?
THE WITNESS: 29th, 2018.
A. There was an additional investment in August 2018, in January 2019, in January 2020 and then the cash pledge agreement which was January '21.
Q. I don't want to interrupt.
A. That's it.
Q. So with the looks like, excluding the cash pledge agreement, four additional times that

additional shareholder capital was put in?
A. Excluding the cash pledge security agreement and excluding the initial investment, yes.
Q. So what is the, I guess, the dollar value of that additional capital investments?
A. Excluding the cash pledge and security agreement?
Q. Yes, you said that there was January 2018, August 2018, looks like was it June or January, January 2019 and January 2021, those four, what was the amount of money for those four capital calls?
A. Roughly $30 million split between Goode Partners and Cohesive.
Q. When you say split, what you are saying, 15 million dollars --
A. Roughly, we own the same amount, so it would have been roughly split 50/50.
Q. Not counting these four capital contributions that we just talked about, the January 2018, the August 2018, the January 2019 and January 2020 and not counting the cash pledge agreement, were there any other instances in which capital was infused into Forman Mills, Inc.?
A. No, not to my knowledge.
Q. I'm not talking about shareholder capital



infusion or capital call infusion. Were there additional capital infusions from any other source?
A. Monroe may have -- I believe Monroe extended an additional amount in January 2020.
Q. Do you have an idea how much Monroe, the additional amount that they put in?
A. I believe it was five million from Monroe.
Q. When Monroe put in that five million, was anything given in exchange for that other than, let's say, maybe, a promise to repay, was there any shares, any options, anything like that, given to Monroe?
A. Yes, I believe Monroe received a fee and Monroe, I believe, received a warrant for equity.
Q. Can you please tell me what you mean by what a warrant for equity is?
A. A warrant is a right to acquire equity at a set price at some point in the future.
Q. So it's a right to acquire equity, I think you said at a certain price, at some point in the future?
A. Correct. That price could be zero, but there is some exercise price.
Q. So when you have a warrant, right, if the person, let's say, or the entity acquires equity through that warrant is in this situation, would new



equity have been issued or would the existing equity have been diluted?
A. Really both. The company would have issued new equity to satisfy the warrant, which by default would in minimize the percentage of ownership of all existing members because the number of shares outstanding would have been increased by the number of shares issued upon the conversion of the warrant.
Q. So it wasn't that shares were taken away from anybody. It was new shares that were issued and which had a dilutive effect on the existing shareholders?
A. That would be correct.
Q. In terms of percentage, when those warrants were issued, would they have constituted one percent of the company, five percent, do you have an idea?
A. I don't remember the exact percent. If memory serves me it was 10, 20 percent was my recollection.
Q. As a private equity guy would you have a reference to take on debt instead of giving up equity?
A. I don't think it's easy enough to -- I don't think that statement can be simplified in that manner.
Q. Would it have been preferable for, let's say, Goode Consumer Fund III to not issue warrants and instead just a promise to repay?



A. The warrants were required to secure the financing. That was a requirement for the financing.
Q. You weren't going to give, unless equity was given up, correct?
A. The company would not be able to obtain that loan without the issuance of the warrants.
Q. Generally, when you purchase and I say you, when a Consumer Fund III would purchase a company, would it out of the gate, let's say, issue warrants?
A. It various by fund and by lenders' requirements. It would have been unusual for Goode Partners Consumer Fund III to issue warrants in connection with the securing of leverage, you know, at the time of an investment.
Q. Issuing warrants, in other words, would not be preferred, correct?
A. Typically was never required because the level of leverage provided by the banks was so conservative that they did not feel that their risk was such that they needed to be compensated through the receipt of warrants.
Q. Was it accurate to say Monroe Capital had a perceived increase of risk with lending to Forman Mills?
MR. CABRERA: Objection. You can

Page 81

answer.
THE WITNESS: I'm sorry. Say that again, Jason.
MR. CABRERA: I had to make an objection, but you can answer the question if you can.
A. As of January 2020 they did.
MR. ROOKS: Let's take a ten-minute break.
- - -
(At which time a short recess was taken.)
- - -
Q. Mr. Oddi, we left off talking about warrants, but what percentage, if you can just repeat that, of the company would have been given up through the exercise of those warrants that were required for Monroe Capital?
A. I don't remember the exact number, but I think it was somewhere between 10 and 20 percent.
Q. So I'm clear in order to secure that round of financing, up to 20 percent of the equity in Forman Mills would have been given up?
A. That was a requirement for them completing the loan in the amendment and again, I don't remember what the exact percentage was.

Page 82

Q. Again, that was required because of the increased risk in investing money or lending money to Forman Mills, correct?
A. That is what they were -- what they told us they needed.
Q. I think you said that was Monroe Capital, right?
A. Correct.
Q. I just want to clear up a few things. There was Encina Business Credit identified and they were a lender, correct?
A. Correct.
Q. And I believe you said that's separate and distinct from Monroe Capital, right?
A. Correct.
Q. So there are those two lenders, right?
A. Correct.
Q. Any additional lenders?
A. Not that I can recall.
Q. Early on, we talked about CIT, right? Was CIT a lender that was replaced?
A. By Encina Business Credit.
Q. Correct. In terms of the financing, you had just said that Monroe Capital had given or lent money, which was accompanied by the issuance of warrants,

Page 83

right, but did Encina Business Credit lend any additional money to this investment?
A. No, not as part of that amendment that you're referencing.
Q. When additional money was borrowed from Monroe was Encina also approached to lend money?
A. Encina's facility was, again, driven by a borrowing base that restricted what they would lend. I don't recall if Encina was asked if it would provide additional lending above and beyond their borrowing based formula. That I don't recall.
Q. Now, it was something about a revolver. Who provided the revolver, was that Encina?
A. Encina.
Q. At the time that Monroe Capital put in additional money that, you know, required the warrants at that time, what was Forman Mills, if you know, what was the EBITDA around that time?
A. I don't recall as of that time. That would have been in January of 2020. I don't remember.
Q. From the time period of, let's say, January 2018 through January of 2021, was Forman Mills' EBITDA increasing, staying the same or decreasing?
A. I can look for that answer, but I don't remember off the top of my head.

Page 84

Q. I want to touch on something I skipped over earlier.
MR. ROOKS: So I'm going to introduce a document I think it's Exhibit 9.
- - -
(At which time, March 31, 2025 Form ADV Part 2 brochure was marked as Exhibit 9 for identification.)
- - -
Q. It's a form, which is filed with the SEC. It's Form ADV, I believe. Can you see that?
A. I can. Can you show me what the date is on that?
Q. This is a current one. This is not anything that was produced in discovery. It says, Form ADV Part 2 brochure. Can you tell me what a Form ADV Part 2 brochure is?
A. I believe it's a document that the SEC requires certain entities to, you know, disclose and to have on file with the SEC.
Q. Certain entities, you mean entities like private equity firms?
A. Correct.
Q. This is dated March 31, 2025. How frequently are you required to file a Form ADV with the SEC?

MR. CABRERA: I'm going to object to beyond the scope of the notice. To the extent you want to ask these questions, you can. But the witness is answering in his individual capacity, not as a Goode Partners, LLC designee.
MR. ROOKS: It says, Goode Partners, LLC on it.
Q. If it's in your personal capacity --
A. I think it's once per year.
Q. You would have filed this form every year that you've been in business, correct?
A. I don't believe it was required when we initially started. I don't remember when this would have come into effect, but I don't think it was in existence or required by the SEC all the way back in 2004.
Q. Do you know if it would have been required in 2016?
A. I don't know.
Q. This document references the general partner and says collectively it's Goode Investors III, LLC. It also references Goode Investors III, LLC, right, and that is the general partner of Goode Consumer Fund III, limited partnership, correct?
A. Goode Partners Consumer Fund III, LP,



correct.
Q. If you know, would this have been completed in, let's say, 2020?
A. I don't know.
Q. This references Goode Fund III. It talks about Goode Investors III, LLC, Delaware limited liability company. I think earlier you identified Goode Investors III as an LP. Is there a Goode Investors III, LLC and a Goode Investors Fund, LP?
A. No, that would have be one and the same. That would have been my error.
Q. This Form ADV talks about advisory services. What advisory services does Goode Investors III, LLC provide?
A. Investors III is simply the general partner of the fund. To my recollection, it doesn't provide advisory services.
Q. I'm sorry. You're saying that Goode Investors III, LLC does not provide any advisory services?
A. Correct. It is simply the general partner of the fund, of Goode Partners Consumer Fund III.
Q. If you know, what Goode entities would provide advisory services?
A. Goode Partners, LLC.



Q. What advisory services would Goode Partners, LLC provide?
A. Goode Partners advises the fund on diligence and on investments that it is reviewing to be made in the fund. It also serves as an advisor to certain portfolio companies pursuant to an advisory agreement.
Q. But Goode Partners, LLC would you say was an advisor to Goode Partners Consumer Fund III?
A. It provided advisory services for all Goode funds.
Q. Did Goode Partners, LLC provide advisory services to Forman Mills, Inc.?
A. It did.
Q. I'm sorry. You said it did?
A. It did.
Q. Okay. And what were those advisory services to what would those advisory services have been to Forman Mills, Inc.?
A. Helping them review financial performance, helping them develop financial budgets, interfacing on their behalf with the lenders to provide analyses that the lenders were requiring, helping them develop reporting procedures. A variety of things.
Q. Would Forman Mills, Inc. pay Goode Partners, LLC for those advisory services?



A. There was required payment that was waived so they, basically, were accruing those fees, but not paying them in cash.
Q. What point were they waived?
A. They were not -- the last payment in cash, I believe, I think it would have been in 2019.
Q. So from the time that Forman Mills was acquired up until 2019, you're saying it was paying advisory fees to Goode Partners, LLC?
A. Yes.
Q. Do you know how much the Forman Mills, Inc. was paying, let's say, on an annual basis to Goode Partners, LLC for the advisory fees?
A. I believe in '17 and 2017, '18 and '19, I believe that would have been 500,000 per year.
Q. You said that at some point 2019 Forman Mills stopped paying Goode Partners, LLC those advisory fees, I think you said they were waived, but were being accrued; is that correct?
A. That is correct. That was, yes, as of the end of 2019, correct.
Q. And were they waived, but still being accrued because Forman Mills was not in a position or could not afford to pay those fees?
A. There was -- the company's lenders as part of

Page 89

its amendment required that those management fees not be paid in cash.
Q. You had referenced a few minutes ago some of the advisory services that Goode Partners, LLC provided to Forman Mills, Inc. Who would have provided those services at Goode Partners, LLC? Would it have been you or Mr. Bonoff or Mr. Ferreira or someone else?
A. Depending upon what was going on, it would have been all of us, plus junior support staff.
Q. From the acquisition in 2016 up until the sale of Forman Mills in 2023 around June, those advisory services were being provided, right?
A. Correct.
Q. If you know, let's say in 2023, how many hours per week you were spending providing advisory services to Forman Mills?
A. We don't track hours.
Q. Did you have an estimate of how much time you were spending on Forman Mills?
A. Again, I couldn't -- don't track it. I couldn't even give you an estimate of what it was.
Q. Aside from what you've said, what other types of services under the umbrella, I guess, advisory fees were provided to Forman Mills, Inc.?

Page 90

A. It would have been developing new unit budgets for new units that they were considering that were being presented to the board for approval. It was helping them work through issues. The company had with a transition to a new distribution center. It was helping to facilitate the sale at the Shoppers World. It was extensive and varied.
Q. Did any of your advisory services pertain to working with Forman Mills for development of policies and procedures?
A. Can you give me an example?
Q. Human resource policies, for example.
A. Not that I can recall.
Q. Did any of your advisory services include provide, let's say, other policies and procedures that weren't related to human resources, operational policies, for example?
A. Not that I can recall.
Q. Inventory policies?
A. No, not that I can recall.
Q. Purchasing policies?
A. We helped them review their overall, what's called open to buy allocation, which, basically, tied back to the company's credit facilities as to how much liquidity they had and again, that inventory and

Page 91

receivables was tied to the company's borrowing base. So understanding how much inventory they were purchasing and how that was going to impact the company's borrowing base, but as it relates to this buy many of that unit in that color, no.
Q. But also, your advisory services would have extended to creating an executive leadership team, right?
A. As indicated, we helped find Allen Weinstein and then we ultimately interviewed candidates to be his successor.
Q. Mr. Weinstein's successor was that Mike Kvitko?
A. Correct.
Q. How did you come across Mike Kvitko?
A. I believe we did a retained search. I believe the company did a retained search through a headhunting firm, I believe and Mike Kvitko's name was surfaced through that headhunter.
Q. When was Mr. Kvitko brought on board?
A. I believe it was 2017, but I'm not positive.
Q. There is another individual. I saw his name somewhere. Tony Sullivan, do you know Tony Sullivan?
A. Yes.
Q. And I think Tony Sullivan, correct me if I'm

Page 92

wrong, but he was, I guess, a chief operating officer of Forman Mills?
A. Correct.
Q. What role did you or did Goode Partners, LLC play in bringing Mr. Sullivan to the executive leadership team of Forman Mills?
A. I believe Mr. Sullivan had worked with Mr. Kvitko previously and so Mr. Kvitko introduced him to the board and we interviewed him prior to him formally being hired by the company.
Q. Were there any other executive positions at Forman Mills that Goode Partners, LLC facilitated the placement of?
A. Mike Kvitko had another head of IT that he had worked previously that he wanted to hire that we interviewed and then there were various CFO hires that we helped the company identify individuals and then interview for hiring.
Q. There was, I want to say, a person named Kevin Hess. Does that name sound familiar?
A. Kevin Hess, I believe, was the company's comptroller or director of accounting. He was not the CFO at that time. I don't believe he was CFO while we were an investor.
Q. At the time that you guys were an investor,

Page 93

who was the CFO for Forman Mills?
A. There were several over that duration. I'm trying to think, at exit I think the CFO's name was, I think, it was Brian Connolly, I believe. I may not be right.
Q. Did Goode Partners, LLC place Mr. Connolly?
A. He was surfaced through a headhunter.
Q. How about any of the other CFOs that worked at Forman Mills from 2016, did you source any people?
A. Again, my recollection is they were all sourced by headhunters.
Q. When you say headhunter, is that a firm that you --
A. It would have been a recruiting firm.
Q. Is there a particular recruiting firm that Goode Partners, LLC has utilized or does utilize?
A. We've used a significant number of recruiting firms.
Q. Within the hierarchy of Forman Mills' executive team, we've got the CEO would be at the top, right?
A. Correct.
Q. And then we have a CFO, correct?
A. Correct.
Q. And then a COO?

Page 94

A. For part of the time I don't believe it was for the entire period of our investment.
Q. Well, I mean, when you say not the entire time, would you say towards the end that you did?
A. I can't remember when Tony Sullivan left the company. It was certainly prior to the sale from Shoppers World, I think. Again, I don't remember the exact date, but it was well in advance of the company's sale and there was no successor hired.
Q. So you've got the CEO and then a CFO and when you had the COO, they would report to the CEO correct?
A. Tony would have reported to Mike, correct.
Q. Would you agree that the CEO, CFO, COO, they would not have unlimited authority, correct?
A. Correct.
Q. You would agree that there's certain decisions that the CEO can make on his own, correct?
A. Correct.
Q. And there would be certain decisions that the CEO could not make on his own, correct?
A. He would have been expected to bring certain items at the direction of the board for approval.
Q. There were certain decisions that the CEO of Forman Mills needed to obtain board approval for, right?

Page 95

A. Correct.
Q. And I think you said earlier that the Forman Mills did, in fact, have a board of directors, right?
A. Correct.
Q. I know that the board was replaced because you had referenced you had submitted a resignation at some point, correct?
A. Correct.
Q. So let's talk about the time period prior to your resignation from the board, which again, I believe, was in May of 2023, sound about right?
A. Sounds about right.
Q. Let's say in May of 2023 prior to your resignation, who was on the Forman Mills Board of Directors?
A. My recollection, it was myself, Joe Ferreira, Daniel Bonoff and Mike Kvitko.
Q. Yourself, Mr. Bonoff, Ferreira and Kvitko. Were there titles that were assigned to the board members, for example, chairman of the board or secretary of the board?
A. I don't know if there were official titles. I don't remember if there were official titles designated to the board members. I'm trying to think. Joe Ferreira may have been the chairman of the board,

Page 96

but I'm not positive.
Q. The board of directors, would they have met on a quarterly basis?
A. Typically.
Q. Would they have met, maybe, on a more frequent basis?
A. From time to time, correct.
Q. When there is a board meeting, is a board agenda typically created?
A. Correct.
Q. Who would create the board agenda?
A. Usually Mr. Kvitko.
Q. That would be distributed to all the board members, right?
A. Correct.
Q. Who would attend the board meetings besides the four members of the board of directors that you just identified?
A. Well, again, it varied over the duration of the investment. But ultimately, there was also what we called an advisory board of former operating executives that were invited to attend the board, as well ascertain members as management, as well as representatives of Cohesive. They were board observers.

Page 97

Q. Would any lenders be present at the board meetings?
A. I don't recall a lender being present at the board meeting, but it's possible that they would have been, but I don't recall any.
Q. Are minutes kept of the board meetings?
A. I believe they were kept.
Q. And when I say minutes, I'm referring to some document other than the board agenda?
A. Correct.
Q. And who would be, if you know, the custodian of those minutes from the board meeting?
A. I think it may have varied, but I think it was typically the company's CFO, who would have been responsible for taking the minutes and distributing them to the members of the board for approval.
Q. Do you know if Goode Partners, LLC would have retained any copies of the board meetings minutes?
A. I would think that we would have some copies of those minutes. I thought we had actually produced copies of the board minutes that we did have.
Q. I will check the production and to the extent that they are not there, I will let your attorney know and then would ask that you guys produce them.
So where were the board meetings

Page 98

typically held?
A. At the company offices in New Jersey.
Q. Would you attend in person the board meetings?
A. Prior to COVID, correct.
Q. So when we talk about COVID, for example, what period of time would that be? Would that be, I guess, I would a call from March of 2020 and then ending at some point. When we talk about a COVID period, what would you refer to, from when to when?
A. I mean to be honest, those dates all start to blend together, but I think it was kind of end of Q1, Q2 of 2020 through when social distancing was kind of lessened effectively.
Q. So in 2023 there were board meetings, correct?
A. Yes.
Q. And I'm talking about prior to the sale of Forman Mills?
A. Correct.
Q. For those board meetings that occurred in 2023 prior to the sale, would you have attended any of those board meetings in person?
A. My recollection is there were various board meetings during 2023 prior to the sale and my sense is

Page 99

some of them would have been in person and some of them would have been telephonically.
Q. When you say telephonically, are we talking true over the telephone or via some medium like this?
A. To be honest with you, I don't remember whether they were truly over telephone or Zoom call.
Q. Were there any board meetings that you missed that you recall?
A. Not that I can recall.
Q. The attendees of the board meeting, were there any board observers there?
A. Meaning, the formal board observers from Cohesive or other individuals that were not members of the board that participated.
Q. Other individuals who were not members of the board and who were not part of Cohesive?
A. Yes.
Q. Who might those people have been?
A. That typically would have been at least the CFO, if not other members of the management.
Q. Does Goode Partners, LLC employ any analysts?
A. We do.
Q. Would any of the analysts have attended the board meetings?
A. Possible if it was an in-person board meeting

Page 100

they possibly would have attended.
Q. So in general, I guess a high level view, what types of things would be discussed at the board meeting at Forman Mills?
A. Again, it varied. Depending upon the time, I think it was one of the things I referenced previously. It could be new stores that the team wanted to open. It could be new information systems that the company wanted to transition to. Move of a third-party distribution facility. Obviously, any issues with the company's credit agreement or lenders that needed to be discussed, any modifications that needed to be requested of the lenders, review and approval of budgets of capital spending plans. Those were the substantial. Obviously, then the ultimate sale of the company and hiring of a banker to do that. Those were the big items.
Q. You had mentioned that, you know, the CFO might have been for the board meetings, the COO might have been present for the board meetings.
A. At a typical board meeting during our history many managers would participate in some or all.
Q. When you say members of management, so I'm clear on who we're talking about, we've got the CEO, correct?

A. Correct.
Q. CFO, correct?
A. Correct.
Q. COO?
A. Correct.
Q. Was there a chief marketing officer?
A. There was a chief marketing officer, correct.
Q. Would that person have been present?
A. At many of the board meetings, correct.
Q. Was there anyone, any director or chief human resources officer present?
A. Not that I can recall.
Q. Did Forman Mills have a chief human resources officer, if you know?
A. They did.
Q. Do you know who that person was?
A. I want to say her name was Gloria. I don't remember her last name.
Q. Do you know if she would have been employed immediately up to the time of the sale?
A. I don't recall.
Q. Can you think of any other, let's say, departments at Forman Mills that might have had a representative present at the board meetings?
A. Yes, the person in charge of planning and



allocation and the person in charge of warehouse and logistics.
Q. Would there be a presentation or comments or contributions from each representative of a department at the Forman Mills board meetings?
A. It varied by meeting to meeting, but often certain department heads would make a presentation. Not every time, but there were certain presentations depending upon what was going on in their respective departments that they would present on.
Q. Would there be a legal representative at any of the board meetings?
A. There were board meetings where company counsel was present.
Q. You're saying company counsel, you mean, company general counsel?
A. No, third-party legal firm. The company did not have an internal general counsel.
Q. When you say third-party legal firm, you're saying a law firm such as Blank Rome, for example?
A. Yeah, I don't remember the exact name of the firm that the company employed, but that firm, whatever it may have been, would have been participating in certain board meetings.
Q. And when you say companies, so I'm clear, it



could have been an outside law firm that represented Forman Mills, Inc.?
A. Correct.
Q. And not Goode Partners, LLC?
A. Correct.
Q. So the board of directors, you would, I guess, agree they have a duty to act in the best interest of the shareholders?
A. Actually, in the best of interest of all constituents.
Q. Who are the constituents that you're referring to?
A. Secured and unsecured lenders, as well as employees and shareholders.
Q. So the board of Forman Mills, right, they were appointed by Goode Partners, LLC; is that correct?
A. I think the legal right to appoint a board of directors was actually granted to Goode Partners Consumer Fund III as a shareholder or as a member.
Q. So Goode Partners Consumer Fund III, you're saying had the authority to appoint board members, right?
A. That is my recollection. Just to go all the way back, it was an indirect right because the board



was actually at Forman Mills Holdings. The parent of Forman Mills Holdings was Goode Forman Holdings. Goode Forman Holdings had the right to elect the board of Forman Mills Holdings and then back up the food chain all the way back to Goode Partners Consumer Fund III as the majority shareholder of Goode Forman Holdings.
Q. We're talking about a board, right, and the board we're talking about is the board of directors for Forman Mills, Inc., right?
A. It's either Forman Mills, Inc. or Forman Mills Holdings. I don't remember exactly.
Q. Was it two separate boards, a board for Forman Mills, LLC --
A. I don't believe so. I think it would have been, basically, one and the same.
Q. The other companies that you identified, Goode Investors III, LLC, would they have had their own board?
A. No.
Q. How about Goode Heavyweight Coinvest, would they have had a board?
A. No.
Q. Goode Forman Holdings?
A. I don't believe Goode Forman had a board.

Page 105

I'm not positive, but I don't believe so.
Q. But when a board is appointed, I mean, let's say, that Goode Partners Consumer Fund III appoints the board, right? I think that's what you said.
A. Typically, the members of Goode Forman Holdings were entitled to elect the board of which the majority controlled shareholder of Goode Forman Holdings was Goode Partners Consumer Fund III.
Q. But the election has to occur right through the actions of a person, right? I mean, an LLC can't speak, right, unless some person communicates that, would you agree?
A. So I as managing member of Goode Investors III, the general partner of the fund would have been entitled to make those decisions on behalf of the fund.
Q. So you would have appointed the board members to Forman Mills, Inc., correct?
A. I think it's an indirect appointment because the board members were actually appointed by Goode Forman Holdings. We're just going back up the food chain. I'm not qualified actually to make that conclusion.
Q. Who would have spoken to Goode Forman Holdings, what person?

Page 106

A. I would assume the managing member or president of Goode Forman Holdings, which would have been me.
Q. We were talking a little bit about the CEO's authority and what the CEO had authority for or didn't have authority for in very general terms. We talked about there were certain decisions that the CEO would require board approval in order to do something, right, you remember we talked about that?
A. Yes.
Q. Without getting into any specifics, we talked about the CEO's authority is not unlimited, that there are certain decisions that he can make on his own and certain decisions that board approval is required for, right?
A. Correct.
Q. So if Forman Mills, Inc. wanted to open up a new store, new location, would that have been something that the board approval would have been required for or could the CEO just do that on his own?
A. No, he would present it to the board for approval.
Q. And the board would have to agree, correct?
A. Correct.
Q. In order for it to be done, right. How

Page 107

about, like, opening up a brand new location, I'll call that a de novo location, right?
A. Correct.
Q. But what if Forman Mills wanted to expand by purchasing a competitor, for example, would that have been something that the board would have required to approve?
A. I don't recall that circumstance ever coming up, but I would have expected that to be raised to the board.
Q. How about if the CEO wanted to close down a nonperforming store, would board approval been required to close down a store?
A. That typically would have been raised with the board, as well.
Q. I'm guessing that Forman Mills had an annual budget; is that correct?
A. It did, correct.
Q. Would the board have to approve the annual budget?
A. Yes, I articulated that previously.
Q. Just double checking here. What about if Forman Mills wanted to file for bankruptcy, would the board have to approve that?
A. I believe that would be required by the

Page 108

board.
Q. How about limits on the CEO's spending authority? Let me give an example. If the CEO wanted to make a purchase for $500, that's probably not going to be raised to the board, correct?
A. Correct.
Q. But if the CEO wanted to make a purchase for a million dollars, that might be something that would be required to seek board approval for, right?
A. Again, it would need to depend upon what it was. So, for example, I'll differentiate between typical, ordinary course events. So, for example, inventory purchases, which well could have been in excess of million dollars versus purchasing a new information technology system that the CEO would have been expected to raise with the board.
Q. Did the board of directors, from the time of Forman Mills being acquired in 2016 up until let's say sometime in May of 2023 when you resigned, was the board consistent in its members?
A. Well, Allen Weinstein would have initially been on the board and then when he was replaced by Mr. Kvitko, he left the board and Michael Kvitko joined the board. I'm trying to think. There was one other gentleman who may have initially been on the board by

Page 109

the name of Michael Blitzer, whose wife passed away at some point and I believe he left the board in connection with his wife's passing and I can't remember any other members of the board that would have joined or left.
Q. Let me go back to the cash pledge security agreement and the additional capital costs that we talked about. So would you agree that Forman Mills was having cash flow issues back in, let's say, 2018 when that additional capital call was made?
A. I wouldn't deem it a cash flow issue in 2018. I believe the company just underperformed its financial covenants that were laid out in the credit agreement.
Q. When you say underperformed, you mean that there was some budget amount of gross revenue or some budget amount of EBITDA that Forman Mills failed to achieve, correct?
A. There was a contractually required, either minimum level of EBITDA or maximum leverage ratio that was in the credit agreement that the company had anticipated that it would exceed, but ultimately did not.
Q. You said covenants. What type of covenants would have been contained within the Encina Business

Page 110

Credit lending agreement?
A. There would have been a variety of both positive and negative covenants. Positive covenants are things like, the company will maintain its insurance policies in full force and effect. It would continue to be an entity in good standing under required governmental authorities.
And then negative covenants would be things like, the company shall not have more money outstanding than otherwise permitted under its borrowing base.
Q. Did the Forman Mills ever violate any of the positive covenants that were in the Encina financing agreements?
A. Not that I can recall.
Q. Did Forman Mills violate the negative covenants of the Encina?
A. I don't recall whether Forman ever violated a specific Encina covenant or whether there was a cross-the-fault provision between Encina's agreement and the Monroe agreement. So, for example, a breach of a covenant under the Monroe agreement would have triggered a breach under the Encina agreement. My recollection it was more that cross-the-fault provision, as opposed to a specific breach of an

Page 111

Encina covenant, but I'm not 100 percent positive of that.
Q. So there are covenants. You said positive and negative?
A. Correct.
Q. There would have been positive and negative covenants in the Encina agreement and positive and negative covenants in the Monroe agreement, right?
A. Correct.
Q. You said that there, and I just want to make sure I understand this right, that there could have been a negative covenant that was violated in Monroe to trigger a covenant in Encina; is that accurate?
A. That's correct.
Q. What agreement was entered into first, the Encina or the Monroe?
A. Well, the predecessor to Encina was CIT and that agreement was entered into simultaneously with the agreement with the Monroe.
Q. But I think you said there is no relationship between the two, Encina and Monroe?
A. Correct. Not that I know of.
Q. Just that there might have been a provision in Encina that referenced a default or a violation of the covenant in Monroe?

Page 112

A. Correct.
Q. With these loan agreements that Forman Mills had with Encina and Monroe, was Forman Mills required to present certain financial reports on a periodic basis?
A. Yes.
Q. Let's talk about just with Encina. If you know, what financial reports was Forman Mills required to provide to Encina?
A. My recollection is they were required to provide a borrowing base calculation and I don't remember if that was weekly or monthly. They would have been required to provide monthly financial statements. They would have been required to provide an annual budget. They would have been required to provide audited financial statements and there may have been other things, but that was the majority of it.
Q. You just identified four things that Forman Mills was required to present to Encina, right?
A. Correct.
Q. Would Forman Mills provide them to Goode Partners, LLC for their review prior to submitting to Encina?
A. Not typically.

Page 113

Q. Would Forman Mills, Inc. provide those documents directly to Encina without yourself, Mr. Ferreira, Mr. Bonoff having any type of review of those documents?
A. Yes. Again, depending upon the document, but yes. So, for example, the budget was approved by the board prior to distribution to the company's lenders. The company's borrowing base, for example, was never approved by the board prior to its distribution.
Q. Can you think of any documents that in Goode Partners, LLC and yourself, Mr. Ferreira, Mr. Bonoff would have seen prior to being sent to Encina?
A. The things that come to mind are really their projections for future performance and that's the primary thing that I can think of. Whether it was a budget or in connection with the company's negotiating an amendment under its credit facility.
Q. Let me ask you the same thing relative to Monroe. Was Forman Mills required to submit financial documents to Monroe?
A. Substantially similar to what they would have provided to Encina. I'm not sure they provided the borrowing base, but they may have.
Q. When you say borrowing base, can you define that, borrowing base, what that means?

Page 114

A. The Encina credit agreement or the CIT and then the Encina credit agreement had a formulated calculation to determine how much capital the company could drawdown under the Encina facility. Again, the that was primarily driven by the amount of inventory and receivables that the company had subject to certain reserves that Encina required there to be put in place. There was then a percentage of that borrowing base that became available and Encina required, again, either a weekly or a monthly calculation of what that borrowing base was to determine how much availability the company could borrow down under its revolving credit facility.
MR. ROOKS: Looks like this will be Exhibit 10. So I'm going to introduce this as Exhibit 10, this loan and security agreement.
\- - -
(At which time, the Loan and Security Agreement was marked as Exhibit 10 for identification.)
\- - -
Q. Have you seen this document before?
A. I believe so.
Q. I'm going to scroll all the way down to the bottom here. Not quite the bottom, but there is a

Page 115

borrower identified, Forman Mills, Inc. and there is a person, Brian --
A. Sullivan, correct.
Q. I thought I called him Tony Sullivan.
A. My recollection is, there was a guy by the name of Tony Sullivan.
Q. This is a different person then?
A. Correct.
MR. ROOKS: For identification purposes, Exhibit 10 and the Bates number is FM001687 through FM00183.
Q. Here I just pulled case 68 of this agreement under a section called financial covenants. Do you see that?
A. I do. Can you just go up, though? Is that the same -- I don't think that's the security agreement. I think that may be the credit agreement.
Q. This is a --
A. Okay. Got it. Yep. Understood.
Q. So since I'm here on this page, let me just start by identifying the parties to this. It looks like the borrower is identified as Forman Mills, Inc. Do you see that?
A. Yes.
Q. Forman Mills Holdings, LLC is the parent and

Page 116

then we have Encina Business Credit as an agent for the lender here.
A. Yes. Understood.
Q. If you need me to go to any specific point to refresh your memory or anything, just let me know. But I wanted to come down to the financial covenants here. It says, each party obligor shall at all times comply with the following financial covenants. I don't know if we identified who the obligor is. We can go back to that. Let me focus really on the financial covenants here. It says, borrower shall not permit EBITDA at any time to be less than the applicable amount set forth for each fiscal quarter. Do you see that?
A. Yes.
Q. It says 4.7 million and then the next one is 9.9 million. That's very disproportionate to these other figures here. Any idea why that's $9 million?
A. So the company, for Forman Mills, it's primary custom role is a lower-income consumer that would typically receive a fairly substantial tax refund check in the first quarter. Well, either in the first quarter or in April and so as a result, the company's sales would be significantly boosted during that period between January 31st and April 30th

because of what tax refund checks that were issued to our customers.
Q. Now this minimal EBITDA here, would you agree that that is normal to have a clause like this in a lending agreement?
A. A minimum EBITDA, yes.
Q. Now with these numbers here, do you recall if any of these EBITDA targets were missed?
A. I don't recall.
Q. If Forman Mills' EBITDA was less than these numbers here in any fiscal quarter, would you agree that would trigger a default?
A. That would be a default under the credit agreement.
Q. Did you and Goode Partners, LLC participate in any way in negotiating this loan and credit agreement?
A. Yes.
Q. What was your participation in the negotiation of this loan and credit agreement?
A. It was negotiating with the lenders on the company's behalf to, obviously, provide as much latitude in these covenants relative to the company's projections as we could possibly negotiate. It would then be to work with counsel to actually document the



agreement and make sure that the provisions were attainable by the company, as well as that the company could live with any restrictions that were put into the agreement by the lenders.
Q. Just so I'm clear, Forman Mills did not negotiate this agreement, right?
A. No, the company's -- Mike Kvitko and the company's CFO were party to that process.
Q. But not on its own, as you just testified, right?
A. No, it would have been a group effort, correct.
MR. ROOKS: We'll do a break.
- - -
(At which time a lunch recess was taken.)
- - -
Q. So we were talking about those EBITDA thresholds for the Encina loan agreement and we also talked about that if Forman Mills had EBITDA that was less than that EBITDA that was specified, then they would be in default. Do you remember that?
A. I do.
Q. I want to introduce another document and I am going to say this is Exhibit 11. I'm going to



identify by the numbers. It's the Waiver and Amendment Number 14 to the Credit Agreement, document number FM002218 through FM002232.
- - -
(At which time, Waiver and Amendment Number 14 to the Credit Agreement, document number FM002218 through FM002232 was marked as Exhibit 11 for identification.)
- - -
Q. Mr. Oddi, have you seen this document before?
A. Yes, I believe so.
Q. And this looks like it's from what it says, it says, Waiver and Amendment Number 14 to Credit Agreement and here it identifies the parent as Forman Mills Holdings, LLC. Do you see that?
A. Yes.
Q. Forman Mills, Inc. is the borrower, right?
A. Yes.
Q. And it also references Monroe Capital Advisors, right?
A. Yes.
Q. So Monroe Capital Advisors, that would be the lender in this situation?
A. Correct.
Q. Now it says, Amendment Number 14. Do you see



that at the top of the page?
A. I do.
Q. So would that mean that there were 13 other amendments to this credit agreement?
A. It would.
Q. Why would this credit agreement need to be amended?
A. A resetting of the covenants, additional liquidity requirements. Those would be the primary things to Forman Mills.
Q. In your experience, would it be unusual to have 14 amendments to a credit agreement?
A. That would be, yes, that would be unusual.
Q. Again, this was with Monroe, 13 other amendments. So to the best of your knowledge, was this amendment due to any, I guess, let's say, a negative covenant?
A. I don't remember this specific amendment, but it would be my guess that the company breached a negative covenant.
Q. Let's see here. Let me just scroll to this here. The purpose of this agreement here, let me find the exact language I'm looking for.
A. If you go to definition of existing defaults, it should give you what the breach was for.

Q. Thank you.
A. It may be below that. I guess it's up. Right there, in the whereas.
Q. Events of default have occurred and are continuing as a result of borrower incurring indebtedness in connection with a letter of credit issued on October 26, 2022. Do you see that there?
A. Yes.
Q. And it says, constituting a breach of Section 7 of the credit agreement and an event of default under Section 8.01(b). Does that refresh your recollection as to what the default was?
A. It looks like that they were arguing that the providing of additional credit support that Goode Partners Consumer Fund III and Cohesive Capital made was somehow viewed as an indebtedness under their provision, which everybody disputed, but we did a waiver to clarify that that would not be deemed in default.
Q. So you're saying that Monroe Capital has a concern that additional funds are being pumped into Forman Mills, right?
A. They were concerned that the additional collateral that was provided to CIT was in breach of their definition of incurring indebtedness.



Q. Why was additional collateral needed?
A. That was the topic that we discussed before that the company liquidity needs that were in excess of their available under the existing formula in the CIT or the Encina credit definition.
Q. This is agreement April 27, 2023, right, that's what it says?
A. Correct.
Q. How would you describe Forman Mills' financial status at this time?
A. I would say at this time the company's financial status was very precarious because Encina was unwilling to allow the company to drawdown under its credit agreement.
Q. Now, I'm going to scroll down here. It's in the covenant section. Can you see that?
A. I do.
Q. Paragraph six under this agreement looks like A through I are the covenants here and the first covenant says that the borrower shall engage an investment banker reasonably acceptable to the administrative agent to conduct the sale process with respect to either all of the capital stock of the parent or borrower or substantially all of the assets of the borrowing parties. Do you see that?



A. I do.
Q. In plain English, what does that say?
A. Monroe wanted to know that the company was going to put itself up for sale and wanted there to be a trigger in the event that it did not follow through on its commitment actually to market itself.
Q. So Monroe Capital as a condition of this modification or Amendment Number 14 to the credit agreement imposed a condition that Forman Mills had to be sold, right?
A. Or that it had to be marketed, correct.
Q. And would you say that the reason for that is because Monroe wanted to recover the funds that it had lent to Forman Mills?
MR. CABRERA: Objection. You can answer the question.
A. I don't know exactly why, what their ultimate decision was, but they effectively wanted to see what the market appetite was for the company.
Q. Prior to this credit agreement being executed, were there any plans in place for the sale of Forman Mills?
A. I believe we had been interviewing and discussing the sale of the company prior to this date of this amendment.



Q. And do you recall when you began entertaining the thought of selling Forman Mills prior to this amendment?
A. I don't remember the exact date.
Q. Would it have been prior to January of 2023?
A. We had some conversations with a potential acquirer before that date, but we also began speaking to them again in 2023.
Q. Upon signing this agreement, let me just scroll down to the signatories. We've got the borrower identified as Forman Mills, Inc. We've got the parent, Forman Mills Holdings, LLC and that's Kevin Hess, looks like his signature, right?
A. Yes.
Q. It identifies him as a CFO?
A. Correct.
Q. And treasurer of Forman Mills Holdings, correct, I guess?
A. That's what it says.
Q. At the bottom on page FM00230 there's a signature of you as president for Goode Forman Holdings, LLC, right?
A. Correct.
Q. I'm looking to see where Goode Forman Holdings is identified as any type of party to this

agreement and it does not appear that Goode Forman Holdings is a party to this agreement in the language. Would you agree with that?
A. I think there is a separate agreement that you scrolled past that was after that agreement. There's two separate agreements.
Q. So this agreement here, Waiver and Amendment No. 14, let me see if I'm going in order. This is all in consecutive order.
A. You just went past the separate agreement right there. That is the consent and reaffirmation.
Q. It's part of the Credit Amendment No. 14; is it not?
A. It's an attachment, but it's a separate document.
Q. Right, it's part of that Amendment No. 14, would you agree with that?
A. I believe it is, correct. But again, the signatory of this document does not need to be a signatory of the prior document.
Q. I think there's two consents. The one document says, consent and reaffirmation?
A. Correct.
Q. And that's the signatory is Forman Mills Holdings?



A. Yes, correct.
Q. And then the next document is participant consent and reaffirmation, right, you see that?
A. Right, correct.
Q. Now here it says, there's a participation agreement dated January 14, 2020 between Goode Forman Holdings, LLC and Monroe Private Credit Fund. Do you see that?
A. I do.
Q. What is a participation agreement and what participation agreement is this referring to?
MR. CABRERA: Objection to form. You can answer the question.
A. Generally a participation agreement is an agreement between a lender and a third party that is participating in a loan from the lender to a company. This specific agreement relates to at least one of the infusions that Goode Forman Holdings made into company was through a participation agreement in Monroe's loan. So I articulated before that Monroe at one point provided an additional $5 million to the company. Separate from that, the shareholders provided an incremental $8 million to the company. That $13 million was in a new class of the loan, which the shareholders were not lenders to, but they were a



participant under Monroe's credit facility. So they were not lenders. They were participants.
Q. When you say they were not lenders, what's the distinction between a lender and a participant?
A. A participant does not have any rights, per se, under the credit agreement. All of those rights under the credit agreement are held by the lender.
Q. There is another participant and consent and reaffirmation document attached here and that is between Goode Heavyweight Coinvest, LLC and Monroe Private Credit. Do you see that?
A. I do.
Q. That's signed by you in your capacity as president of Goode Heavyweight Coinvest, LLC, right?
A. Correct.
Q. Your answer would be the same, I guess, if I asked you about this?
A. The numbers were smaller, but the same answer. When I referenced the $8 million investment, that was a combination of Goode Partners Consumer Fund III, the Cohesive entities, as well as Goode Heavyweight.
Q. After this agreement was executed, there were covenants that were identified that had to be adhered to, one of which was exploring investment banker,



right? It says, covenant 6(a) was borrower shall engage an investment banker reasonably acceptable to the administrative agent. So at that point in time was an investment banker engaged?
A. I actually thought the banker was engaged prior to that date, but if it wasn't, it was right around that date, correct.
Q. And what investment banker was engaged?
A. Threadstone.
Q. You said Threadstone?
A. Yes, correct.
Q. Where is Threadstone located?
A. New York.
Q. Had you ever used Threadstone before?
A. Threadstone had actually represented Rick Forman in its sale of Forman Mills to Goode.
Q. Did you attend any meetings with Threadstone?
A. Not in person. I participated on some telephonic or video calls in which Threadstone was a participant.
Q. So there is, I guess, a process that's involved in selling a business, would you agree?
A. Agreed.
Q. In order to sell a business I'm guessing that you have to prepare certain documents for any would-be

acquirer, would that sound about right?
A. That's correct.
Q. So what would you term that? Would you have a create a book or something like that, a pitch book?
A. A pitch book, a sale memo, some presentations, correct.
Q. In order to sell Forman Mills at this point in time, we're talking about this agreement was entered into April of 2023, was there anything that you needed to do to make Forman Mills more attractive to any would-be acquirer?
A. At that point in time, no.
Q. Was Forman Mills at that point in time losing money?
A. Do you mean that net income was negative?
Q. Was EBITDA negative?
A. I don't remember if EBITDA was negative.
Q. When you were exploring this sale, I think you said there was nothing that you needed to do to make Forman Mills more attractive to a purchaser?
A. Not that I can think of. Not at that point in time when we engaged the banker.
Q. But this agreement is entered into April 27th of 2023 and Forman Mills was sold in June of 2023, right?



A. That sounds correct.
Q. So at any point in time when an investment banker was engaged, were there any changes necessary to facilitate the sale of Forman Mills?
A. There were many things that, yes, I guess is the answer to that. There was a negotiation in particular with Shoppers World where there were multiple points where Shoppers World wanted different things to help facilitate the transaction. Those included, for example, keeping the cash pledge and security agreement outstanding that was put up by Goode Partners Consumer Fund III, as well as Cohesive Capital. They wanted the business to continue as a going concern with its employees. They wanted Mike Kvitko to waive certain rights that he had and amounts that he was due and I'm sure there were others that I'm forgetting.
Q. Let's just, I guess, focus on the financial state of Forman Mills around that time. Was Forman Mills having problems making payroll?
A. Forman Mills had liquidity challenges that were significant because its lender, Encina, unexpectedly refused to allow Forman Mills to drawdown under its revolving credit agreement that it had expected to be able to access.



Q. Did Forman Mills not have enough cash coming in from sales to satisfy its payroll obligations?
A. Under its credit agreement any cash that came in the door was immediately effectively secured by Encina and not available to Forman Mills, itself, without Encina's consent.
Q. Was Encina not consenting to allow Forman Mills to make payroll?
A. There was a process put in place that was managed by a third-party advisor engaged by the company, Clear Thinking Group that, basically, Clear Thinking would need to submit certain expenditures for Encina's approval, one of which would be payroll.
Q. So Clear Thinking Group, who is Clear Thinking Group?
A. Clear Thinking Group, I think its official name is PK Clear Thinking, I think is the name. They are a third-party consulting firm that the company had used previously to help it with an issue with its warehouse facility. In addition to operational consulting, they also provide financial management consulting and cash flow management. At some point the lenders, and specifically Monroe, had asked that the company engage someone like Clear Thinking and they had worked with Clear Thinking in advance, so



that was a name that was acceptable to them to come in and opine on that the company was doing everything that it could to manage its cash flow.
Q. Prior to Forman Mills being acquired in 2016, do you know if Forman Mills had ever used the Clear Thinking Group?
A. I don't believe so.
Q. Was Forman Mills introduced to Clear Thinking through Goode Partners, LLC or anyone at Goode Partners?
A. Yes.
Q. Who would have done that introduction?
A. I probably would have made that introduction.
Q. You worked with Clear Thinking in the past?
A. I don't -- I'm not positive. I think the first time I may have worked with them was when we brought them in for their warehouse consulting experience. We had some issues integrating a new warehouse at Forman Mills and I know we brought them in. That may have been the first time I worked with them. Not 100 percent positive, but I believe so.
Q. So you said that Forman Mills used Clear Thinking earlier, but now in connection with, let's say, this amendment to the credit agreement, was this a new engagement for Clear Thinking with Forman Mills?

A. It was.
Q. Do you know what the cost of that engagement was?
A. I don't. There was an engagement letter. I don't remember what their hourly rates were.
Q. Would the engagement of Clear Thinking been something approved by the board?
A. I believe so, but I'm not positive.
Q. Is this engagement of Clear Thinking something that should have been approved by the board?
A. I don't think it raised to that level.
Q. When you say that level, you mean the expenditure?
A. The amount that was going to be expended under their engagement.
Q. So when Clear Thinking was engaged for the second time, was it gone at the direction of Goode Partners or you or anyone at Goode Partners?
A. It was really done at the direction of Monroe Capital that they required us to bring someone in and I submitted Clear Thinking's name to Monroe for approval, which they provided.
Q. So would you say that you greenlighted the use of Clear Thinking for Forman Mills?
A. They were affirmed that I submitted to Monroe



for approval and Monroe executed ultimately Mike Kvitko hired them and signed their engagement letter.
Q. Did you submit any other firms to Monroe for their consideration besides Clear Thinking?
A. Not positive, but I believe I did.
Q. Do you have an idea who that might have been?
A. I think I may have interviewed Huron, H-U-R-O-N, but I'm not positive.
Q. Would anyone else have introduced a company like Clear Thinking to Monroe Capital from --
A. Monroe may have submitted another party for consideration, but I'm not positive. Actually, I know -- yes, I know Monroe submitted another party for consideration, as well, but I can't remember the gentleman's name, but it was an individual.
MR. ROOKS: Let me introduce another document here. This is Exhibit 12 and we've got a Bates number here, FM006214.
\- - -
(At which time, an e-mail from Joe Ferreira to Nathan Harrell of Monroe Capital Bates stamped FM006214 was marked as Exhibit 12 for identification.)
\- - -
Q. This looks like it's an e-mail from Joe



Ferreira to Nathan Harrell of Monroe Capital. Do you see that?
A. I do.
Q. It says here that Mr. Ferreira is saying that he's working with Kevin on cash flow. That would be Kevin Hess?
A. Correct.
Q. And that Mr. Ferreira has another work session planned for Friday, right?
A. Correct.
Q. Then it also talks about they are missing the sales forecast. They meaning is that Forman Mills?
A. Correct.
Q. And then it says that we are going to lay out three scenarios, current sales trend is most likely a better option and a worse option. Now, you're not copied on this e-mail. You agree with that, right?
A. Correct.
Q. But have you ever seen this e-mail before?
A. I may have seen it during the discovery process of identifying e-mails that needed to be provided pursuant to the request.
Q. Can you describe the engagement that Mr. Ferreira had with Mr. Hess in working through the financial, I guess, situation that existed in May of



2023 at Forman Mills?
A. Again, the company had significant liquidity constraints because some of the impact of decisions that Encina was, again, limiting access to our revolver and so the company was actively on a daily basis trying to monitor the latest trends and expenditures to make sure that we would be able to -- that the company would be able to continue to operate.
MR. ROOKS: Ms. Russell, can you just read back that answer?
\- - -
(The court reporter read the record as requested.)
\- - -
Q. When you say the company was actively monitoring, is the company Goode Partners? Is the company Forman Mills? Like, who are you referring to when you say the company was monitoring?
A. I was referring to Forman Mills.
Q. Now here, going back to this e-mail Mr. Ferreira says, for Fridays work session we're going to lay out three scenarios. Current sales trends are more likely a better option and a worse option.
Do you have any idea what a better option or a worse option means in this context?

A. I believe what Mr. Ferreira was referring to was there would be three scenarios, a current course and speed of sales, a scenario that forecasted an improvement in sales from the current trend and a scenario that laid out a lower level of sales than the current trend.
Q. Now further down in this e-mail it says, that we are scrambling to make payroll this week. As a few hours ago, we think by moving payroll to Friday, holding checks, adjusting Eclipse's reserve for Monroe interest and a couple other actions we will make payroll, but it will be close. Do you see that?
A. I do.
Q. We talked about like Encina and Monroe. Who is Eclipse?
A. Eclipse is really actually -- I think CIT Encina may have been the same and the Eclipse may have been the successor to them, but I think what he's referring to is the company's ABL lender.
Q. The company's what lender?
A. Asset based lender.
Q. You said earlier that money wasn't necessarily immediately usable by Forman Mills, right?
A. So the lender had a cash -- had what's referred to as a lockbox agreement so that any capital



-- any cash that came in was effectively secured by the lender and effectively we would need their approval to distribute cash.
Q. So you needed their approval to distribute the cash, but here when Mr. Ferreira says that, you know, talk about moving payroll to Friday, would that be to collect additional cash? Would that be the reason to move payroll to Friday?
A. There was a limit on -- my recollection is, there was a limit on how much cash the lender was willing to go out the door per week regardless of whether it went to payroll or for other expenses or for merchandise purchases.
MR. ROOKS: Let me stop sharing that. I'm opening up another document. I'm going to introduce this document as Exhibit 13. It's Bates number FM002905 --
A. Could you go up a little bit, just down a little to the signature page. So this addresses the confusion that we had before. Eclipse is the successor to Encina, formerly known as Encina Business Credit effectively.
\- - -
(At which time, a letter dated May 15, 2023 Bates stamped FM002904 through FM002906 was



marked as Exhibit 13 for identification.)
\- - -
MR. ROOKS: For identification purposes this is FM002904 through FM002906.
Q. So you've seen this document before?
A. I believe so.
Q. And then this is a letter dated May 15, 2023 to Forman Mills, right?
A. Correct.
Q. It's regarding notice of events of default and reservation of rights. Do you see that?
A. I do.
Q. So this document it says, please take notice that in light of existence of the specified events of default, the agents hereby impose effective as of May 15, 2023 the default rate under Section 3.1 of the credit agreement. Do you see that?
A. I do.
Q. I'm guessing that that's not a good thing. Would you agree with that?
A. No default is good at any company with its lenders.
MR. CABRERA: Objection.
Q. If a default rate was imposed, would that have made it more difficult for the company to do



business?
A. My recollection is default rate would have been incremental two percentage points. I don't remember whether that rate was being imposed in cash or in kind, but yes any increases in payables by the company would be negative to its liquidity.
Q. It's a higher interest rate being charged, right?
A. Correct. And just I don't know if it was being charged in cash or in kind.
Q. When you say in kind, do you mean, like, being accrued?
A. Accrued, but not being required to be paid in cash.
Q. So you had touched on this, that Encina, this is Eclipse formerly known as Encina Business Credit, to your point they are one and a same, correct?
A. Correct.
Q. Then this is, again, May 15, 2023. So can you tell me at this point how severe were the liquidity issues or cash flow issues that Forman Mills was experiencing?
A. Well, again, the answer to that question really depended upon whether or not Encina was going to continue to fund the request that we had for

Page 141

capital. So if you notice the last provision of that agreement was a specifically call out that they were no longer obligated to fund draws that the company made. So I think at that time the company had borrowing base available to actually fund its cash needs, but it was effectively at the discretion of Encina, which made planning fairly difficult as to whether or not we were going to have cash to fund the company's needs because it was completely at the discretion of whether or not Encina provided that cash.
Q. So earlier, we talked about this waiver agreement, Waiver and Amendment to Credit Agreement No. 14 and that was with Monroe?
A. Correct.
Q. And now there's another lender, Encina or Eclipse, that Forman Mills was also in default with, right?
A. Correct. Again, there was a -- I had referenced previously a cross-default provision under the two different credit agreements that a default under the Monroe agreement would trigger a default under the Encina agreement.
Q. Under this default notice from Encina or Eclipse, would you say that this lender was trying to

Page 142

force your hand, so to speak, to sell the business?
A. My understanding is that Eclipse at that point wasn't, per se, forcing our hand to sell the business. They were minimizing the additional capital that they would -- they were limiting the additional dollars that they were willing to have exposed as outstanding amounts under the credit agreement.
Q. And the amendment by to the agreement, amendment No. 14, which is with Monroe that was the agreement that required an investment banker to be engaged. Would you say that Monroe is forcing your hand, so to speak, to sell the business?
A. As I said before, I think Monroe wanted to understand what their options were. I'm not sure that they truly -- again, you have to ask them. I'm not sure they necessarily wanted to sell the business. I think it was really driven by what was the value that potentially could be secured and that would drive whether or not they actually wanted the business to be sold or not.
Q. We had an e-mail up with Joe Ferreira earlier that was the last exhibit. I want to say it was Exhibit 13 in which he said he was working with Kevin on cash flow.
I want to introduce a different e-mail

Page 143

here. Before I do what, efforts were happening to, let's say, turnaround Forman Mills to improve its liquidity to improve its financial position and again, I'm talking, let's say, the timeframe from January 2023, starting with that period of time.
A. I don't recall the specific initiatives that we had in place, but my recollection is they were generally -- this was becoming the most important season of the year or time period of the year, as I believe I referenced to you before, as to why EBITDA the quarter ended April 31st was so much higher than in other periods. So the typical initiatives that the company would be going through would be making sure that we were properly inventoried and assorted and staffed to maximize the opportunity during our peak selling period.
Q. When we talked about that Amendment No. 14 and that requirement that an investment banker be engaged, I believe you said that you had talked or explored that engagement of an investment banker prior to that amendment of the credit agreement, correct?
A. Correct.
Q. I don't recall if you said this, what is the earliest point in time in which an investment banker was consulted or the notion of engaging an investment

Page 144

banker for Forman Mills was, you know, kicked around?
A. I'd have to go back and look at the exact date as to whether it was during the beginning of that year or in the prior year. I know we did -- I think Joe spoke to several investment banks and I just can't remember the exact time period as to when that was initiated.
Q. The credit agreements, again, the one we referenced. I'll find out which one. Its here. Hold on. It was the credit agreement that had the covenants, the EBITDA. Let me go back to that. I want to go back to the agreement that the had EBITDA requirements. The covenant agreements had these EBITDA covenants that you had to hit in order to stay in compliance. What role did Goode Partners or did you take in assisting with the budgeting process with Forman Mills to make sure that these EBITDA covenants were adhered to?
A. Goode Partners had entered into a process of reviewing the projections that the company was providing. We went through a process of smell testing and probing the validity of those assumptions and then worked with the company to negotiate covenants that provided as much cushion as we could possibly secure from the levels that they expected to perform at to

set those covenants.
Q. But independent of setting covenants with a loan document, when we look at the performance of Forman Mills, would you agree that performance can be affected, let's say, by increasing sales?
A. Increasing sales, definitely improves performance.
Q. It can also be done through, let's say, raising prices, for example, to collect more money. Would you agree with that?
A. Increasing prices can potentially lead to increasing sales.
Q. Reducing expenses would also be one way to potentially increase EBITDA. Would you agree with that?
A. Lower expenses can potentially increase EBITDA.
Q. Certain expenses that I would think can't be changed that they're fairly fixed. For example, rent, right, that's probably not, you know, unless you renegotiate the lease, that's a fixed expense, right?
A. Typically, although it's not uncommon to have what's call a percentage rent component of lease expense, so that, you know, rent expense declines and sales decline. I don't remember how many of the



former leases had percentage rent provisions, but typically to your point, rent is often a more fixed component of the expense structure.
Q. There's also, variable experiences, right? What would be an example of some variable expenses with the Forman Mills budget?
A. Cost of products that we sell.
Q. Anything else?
A. Labor to store staffing levels, hours of operation, our distribution expense is tied to our level of sales because if we're not selling goods, we don't need to replenish those goods from our warehouse. Our trucking expenses go up and down based upon the amount of sales and the amount of Goode's that we're shipping to stores.
Q. Did Mr. Ferreira, yourself, Mr. Bonoff have any discussions about labor at Forman Mills?
A. During the course of our investment, there were numerous conversations brought to the board about how we were going to operate or how the company was going implement some of its strategies to improve customer service. For example, putting additional people on the floor, cleaning the stores more often, things like that. There were, obviously, conversations that the board for approval to hire the



people that we talked about in the meetings previously. So there were numerous instances that effectively related to people or staffing.
Q. So let's, I guess, talk about in 2023. Do you recall any specific conversations about staffing at Forman Mills?
A. We were conscious of what the expense was in the organization. We had looked at whether or not -- I know the team had evaluated whether or not there were people that were required in the operation and then, obviously, we were -- the company was aware of the requirements under the WARN Act as to what was needed to be provided to the team in terms of advance notice of any terminations.
Q. We'll come back to the WARN Act.
MR. ROOKS: I want to introduce a document. This, I guess, is Exhibit 14, Bates stamped FM005904 through FM005906.
- - -
(At which time, an e-mail exchange between Joe Ferreira and Mike Kvitko Bates stamped FM005904 through FM005906 was marked as Exhibit 14 for identification.)
- - -
Q. This is an e-mail from Joe Ferreira and in



the chain, it's an e-mail exchange between Mike Kvitko and Joe Ferreira. Do you see that?
A. I do.
Q. Have you ever seen this e-mail before?
A. I may have seen it as part of the review of the document production that we were required to provide.
Q. In this e-mail here, Mr. Ferreira references a plan B. It says, plan B will include a more aggressive cut in staffing. Do you know what he's talking about there, this plan B?
A. My sense is Joe is referencing that we needed to get the fixed costs -- the company needed to get the fixed costs down as low as possible to maximize cash flow.
Q. Are you aware, was there a plan A involving staffing? This says a more aggressive cut in staffing. Was there a prior plan that addressed a cut in staffing, but I guess, not as aggressive?
A. I don't recall that.
Q. But would you say that, again, this is what the date on this is February 19, 2023. So at that time in February of 2023, staff cuts or aggressive staff cuts, were something that was at least considered or kicked around?

Page 149

A. That is correct.
Q. Staff cuts were contemplated, in other words, right?
A. Correct.
MR. ROOKS: So I just want to five minutes organize some notes.
- - -
(At which time a short recess was taken.)
- - -
MR. ROOKS: I want to talk about May of 2023. I'm going to introduce a document. This document is Exhibit 15, Bates stamped FM003128 through FM003129.
- - -
(At which time, a document Bates stamped FM003128 through FM003129 was marked as Exhibit 15 for identification.)
- - -
Q. Mr. Oddi, have you seen this document before?
A. Yes.
Q. It says, action by unanimous written consent of the members. Do you see that?
A. I do.
Q. What this says here is that there's the

Page 150

removal of a manager, it says that all managers are being removed, right?
A. Correct.
Q. And they are all being replaced by a single individual, who's this Tobias S. Keller, right?
A. Yes.
Q. So earlier we talked and you had said that you had submitted a resignation from the board. So would this have been the event whereby you would have submitted your resignation?
A. No, I believe I submitted a separate letter of resignation from the board of the company, of Forman Mills, Inc.
Q. I'm saying that this would have been the event that triggered your submission of a resignation?
A. I don't recall which came first or whether they came simultaneously.
Q. The board was replaced by a single person and you resigned from the board because of Mr. Keller replacing the board, right?
A. That sounds correct.
Q. Who is Tobias S. Keller?
A. He is a former -- well, he is a lawyer that had been referred to us through, it was either Clear Thinking or Jones Day. Actually, I think it was

Page 151

through Jones Day that as a potential independent board director and that was something that Toby had done from time to time.
Q. So prior to Mr. Keller's appointment, had the board had an independent member?
A. Well, the board was comprised of the four people that I had articulated before.
Q. But no one was an independent member, right?
A. I'm not sure exactly what definition of independent you're referencing, but it was the four people that I referenced before.
Q. I think you said Mr. Keller was appointed as independent director?
A. He was appointed as the sole director.
Q. So why did the board resign?
A. The board had been advised by a number of people that serving as both director at a time, as well as a representative of affiliated parties through the equity and through the participation and through the plex board was -- should be considered to be changed given the potential events of both the sale, potential bankruptcy, were being evaluated.
Q. You said potential events being evaluated. So the potential events that were being evaluated, you said, one, sale?

Page 152

A. Correct.
Q. Two, bankruptcy?
A. Correct.
Q. What were other events?
A. Additional infusions of capital from either the lenders or from shareholders. There had been conversations about Monroe actually buying Goode's securities and actually buying Encina. We had conversations about buying out Monroe's position in terms of their debt. So there were a number of strategic conversations that were going on at that time.
Q. The basis for the resignation, if I'm clear, is it because there could have been conflicts?
A. There could potentially be conflicts.
Q. Monroe had infused capital on prior occasions, right?
A. One time that I remember.
Q. To your knowledge, is this the first time since Forman Mills was acquired that these conflicts developed?
A. Yes.
Q. These conflicts, to your knowledge, did not exist at any other point in time?
A. Not in my opinion.

Page 153

Q. In your opinion, did these conflicts potentially give rise to legal liability?
MR. CABRERA: Objection. You can answer to the extent you can. Please don't reveal any information you learned through the advice of counsel.
MR. ROOKS: My question was in Mr. Oddi's opinion.
Q. I'm not asking for any opinions how you form those opinions. But in your opinion, do you believe that potentially created some legal exposure?
MR. CABRERA: Objection. You can answer the question.
A. No, I didn't.
Q. Without saying who, you were advised to appoint Mr. Keller as the director, right?
A. It was our understanding it would be recommended that someone with no affiliation to any of the equity holders or lenders would be more appropriate on the board at that time.
Q. You said that there would be conflicts. You believe there would have been conflicts if it board wasn't replaced, right?
A. There would potentially be a conflict.
Q. Can you describe the conflict?
A. There were many constituencies that the board

Page 154

was responsible for looking after. As I mentioned before, the board has an obligation to act in the best interest of all parties, not just the shareholders, but secured parties and unsecured parties, as well as the employees. At the same time, I had a fiduciary obligation as did Joe Ferreira and Dan Bonoff to act in the best interest of Goode Partners Consumer Fund III and there could be a scenario given some of the conversations that were unfolding, whereby my obligation to act as a fiduciary for Goode Partners Consumer Fund III could be at odds with my obligation to be a fiduciary for Forman Mills.
Q. You said conversations were unfolding. What conversations were unfolding?
A. Whether or not Encina was going to provide additional capital, the terms under which whether or not Monroe was willing to provide another waiver or allow additional capital to come in, whether it be from Goode Partners Consumer Fund III or from third parties, so those types of conversations.
Q. Without revealing any attorney-client privilege, did you seek any type of legal advice advisory opinion on remaining a board member?
MR. CABRERA: Objection. That answer necessarily calls him to reveal privilege. Did you

Page 155

talk to an attorney about topic A, that would require him to reveal.
MR. ROOKS: I'm just asking if he obtained any advisory opinions.
Q. Did you seek out any without revealing the substance?
A. If your question is, did I speak to any parties outside of counsel? No.
Q. That's fair enough. Can you tell me how many times if a portfolio company within any of the funds, whether it's Goode Consumer Fund III, how many times did a portfolio company replace an entire board with a single member?
MR. CABRERA: I'll object to outside the scope. You can ask him in a personal capacity.
A. Two, I think, come to mind. I'm not 100 percent positive, but I think two.
Q. You're saying two portfolio companies that the entire board was replaced with a single person?
A. Two other instances, correct.
Q. Out of how many portfolio companies would we be talking about?
A. We've made 35 investments. 34, I want to say.
Q. So prior to Mr. Keller becoming the sole

Page 156

director of Forman Mills, had you had any conversations with Mr. Keller?
A. Had I known Mr. Keller prior to him becoming a board member at Forman Mills?
Q. You can answer that, too. Did you know him prior to him becoming a board member?
A. I did.
Q. When did you first meet Mr. Keller?
A. I don't remember the date, but it would have been one of those other boards that I referenced that we needed an independent director for.
Q. In terms of your conversation with Mr. Keller relative to his appointment as the sole director here, had you had any conversations with Mr. Keller?
A. I reached out to Mr. Keller, as well as a couple other people, to see if he might be amenable to joining the board.
Q. I would say he did become a board member, so he was obviously amenable, right?
A. He had an interview. To my recollection, he met with both Clear Thinking, as well as Mike Kvitko, as well as company counsel and then came back to me requiring an indemnification agreement as part of his consideration to serve on the board. Following all those items, he did agree to join the board and he was

Page 157

elected as a member of the board.
Q. So excluding Mr. Keller, how are board members compensated? Let's limit that to board members for portfolio companies that are owned by Goode Consumer Fund III?
A. Typically, board members are not compensated. Let me clarify. Goode employees, including myself, Joe Ferreira and Dan Bonoff, are not compensated by a portfolio company for serving another board.
Q. How many of the board members of the portfolio companies of Goode Consumer Fund III have indemnity agreements?
A. I believe almost all board members at our portfolio companies received indemnity agreements from the company.
Q. From what company?
A. I'm sorry. From the underlying portfolio company.
Q. So the portfolio company, Forman Mills, for example, that's the portfolio company, right?
A. Correct.
Q. So you're saying that when a person serves as a board member for a portfolio company that's owned by the Goode Consumer Fund III, there is a separate indemnification agreement or there is an

Page 158

indemnification agreement that is executed by that board member and the portfolio company?
A. Not sure under every case, but that is typically something that they would receive.
Q. So I'm clear, that is separate from a directors and officers insurance policy, correct?
A. Correct. Usually the signatory to a D&O policy is actually the company, itself. I don't think it's necessarily, per se, the board member. Usually the company enters into that policy with the carrier.
Q. Right. But under a D&O, directors and officers insurance policy, the board members are covered under that policy, right?
A. They are typically covered. They are typically insured people, correct. The distinction, Franklin, is that they may not be entering into that agreement between themselves and the insurance carrier. Companies typically enter into that agreement on their behalf.
Q. The company is the policyholder, they're beneficiaries, I guess you'd say?
A. Exactly. Correct.
Q. You said that you had some conversations with Mr. Keller pertaining to an indemnification agreement, right?

Page 159

A. Correct.
Q. And that indemnification agreement was negotiated, right?
A. Correct.
Q. Between what parties? Who negotiated that indemnification agreement with Mr. Keller?
A. I don't recall whether or not Mr. Keller had an independent attorney review that or if he simply reviewed it, as well, but I would have had conversations with Mr. Keller about that agreement and its terms.
Q. There would be, you said, an attorney for Mr. Keller. But on the other side, there would be another attorney representing the interest of, I guess, Goode Consumer Fund III or Forman Mills, right?
A. I don't believe -- I'm not sure Forman Mills actually a participant to that agreement. So I'm not sure that Forman Mills had an attorney review that document. But yes, I did have counsel for Goode Partners Consumer Fund III review the document.
Q. And who was that counsel?
A. That would have been Jones Day.
MR. ROOKS: Let me just introduce another document, Exhibit 16.
\- - -

Page 160

(At which time, Indemnification Agreement Bates stamped Keller-00489 through Keller-00496 was marked as Exhibit 16 for identification.)
\- - -
Q. You can see this agreement here?
A. Yes.
Q. Indemnification agreement, the Bates stamp is Keller-00489 through Keller-00496. I'm going to scroll up to the top. I guess a minute ago you had said, you know, that the board members would have an indemnification agreement between themselves and the portfolio company, right?
A. Correct.
Q. This agreement isn't between the Keller and the portfolio company. It's between Keller and Goode Partners Consumer Fund III, LP, correct?
A. Correct.
Q. Would that be unusual?
A. It would be.
Q. Why wasn't an agreement done between Tobias Keller and Forman Mills, Inc., the portfolio company?
A. I may have been. I don't remember if it was or if it wasn't.
Q. I'm not following you.

Page 161

A. I just don't remember if there was a separate indemnification agreement between Tobias Keller and Forman Mills.
Q. But if there was a separate indemnification agreement between Forman Mills and Mr. Keller, why would this indemnification agreement be necessary?
A. Mr. Keller's conclusion, as I recall, was that after speaking to all of the constituents, including Mike Kvitko and Clear Thinking and company's counsel, was that because certain decisions that were outside of the company's control and outside of -- well, outside of Forman Mills' control and outside of the board members of Forman Mills' control, specifically whether or not Encina was going to continue to provide availability under the loan, that there could be exposure to Mr. Keller that he wanted to be indemnified for that an indemnification strictly from the company would not get him comfortable for serving on the board.
Q. You've said the word exposure to Mr. Keller. Exposure in what way? What would he be exposed to?
MR. CABRERA: Objection. You can answer the question.
A. Anything that may come out of litigation resulting to how the process with Forman Mills was

Page 162

unfolding with its lenders.
Q. When you say anything, are you able to be more specific? Like, what scenarios were envisioned that would trigger the exposure for Mr. Keller?
MR. CABRERA: Objection. You can answer the question.
A. There was a scenario where if the company did not provide -- I'm sorry. There was a scenario where if Encina did not provide additional liquidity to the company, it would literally have to liquidate and be unable to go through an orderly bankruptcy process or fulfill the requirements under the WARN Act.
Q. When you say WARN Act, can you be more specific? Are you talking about a federal WARN Act, a state WARN Act?
A. I don't know the distinction between federal and state WARN Acts, but I specifically know that they both require the advanced notice to employees prior to termination.
Q. Are you familiar with how much notice is required?
A. I am not positive I know the time periods. I believe they are either 60 or 90 days.
Q. So this indemnification agreement here between Goode Partners Consumer Fund III, LP, if Mr.

Page 163

Keller had to make a claim under this indemnification agreement, how would Goode Partners Consumer Fund III indemnify Mr. Keller?
A. By advancing funds to satisfy his exposure.
Q. Now those funds, they wouldn't be raised through capital costs, would they?
A. Yes, they would be.
Q. So this indemnification agreement, if he had to satisfy a claim, you're saying that Goode Consumer Fund could raise capital through capital costs. Are there any other resources that the Goode Consumer Fund III, LP has to satisfy the indemnification agreement?
A. Not that I can think of.
Q. There's no bank account for Consumer Fund III, is there?
A. It doesn't hold ongoing cash. It's strictly a pass-through vehicle for when we actually drawdown the capital and then make a payment.
MR. ROOKS: Let's pause for a second five minutes.
- - -
(At which time a short recess was taken.)
- - -
Q. Mr. Keller, we were talking about him and I

Page 164

had asked you about compensation for board members and you had said that board members aren't compensated. Is that accurate, Mr. Oddi?
A. Employees of Goode Partners are not compensated for serving on the board of portfolio companies.
Q. Mr. Keller was compensated. It looks like there was a retainer given to him in the amount of $85,000. Does that sound about accurate?
A. I don't recall.
MR. ROOKS: For identification is purposes, we are going to call this Exhibit 17.
- - -
(At which time, an e-mail from Stuart Kessler to Toby Keller Bates stamped FM006292 was marked as Exhibit 17 for identification.)
- - -
Q. Let me share this document. Can you see this document?
A. I can.
Q. This is a document here. It's an e-mail from Stuart Kessler to Toby, I guess that's Mr. Keller. It says, please send a retainer invoice for $85,000. This is FM006292. Do you see that?
A. I do.

Q. There is an e-mail here, which contains an attachment. It's not produced here, but it's a retainer invoice for $85,000. Would you agree with that?
A. I see the language you are referring to, yes.
Q. So is that normal that a board member would be receiving an $85,000 retainer to serve on the board?
MR. McDONALD: Objection. I just put an objection on behalf of Keller's counsel. You can answer. It's just an objection to the question.
A. As I said before, employees of Goode Partners don't get paid at all for any of its serving on the board. Do we have other members of boards that are not employees of Goode Partners that get paid? Yes.
Q. So when you have board members in the portfolio companies that aren't employees, do they get equity for their service?
A. It varies, but they could receive cash payments. They could receive equity. They could receive a combination of both.
Q. Do you know how long Mr. Keller served on the board of Forman Mills?
A. I don't recall off the top of my head. I assume it ended when we sold the business to Shoppers



World.
Q. That would have been June of 2023?
A. Correct.
Q. So from May 24th when he was appointed until some point in June of 2023, he was compensated or at least had a retainer for $85,000, right?
MR. CABRERA: Objection.
MR. McDONALD: Objection.
A. I don't think I saw Mr. Keller's engagement agreement and whether he kept the retainer or whether it was just an advance against future expenses and whether or not any of that capital was retained.
Q. We'll find that out at Mr. Keller's deposition, but is that normal for a board member to receive a retainer in the amount of $85,000 in?
MR. McDONALD: Objection.
MR. CABRERA: Objection. You can answer.
A. It is unusual that we are bringing on, as I referenced before, there's only a couple of instances where we've had to bring on a board member in a situation such as the one faced by Forman Mills and I do think it's actually fairly standard for a director coming on in that role to request an upfront retainer given the company's inability, potential inability, to



fund their invoices.
Q. Just jumping back to that indemnification agreement, we had seen that it was an indemnification agreement between Mr. Keller and Goode Consumer Fund III. Do you know if there was an issue for Forman Mills to honor an indemnification agreement had one been presented?
MR. CABRERA: Objection.
A. Is your question, did Forman Mills provide an indemnification agreement?
Q. Let me start over. So you testified earlier that the board members received indemnification agreements from the portfolio. Do you remember testifying to that?
A. Correct.
Q. And I introduced the indemnification agreement for Mr. Keller that showed that it wasn't between Forman Mills and Mr. Keller, but it was instead between Mr. Keller and Goode Consumer Fund III, right?
A. Correct.
Q. My question is, to your knowledge if you know, was that agreement done between Mr. Keller and Goode Consumer Fund III because Forman Mills might not be able to satisfy any indemnification obligations?



MR. McDONALD: Objection.
A. I believe Mr. Keller may have had a concern about the company's ability to provide any indemnification to him.
Q. So why do you think he would have had that concern, if you know?
MR. CABRERA: Objection.
MR. McDONALD: Objection.
A. My sense is because there was a risk of bankruptcy.
MR. ROOKS: Let me go to Exhibit 18. For identification purposes, this will be Exhibit 18. This is identified as Keller-00530 and Keller-00542 and Keller-00548.
\- - -
(At which time, e-mails Bates stamped Keller-00530, Keller-00542 and Keller-00548 were marked as Exhibit 18 for identification.)
\- - -
Q. The first e-mail here at Keller 00530 is an e-mail from you, David Oddi, to Mr. Keller. Do you see that?
A. I do.
Q. And in that e-mail you say, Toby, I'd like to limit that indemnity strictly to WARN liabilities.

Tell me about that. Was a broader indemnification agreement sought?
MR. McDONALD: Objection to the fact you didn't read the full sentence, but you can answer the question.
Q. It's on the screen if you want to read the entire e-mail before you answer.
A. I don't remember the exact exchange candidly. But from reading this e-mail, it looks like other concerns that he may have, that Keller may have would, have been covered under a D&O policy, whereas a WARN liability would not have been.
Q. Did Mr. Keller express any of the concerns that he had to you?
A. About what?
Q. About serving as the sole director?
A. Yes, he was concerned after speaking to the parties that I mentioned before that there was the potential of WARN liability, if Eclipse was unwilling to fund the business.
Q. This next e-mail is an e-mail from Mr. Keller to you. I guess, he sent you a draft of the indemnification agreement, right?
A. Correct.
Q. This e-mail is not to you, but you are



copied. It's from Stuart Kessler to Tobias Keller. I don't know if there's anymore parts of this, but there is an expression -- I understand your concern around the WARN issue. Was there any concern to your knowledge that Mr. Keller had concerning a WARN issue that was independent of any actions a lender would take?
A. I don't know the answer to that.
Q. When Mr. Keller was engaged to be the director, what conversation did you have with Mr. Keller as far as what actions he would take from the time of his appointment onward?
A. None that I can recall.
Q. Did you and Mr. Keller discuss Forman Mills terminating the employees at the Pennsauken corporate office?
A. No.
Q. So Mr. Keller's engaged May 24, 2023 and then, approximately, two weeks later, I want to say on June 6th, we have a termination of nearly the entire staff of the Forman Mills corporate office, right?
A. I don't remember the exact dates, but that sounds about right.
Q. Did that come as a surprise to you that nearly the entire staff of the Forman Mills corporate



office was terminated?
A. Yes.
Q. You never had any discussions with Mr. Keller about staff changes, staff reductions or anything like that?
A. No, I was -- I found out that he had made that conclusion. I was copied, I believe, on an e-mail that I can't remember who else it went to, but I think I was one of the people copied and candidly, I had been working with Threadstone and with Stu Kessler to facilitate the sale of the company to Shoppers World and Sammy Dushey, I think the CEO or majority shareholder of Shoppers World, had actually expressed to us that he would be uninterested in actually completing the acquisition of Forman Mills unless he could buy it as a going concern with its corporate employees.
MR. ROOKS: One second.
\- - -
(At which time a discussion was held off the record.)
\- - -
Q. You weren't aware of any staffing reductions that were going to happen until they actually happened, is that your testimony?



A. I wasn't aware until I actually received the e-mail, which I think was after the fact that it actually happened.
Q. But you testified earlier that you were aware of certain WARN notification requirements, right?
A. Correct.
Q. Did you have any discussions with Mr. Keller about WARN notification requirements?
A. Prior to his engagement I had conversations with him given that we were negotiating the indemnification agreement, which related to WARN notification exposure.
Q. Now you said that you found out about the staff terminations at the corporate location, I think you said, through an e-mail, right?
A. Correct.
Q. And that would have been after the fact; is that correct?
A. I believe it was after the fact. It specifically states in the e-mail whether it's after the fact or whether it was going to happen the next day, but that's when I found out.
Q. Is it your testimony that Mr. Keller did not run this by you before this action was taken?
A. That's correct.

Q. We talked earlier about roles, responsibilities and authority levels. So the staff reduction that happened at the Forman Mills corporate location, I want to say it's at least 75 employees, would you agree with that?
A. I don't remember.
MR. CABRERA: You can answer.
A. I don't remember the number of what those include.
Q. Let me ask you this. In terms of Mr. Kvitko, the CEO, would Mr. Kvitko have had the authority to terminate 75 people or would Mr. Kvitko had to obtain board approval for that action to be taken?
MR. CABRERA: Objection.
MR. McDONALD: Are you asking while he was on the board or at the time of the termination?
MR. ROOKS: I'm asking him --
Q. At the time that you were on the board, if Mike Kvitko wanted to terminate 75 people at once, would that have been something that Mike Kvitko could have done on his own without involving the board or would Mike Kvitko have had to seek board approval to take that action?
A. I would have expected that he would have brought it to the board to take that action. We did



not have an instance that gave rise to that decision, so I'm just being in theory. But I would have expected him to bring it to the board. Just as I would have expected him to bring it to the board if he wanted to go out and hire 75 people.
Q. But in your position as a board member, would you require the CEO to get approval from the board prior to taking that action?
A. We did not have a delineated list of items that Mike Kvitko specifically needed to bring to the board or that he could make on his own. I think we had a general understanding that if there were significant strategic decisions that would be made, that he would bring it to the board's attention.
Q. Would you consider termination of 75 people at once to be a considerable strategic decision?
MR. McDONALD: Objection.
A. I think it's unusual.
Q. What's unusual, the termination of 75 people at once or the fact that not running it by the board?
A. Both.
Q. You said that you didn't have any conversations with Mr. Keller prior to the termination of the corporate staff at the Pennsauken location. To your knowledge, did Mr. Bonoff or Mr. Ferreira have



any conversations with Mr. Keller about the termination of the 75 people or so at the corporate location?
A. Not to my knowledge. I'm not sure that Mr. Bonoff or Mr. Ferreira actually had any conversations with Tobias Keller.
Q. Would you have expected Mr. Keller to discuss the termination of 75 people at once with you prior to having that action taken?
A. No.
Q. Why not?
A. I was no longer on the board and he was the independent director or he was the sole director.
Q. Correct, but the general partner of Goode Consumer Fund III was Goode Investors III, LLC, right?
MR. CABRERA: Objection. You can answer.
A. Correct.
Q. So in your capacity as a member of Goode Investors III, LLC, the general partner, would you have expected to have a conversation with Mr. Keller about the mass termination of 75 people before it happened?
MR. McDONALD: Objection.
A. No.



Q. Are you okay with the way things happened with the termination of 75 people at once without any notice being issued to them?
MR. CABRERA: Objection.
MR. McDONALD: Objection.
A. I'm glad that we were able to sell the company to Shoppers World and I'm glad that not one employee missed a paycheck. I'm not happy that we're having this conversation as a result, so...
Q. This could have been avoided?
A. Well, you know, I think that's -- hindsight is 2020 and it's to easy to armchair quarterback, candidly. If we were highly confident at that time that Sammy Dushey was going to close the transaction and that Eclipse was going to continue to provide liquidity, it would have been crystal clear.
Unfortunately, we were dealing with a couple of banks that were extremely difficult to deal with and very unpredictable as to be whether or not they were going to provide cash and we were dealing with a buyer that was extremely difficult to deal with and candidly, until the ink met the paper, we were unclear as to whether that deal was going to be consummate.
Q. You said a few minutes ago, Sam Dushey, you

Page 177

said that he was the CEO or the owner of Shoppers World; is that right?
A. I believe he's a shareholder and I believe he is the owner, but he was the primary point person that I was interacting with concerning the sale.
Q. There were, I think you said, discussions with Mr. Dushey regarding the sale of the business, right?
A. Many.
Q. And you were involved in those conversations, right?
A. Not all of them, but many of them.
Q. And during those conversations, I think you just said this, that Mr. Dushey, I think that the conditions would be that with the sale that the corporate people would not come along with the sale, right?
MR. MINGIONE: Objection.
A. No, I said the opposite, that Mr. Dushey wanted the corporate employees and all employees to come along with the sale.
Q. I'm sorry. You said that Mr. Dushey wanted everybody to come on board?
A. Correct.
Q. But prior to that sale being, I'll say

Page 178

consummated, at least 75 people at that corporate office were terminated, right?
A. Correct. And it created a significant issue vis-a-vis those negotiations with Mr. Dushey.
Q. Let's call it, for round numbers, 75. I can give you the actual number, but it's at least 75 people. Those 75 people didn't fire themselves, right?
MR. CABRERA: Objection.
MR. McDONALD: Objection.
MR. MINGIONE: Make it three.
A. I'm going to assume not.
Q. Somebody I'm guessing had to pull the trigger if they didn't fire themselves, right? Somebody must have given that order to say, these people are terminated effective this date, right?
A. I would assume so.
Q. Who is that person that authorized the termination of those at least 75 people at the corporate location?
A. Again, all I can do is regurgitate that e-mail that's been provided to you that alerted me to that decision being made. You can pull that e-mail up to see exactly what it says, but I don't remember the exact verbiage as to how it was communicated. It was

Page 179

just that e-mail communicated that the decision had been made.
Q. Let me ask you this --
A. That e-mail is the most I know.
Q. In your opinion, which person was responsible for terminating the people at the corporate office that the plaintiffs in this litigation?
MR. CABRERA: Objection.
MR. MINGIONE: Objection. You asked him for lay opinion.
A. My answer to that is Encina Business Credit.
MR. McDONALD: Objection. It requires speculation.
Q. So do you have any reason to doubt that Mr. Keller was the person responsible for giving the order to terminate those individuals at the corporate center given the fact that he was the sole board member?
MR. McDONALD: Same objection.
MR. CABRERA: Objection.
Q. Sole manager of the board?
A. Again, I don't know. The reason that I would doubt that -- look, the reason I cannot definitively answer that question is because a number of the parameters that were driving the day-to-day decisions was how much capital was coming from Encina Business

Page 180

Credit and specifically, the day-to-day interface that Clear Thinking was providing them and which bills were being submitted for payment. So there were many constituencies solving. My guess is there were many constituencies involved in determining whether or not employees got terminated or not.
Q. Did anyone at Encina Credit or Monroe Credit, Monroe Capital or Eclipse give, to your knowledge, any directive that staff layoffs?
MR. CABRERA: Objection. You can answer.
A. I believe, yes, that Encina did understand that those -- that that was a possibility and that that was something that, candidly, they knew it would be a direct result of their unwillingness to continue to provide any liquidity to the company.
Q. But Forman Mills had a bunch of locations, right? They had stores in Pennsylvania, New Jersey, other locations, right?
A. At that time, correct.
Q. They had the corporate office in Pennsauken, right?
A. Correct.
Q. Do you know at that time as of, let's say, the day before the terminations, June 5th. As of June

Page 181

5th, how many states was Forman Mills operating in?
MR. CABRERA: Objection. You can answer, if you know.
A. I'm going to guess five or six.
Q. Do you know, approximately, independent of the corporate office, how many locations Forman Mills had in those five or six states?
A. If memory serves me, I think it was around 40 units at that time.
Q. Did you say 40?
A. I think it was around 40 locations.
Q. So 40 locations, plus the corporate office, right?
A. Correct.
Q. Then Encina Credit or Monroe Capital or Eclipse, did any of them give a direction to close the corporate office specifically and not any other location?
MR. CABRERA: Objection. You can answer, if you know.
A. I think their concern was that the corporate employees were a fixed expense as opposed to the stores, which needed employees to stay open to generate the sale of inventory, which would continue to pay down the debt.

Page 182

Q. Did you see any communication from any of the lenders that say, we need you to shutdown the corporate location?
A. I think it was -- I had a -- I didn't see a direct notification from them or hear from them directly, but I gathered that through the communications from Clear Thinking.
Q. So from what I understand, you're saying that the staff terminations, I believe you're saying, that they were necessitated by the lenders, right, Encina or Monroe or Eclipse? You're saying that?
MR. CABRERA: Objection to the form of the question. You can answer, David.
A. The risk was that the company was not going to be able to meet payroll because Encina was unwilling to provide the drawdown request that the company was making.
Q. But the actual, I'll say messenger, the person that pulled the trigger on those terminations, wasn't Encina or Monroe or Eclipse, right? They didn't notify the employees they were being terminated, correct?
MR. CABRERA: Objection.
MR. McDONALD: Objection. Asked and answered.

Page 183

Q. I'll ask it again. No one from these lenders contacted the employees at the corporate office to tell them that they were terminated, right?
A. Franklin, the only notification I have of how that was communicated or the message was even communicated was pursuant to the e-mail, which is part of the discovery. Who communicated it? Who was in the -- who was privy to the conversations before it happened? I just don't know that answer. I was not party to it at all. I don't know if it was Kevin Hess or if it was somebody from Eclipse, if it was Tobias or whether they were all in the room together. I just don't know.
Q. As we're here today, you don't know if Kevin Hess delivered that message, if Tobias Keller or Mike Kvitko, all of them at once, that's your testimony, that you don't know who?
A. Individually, sequentially, in a chorus to a singing routine, I don't know who delivered the message, when or how. The only notification I have is in the e-mail that I was copied on.
Q. You said earlier that Mr. Dushey wanted the corporate people to come on board, right?
A. Correct.
MR. ROOKS: Let me just introduce one

Page 184

more document here. Let me introduce this document here, Exhibit 19.
- - -
(At which time, an e-mail Bates stamped FM006282 was marked as Exhibit 19 for identification.)
- - -
Q. You see this document here? I'm going to identify it as FM006282.
A. Yes, correct.
Q. You're not copied on this e-mail, but I'll ask you, have you ever seen it before?
A. I don't remember seeing it. It's possible that I did, but I don't recall it.
Q. So this is an e-mail from Mike Kvitko to Mr. Keller. It says, Toby, attached above are two attachments we worked up for Sammy today. Now Sammy, I'm guessing is Mr. Dushey, right?
A. Correct.
MR. CABRERA: Objection.
MR. McDONALD: Objection.
MR. ROOKS: What's the objection?
MR. MINGIONE: Objection.
MR. CABRERA: Mr. Rooks, asked why and I said this witness is speculating as to the identity of an individual on an e-mail he has never seen that

he did not author and I think Tony was making a similar comment.
MR. MINGIONE: Same.
Q. Can you think of any other person in the world that Sammy would referred to other than Sammy Dushey in this context?
MR. CABRERA: Objection.
A. No.
Q. Here it says, first is a four-week cash flow to show anticipated cash in and out, so Sammy knows what to plan for, right? There's another sentence here that says, the second is a staffing plan reduction that Sammy asked me for that shows how we skinny down the office and DC staff as early as next week if he buys the company.
So if you can just take a minute to read this e-mail in its entirety and let me know once you've done that.
A. I've done it.
Q. So DC staff, do you know what that means?
A. Distribution center.
Q. And then the office, is that the corporate office that is referring to?
A. I would assume so.
Q. The staffing plan reduction shows that Sammy



asked me for that shows how we skinny down the office. So that skinny down, do you take that to mean a staff reduction?
MR. CABRERA: Objection.
MR. MINGIONE: I'm doing the same continuing objection to your string of speculations. There are witnesses you're going to ask these questions to who know what this document is about.
MR. ROOKS: But they are not here right now.
MR. MINGIONE: I know. I'm saying, I don't understand. Fine. You asked the question.
MR. ROOKS: Noted.
MR. MINGIONE: As long as it's general, I will shut up.
Q. I think you said that you believe that Mr. Dushey wanted all of the corporate office to come on board, right?
A. That was my understanding, correct.
Q. This e-mail refers to a staffing plan reduction that Sammy asked for. So are you aware of any conversations that occurred with Mr. Dushey that involved a termination of some or all of the corporate staff?
A. I had a general sense from Sammy that part of



his strategy was that there were certain functions that he would hope to get synergies between his existing corporate people and the Forman Mills staff. But my sense was that he wanted to make those decisions post closing as opposed to having, basically, all the employees terminated before closing.
Q. So was the termination of the staff at the corporate location a condition of closing for the sale of Forman Mills to Shoppers World?
MR. MINGIONE: Objection.
MR. CABRERA: Objection.
A. I don't recall the timing as to when we brought the staff back versus when we actually closed the transaction.
Q. That wasn't really the question. My question was, was the termination of the corporate location employees in Pennsauken a condition of closing, a condition of selling Forman Mills to Shoppers World regardless of whether they were brought back after the sale?
THE WITNESS: Tish, could you repeat that question for me?
\- - -
(The court reporter read the record as



requested.)
\- - -
A. No. Again, my understanding was the opposite, that the termination of those corporate employees was going to jeopardize Sammy's interest in buying the company.
MR. ROOKS: I'm going to take five minutes and we are going to wrap up.
\- - -
(At which time a short recess was taken.)
\- - -
Q. Mr. Oddi, when did the conversations first begin or discussions first begin with Mr. Dushey for the possible sale of Forman Mills to Shoppers World, do you know?
A. It would have been sometime in -- I believe, it was sometime in the first calendar quarter of '23. It's possible it was in Q4 of '22, but I think first part of '23.
Q. So now I understand that you were saying that there was, I guess, no choice, but to have these employees terminated because of credit pressures from Encina and Monroe and I think you said there was no plans for a mass layoff; is that correct?

Page 189

MR. CABRERA: Objection to form. It misstates testimony. You can answer.
A. The issue was specifically Encina, not Monroe because Encina was determining what cash they would provide the company access to.
Q. So Mr. Keller came on board on May 24, 2023 and the layoffs occurred on June 6, 2023. In that roughly two-week period between Mr. Keller coming on board and the separation of those employees, what changed about the credit pressures in that two-week period?
MR. CABRERA: Objection. You can answer.
A. There was a significant amount of -- there was a significant amount of conversation and distrust between whether or not a buyer was going to be found and what that would mean in terms of the continued outlay of capital by Encina in terms of them increasing their exposure versus continuing to collect sales as merchandise was sold and reducing their exposure. So because of the uncertainty as to whether a transaction was going to be consummated or not, that was I think, fueling the anxiety among the lender group or specifically at Encina.
Q. You had talked earlier about, you know,

Page 190

conversations about WARN and awareness of notification obligations. Do you remember that?
A. I do.
Q. And I think you also testified that Mr. Keller had expressed concerns about the WARN statute, the New Jersey WARN statute in particular, right?
MR. McDONALD: Objection. I think he said he didn't know the difference between the federal one and the New Jersey one was his testimony.
MR. ROOKS: There's an e-mail. We can pull that up where --
MR. McDONALD: I was just objecting to your question because I don't think he said that.
Q. Do you know why there was no notification provided to the employees at Forman Mills who were laid off on June 5th?
MR. McDONALD: Objection.
MR. MINGIONE: Objection to form.
MR. CABRERA: Objection.
A. I guess I'd have to ask when you're referring to because ultimately, they were notified that they were being terminated. So I guess I don't understand your question specifically.
Q. Are you saying that the people were notified prior to being terminated -- of the termination?

Page 191

A. No, I just don't understand your question. I don't think your question as stated makes sense.
Q. Do you know why the people who were terminated at the Forman Mills corporate location were not given advanced notice of that separation?
MR. MINGIONE: Objection to form.
A. Because we were trying to sell the company as a going concern with all its employees and I believe the concern was that if we provided WARN notice, the employees were going to leave the company and we would not have a business to sell.
Q. Okay. I do not have any additional questions. I don't know if Jason has any. I certainly want to thank you for your time today, Mr. Oddi. I appreciate that.
A. No problem.
MR. CABRERA: I'll say the witness will read and sign, but I will ask my colleagues if they have questions of the witness before I do any questioning.
MR. McDONALD: I do not. I don't have any questions at this time.
MR. MINGIONE: I have no questions at this time.
MR. CABRERA: I have no questions.

Page 192

David, thank you very much for your time. The deposition is now over.
COURT REPORTER: Does anyone want to order the transcript?
MR. CABRERA: Yes.
MR. MINGIONE: Yes.
MR. McDONALD: Yes.
\- - -
(Witness excused.)
(Deposition concluded at 3:35 p.m.)
\- - -

Page 193

CERTIFICATE

I hereby certify that the proceedings and evidence noted are contained fully and accurately in the notes taken by me on the deposition of the above matter, and that this is a correct transcript of the same.

________________

LATITISA RUSSELL, RPR
CCR #30XI00234100
JANUARY 14, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 194

LAWYER'S NOTES
LINE PAGE
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________
___ ___ _____________

**A**
**a.m** 1:20
**ability** 22:7 31:1 56:15 168:3
**ABL** 137:19
**able** 8:12 9:23 23:16 68:18 71:23 73:14 80:5 130:25 136:7,8 162:2 167:25 176:6 182:15
**aboard** 51:22
**acceptable** 122:21 128:2 132:1
**accepted** 65:22
**access** 74:10 75:3,7,10,10 130:25 136:4 189:5
**accompanied** 9:20 82:25
**account** 57:24 60:3,7 74:7 163:14
**accounting** 65:22 92:22
**accounts** 56:15 63:20
**accrued** 88:19 88:22 140:12 140:13
**accruing** 88:2
**accurate** 33:13 38:2,7,8 43:3 72:25 74:6 80:22 111:13 164:3,9
**accurately** 193:5
**achieve** 109:18
**achieved** 24:19 24:24 25:12,13
**achievement** 34:14,15 69:14
**achieving** 24:15
**acquire** 22:3 31:7 78:16,18
**acquired** 46:6 46:12 66:19,25 71:16 88:8 108:18 132:4 152:20
**acquirer** 124:7 129:1,11
**acquires** 31:18 31:18 78:24
**acquiring** 47:21 52:14
**acquisition** 36:3 36:5,8,12,18 36:20,23 43:5 43:14 44:13 46:25 47:3 67:3 72:17 89:11 171:15
**act** 21:12 103:7 147:12,15 154:2,6,10 162:12,13,14 162:15
**acting** 59:5
**action** 1:3 22:20 149:22 172:24 173:13,23,25 174:8 175:9
**actions** 24:7 40:16 105:10 137:11 170:6 170:11
**active** 29:19,25 30:1,3
**actively** 52:15 52:20 136:5,15
**Acts** 162:17
**actual** 26:17 34:13 57:24 59:16 62:12 178:6 182:18
**addition** 131:20
**additional** 50:24 52:23,25 63:5 63:9,13,14,16 63:23 64:1,3 70:14 71:12,14 71:18,25 72:1 72:3,6,9,12 73:4,8,14 74:22 75:4,11 76:19,25 77:1 77:5 78:2,4,6 82:18 83:2,5 83:10,16 109:7 109:10 120:8 121:14,21,23 122:1 126:21 138:7 142:4,5 146:22 152:5 154:16,18 162:9 191:12
**address** 61:6,16 61:20 75:21
**addressed** 148:18
**addresses** 138:19
**adds** 65:15
**adhered** 127:24 144:18
**adjusting** 137:10
**administrative** 122:22 128:3
**ADV** 5:5 84:6,11 84:15,16,25 86:12
**advance** 94:8 131:25 147:13 166:11
**advanced** 162:18 191:5
**advancing** 163:4
**advice** 153:5 154:22
**advised** 151:16 153:14
**advises** 87:3
**advisor** 54:18 87:5,8 131:10
**Advisors** 119:20 119:22
**advisory** 11:19 11:22 86:12,13 86:17,19,24 87:1,6,9,11,16 87:17,25 88:9 88:13,17 89:4 89:13,16,24 90:8,14 91:6 96:21 154:23 155:4
**affiliated** 58:15 151:18
**affiliation** 153:17
**affirmed** 133:25
**afford** 88:24
**agenda** 96:9,11 97:9
**agent** 59:4,5 116:1 122:22 128:3
**agents** 139:15
**aggregate** 20:23
**aggressive** 148:10,17,19 148:23
**ago** 89:3 137:9 160:10 176:25
**agree** 28:11 52:1 52:21 53:2 94:13,16 103:7 105:12 106:23 109:8 117:3,11 125:3,17 128:22 135:17 139:20 145:4 145:10,14 156:25 165:3 173:5
**agreed** 28:12 63:7 128:23
**agreeing** 64:17
**agreement** 4:16 4:18,19,22,24 5:6,7,16 11:22 16:7,9 21:14 22:18 23:12,14 24:4,9 26:2,5 37:15,21 40:8 40:25 41:4,4 42:20,23,24 44:20,23 45:2 45:6 55:23 56:2,6,8,13,20 57:6,23 59:4,8 59:11,16 62:4 62:8,14,21,25 63:11 64:8,25 65:3,7,23 66:8 66:11,15,17,21 67:8,14,19,23 67:23 68:2,4,5 68:12,16,20,22 69:2 73:17,18 74:2 75:17 76:21,25 77:2 77:7,21 87:6 100:11 109:7 109:14,21 110:1,20,21,22 110:23 111:7,8 111:15,18,19 114:1,2,16,19 115:12,17,17 117:5,14,17,20 118:1,4,6,19 119:2,6,14 120:4,6,12,22 121:10 122:6 122:14,18 123:9,20 124:9 125:1,2,4,5,7 125:10 126:6 126:10,11,14 126:15,17,19 127:6,7,23 129:8,23 130:11,24 131:3 132:24

137:25 139:17 141:2,13,13,22 141:23 142:7,8 142:10 143:21 144:10,12 156:23 157:25 158:1,17,19,24 159:2,6,10,17 160:2,6,8,12 160:15,21 161:2,5,6 162:24 163:2,8 163:12 166:10 167:3,4,6,10 167:17,23 169:2,23 172:11
**agreements** 41:6 64:5 67:5 73:7 110:14 112:2 125:6 141:21 144:8,13 157:12,14 167:13
**agrees** 74:10
**alerted** 178:22
**Allen** 48:3 50:5 51:18,24 91:9 108:21
**allocated** 19:1
**allocation** 90:23 102:1
**allow** 30:4 69:10 69:22 122:13 130:23 131:7 154:18
**allowed** 57:22 75:13
**alongside** 20:20
**alter** 22:25
**alternative** 24:14
**amenable** 156:16,19
**amended** 4:19 42:23 45:1,6 120:7
**amendment** 4:16,18,19 5:7 37:14,21 40:25 41:4 42:19,22 44:5,19,25 45:5 73:6 81:24 83:3 89:1 113:17 119:2,5,13,25 120:16,18 123:8,25 124:3 125:7,12,16 132:24 141:13 142:8,9 143:17 143:21
**amendments** 120:4,12,15
**Americas** 3:13
**amortization** 65:16
**amount** 16:10 26:9 53:3 65:11 73:23 74:5,16 77:11 77:16 78:4,6 109:16,17 114:5 116:13 133:14 146:14 146:14 164:8 166:15 189:14 189:15
**amounts** 130:15 142:7
**analyses** 87:21
**analysts** 99:21 99:23
**and/or** 193:18
**annual** 88:12 107:16,19 112:15
**answer** 6:13 8:15,19 9:9 31:10 38:12 52:18 62:13 69:21 70:9,12 81:1,5 83:24 123:16 126:13 127:16,19 130:6 136:10 140:23 153:4 153:12 154:24 156:5 161:23 162:6 165:11 166:18 169:4,7 170:8 173:7 175:17 179:11 179:23 180:11 181:3,20 182:13 183:9 189:2,13
**answered** 182:25
**answering** 8:20 8:22 9:13 85:4
**answers** 9:24
**ANTHONY** 3:12
**anthony.ming...** 3:15
**anticipate** 9:9
**anticipated** 64:11,14,15,18 71:15 72:6,9 72:12,20 109:22 185:10
**anticipation** 72:16
**anxiety** 189:23
**anybody** 18:1 79:10
**anymore** 170:2
**apparel** 47:24
**appear** 125:1
**appearing** 7:11 8:7
**appetite** 123:19
**applicable** 116:13
**apply** 193:17
**appoint** 103:18 103:22 153:15
**appointed** 103:16 105:2 105:17,20 151:12,14 166:4
**appointment** 39:15,17 105:19 151:4 156:13 170:12
**appoints** 105:3
**appreciate** 191:15
**approached** 83:6
**appropriate** 23:21 153:19
**approval** 21:17 90:3 94:22,24 97:16 100:14 106:8,14,19,22 107:12 108:9 131:13 133:22 134:1 138:3,4 146:25 173:13 173:22 174:7
**approve** 107:7 107:19,24
**approved** 49:6,7 113:6,9 133:7 133:10
**approving** 50:12
**approximately** 27:19 170:19 181:5
**April** 116:23,25 122:6 129:9,23 143:11
**architect** 46:10
**areas** 51:5,8
**arguing** 121:13
**armchair** 176:12
**arrangement** 57:21
**articulated** 24:4 26:17 48:12 59:17 107:21 126:20 151:7
**ascertain** 96:23
**Asia** 30:17
**Aside** 89:23
**asked** 10:9 49:16 67:25 76:12 83:9 127:17 131:23 164:1 179:9 182:24 184:23 185:13 186:1,12,21
**asking** 9:8 49:25 50:1,2 153:8 155:3 173:15 173:17
**asset** 24:14 137:21
**asset-based** 56:9 56:12 63:18
**assets** 16:13 28:19,19 56:11 122:24
**assigned** 95:19
**assist** 11:2
**assistance** 53:15
**assisting** 144:16
**associated** 18:14 20:19
**assorted** 143:14
**assume** 8:20 20:2 38:16 106:1 165:25 178:12,17 185:24
**assuming** 25:12
**assumptions** 144:22
**attached** 127:9 184:15
**attachment** 125:14 165:2
**attachments** 184:16
**attainable** 118:2
**attempting** 71:24

**attend** 96:16,22 98:3 128:17
**attended** 98:22 99:23 100:1
**attendees** 99:10
**attention** 174:14
**attorney** 9:11 10:9,10 11:9 12:1 37:25 60:15 97:23 155:1 159:8,12 159:14,18
**attorney-client** 154:21
**attorneys** 60:10 60:13,15,18
**attractive** 129:10,20
**audited** 112:16
**August** 76:19 77:9,20
**author** 185:1
**authorities** 110:7
**authority** 21:11 94:14 103:22 106:5,5,6,12 108:3 173:2,11
**authorize** 22:1
**authorized** 178:18
**availability** 63:19 114:12 161:15
**available** 114:9 122:4 131:5 141:5
**Avenue** 3:13
**avoid** 9:24 48:15
**avoided** 176:10
**Avon** 30:14,16 30:19,19
**aware** 147:11 148:16 171:23 172:1,4 186:21
**awareness** 190:1

**B**

**B** 4:11 5:2 148:9 148:9,11
**B-E-E-G-L-E** 13:3
**back** 14:11 38:16 65:15 74:19 75:24 76:11 85:15 90:24 103:25 104:4,5 105:21 109:6,9 116:10 136:10,20 144:2,11,12 147:15 156:22 167:2 187:14 187:20
**bank** 56:15,22 56:22 57:15,15 57:17,19 74:21 163:14
**banker** 100:16 122:21 127:25 128:2,4,5,8 129:22 130:3 142:10 143:18 143:20,24 144:1
**banking** 57:17
**bankruptcy** 107:23 151:22 152:2 162:11 168:10
**banks** 57:23 80:18 144:5 176:18
**Barber** 1:5 7:10
**base** 75:4,12 83:8 91:1,4 110:11 112:11 113:8,23,24,25 114:9,11 141:5
**based** 49:2 52:12 83:11 137:21 146:13
**basically** 27:1
88:2 90:23 104:16 131:11 187:6
**basis** 88:12 96:3 96:6 112:5 136:6 152:13
**Bates** 4:15,16,20 4:22,24 5:7,9 5:11,13,14,16 5:18,19,20 37:5,15 43:24 44:2,4 45:2,7 47:10 55:23 62:21 63:1 115:10 134:18 134:21 138:16 138:25 147:17 147:21 149:13 149:16 160:2,8 164:15 168:16 184:4
**bear** 30:8
**becoming** 30:18 143:8 155:25 156:3,6
**Beegle** 13:1,3,4 13:5
**began** 64:23 124:1,7
**beginning** 48:14 144:3
**behalf** 1:6 8:7 21:10,12 27:23 28:2 87:21 105:15 117:22 158:19 165:10
**belief** 51:5,6
**believe** 10:9,18 11:22 15:3,9 17:15,25 18:10 20:10 21:5 31:15 33:4 34:1 36:5,13 37:10 38:23 40:1 42:8,13 45:12 46:19
51:23 52:14 53:21 54:5 55:15 57:18,19 57:21,24 59:15 59:20 62:12 63:12 64:22 66:9 69:14,22 70:2 71:2 74:4 74:15 78:3,7 78:12,13 82:13 84:11,18 85:12 88:6,14,15 91:16,17,18,21 92:7,21,23 93:4 94:1 95:11 97:7 104:15,25 105:1 107:25 109:2,12 114:23 119:11 123:23 125:18 132:7,21 133:8 134:5 137:1 139:6 143:10 143:19 150:11 153:9,21 157:13 159:16 162:23 168:2 171:7 172:19 177:3,3 180:12 182:9 186:16 188:17 191:8
**beneficiaries** 158:21
**benefit** 30:8 35:2
**benefits** 30:5
**best** 9:12 15:7 59:13 103:7,9 120:15 154:2,7
**better** 16:17 135:16 136:23 136:24
**beyond** 10:20 53:6 63:24,24 83:10 85:2
**big** 100:17
**bills** 180:2
**bit** 14:23 106:4 138:18
**Blank** 3:11 102:20
**blend** 98:12
**Blitzer** 109:1
**board** 30:4,16 38:18,22,24 39:2,6,7,8,16 39:20,21,25 40:3 46:17,18 46:18,19,21 48:25 49:6,7,8 51:19 90:3 91:20 92:9 94:22,24 95:3 95:5,10,14,19 95:20,21,24,25 96:2,8,8,11,13 96:16,17,21,22 96:24 97:1,4,6 97:9,12,16,18 97:21,25 98:3 98:15,21,23,24 99:7,10,11,12 99:14,16,24,25 100:3,19,20,21 101:9,24 102:5 102:12,13,24 103:6,15,18,22 103:25 104:3,8 104:9,9,13,19 104:22,25 105:2,4,6,17 105:20 106:8 106:14,19,21 106:23 107:6 107:10,12,15 107:19,24 108:1,5,9,16 108:17,20,22 108:23,24,25 109:2,4 113:7 113:9 133:7,10

146:19,25 150:8,12,18,19 150:20 151:2,5 151:6,15,16,20 153:19,21,25 154:2,23 155:12,19 156:4,6,17,18 156:24,25 157:1,2,3,6,9 157:10,13,23 158:2,9,12 160:11 161:13 161:19 164:1,2 164:5 165:6,8 165:14,16,23 166:14,21 167:12 173:13 173:16,18,21 173:22,25 174:3,4,6,7,11 174:20 175:12 177:23 179:17 179:20 183:23 186:18 189:6,9
**board's** 174:14
**boards** 104:13 156:10 165:14
**Bonoff** 13:11,12 14:23 15:1 19:14,19,24 20:8 36:25 89:7 95:17,18 113:3,11 146:16 154:6 157:8 174:25 175:5
**Bonoff's** 14:24
**book** 129:4,4,5
**boosted** 116:24
**borrow** 75:13,14 114:13
**borrowed** 83:5
**borrower** 41:16 58:20 61:23 62:1,3 115:1 115:22 116:11 119:17 121:5 122:20,24 124:11 128:1
**borrowing** 75:4 75:12 83:8,10 91:1,4 110:11 112:11 113:8 113:23,24,25 114:9,11 122:25 141:5
**bottom** 11:5 38:4 60:21 61:25 76:10 114:25,25 124:20
**brand** 107:1
**breach** 110:21 110:23,25 120:25 121:9 121:24
**breached** 120:19
**break** 32:18,21 43:18 81:8 118:13
**Brian** 93:4 115:2
**bring** 30:8,11,25 51:19 62:17 94:21 133:20 166:21 174:3,4 174:10,14
**bringing** 29:18 92:5 166:19
**Broad** 1:22
**broader** 169:1
**brochure** 5:5 84:7,16,17
**brought** 24:10 91:20 132:17 132:19 146:19 173:25 187:14 187:20
**budget** 107:17 107:20 109:16 109:17 112:15 113:6,16 146:6
**budgeting** 144:16
**budgets** 87:20 90:2 100:14
**built** 47:23
**bunch** 180:17
**business** 27:2 34:13 46:12 50:7,10 53:7 57:3 58:12,13 58:16 59:6 63:6,8,21 64:2 64:10 73:5 76:10 82:10,22 83:1 85:11 109:25 116:1 128:22,24 130:13 138:21 140:1,16 142:1 142:4,12,16,19 165:25 169:20 177:7 179:11 179:25 191:11
**buy** 32:3 90:23 91:5 171:16
**buyer** 176:21 189:16
**buying** 152:7,8 152:9 188:6
**buys** 185:15
**bylaws** 40:20

**C**

**C** 2:1 3:1 36:8 193:1,1
**CABRERA** 2:19 7:16,20 12:6 31:9 42:13 44:6,15 49:24 50:4 52:17 62:6 69:20 70:8 75:24 76:17 80:25 81:4 85:1 123:15 126:12 139:23 153:3 153:11 154:24 155:14 161:22 162:5 166:7,17 167:8 168:7 173:7,14 175:16 176:4 178:9 179:8,19 180:10 181:2 181:19 182:12 182:23 184:19 184:23 185:7 186:4 187:12 189:1,12 190:19 191:17 191:25 192:5
**calculation** 63:22 112:11 114:3,11
**calendar** 188:18
**call** 8:6 15:25 16:7 26:18,19 29:7 37:2 42:17 71:12 78:1 98:8 99:6 107:2 109:10 141:2 145:23 164:12 178:5
**called** 10:18 14:14 16:13 17:15 22:10 26:8,10 33:12 44:25 47:10 48:11 55:16 56:1,5,9 72:2,3 72:7,10,13 90:23 96:21 115:4,13
**calls** 26:14,15 77:11 128:19 154:25
**candidates** 91:10
**candidly** 46:5 169:8 171:9 176:13,22 180:14
**capacity** 7:18,23 8:20,22 14:4 41:2 49:25 85:4,8 127:13 155:15 175:19
**capital** 5:9 12:18 15:10,25 16:1 16:4,10,13 18:14,15,16 20:20 21:16,25 22:10 23:10,24 25:9,14 26:1,4 26:8,9,14,17 26:19 28:5 31:2,3,4 33:6 35:12,13 52:2 52:3,21,23 53:6,20,21,23 54:1,3,4,7,10 54:19,21,22 55:2,5,8,13,17 58:17 63:7,9 63:23,25 70:14 70:20 71:1,3 71:11,12,14,19 71:25 72:3,6 72:10,13,19,20 72:22,24 73:5 73:8,15 74:18 74:20,22 75:5 77:1,5,11,18 77:22,25 78:1 78:2 80:22 81:17 82:6,14 82:24 83:15 100:14 109:7 109:10 114:3 119:19,22 121:15,20 122:23 123:7 130:13 133:20 134:10,21 135:1 137:25 141:1 142:4 152:5,16

154:16,18 163:6,10,10,18 166:12 179:25 180:8 181:15 189:18
**care** 61:3,13,18 75:25
**career** 30:15
**carried** 14:14,16 14:18,21,22 20:25 21:2 24:11,12,13,18 24:25 25:4,6,9
**carrier** 158:10 158:18
**case** 9:10 32:9 57:18 115:12 158:3
**cash** 4:24 53:7 56:11,15 62:20 62:24 66:11,21 67:4,7,14,19 68:1,3,4,11,15 68:19,21 69:1 69:7,11 73:17 73:23 74:19 76:21,24 77:2 77:6,21 88:3,5 89:2 109:6,9 109:11 130:10 131:1,3,22 132:3 135:5 137:24 138:1,3 138:5,7,10 140:4,10,14,21 141:5,8,11 142:24 148:15 163:16 165:19 176:20 185:9 185:10 189:4
**CCR** 1:17 193:12
**center** 90:5 179:16 185:21
**CEO** 46:13,22 46:24 47:1,4,6 93:20 94:10,11 94:13,17,20,23 100:24 106:5,7 106:20 107:11 108:3,7,15 171:12 173:11 174:7 177:1
**CEO's** 106:4,12 108:2
**certain** 10:23 11:21 16:10 23:6,16 24:15 24:20 25:11 26:23 34:14,15 39:10 40:15 53:2 56:14 66:6 71:7 78:19 84:19,21 87:5 94:16,19 94:21,23 102:7 102:8,24 106:7 106:13,14 112:4 114:7 128:25 130:15 131:12 145:18 161:10 172:5 187:1
**certainly** 94:6 191:14
**certainty** 43:16
**certificate** 44:2
**certificates** 4:15 37:4 44:4,7
**certification** 193:16
**certify** 193:4
**certifying** 193:19
**CFO** 10:22 92:16,23,23 93:1,23 94:10 94:13 97:14 99:20 100:18 101:2 118:8 124:15
**CFO's** 93:3
**CFOs** 93:8
**chain** 104:5 105:22 148:1
**chairman** 95:20 95:25
**challenges** 130:21
**changed** 41:5 52:13 145:19 151:21 189:10
**changes** 130:3 171:4
**characterizati...** 73:1
**charge** 101:25 102:1
**charged** 140:7 140:10
**check** 14:11 42:9 97:22 116:22
**checking** 107:22
**checks** 117:1 137:10
**Chemical** 30:20
**chief** 30:14,18 48:5 49:4 51:11 92:1 101:6,7,10,13
**choice** 188:22
**chorus** 183:18
**circumstance** 107:8
**CIT** 53:24,25 56:9,22 57:15 57:17,19,24 58:15 59:18 62:10 82:20,21 111:17 114:1 121:24 122:5 137:16
**CIVIL** 1:3
**claim** 163:1,9
**clarify** 17:11 121:18 157:7
**class** 126:24
**clause** 117:4
**cleaning** 146:23
**clear** 8:24 57:5 81:20 82:9 100:24 102:25 118:5 131:11 131:11,14,14 131:16,17,24 131:25 132:5,8 132:14,22,25 133:6,9,16,21 133:24 134:4 134:10 150:24 152:13 156:21 158:5 161:9 176:16 180:2 182:7
**close** 107:11,13 137:12 176:14 181:16
**closed** 28:25 187:14
**closing** 59:21,25 60:4,5 62:12 187:5,7,9,18
**Co-Counsel** 2:16
**co-founder** 12:10 15:6
**co-investor** 31:25
**Cohesive** 18:14 18:15,16 19:1 33:6 35:12,12 63:7,25 71:6 76:13 77:13 96:24 99:13,16 121:15 127:21 130:12
**coincided** 39:15
**Coinvest** 1:12 33:25 34:25 35:7,14 45:17 104:21 127:10 127:14
**collateral** 63:8 64:1 73:24 74:1,8,18 75:1 75:12 121:24 122:1
**colleagues** 191:18
**collect** 138:7 145:9 189:19
**collectively** 85:21
**color** 91:5
**combination** 15:13 29:18 127:20 165:21
**come** 41:7 64:23 71:12 74:19 85:14 91:15 113:13 116:6 132:1 147:15 154:18 155:16 161:24 170:24 177:16,21,23 183:23 186:17
**comes** 27:1
**comfortable** 161:18
**coming** 51:21 107:8 131:1 166:24 179:25 189:8
**commencing** 1:19
**comment** 185:2
**comments** 102:3
**commit** 16:10
**commitment** 15:22 20:20,24 26:2,5 123:6
**communicated** 178:25 179:1 183:5,6,7
**communicates** 105:11
**communication** 182:1
**communicatio...** 182:7

**companies** 12:19 22:2 25:21 27:4,6 27:17,20 28:11 28:19,22,25 29:21 30:21,25 52:15 87:6 102:25 104:17 155:18,21 157:4,11,14 158:18 164:6 165:17
**company** 4:19 22:5 27:13 28:18 30:9,11 31:6,8,18,19 31:23 32:3 33:10,12 34:18 34:21 36:2 39:9,11 40:22 45:1,6 46:8 47:23 48:11 51:3 52:9,20 53:1 55:16 56:11,16,24 57:6,6,22 58:14 60:8 63:23 64:3,23 69:5,8,23,24 70:14,21 72:25 73:10 74:24 75:3,10 79:3 79:15 80:5,8 81:15 86:7 90:4 91:17 92:10,17 94:6 98:2 100:9,16 102:13,15,16 102:17,22 109:12,21 110:4,9 114:3 114:6,12 116:19 118:2,2 120:19 122:3 122:13 123:3 123:19,24 126:16,18,22 126:23 131:11 131:18,24 132:2 134:9 136:2,5,8,15 136:16,17,18 139:21,25 140:6 141:3,4 143:13 144:20 144:23 146:20 147:11 148:13 150:12 155:10 155:12 156:22 157:9,15,16,18 157:19,20,23 158:2,8,10,20 160:13,16,22 161:18 162:7 162:10 171:11 176:7 180:16 182:14,17 185:15 188:6 189:5 191:7,10
**company's** 40:20 50:21 53:4 56:15 57:20 65:14 70:17 73:5,6 73:13 88:25 90:24 91:1,4 92:21 94:9 97:14 100:11 113:7,8,16 116:24 117:22 117:23 118:7,8 122:11 137:19 137:20 141:9 161:9,11 166:25 168:3
**compensated** 80:20 157:3,6 157:8 164:2,5 164:7 166:5
**compensation** 26:25 164:1
**competitor** 107:5
**complete** 31:7
**completed** 86:2
**completely** 39:9 141:9
**completing** 36:5 81:23 171:15
**compliance** 144:15
**comply** 116:8
**component** 145:23 146:3
**comprised** 151:6
**comptroller** 92:22
**concept** 51:7
**concern** 121:21 130:14 168:2,6 170:3,4 171:16 181:21 191:8,9
**concerned** 121:23 169:17
**concerning** 170:5 177:5
**concerns** 169:10 169:13 190:5
**concluded** 192:10
**conclusion** 39:9 105:23 161:7 171:7
**conclusively** 38:12
**condition** 64:10 123:7,9 187:9 187:18,19
**conditions** 52:13 67:22 177:15
**conduct** 122:22
**confident** 176:13
**Confidential** 6:8
**conflict** 153:23 153:24
**conflicts** 152:14 152:15,20,23 153:1,20,21
**confusion** 138:20
**conjunction** 49:18
**connection** 80:13 109:3 113:16 121:6 132:23
**Connolly** 93:4,6
**conscious** 147:7
**consecutive** 125:9
**consent** 22:18 24:5 69:13,15 69:16,18 125:11,22 126:3 127:8 131:6 149:22
**consenting** 131:7
**consents** 125:21
**conservative** 80:19
**consider** 23:19 30:3 174:15
**considerable** 174:16
**consideration** 134:4,12,14 156:24
**considered** 148:25 151:20
**considering** 90:2
**consist** 48:3
**consistent** 23:11 23:13 108:20
**constituencies** 153:25 180:4,5
**constituents** 103:10,11 161:8
**constituted** 79:14
**constituting** 121:9
**constraints** 136:3
**consult** 11:25
**consulted** 143:25
**consulting** 131:18,21,22 132:17
**consumer** 17:6,8 17:12,16,19,24 18:2,4,13,23 19:3,6 20:15 21:7 23:2,11 24:21,23 25:6 25:17,20,21,23 25:24 27:5,8 27:13,16,23,25 28:2,9,17,20 28:21,23,24 29:20 31:5,17 35:11 36:1 39:25 54:24 55:7,12 56:17 56:25 57:8,25 58:8 60:5,8,9 60:13,14,25 61:5,7 62:11 63:6,25 66:20 71:6,8,15 72:19 73:25 74:2 75:2,9,18 75:21 76:6 79:24 80:8,12 85:23,25 86:22 87:8 103:20,21 104:5 105:3,8 116:20 121:15 127:20 130:12 154:7,11,19 155:11 157:5 157:11,24 159:15,20 160:17 162:25 163:2,9,11,14 167:4,19,24 175:15

**consummate** 176:24
**consummated** 178:1 189:22
**contacted** 183:2
**contained** 109:25 193:5
**contains** 165:1
**contemplate** 52:22
**contemplated** 149:2
**context** 59:1 64:21 136:25 185:6
**continue** 50:20 71:24 110:6 130:13 136:8 140:25 161:15 176:15 180:15 181:24
**continued** 3:1 50:19 69:3 189:17
**continuing** 121:5 186:6 189:19
**contractual** 57:23
**contractually** 109:19
**contribute** 26:9
**contributions** 71:19 77:18 102:4
**control** 4:22 22:7 31:7 55:22 56:2,5,8 56:12,15 57:5 62:4,8 161:11 161:12,13 193:18
**controlled** 21:4 60:2 105:7
**controls** 59:3
**conversation** 9:15 156:12 170:10 175:21 176:9 189:15
**conversations** 10:8,12 50:17 124:6 146:19 146:25 147:5 152:7,9,11 154:9,13,14,20 156:2,14 158:23 159:10 172:9 174:23 175:1,5 177:10 177:13 183:8 186:22 188:13 190:1
**conversion** 79:8
**COO** 93:25 94:11,13 100:19 101:4
**copied** 135:17 170:1 171:7,9 183:21 184:10
**copies** 97:18,19 97:21
**corner** 11:6
**Corp** 36:9,9
**corporate** 7:12 7:21,23 8:21 8:22 15:14 40:16 59:2 61:12,17 170:15,21,25 171:16 172:14 173:3 174:24 175:2 177:16 177:20 178:1 178:20 179:6 179:16 180:21 181:6,12,17,21 182:3 183:2,23 185:22 186:17 186:23 187:3,9 187:17 188:4 191:4
**correct** 8:8 12:15 13:9,16 14:6 15:19,21 16:11,14,15,18 16:19,21,22,24 17:2,3,4,7,9,22 18:7,19,20 19:1,2 20:6 21:13,16,25 22:3,4,12 23:2 23:5,7,8,9,17 23:18 24:1 25:1,7,8,10,18 26:6,7,11,13 27:7,9,15 28:4 28:7,8,15,16 29:14,23,24 31:20 32:8,14 32:17,24,25 33:3,6,7,9,14 33:21 34:7 36:21 37:1,23 38:3,20 40:1 43:3,4,6,7 45:14,15,19,22 47:5 48:7,23 49:5,19,20 52:2,10,11,16 53:9,10,12,13 54:2,12,13,16 54:19,25 55:1 55:2,3,5,6,9,10 56:7,23,25 57:4 58:7,18 58:21 60:19,20 60:23,24 61:1 61:2,3,4 63:15 64:12,16 65:20 66:14,23,24 67:2,12,16 68:13,17,25 70:4,22 71:9 71:10,13 72:7 72:8,11,14,15 74:4,8,12,18 75:1,8,16,20 75:22,23 76:7 76:8 78:21 79:12 80:4,16 82:3,8,11,12 82:15,17,23 84:23 85:11,24 86:1,21 88:19 88:20,21 89:14 91:14,25 92:3 93:22,23,24 94:11,12,14,15 94:17,18,20 95:1,4,7,8 96:7 96:10,15 97:10 98:5,16,20 100:25 101:1,2 101:3,5,7,9 103:3,5,17 105:18 106:16 106:23,24 107:3,17,18 108:5,6 109:18 111:5,9,14,22 112:1,21 115:3 115:8 118:12 119:24 122:8 123:11 124:16 124:18,23 125:18,23 126:1,4 127:15 128:7,11 129:2 129:6 130:1 135:7,10,13,18 139:9 140:9,17 140:18 141:15 141:19 143:21 143:22 149:1,4 150:3,21 152:1 152:3 155:20 157:21 158:6,7 158:15,22 159:1,4 160:14 160:17,18 166:3 167:15 167:21 169:24 172:6,16,18,25 175:14,18 177:24 178:3 180:20,23 181:14 182:22 183:24 184:9 184:18 186:19 188:25 193:7
**cost** 133:2 146:7
**costs** 109:7 148:13,14 163:6,10
**counsel** 2:8,23 3:9,16 5:24 7:16 10:12 102:14,15,16 102:18 117:25 153:5 155:8 156:22 159:19 159:21 161:10 165:10
**counting** 77:18 77:21
**couple** 137:11 156:16 166:20 176:18
**course** 70:11 108:12 137:2 146:18
**court** 1:1 3:5 9:5 9:6,17,22 11:10,19 136:12 187:25 192:3
**covenant** 110:19 110:22 111:1 111:12,13,25 120:17,20 122:16,20 128:1 144:13
**covenants** 64:4 64:7,7 74:9 109:13,24,24 110:3,3,8,13 110:17 111:3,7 111:8 115:13 116:6,8,11 117:23 120:8

122:19 127:24 144:11,14,17 144:23 145:1,2
**covered** 158:13 158:14 169:11
**COVID** 64:22 98:5,6,9
**COZEN** 2:18
**create** 31:6 96:11 129:4
**created** 96:9 153:10 178:3
**creates** 29:17
**creating** 91:7
**credit** 4:16 5:7 37:14,21 40:8 40:25 41:4,4,6 44:20 53:11,14 53:18 54:5 57:3 58:12,13 58:16 59:6,16 63:8,18,21 64:3,3,7,25 65:3,23 66:8 67:23 73:7 76:10 82:10,22 83:1 90:24 100:11 109:13 109:21 110:1 113:17 114:1,2 114:13 115:17 116:1 117:13 117:16,20 119:2,6,13 120:4,6,12 121:6,10,14 122:5,14 123:8 123:20 125:12 126:7 127:1,6 127:7,11 130:24 131:3 132:24 138:22 139:17 140:16 141:13,21 142:7 143:21 144:8,10
179:11 180:1,7 180:7 181:15 188:23 189:10
**CROSS** 4:4
**cross-default** 141:20
**cross-the-fault** 110:20,24
**crystal** 176:16
**CSC** 61:11
**current** 84:14 135:15 136:22 137:2,4,6
**cushion** 144:24
**custodian** 97:11
**custom** 116:20
**customer** 146:22
**customers** 47:25 50:23 117:2
**cut** 148:10,17,18
**cuts** 148:23,24 149:2

**D**

**D** 4:2 7:2,2,2,2
**D&O** 158:7,11 169:11
**daily** 136:5
**Dan** 154:6 157:8
**Daniel** 13:11,12 19:14 95:17
**date** 13:7,22 39:3,14 42:4 58:3,5,5 67:2 70:1 84:12 94:8 123:24 124:4,7 128:6 128:7 144:3 148:22 156:9 178:16
**dated** 66:23 84:24 126:6 138:24 139:7
**dates** 39:23 98:11 170:22
**David** 1:16 4:5
8:5,6 31:10 47:25 168:21 182:13 192:1
**Dawn** 1:5 7:10
**day** 150:25 151:1 159:22 172:22 180:25
**day-to-day** 27:22,24 179:24 180:1
**days** 162:23
**DC** 185:14,20
**de** 107:2
**deal** 176:18,21 176:23
**dealing** 176:17 176:20
**debt** 53:1,1,3,5 53:18 79:20 152:10 181:25
**December** 1:19
**decide** 22:9
**decision** 27:25 28:1 123:18 174:1,16 178:23 179:1
**decisions** 21:10 27:22 94:17,19 94:23 105:15 106:7,13,14 136:3 161:10 174:13 179:24 187:5
**decline** 145:25
**declines** 145:24
**decreasing** 83:23
**deem** 109:11
**deemed** 121:18
**default** 79:4 111:24 117:12 117:13 118:22 121:4,10,12,19 139:10,15,16 139:21,24 140:2 141:17
141:21,22,24
**defaults** 120:24
**defendant** 2:23 3:9,16 8:8
**defendants** 1:14 7:12
**define** 113:24
**defined** 59:15 65:21
**defining** 23:22 65:24
**definitely** 145:6
**definition** 59:18 65:11,12,13,18 65:23,24 66:1 66:2 120:24 121:25 122:5 151:9
**definitively** 179:22
**Del** 1:5 7:9
**Delaware** 61:12 61:18 86:6
**delay** 59:21,23
**delighted** 47:21
**delineated** 174:9
**delivered** 183:15 183:19
**Dennis** 51:13,17
**denominator** 35:3
**department** 102:4,7
**departments** 101:23 102:10
**depend** 108:10
**depended** 140:24
**depending** 89:9 100:5 102:9 113:5
**depends** 23:22 28:10
**deployed** 21:16 74:17,17
**deployment**
23:10
**deposit** 4:22 55:22 56:2,5,8 57:5 62:4,8 74:6,7 75:7
**deposition** 1:16 7:20 8:10,11 8:13,17 9:2 10:3,4 11:14 11:25 48:14 166:14 192:2 192:10 193:6
**depository** 56:22 57:15
**deposits** 57:17 57:20
**depreciation** 65:15
**describe** 12:13 27:6 34:10,11 122:9 135:23 153:24
**DESCRIPTION** 4:13 5:4
**designated** 95:24
**designee** 7:17 85:5
**designer** 46:11
**designing** 49:21
**desk** 11:1
**details** 11:23
**determine** 21:16 21:24 22:2,5 38:14 114:3,12
**determining** 180:5 189:4
**develop** 87:20 87:22
**developed** 152:21
**developing** 49:22 90:1
**development** 90:9
**difference** 43:10

46:4 190:8
**different** 46:1 54:15 57:11 58:16 60:15 64:11,13 65:19 66:2 115:7 130:8 141:21 142:25
**differentiate** 108:11
**difficult** 74:23 139:25 141:7 176:18,21
**diligence** 87:3
**diluted** 79:2
**dilutive** 79:11
**direct** 4:4 7:5 180:15 182:5 193:18
**direction** 6:13 94:22 133:17 133:19 181:16
**directive** 180:9
**directly** 18:1 25:19 113:2 182:6
**director** 39:10 39:18 42:1 92:22 101:10 151:2,13,14,17 153:15 156:1 156:11,13 166:23 169:16 170:10 175:13 175:13
**directors** 95:3 95:15 96:2,17 103:6,19 104:9 108:17 158:6 158:11
**disapproving** 50:13
**discharge** 69:6
**discharged** 69:11
**disclose** 84:19
**discovery** 10:17 37:19 84:15 135:20 183:7
**discretion** 141:6 141:10
**discuss** 170:14 175:7
**discussed** 27:11 35:11 100:3,12 122:2
**discussing** 123:24
**discussion** 8:2 171:20
**discussions** 146:17 171:3 172:7 177:6 188:14
**disproportion...** 116:17
**disputed** 121:17
**distancing** 98:13
**distinct** 82:14
**distinction** 46:2 127:4 158:15 162:16
**distressed** 28:19
**distribute** 138:3 138:4
**distributed** 21:1 96:13
**distributing** 97:15
**distribution** 90:5 100:10 113:7,9 146:10 185:21
**DISTRICT** 1:1 1:2
**distrust** 189:15
**diversification** 22:25
**document** 5:14 29:6 36:15,16 37:12,18,19,24 38:13 40:7,24 41:10,14,16 42:17 44:24 45:10,24,25 47:10 55:20 56:1,3 57:11 57:12 59:20,24 60:9 61:23,25 62:18,24 63:2 63:4 84:4,18 85:20 97:9 113:5 114:22 117:25 118:24 119:2,6,10 125:15,19,20 125:22 126:2 127:9 134:17 138:15,16 139:5,13 145:3 147:17 148:6 149:12,13,16 149:20 159:19 159:20,24 164:18,19,21 184:1,1,7 186:8
**documentation** 25:3 40:15
**documents** 6:3 10:15,15 11:3 11:8,15,16,17 12:1 41:1 42:6 63:10 113:2,4 113:10,20 128:25
**doing** 73:21 132:2 186:5
**dollar** 77:4
**dollars** 77:15 108:8,14 142:6
**door** 131:4 138:11
**double** 107:22
**doubt** 179:14,22
**draft** 169:22
**drawdown** 114:4 122:13 130:23 163:17 182:16
**draws** 141:3
**drive** 142:18
**driven** 63:19 68:5 83:7 114:5 142:17
**driving** 179:24
**due** 120:16 130:16
**duly** 7:3
**duration** 93:2 96:19
**Dushey** 171:12 176:14,25 177:7,14,19,22 178:4 183:22 184:17 185:6 186:17,22 188:14
**duty** 103:7

**E**

**E** 2:1,1,11 3:1,1 4:2,11 5:2 193:1,1
**e-mail** 5:9,12,17 5:20 134:20,25 135:17,19 136:20 137:7 142:21,25 147:20,25 148:1,4,8 164:14,21 165:1 168:20 168:21,24 169:7,9,21,21 169:25 171:8 172:2,15,20 178:22,23 179:1,4 183:6 183:21 184:4 184:10,14,25 185:17 186:20 190:10
**e-mails** 5:19 135:21 168:16
**earlier** 15:10 24:10 25:15 33:4 45:23 52:10 54:15 84:2 86:7 95:2 132:23 137:22 141:12 142:21 150:7 167:11 172:4 173:1 183:22 189:25
**earliest** 143:24
**early** 82:20 185:14
**earning** 74:13
**earnings** 14:7,8 14:10 15:1,8 53:8,9 74:24
**earns** 74:15
**easy** 79:21 176:12
**EBITDA** 65:5,6 65:12,13,19,20 65:21,23,25 66:1,2 83:18 83:22 109:17 109:20 116:12 117:3,6,8,10 118:18,20,21 129:16,17 143:10 144:11 144:12,14,17 145:14,17
**Eclipse** 137:15 137:16,17 138:20 140:16 141:17,25 142:2 169:19 176:15 180:8 181:16 182:11 182:20 183:11
**Eclipse's** 137:10
**effect** 79:11 85:14 110:5
**effective** 75:3 139:15 178:16

**effectively** 59:2 98:14 123:18 131:4 138:1,2 138:22 141:6 147:3
**effort** 118:11
**efforts** 143:1
**either** 36:6 49:9 59:21 61:11,17 69:13 104:11 109:19 114:10 116:22 122:23 150:24 152:5 162:23
**elect** 104:3 105:6
**elected** 157:1
**election** 105:9
**employ** 99:21
**employed** 18:1 101:19 102:22
**employee** 14:5 34:17 176:8
**employees** 19:15 19:15 20:5 26:25 35:16 61:9 103:14 130:14 154:5 157:7 162:18 164:4 165:12 165:15,17 170:15 171:17 173:4 177:20 177:20 180:6 181:22,23 182:21 183:2 187:6,18 188:5 188:23 189:9 190:15 191:8 191:10
**employment** 34:21
**Encina** 57:2 58:12,13,16 59:6,19 63:8 63:21 64:2 75:5 76:9 82:10,22 83:1 83:6,9,13,14 109:25 110:13 110:17,19,23 111:1,7,13,16 111:17,21,24 112:3,7,9,20 112:24 113:2 113:12,22 114:1,2,4,7,9 116:1 118:19 122:5,12 130:22 131:5,7 136:4 137:14 137:17 138:21 138:21 140:15 140:16,24 141:7,10,16,23 141:24 152:8 154:15 161:14 162:9 179:11 179:25 180:7 180:12 181:15 182:10,15,20 188:24 189:3,4 189:18,24
**Encina's** 83:7 110:20 131:6 131:13
**ended** 143:11 165:25
**engage** 122:20 128:2 131:24
**engaged** 128:4,5 128:8 129:22 130:3 131:10 133:16 142:11 143:19 170:9 170:18
**engagement** 132:25 133:2,4 133:6,9,15 134:2 135:23 143:20 166:9 172:9
**engaging** 143:25
**English** 123:2
**enhance** 73:5
**enter** 158:18
**entered** 111:15 111:18 129:9 129:23 144:19
**entering** 158:16
**enters** 158:10
**entertaining** 124:1
**entire** 94:2,3 155:12,19 169:7 170:20 170:25
**entirety** 185:17
**entities** 7:14 17:18 18:14 19:1 27:10 33:5 35:5,10 36:13 43:10,11 53:20 54:21 61:14 71:6 76:13 84:19,21 84:21 86:23 127:21
**entitled** 105:6 105:15
**entitles** 34:8,13
**entity** 20:9,11 20:12 25:5 33:18 36:4 58:11 59:2,3 78:24 110:6
**entrepreneurial** 30:5
**envisioned** 162:3
**equity** 12:14,16 12:17 20:17 31:20 32:4,7 32:13 34:5,6 34:10,12,13,19 41:5 52:23,25 62:11 78:13,15 78:16,18,24 79:1,1,4,19,20 80:3 81:21 84:22 151:19 153:18 165:18 165:20
**error** 86:11
**ESQUIRE** 2:4 2:11,19 3:4,12
**established** 54:11
**estimate** 89:19 89:22
**Europe** 30:17
**evaluated** 147:9 151:22,23,24
**event** 56:13 121:10 123:5 150:9,15
**events** 39:10 56:14 70:10 108:12 121:4 139:10,14 151:21,23,24 152:4
**everybody** 121:17 177:23
**evidence** 193:5
**exact** 13:7,22 19:20 35:21 39:23 70:1 79:16 81:18,25 94:8 102:21 120:23 124:4 144:2,6 169:8 170:22 178:25
**exactly** 20:2 57:12 59:23 64:20 104:12 123:17 151:9 158:22 178:24
**EXAMINATI...** 7:5
**examined** 7:3
**example** 22:21 22:24 30:13 61:10 66:5 70:13 90:11,12 90:17 95:20 98:6 102:20 107:5 108:3,11 108:12 110:21 113:6,8 130:10 145:9,19 146:5 146:22 157:20
**examples** 41:1
**exceed** 109:22
**exception** 32:5
**exceptions** 32:16
**excess** 108:14 122:3
**exchange** 5:12 78:9 147:20 148:1 169:8
**exclude** 76:13
**excluding** 76:24 77:2,3,6 157:2
**excused** 192:9
**execute** 50:10,14
**executed** 62:25 123:21 127:23 134:1 158:1
**executing** 40:14
**executive** 48:5,9 49:4 51:11 91:7 92:5,11 93:20
**executives** 30:13 96:22
**exercise** 34:19 78:22 81:16
**exhibit** 29:8,12 37:2,6,12,16 41:11 42:17,20 42:22 43:23 44:1,5,8,17,19 44:22,25 45:8 47:10,14 55:20 55:24 62:18,22 62:24 84:4,7 114:15,15,19 115:10 118:25 119:7 134:17 134:22 138:16

139:1 142:22 142:23 147:17 147:22 149:13 149:18 159:24 160:3 164:12 164:16 168:11 168:12,18 184:2,5
**EXHIBITS** 5:24
**exist** 51:7 152:24
**existed** 135:25
**existence** 85:15 139:14
**existing** 35:2 39:7 48:22 79:1,6,11 120:24 122:4 187:3
**exists** 29:2
**exit** 93:3
**exits** 12:21
**expand** 50:20 51:8 107:4
**expansion** 51:1
**expect** 8:12 52:5
**expectation** 65:4
**expectations** 64:24 65:1,2
**expected** 94:21 107:9 108:16 130:25 144:25 173:24 174:3,4 175:7,21
**expended** 133:14
**expenditure** 133:13
**expenditures** 131:12 136:7
**expense** 27:1 65:15 145:21 145:24,24 146:3,10 147:7 181:22
**expenses** 11:20 11:21 26:24,25 138:12 145:13 145:16,18 146:5,13 166:11
**experience** 31:3 50:23 69:3 120:11 132:18
**experiences** 30:6 146:4
**experiencing** 68:15 140:22
**explain** 24:11 59:19
**explored** 143:20
**exploring** 127:25 129:18
**exposed** 142:6 161:21
**exposure** 153:10 161:16,20,21 162:4 163:4 172:12 189:19 189:21
**express** 169:13
**expressed** 171:13 190:5
**expression** 170:3
**extend** 64:3
**extended** 78:3 91:7
**extensive** 65:13 90:7
**extent** 22:7 42:2 42:10,15 85:2 97:22 153:4
**extremely** 176:18,21

**F**

**F** 193:1
**faced** 166:22
**facilitate** 63:9 90:6 130:4,9 171:11
**facilitated** 92:12
**facilities** 53:11 53:14 90:24
**facility** 53:5 54:5 63:19 83:7 100:10 113:17 114:4,13 127:1 131:20
**facing** 66:13
**fact** 12:1 35:3 95:3 169:3 172:2,17,19,21 174:20 179:17
**failed** 109:17
**failures** 30:7
**fair** 27:7 155:9
**fairly** 40:14 65:13 116:21 141:7 145:19 166:23
**fairly-limited** 51:4
**familiar** 29:3,14 92:20 162:20
**family** 47:24
**far** 43:8 170:11
**Fargo** 53:22,24
**feature** 24:13
**February** 148:22,23
**federal** 162:14 162:16 190:8
**fee** 16:3 25:16 25:17,19,25 26:12,21,22 27:3 78:12
**feel** 8:6 80:19
**fees** 11:20,21 26:15,20 88:2 88:9,13,18,24 89:1,24
**Ferreira** 5:9,12 13:1,14 15:4,8 19:14,19,24 20:8 30:13 89:7 95:16,18 95:25 113:3,11 134:21 135:1,4 135:8,24 136:21 137:1 138:5 142:21 146:16 147:21 147:25 148:2,8 154:6 157:8 174:25 175:5
**fiduciary** 40:21 154:5,10,12
**figures** 116:18
**file** 84:20,25 107:23
**filed** 11:10,18 84:10 85:10
**finance** 53:3
**financial** 11:12 11:19,23 29:18 30:24 34:16 87:19,20 109:13 112:4,8 112:13,16 113:19 115:13 116:6,8,11 122:10,12 130:18 131:21 135:25 143:3
**financing** 53:1 53:19 80:2,2 81:21 82:23 110:13
**find** 91:9 120:22 144:9 166:13
**fine** 9:17 186:12
**finish** 9:9 32:20
**fire** 178:7,14
**firm** 12:16,17 13:4,5,8,10,12 13:17,19,20 31:3 91:18 93:12,14,15 102:17,19,20 102:22,22 103:1 131:18
**firms** 84:22 93:18 134:3
**first** 44:16 50:22 56:10 67:5,7 111:15 116:22 116:23 122:19 132:16,20 150:16 152:19 156:8 168:20 185:9 188:13 188:14,18,19
**fiscal** 116:13 117:11
**five** 78:7,8 79:15 149:5 163:20 181:4,7 188:7
**five-minute** 43:17
**fixed** 145:19,21 146:2 148:13 148:14 181:22
**fjrooks@mor...** 2:7
**floor** 146:23
**flow** 53:7 109:9 109:11 131:22 132:3 135:5 140:21 142:24 148:15 185:9
**FM001687** 115:10
**FM00183** 115:11
**FM001852** 4:17 37:15 44:20
**FM001859** 4:17 37:15 44:21
**FM002218** 5:7 119:3,7
**FM002232** 5:8 119:3,7
**FM00230** 124:20
**FM002904** 5:11 138:25 139:4
**FM002905** 138:17
**FM002906** 5:11 138:25 139:4

**FM002943** 4:15 37:5 44:3,18
**FM002962** 4:15 37:5 44:3,18
**FM002964** 44:23
**FM003041** 44:23
**FM003042** 4:20 45:2,7
**FM003044** 4:20 45:3,7
**FM003128** 5:14 149:13,17
**FM003129** 5:15 149:14,17
**FM005324** 4:24 62:21 63:1
**FM005325** 73:18
**FM005330** 4:24 62:22 63:1
**FM005342** 4:23 55:23 56:2
**FM005352** 4:23 55:23 56:2
**FM005904** 5:13 147:18,22
**FM005906** 5:13 147:18,22
**FM006214** 5:10 134:18,22
**FM006282** 5:20 184:5,8
**FM006292** 5:18 164:15,24
**focus** 116:10 130:18
**focused** 28:21 51:4
**fold** 20:23
**follow** 123:5
**following** 52:6 52:23 70:16 116:8 156:24 160:25
**follows** 7:3
**food** 104:4 105:21
**force** 110:5 142:1
**forcing** 142:3,11
**forecast** 135:12
**forecasted** 137:3
**foregoing** 193:16
**forgetting** 130:17
**form** 5:5 11:14 12:14 14:8 31:9 52:17 84:6,10,11,15 84:16,25 85:10 86:12 126:12 153:8 182:12 189:1 190:18 191:6
**formal** 13:25 99:12
**formally** 92:9
**Forman** 1:10,11 3:16 11:13 13:6,23 17:4,9 17:13,14,15,17 18:5,8,10,11 18:18 27:8,12 28:13,15 32:9 32:15,23,23 33:1,1,10,11 33:12,15,19,20 33:23,24 34:25 35:6,8,10,20 36:6,7,14,19 37:9 38:5,6,10 38:15 39:12,19 39:24 40:9,9 40:11,12,19 41:3,12,17,17 41:19,20 42:1 43:1,11,12,14 43:15 44:13,18 45:16,24 46:6 46:20,20,21,21 46:25 47:21,22 49:4,8,9,9,11 49:11,14,15,22 50:11 51:2,6 51:20 52:1 53:2,8,12,19 53:20 54:6 55:8 56:19 57:8,16 58:19 58:22 59:22 60:4,6 61:19 61:24 62:2,5,7 62:9,13,15 63:5,10,12,18 64:5,10 66:3,4 66:12,19,25 67:13 68:9,14 68:18,20 69:3 69:18 70:6,11 71:16 77:23 80:23 81:21 82:3 83:17,22 87:12,18,24 88:7,11,16,23 89:5,12,17,20 89:25 90:9 92:2,6,12 93:1 93:9,19 94:24 95:2,14 98:19 100:4 101:13 101:23 102:5 103:2,15 104:1 104:2,2,3,4,6 104:10,11,11 104:14,24,25 105:5,7,18,21 105:24 106:2 106:17 107:4 107:16,23 108:18 109:8 109:17 110:12 110:16,18 112:2,3,8,19 112:22 113:1 113:19 115:1 115:22,25 116:19 117:10 118:5,20 119:14,17 120:10 121:22 122:9 123:9,14 123:22 124:2 124:11,12,17 124:21,24 125:1,24 126:6 126:18 128:16 128:16 129:7 129:10,13,20 129:24 130:4 130:19,19,21 130:23 131:1,5 131:7 132:4,5 132:8,19,22,25 133:24 135:12 136:1,17,19 137:23 139:8 140:21 141:17 143:2 144:1,17 145:4 146:6,17 147:6 150:13 152:20 154:12 156:1,4 157:19 159:15,16,18 160:22 161:3,5 161:12,13,25 165:23 166:22 167:5,9,18,24 170:14,21,25 171:15 173:3 180:17 181:1,6 187:3,10,19 188:15 190:15 191:4
**formats** 9:24
**former** 30:12 48:9 96:21 146:1 150:23
**formerly** 138:21 140:16
**forms** 17:24
**formula** 63:19 63:24 64:2,4,6 83:11 122:4
**formulated** 114:2
**forth** 116:13
**found** 171:6 172:13,22 189:16
**founded** 12:11
**founders** 12:23
**founding** 12:24
**four** 19:25 35:5 76:25 77:10,11 77:18 96:17 112:19 151:6 151:10
**four-week** 185:9
**Franklin** 2:4 7:8 74:19 158:16 183:4
**free** 8:6
**frequent** 96:6
**frequently** 84:24
**Friday** 135:9 137:9 138:6,8
**Fridays** 136:21
**front** 42:14
**fueling** 189:23
**fulfill** 162:12
**full** 110:5 169:4
**full-time** 46:14 46:16
**fully** 193:5
**function** 20:15
**functions** 187:1
**fund** 12:17 15:18,21,24 16:12 17:6,8 17:12,16,19,24 18:2,4,13,23 19:3,6 20:15 20:18,19,21,24 21:7,8,10 22:2 22:24 23:2,11 24:21,23 25:2 25:6,17,20,21

25:23,25 27:5
27:8,14,16,23
27:25 28:2,10
28:17,20,21,24
28:25 29:1,2
31:5,18 35:12
36:1 39:25
53:6,12 54:24
55:7,12,15
56:17,25 57:8
57:25 58:8,9
60:2,5,8,9,13
60:14,25 61:5
61:7 62:11
63:6,25 66:20
71:6,8,15
72:19 73:25
74:2 75:2,9,18
76:6 79:24
80:8,10,12
85:23,25 86:5
86:9,16,22,22
87:3,5,8
103:20,21
104:5 105:3,8
105:14,16
121:15 126:7
127:20 130:12
140:25 141:3,5
141:8 154:7,11
154:19 155:11
157:5,11,24
159:15,20
160:17 162:25
163:2,10,11,14
167:1,4,19,24
169:20 175:15
**funded** 53:9
57:25
**funding** 59:25
**funds** 14:19
15:14 24:20
31:12 52:9
54:15 60:12
87:10 121:21
123:13 155:10
163:4,5
**fungible** 74:20
**further** 72:21,21
137:7
**future** 78:17,20
113:14 166:11

**G**

**gains** 24:16
25:10,14
**gate** 80:9
**gathered** 182:6
**general** 16:20
17:21 19:4,5
20:14,18,24
21:6,9,11,15
21:17,19,20,24
22:9,19 24:1,3
24:7,14 25:7
28:3 31:12
39:8 54:22
76:7 85:20,23
86:15,21 100:2
102:16,18
105:14 106:6
174:12 175:14
175:20 186:14
186:25
**generally** 65:21
80:7 126:14
143:8
**generate** 28:7
181:24
**generated** 53:7
**gentleman**
108:25
**gentleman's**
134:15
**geographic** 51:1
51:5,8
**geographically**
50:20
**gestures** 9:16,19
**getting** 106:11
**give** 7:25 22:21
40:25 44:2
48:13 80:3
89:22 90:11
108:3 120:25
153:2 178:6
180:8 181:16
**given** 39:10
69:17 75:21
78:9,11 80:4
81:15,22 82:24
151:21 154:8
164:8 166:25
172:10 178:15
179:17 191:5
**giving** 79:20
179:15
**glad** 176:6,7
**Gloria** 101:17
**go** 9:4 14:11
34:24 38:16
59:8,9 75:24
76:2,11 103:24
109:6 115:15
116:4,10
120:24 138:11
138:18 144:2
144:11,12
146:13 162:11
168:11 174:5
**goals** 34:16
**going** 8:19 9:19
10:7 17:18
20:2 21:21
29:7 36:15
37:11 39:11
42:16,24 43:8
47:7,9 51:25
62:17 64:18
80:3 84:3 85:1
89:9 91:3
102:9 105:21
108:4 114:15
114:24 118:25
118:25 122:15
123:4 125:8
130:14 133:14
135:14 136:20
136:21 138:15
140:24 141:8
143:13 146:20
146:21 149:12
152:11 154:15
160:9 161:14
164:12 171:16
171:24 172:21
176:14,15,20
176:23 178:12
181:4 182:14
184:7 186:7
188:5,7,8
189:16,22
191:8,10
**good** 7:8 110:6
139:19,21
**Goode** 1:10,11
1:12 2:23 4:14
4:21 7:13,14
7:17,21,23 8:8
11:12 12:8,11
12:13,14,24,25
14:1,5,17
15:16 16:2
17:5,8,12,13
17:13,16,19,23
18:1,4,5,8,10
18:11,13,18,22
19:3,6,7,8,8,11
19:13,15,18,25
20:5,7,13,14
20:16,22 21:3
21:6,7,22 23:2
23:8,10 24:20
24:23,25 25:3
25:6,16,17,20
25:21,23,24,25
26:22 27:5,8
27:13,16,23,25
28:2,5,9,17,20
28:21,24 29:4
29:8,11,16
30:10,24 31:5
31:11,16,17,22
33:8,24,25
35:6,6,8,10,11
35:14,17,20,23
35:25 36:1
43:15,25 45:16
45:17 47:14,17
48:1,21,22,24
49:3 50:1,3,5
51:6 52:8,8
53:15 54:8,11
54:14,17,19,20
54:24 55:4,7
55:11 56:17,24
57:7,25 58:8
60:5,7,8,10,13
60:14,16,25
61:3,5,6,7,13
61:15,16,18,19
61:20 62:11
63:6,24 66:20
71:5,7,8,15
72:19 73:25
74:2 75:2,9,18
75:21,22,25
76:5,5,6,12,16
77:12 79:24
80:11 85:5,6
85:21,22,23,25
86:5,6,8,8,9,13
86:18,22,23,25
87:1,3,7,8,9,11
87:24 88:9,12
88:17 89:4,6
92:4,12 93:6
93:16 97:17
99:21 103:4,16
103:19,21
104:2,3,5,6,18
104:21,24,25
105:3,5,7,8,13
105:20,24
106:2 112:22
113:10 117:15
121:14 124:21
124:24 125:1
126:6,18
127:10,14,20

127:21 128:16 130:12 132:9,9 133:17,18 136:16 144:15 144:19 154:7 154:10,19 155:11 157:5,7 157:11,24 159:14,19 160:16 162:25 163:2,9,11 164:4 165:12 165:15 167:4 167:19,24 175:14,15,19
**Goode's** 62:10 70:11 146:14 152:7
**GOODLEY** 2:10,11
**goods** 146:11,12
**gotten** 48:10,18 48:19
**governmental** 110:7
**granted** 103:19
**great** 8:19 47:23 47:24
**greenlighted** 133:23
**gross** 65:2,4 109:16
**ground** 9:4
**group** 118:11 131:11,14,15 131:16 132:6 189:24
**grow** 12:20 28:15 50:10 52:1,15,20 53:1,2,20
**growth** 29:20 51:4 53:4,9,12 73:9 74:17
**guarantor** 41:13 41:18
**guess** 31:19 32:19 34:24 35:5 48:13,22 52:12 61:22 62:1 68:7 77:4 89:24 92:1 98:8 100:2 103:7 120:16 120:19 121:2 124:18 127:16 128:21 130:5 130:18 135:25 147:4,17 148:19 158:21 159:14 160:10 164:22 169:22 180:4 181:4 188:22 190:20 190:22
**guessing** 41:22 59:17 107:16 128:24 139:19 178:13 184:17
**guy** 79:19 115:5
**guys** 10:16 92:25 97:24

**H**

**H** 4:11 5:2
**H-U-R-O-N** 134:8
**Hackensack** 3:7
**half** 31:14
**hand** 142:1,3,12
**happen** 31:22 171:24 172:21
**happened** 171:25 172:3 173:3 175:23 176:1 183:9
**happening** 143:1
**happy** 176:8
**Harrell** 5:9 134:21 135:1
**HAYDEN** 3:3
**head** 9:16,18 39:4 41:9 71:22 83:25 92:14 165:24
**headhunter** 91:19 93:7,12
**headhunters** 93:11
**headhunting** 91:18
**heads** 102:7
**hear** 182:5
**Heavyweight** 1:12 33:25 35:6,14 36:2,8 36:11,18,20,22 43:5,13 44:13 45:17 71:7 104:21 127:10 127:14,22
**held** 8:2 98:1 127:7 171:20
**help** 38:14 51:19 130:9 131:19
**helped** 90:22 91:9 92:17
**helping** 87:19,20 87:22 90:4,6
**helps** 12:20
**Hess** 92:20,21 124:13 135:6 135:24 183:10 183:15
**hierarchy** 93:19
**high** 15:11,15,17 15:22 16:25 28:22 29:20 50:8 100:2
**higher** 140:7 143:11
**highly** 176:13
**hindsight** 176:11
**hire** 92:15 146:25 174:5
**hired** 92:10 94:9 134:2
**hires** 92:16
**hiring** 92:18 100:16
**history** 47:23 100:21
**hit** 25:3 144:14
**hold** 18:23 144:9 163:16
**holders** 34:2,4 153:18
**holding** 34:7 62:10 137:10
**Holdings** 1:11 17:13,14 18:5 18:8,10,12,19 33:13,15,20,23 33:25 34:25 35:6,9,10,20 36:7,14,19 38:6 40:10 41:13,18,20,21 43:1,13,15 44:14 45:16,25 46:20,21 49:10 49:12,14 55:17 58:23 61:19 104:1,2,2,3,4,7 104:12,24 105:6,8,21,25 106:2 115:25 119:15 124:12 124:17,22,25 125:2,25 126:7 126:18
**holds** 49:14
**honest** 98:11 99:5
**honor** 167:6
**hope** 187:2
**hourly** 133:5
**hours** 89:16,18 137:9 146:9
**human** 90:12,16 101:10,13
**hurdle** 24:19,24 25:2
**Huron** 134:7

**I**

**idea** 78:5 79:15 116:18 134:6 136:24
**identification** 29:12 37:6,16 42:20 45:8 47:15 55:24 62:22 84:8 114:20 115:9 119:8 134:23 139:1,3 147:23 149:18 160:4 164:11,16 168:12,18 184:5
**identified** 8:16 40:8 41:16,18 43:9 45:24 46:1 59:12 61:23 82:10 86:7 96:18 104:17 112:19 115:1,22 116:9 124:11,25 127:24 168:13
**identifies** 12:19 38:5 42:25 43:6 45:20 56:21 58:22 59:4 60:8 73:19 119:14 124:15
**identify** 92:17 119:1 184:8
**identifying** 115:21 135:21
**identity** 184:24
**II** 18:16 35:13
**III** 17:6,8,12,17 17:19,24 18:2 18:5,13,23 19:3,6,7,8,9,12

19:13,18 20:7 20:13,15,16 21:3,6,7,22 23:2,11 24:21 24:23,25 25:4 25:6,17,20,21 25:23,25 27:5 27:8,14,16,23 27:25 28:2,10 28:17,20,21,24 31:5,18 33:8 35:12,23 36:1 54:24 55:7,12 55:15 56:17,25 57:8,25 58:9 60:8,9,25 61:5 61:7,15 63:7 63:25 66:20 71:6,8,15 72:19 73:25 74:2 75:2,9,18 76:6,7 79:24 80:8,12 85:21 85:22,24,25 86:5,6,8,9,13 86:15,19,22 87:8 103:20,21 104:6,18 105:3 105:8,14 121:15 127:21 130:12 154:8 154:11,19 155:11 157:5 157:11,24 159:15,20 160:17 162:25 163:2,12,15 167:5,20,24 175:15,15,20
**III's** 60:5,13,14 62:11
**immediately** 101:20 131:4 137:23
**impact** 91:3 136:3
**implement** 50:9 50:10 146:21
**important** 143:8
**impose** 139:15
**imposed** 123:9 139:24 140:4
**improve** 50:22 70:7 143:2,3 146:21
**improved** 68:21 69:18
**improvement** 69:19 137:4
**improves** 145:6
**in-person** 99:25
**inability** 166:25 166:25
**incentive** 34:5,6 34:12
**incentives** 34:19
**inception** 13:20 41:22
**Incipio** 55:17
**include** 90:14 148:9 173:9
**included** 38:17 38:25 42:3 64:2 130:10
**including** 24:20 30:17,20 50:25 56:11 157:7 161:9
**income** 25:10 65:14 129:15
**increase** 52:10 52:12 80:23 145:14,16
**increased** 79:7 82:2
**increases** 140:5
**increasing** 83:23 145:5,6,11,12 189:19
**incremental** 126:23 140:3
**incurring** 121:5 121:25
**indebtedness** 121:6,16,25
**indemnification** 5:16 156:23 157:25 158:1 158:24 159:2,6 160:1,8,12 161:2,4,6,17 162:24 163:1,8 163:12 167:2,3 167:6,10,12,16 167:25 168:4 169:1,23 172:11
**indemnified** 161:17
**indemnify** 163:3
**indemnity** 157:12,14 168:25
**independent** 39:10 145:2 151:1,5,8,10 151:13 156:11 159:8 170:6 175:13 181:5
**INDEX** 6:1
**indicate** 8:23
**indicated** 91:9
**indicative** 66:9
**indicator** 66:9
**indirect** 17:9,10 17:11,17 60:6 103:25 105:19
**indirectly** 27:10
**individual** 16:9 85:4 91:22 134:15 150:5 184:25
**individually** 1:6 183:18
**individuals** 1:7 15:12,15,17 17:1 19:22 20:19 35:1 51:18 92:17 99:13,15 179:16
**industry** 23:7,7
**information** 10:5,22 11:11 11:19 100:8 108:15 153:5
**infrastructure** 50:22
**infused** 77:22 152:16
**infusion** 52:21 52:22 70:20,25 71:3,11,14,25 78:1,1
**infusions** 70:14 78:2 126:18 152:5
**initial** 72:17 77:3
**initially** 85:13 108:21,25
**initiated** 144:7
**initiatives** 50:9 143:6,12
**injected** 73:8,9
**injection** 72:23 72:24 73:1,3,4
**injections** 72:22
**ink** 176:22
**installed** 39:22 42:1 47:4
**instance** 174:1
**instances** 32:6 77:22 147:2 155:20 166:20
**institutional** 15:13,17,23 17:1
**instruction** 48:14
**insurance** 110:5 158:6,12,17
**insured** 158:15
**integrating** 132:18
**intended** 51:19
**interacting** 177:5
**interchangeable** 49:13
**interest** 14:14,16 14:18,21,22 17:13,14 21:1 21:2 23:20,23 24:11,12,13,18 25:1,4 31:7,15 32:10 34:9 65:15 74:13,15 103:8,9 137:11 140:7 154:3,7 159:14 188:5
**interests** 18:17
**interface** 180:1
**interfacing** 87:20
**interim** 46:13 47:4,6 49:4 51:11 60:1
**internal** 102:18
**internally** 53:7
**interrogatories** 10:19 11:18
**interrupt** 9:12 76:22
**interview** 50:15 92:18 156:20
**interviewed** 91:10 92:9,16 134:7
**interviewing** 123:23
**introduce** 29:6 36:15 37:11 44:24 47:9 55:19 84:3 114:15 118:24 134:16 138:16 142:25 147:16 149:12 159:23 183:25 184:1

**introduced** 40:7 40:24 41:10 48:24 51:10 92:8 132:8 134:9 167:16
**introduction** 51:23 132:12 132:13
**inventoried** 143:14
**inventory** 63:21 90:19,25 91:2 108:13 114:5 181:24
**invest** 16:6 31:1 50:21
**investing** 20:19 34:8,17 50:23 82:2
**investment** 12:17,19 13:6 13:23 14:19 16:4,12,16 17:4,17 21:8 21:10,18 22:1 23:1,3 31:16 50:6 51:3 52:6 52:6,23 55:15 58:1 60:6 62:11,12 66:20 70:11 72:18,20 73:4 76:14,19 77:3 80:14 83:2 94:2 96:20 122:21 127:19,25 128:2,4,8 130:2 142:10 143:18,20,24 143:25 144:5 146:18
**investments** 12:20,20,21 14:20 16:3 26:16,23 29:1 30:19 31:11 48:11 54:15,17 55:11 60:2 77:5 87:4 155:23
**investor** 17:9,10 17:11 28:6 33:8 62:15 92:24,25
**investors** 12:18 12:22 15:11,17 15:18,22,25 16:2,25 17:1 19:7,8,9,11,13 19:13,18 20:1 20:7,13,16,20 20:22 21:3,6 21:22 25:4 60:1 61:15 76:6 85:21,22 86:6,8,9,9,13 86:15,19 104:18 105:13 175:15,20
**invited** 96:22
**invoice** 164:23 165:3
**invoices** 167:1
**involved** 33:5 128:22 177:10 180:5 186:23
**involvement** 54:8
**involving** 148:16 173:21
**IRS** 14:8
**issuance** 80:6 82:25
**issue** 17:24 79:24 80:9,12 109:11 131:19 167:5 170:4,5 178:3 189:3
**issued** 17:25 35:1 41:5 79:1 79:3,8,10,14 117:1 121:7 176:3
**issues** 66:12 68:14 69:4 90:4 100:11 109:9 132:18 140:21,21
**Issuing** 80:15
**items** 22:17 65:16,17 66:7 94:22 100:17 156:25 174:9

**J**

**J** 2:4
**JAMES** 2:11
**james@gmlab...** 2:15
**January** 64:20 66:23 67:4,10 68:11 69:2 70:5,15,16,24 70:25 71:20 76:15,17,20,20 76:21 77:8,9 77:10,10,19,20 77:20 78:4 81:6 83:20,21 83:22 116:25 124:5 126:6 143:4 193:13
**Jason** 2:19 7:19 12:3 42:10 81:3 191:13
**jcabrera@coz...** 2:22
**jeopardize** 188:5
**Jersey** 1:2,19 2:6 3:7 98:2 180:18 190:6,9
**Joe** 5:9,12 13:1 19:14 30:13 95:16,25 134:20,25 142:21 144:5 147:21,25 148:2,12 154:6 157:8
**join** 13:19 156:25
**joined** 13:20 108:23 109:5
**joining** 156:17
**Jones** 150:25 151:1 159:22
**Jr** 2:4 7:9
**jumping** 167:2
**June** 70:2,6 77:9 89:12 129:24 166:2,5 170:20 180:25,25 189:7 190:16
**junior** 89:10

**K**

**K-1** 14:9,13 15:2 15:8
**KAPLAN** 1:22
**keep** 21:20
**keeping** 130:10
**Keith** 3:4 13:18 13:20 19:14
**Keller** 1:13 3:9 5:18 150:5,19 150:22 151:12 153:15 155:25 156:2,3,8,12 156:14,15 157:2 158:24 159:6,7,10,13 160:15,16,22 161:2,5,16,20 162:4 163:1,3 163:25 164:7 164:15,22 165:22 167:4 167:17,18,19 167:23 168:2 168:20,21 169:10,13,21 170:1,5,9,11 170:14 171:3 172:7,23 174:23 175:1,6 175:7,21 179:15 183:15 184:15 189:6,8 190:5
**Keller's** 151:4 161:7 165:10 166:9,13 170:18
**Keller-00489** 5:16 160:2,9
**Keller-00496** 5:16 160:3,9
**Keller-00530** 5:19 168:13,17
**Keller-00542** 5:19 168:13,17
**Keller-00548** 5:19 168:14,17
**kept** 74:5 97:6,7 166:10
**Kessler** 5:17 164:15,22 170:1 171:10
**Kevin** 92:20,21 124:13 135:5,6 142:23 183:10 183:14
**kicked** 144:1 148:25
**kind** 98:12,13 140:5,10,11
**kmcdonald@...** 3:8
**knew** 47:7 180:14
**know** 10:11,11 11:20 20:2 27:19 32:19 36:9 39:1,5 42:5 43:10,12 43:13 44:12 48:10,17,18,19 49:16 51:21 54:9,21 62:2,6 66:16 68:3

69:17 71:18 72:2 74:14 80:13 83:16,17 84:19 85:17,19 86:2,4,23 88:11 89:15 91:23 95:5,22 97:11,17,23 100:18 101:14 101:16,19 111:22 112:8 116:5,9 123:3 123:17 132:5 132:19 133:2 134:12,13 138:6 140:9 144:1,4 145:20 145:24 147:9 148:10 156:5 160:11 162:16 162:17,22 165:22 167:5 167:23 168:6 170:2,8 176:11 179:4,21 180:24 181:3,5 181:20 183:9 183:10,13,14 183:17,19 185:17,20 186:8,11 188:16 189:25 190:8,14 191:3 191:13
**knowledge** 15:7 40:4 46:3 47:2 49:2 54:6 59:13 69:16 77:24 120:15 152:19,23 167:22 170:5 174:25 175:4 180:8
**known** 138:21 140:16 156:3
**knows** 185:10
**Kvitko** 5:13 34:1,24 35:7 91:13,15,20 92:8,8,14 95:17,18 96:12 108:23,23 118:7 130:15 134:2 147:21 148:1 156:21 161:9 173:10 173:11,12,19 173:20,22 174:10 183:16 184:14
**Kvitko's** 91:18

**L**

**labor** 146:9,17
**lack** 16:16
**ladder** 30:22
**laid** 64:24 65:17 67:24 109:13 137:5 190:16
**language** 120:23 125:2 165:5
**largest** 19:21,21
**latest** 136:6
**Latitisa** 1:17 193:11
**latitude** 117:23
**law** 102:20 103:1
**lawyer** 150:23
**LAWYER'S** 194:1
**lay** 135:14 136:22 179:10
**layoff** 188:25
**layoffs** 180:9 189:7
**layout** 50:8
**lead** 46:13 145:11
**leadership** 91:7 92:6
**LEAMAN** 1:22
**learned** 30:23 153:5
**lease** 145:21,23
**leases** 146:1
**leave** 20:4 191:10
**left** 13:5 81:13 94:5 108:23 109:2,5
**legal** 102:11,17 102:19 103:18 153:2,10 154:22
**lend** 63:22 83:1 83:6,8
**lender** 53:22 55:18 56:9 58:14 59:13,15 59:18 68:15 82:11,21 97:3 116:2 119:23 126:15,16 127:4,7 130:22 137:19,20,21 137:24 138:2 138:10 141:16 141:25 170:6 189:23
**lender's** 65:6,12 65:19 66:2
**lenders** 31:2 41:6 56:12 59:7,7,10,11 69:13,15,17 73:13 82:16,18 87:21,22 88:25 97:1 100:11,13 103:13 113:7 117:21 118:4 126:25 127:2,3 131:23 139:22 152:6 153:18 162:1 182:2,10 183:1
**lenders'** 80:10
**lending** 54:10 63:9 64:5 80:23 82:2 83:10 110:1 117:5
**lent** 82:24 123:14
**lessened** 98:14
**let's** 16:12 19:17 19:24 31:17 39:21 43:17 68:10 78:9,24 79:23 80:9 81:7 83:21 86:3 88:12 89:15 90:15 95:9,13 101:22 105:2 108:18 109:9 112:7 120:16,21 130:18 132:23 143:2,4 145:5 145:8 147:4 157:3 163:19 178:5 180:24
**letter** 5:11 38:19 38:21,23 39:2 39:6 42:3,5,11 121:6 133:4 134:2 138:24 139:7 150:11
**letters** 38:17 42:11
**level** 50:8 80:18 100:2 109:20 133:11,12 137:5 146:11
**levels** 144:25 146:9 173:2
**leverage** 53:18 65:5 80:13,18 109:20
**leveraging** 52:25
**liabilities** 168:25
**liability** 4:19 45:1,6 86:7 153:2 169:12 169:19
**Liberty** 2:12
**lien** 56:10,16 57:6
**lifeline** 72:24
**light** 139:14
**limit** 23:1 138:9 138:10 157:3 168:25
**limitation** 32:19
**limited** 4:19 16:17,23 17:2 17:6,20,20 19:4,5 20:21 21:12,13 22:10 22:13,16,17,19 22:22 23:13,15 24:2,4,5,6,17 25:24 26:1,4,8 26:18,19 27:4 40:14 45:1,6 54:22 55:3 85:24 86:6
**limiting** 136:4 142:5
**limits** 108:2
**Line** 6:4,9,14,19 6:24 194:2
**liquidate** 162:10
**liquidity** 63:5,13 63:14,17 64:9 66:12 68:6,14 68:21 69:4,18 70:7,17 73:6 74:22 75:11 90:25 120:9 122:3 130:21 136:2 140:6,21 143:3 162:9 176:16 180:16
**list** 8:11 11:12 174:9
**listed** 41:19
**literally** 162:10
**litigation** 6:1 7:10 161:24

179:7
**little** 14:22 74:22 106:4 138:18 138:19
**live** 118:3
**LLC** 1:11,11,12 2:10,23 3:11 4:14 7:13,17 7:22,24 8:8 12:9 18:9,10 18:12,19 19:9 20:5 25:16,25 29:9,11 33:13 33:15,20,23,23 35:17,24 36:19 38:6 40:10 41:13,18,20,21 43:1,13,15 44:14 45:17,18 45:25 48:22 49:3 50:3 53:16 55:4 57:3 58:23 60:11,16 61:3 61:6,16,19,20 75:22 76:7 85:5,7,21,22 86:6,9,13,19 86:25 87:2,7 87:11,25 88:9 88:13,17 89:4 89:6 92:4,12 93:6,16 97:17 99:21 103:4,16 104:14,18 105:10 112:23 113:11 115:25 117:15 119:15 124:12,22 126:7 127:10 127:14 132:9 175:15,20
**LLCs** 46:1
**LLP** 35:23
**loan** 5:6 54:4 80:6 81:24 112:2 114:16 114:18 117:16 117:20 118:19 126:16,20,24 145:3 161:15
**local** 57:19
**located** 128:12
**location** 106:18 107:1,2 172:14 173:4 174:24 175:3 178:20 181:18 182:3 187:9,17 191:4
**locations** 57:20 180:17,19 181:6,11,12
**lockbox** 137:25
**logistics** 102:2
**long** 21:20 41:20 47:23 66:15 165:22 186:14
**long-term** 25:9 25:14
**longer** 29:1 141:3 175:12
**look** 83:24 144:2 145:3 179:22
**looked** 147:8
**looking** 28:18,20 45:13 60:22 120:23 124:24 154:1
**looks** 48:4 58:10 76:24 77:9 114:14 115:21 119:12 121:13 122:18 124:13 134:25 164:7 169:9
**losing** 129:13
**lot** 9:15 30:23
**low** 148:14
**lower** 137:5 145:16
**lower-income** 116:20
**LP** 17:8,19,24 18:2,15,16 19:6,10,12,18 20:1,7,13,15 20:16 21:3,6 21:22 23:2 24:25 36:1 54:24 56:18,25 57:8 60:25 61:5,15 75:18 76:6 85:25 86:8,9 160:17 162:25 163:12
**lunch** 118:15

**M**

**magnitude** 71:18
**mail** 61:10
**Main** 3:6
**maintain** 110:4
**majority** 19:21 23:23 31:7 35:22 104:6 105:7 112:17 171:12
**making** 9:24 29:1 130:20 143:13 182:17 185:1
**Mallinckrodt** 30:20
**manage** 26:23 132:3
**managed** 131:10
**management** 16:3 25:16,17 25:19,25 26:12 26:15,20,20,22 27:3 29:20 30:4 34:2,3 35:8 47:22 48:3 89:1 96:23 99:20 100:23 131:21 131:22
**manager** 20:9 20:11 45:20 46:1,3 54:20 150:1 179:20
**managers** 100:22 150:1
**managing** 14:2 14:4 16:4 21:5 105:13 106:1
**manner** 79:22
**March** 84:6,24 98:8
**marked** 6:8,23 29:12 37:5,16 42:20 45:7 47:14 55:24 62:22 84:7 114:19 119:7 134:22 139:1 147:22 149:17 160:3 164:16 168:18 184:5
**market** 2:13,20 52:13 123:6,19
**marketed** 123:11
**marketing** 101:6 101:7
**markets** 31:4
**Marlton** 2:6
**mass** 175:22 188:25
**matter** 7:13 193:7
**maximize** 143:15 148:14
**maximum** 109:20
**McCARTHY** 2:10
**McDONALD** 3:4 165:9 166:8,16 168:1 168:8 169:3 173:15 174:17 175:24 176:5 178:10 179:12 179:18 182:24 184:20 190:7 190:12,17 191:21 192:7
**mean** 10:10 17:11 30:1 49:13 52:3 57:16 58:25 62:7 63:16 73:3 78:14 84:21 94:3 98:11 102:15 105:2,10 109:15 120:3 129:15 133:12 140:11 186:2 189:17
**meaning** 39:20 99:12 135:12
**means** 113:25 136:25 185:20 193:18
**medium** 99:4
**meet** 156:8 182:15
**meeting** 96:8 97:4,12 99:10 99:25 100:4,21 102:6,6
**meetings** 96:16 97:2,6,18,25 98:4,15,21,23 98:25 99:7,24 100:19,20 101:9,24 102:5 102:12,13,24 128:17 147:1
**member** 13:10 13:12 14:3,4 14:25 15:5 21:5 30:15 38:18 39:16 103:20 105:13 106:1 151:5,8 154:23 155:13

156:4,6,18 157:1,23 158:2 158:9 165:6 166:14,21 174:6 175:19 179:17
**members** 18:11 18:18 19:11 20:10 30:3 33:15,22,24 34:1,3 35:2,7,8 35:15,16 39:8 70:22 71:7 79:6 95:20,24 96:14,17,23 97:16 99:13,15 99:20 100:23 103:22 105:5 105:17,20 108:20 109:4 149:23 157:3,4 157:6,10,13 158:12 160:11 161:13 164:1,2 165:14,16 167:12
**membership** 17:13,14 18:5 18:17,21 34:7 34:9,24 35:18 35:19
**memo** 129:5
**memory** 59:21 79:17 116:5 181:8
**mentioned** 13:14 33:6 48:17 100:18 154:1 169:18
**merchandise** 138:13 189:20
**merged** 36:6
**merger** 4:18 42:19,23,23 44:23
**message** 183:5 183:15,20
**messenger** 182:18
**met** 96:2,5 156:21 176:22
**Michael** 51:13 51:16,17 108:23 109:1
**Mike** 5:13 34:1 34:24 35:7 91:12,15,18 92:14 94:12 95:17 118:7 130:14 134:1 147:21 148:1 156:21 161:9 173:19,20,22 174:10 183:15 184:14
**Miller** 13:18,19 13:20 19:14,24 20:8
**million** 74:23,24 74:25 75:11 77:12,15 78:7 78:8 108:8,14 116:16,17,18 126:21,23,24 127:19
**Mills** 1:10 3:16 11:13 13:6,23 17:4,9,15,17 27:9,12 28:13 28:15 32:9,15 32:23 33:2,10 33:12,12,15,19 33:20,23 36:6 36:7,14,19 37:9 38:5,6,10 38:15 39:12,20 39:24 40:9,10 40:11,13,19 41:3,12,17,18 41:19,21 42:1 43:1,11,12,14 44:13,18 45:25 46:6,20,20,21 46:22 47:21 49:4,8,9,10,11 49:12,14,15,22 51:2,6,20 52:1 53:2,8,12,19 53:20 54:6 55:8 56:19 57:8,16 58:19 58:22 60:6 61:24 62:2,5,7 62:9,14,15 63:5,10,12,18 64:5 66:3,4,13 66:19,25 67:13 68:9,14,18,20 69:3,18 70:6 70:11 71:16 77:23 80:24 81:22 82:3 83:17 87:12,18 87:24 88:7,11 88:16,23 89:5 89:12,17,20,25 90:9 92:2,6,12 93:1,9 94:24 95:3,14 98:19 100:4 101:13 101:23 102:5 103:2,15 104:1 104:2,4,10,11 104:12,14 105:18 106:17 107:4,16,23 108:18 109:8 109:17 110:12 110:16 112:2,3 112:8,20,22 113:1,19 115:1 115:22,25 116:19 118:5 118:20 119:15 119:17 120:10 121:22 123:9 123:14,22 124:2,11,12,17 125:24 128:16 129:7,10,13,20 129:24 130:4 130:19,20,21 130:23 131:1,5 131:8 132:4,5 132:8,19,22,25 133:24 135:12 136:1,17,19 137:23 139:8 140:21 141:17 143:2 144:1,17 145:4 146:6,17 147:6 150:13 152:20 154:12 156:1,4 157:19 159:15,16,18 160:22 161:3,5 161:25 165:23 166:22 167:6,9 167:18,24 170:14,21,25 171:15 173:3 180:17 181:1,6 187:3,10,19 188:15 190:15 191:4
**Mills'** 64:10 83:22 93:19 117:10 122:9 161:12,13
**mind** 41:7 45:11 113:13 155:16
**MINGIONE** 3:12 177:18 178:11 179:9 184:22 185:3 186:5,11,14 187:11 190:18 191:6,23 192:6
**minimal** 117:3
**minimize** 79:5
**minimizing** 142:4
**minimum** 109:20 117:6
**minority** 23:19 23:23 31:14
**minute** 17:19 160:10 185:16
**minutes** 89:3 97:6,8,12,15 97:18,20,21 149:6 163:20 176:25 188:8
**missed** 99:7 117:8 176:8
**missing** 59:12 135:11
**misstates** 189:2
**mistaken** 58:4
**modification** 123:8
**modifications** 100:12
**monday** 75:14
**money** 15:16,18 15:24 16:6 52:4 53:11 74:1 75:15 77:11 82:2,2 82:24 83:2,5,6 83:16 110:9 129:14 137:22 145:9
**monitor** 136:6
**monitoring** 136:16,18
**Monroe** 5:9 53:21,23 54:1 54:3,4,7,10 55:5,8,12,17 58:17 78:3,3,5 78:7,8,11,12 78:13 80:22 81:17 82:6,14 82:24 83:6,15 110:21,22 111:8,12,16,19 111:21,25 112:3 113:19 113:20 119:19

119:22 120:14 121:20 123:3,7 123:13 126:7 126:20 127:10 131:23 133:19 133:21,25 134:1,3,10,11 134:13,21 135:1 137:10 137:14 141:14 141:22 142:9 142:11,13 152:7,16 154:17 180:7,8 181:15 182:11 182:20 188:24 189:3
**Monroe's** 126:19 127:1 152:9
**monthly** 112:12 112:13 114:10
**Moore** 51:13,16 51:17
**MORGAN** 2:3
**morning** 7:8
**move** 100:9 138:8
**moving** 14:23 137:9 138:6
**multiple** 130:8

**N**

**N** 2:1 3:1 4:2
**name** 7:8 13:2 21:20 47:8 60:7 91:18,22 92:20 93:3 101:17,18 102:21 109:1 115:6 131:17 131:17 132:1 133:21 134:15
**named** 92:19
**names** 7:14
**Nathan** 5:9
134:21 135:1
**nearly** 170:20,25
**necessarily** 23:9 137:23 142:16 154:25 158:9
**necessary** 41:15 130:3 161:6
**necessitated** 64:10 182:10
**need** 8:23 22:1 24:5 25:3,12 32:18 34:18,20 52:2,5 63:23 108:10 116:4 120:6 125:19 131:12 138:2 146:12 182:2
**needed** 16:1 24:24 28:1 39:9 60:1 63:5 63:12 75:15 80:20 82:5 94:24 100:12 100:13 122:1 129:10,19 135:21 138:4 147:13 148:12 148:13 156:11 174:10 181:23
**needs** 53:6 122:3 141:6,9
**negative** 110:3,8 110:16 111:4,6 111:8,12 120:17,20 129:15,16,17 140:6
**negotiate** 117:24 118:6 144:23
**negotiated** 159:3 159:5
**negotiating** 113:16 117:16 117:21 172:10
**negotiation** 117:20 130:6
**negotiations** 178:4
**net** 15:11,15,17 15:23 16:25 65:14 129:15
**never** 80:17 113:8 171:3 184:25
**new** 1:2,18 2:6 3:7,14,14 39:16,18 41:6 42:1 51:7 73:9 74:21 78:25 79:4,10 90:1,2 90:5 98:2 100:7,8 106:18 106:18 107:1 108:14 126:24 128:13 132:18 132:25 180:18 190:6,9
**nods** 9:16,18
**NOELL** 1:5
**Noelle** 7:9
**nomenclature** 15:20
**nonperforming** 107:12
**Nope** 41:15
**normal** 117:4 165:6 166:14
**North** 2:5
**Notary** 1:18
**noted** 186:13 193:5
**notes** 149:6 193:6 194:1
**notice** 7:16,21 8:10,13 10:2 85:2 139:10,13 141:1,24 147:14 162:18 162:20 176:3 191:5,9
**notices** 61:12
**notification** 172:5,8,12 182:5 183:4,20 190:1,14
**notified** 190:21 190:24
**notify** 182:21
**notion** 143:25
**novo** 107:2
**number** 15:14 19:21,22 20:23 20:25 22:17 30:21 35:3,18 35:21 43:9,23 43:24 44:1,2 47:10 51:5 65:16,17 73:19 79:6,7 81:18 93:17 115:10 119:2,3,6,6,13 119:25 123:8 134:18 138:17 151:16 152:10 173:8 178:6 179:23
**numbers** 44:4 45:2 62:21 63:1 76:12 117:7,11 119:1 127:18 178:5
**numerous** 146:19 147:2

**O**

**O** 7:2
**O'CONNOR** 2:18
**object** 10:10 85:1 155:14
**objecting** 190:12
**objection** 9:11 31:9 49:24 52:17 62:6 69:20 70:8 80:25 81:5 123:15 126:12 139:23 153:3 153:11 154:24 161:22 162:5 165:9,10,11 166:7,8,16,17 167:8 168:1,7 168:8 169:3 173:14 174:17 175:16,24 176:4,5 177:18 178:9,10 179:8 179:9,12,18,19 180:10 181:2 181:19 182:12 182:23,24 184:19,20,21 184:22 185:7 186:4,6 187:11 187:12 189:1 189:12 190:7 190:17,18,19 191:6
**objective** 28:6 28:14
**obligated** 141:3
**obligation** 154:2 154:6,10,11
**obligations** 131:2 167:25 190:2
**obligor** 116:7,9
**observers** 96:25 99:11,12
**obtain** 80:5 94:24 173:12
**obtained** 53:14 53:15 155:4
**obvious** 28:6
**obviously** 23:23 30:23 53:8 100:10,15 117:22 146:24 147:11 156:19
**occasions** 152:17
**occur** 105:9
**occurred** 71:20

98:21 121:4 186:22 189:7
**occurrence** 56:14
**October** 58:6 66:25 67:3,9 68:10 76:15 121:7
**Oddi** 1:16 4:5 7:8,22 8:5 9:1 12:8 13:24 45:10 47:25 50:19 56:3 63:1 70:18 81:13 119:10 149:20 164:3 168:21 188:13 191:15
**Oddi's** 153:7
**odds** 154:11
**office** 61:8 170:16,21 171:1 178:2 179:6 180:21 181:6,12,17 183:2 185:14 185:22,23 186:1,17
**officer** 30:14,18 38:18 40:21 48:5 49:4 51:11 92:1 101:6,7,11,14
**officers** 158:6,12
**offices** 98:2
**official** 14:2 95:22,23 131:16
**okay** 8:7,15 9:1 9:4,13,20,25 10:1,12,13 20:13 21:22,23 32:21 50:4 53:23 57:13 71:23 75:25 87:16 115:19
176:1 191:12
**once** 9:7 73:21 85:9 173:19 174:16,20 175:8 176:2 183:16 185:17
**one-time** 66:6
**ones** 41:7
**ongoing** 28:24 163:16
**onward** 170:12
**open** 73:12 74:20 90:23 100:8 106:17 181:23
**opening** 107:1 138:15
**operate** 63:6 68:19 136:8 146:20
**operated** 67:13 68:1,3,9
**operating** 30:13 30:14,18 92:1 96:21 181:1
**operation** 27:1 51:20 146:10 147:10
**operational** 29:18 30:10,22 90:16 131:20
**operations** 30:16
**opine** 132:2
**opinion** 152:25 153:1,7,9 154:23 179:5 179:10
**opinions** 153:8,9 155:4
**opportunities** 73:10
**opportunity** 50:7,16 51:7 143:15
**opposed** 25:10
52:16 110:25 181:22 187:5
**opposite** 177:19 188:4
**option** 34:2,3 135:16,16 136:23,23,25 136:25
**options** 34:23 78:11 142:14
**order** 24:18,24 51:25 53:2 81:20 106:8,25 125:8,9 128:24 129:7 144:14 178:15 179:15 192:4
**orderly** 162:11
**ordinary** 25:10 108:12
**organization** 147:8
**organize** 149:6
**oriented** 29:21
**original** 53:22 76:14
**out-of-pocket** 26:24
**outlay** 189:18
**outlines** 63:10
**outside** 12:18 52:5 53:11 103:1 155:8,14 161:11,11,12 161:12
**outstanding** 35:4 79:7 110:10 130:11 142:7
**overall** 90:22
**overly-simplis...** 70:12
**owned** 27:5,8,20 157:4,23
**owner** 13:8 32:23 177:1,4
**owners** 29:19
**ownership** 19:18 31:15 32:1,10 39:25 79:5
**owns** 25:22 31:16 32:1 36:19 59:3

**P**

**P** 2:1,1 3:1,1
**P.C** 2:3 3:3
**p.m** 192:10
**Pacific** 30:17
**page** 4:13 5:4 6:4,9,14,19,24 42:25 44:8,8,9 44:9,16,16 45:13 59:9 73:18 75:25 115:20 120:1 124:20 138:19 194:2
**pages** 6:8 44:18 61:25
**paid** 24:15 25:19 25:20 89:2 140:13 165:13 165:15
**paper** 176:22
**Paragraph** 122:18
**parameters** 179:24
**parent** 58:22,25 59:2 104:1 115:25 119:14 122:24 124:12
**part** 5:5 50:15 56:10 83:3 84:7,16,16 88:25 94:1 99:16 125:12 125:16 148:5 156:23 183:6 186:25 188:20
**participant**
126:2 127:1,4 127:5,8 128:20 159:17
**participants** 127:2
**participate** 100:22 117:15
**participated** 99:14 128:18
**participating** 102:24 126:16
**participation** 117:19 126:5 126:10,11,14 126:19 151:19
**particular** 93:15 130:7 190:6
**parties** 56:21 115:21 122:25 151:18 154:3,4 154:4,20 155:8 159:5 169:18
**partner** 12:10 12:24 13:13,21 13:25 14:24,25 15:5 16:20 17:21 19:4,5 20:14,18 21:7 21:9,11,15,17 21:19,20,24 22:9,19 23:14 24:1,3,7,15 25:7 26:18,20 28:3 47:25 50:2 54:22 76:7 85:20,23 86:15,21 105:14 175:14 175:20
**partners** 1:10 2:23 4:14,21 7:13,17,22,24 8:8 11:13 12:9 12:11,13,14,24 13:17 14:1,5 14:17 15:16,23

16:2,23 17:2,6
17:8,12,16,19
17:20,24 18:2
18:4,13,15,15
18:16 19:3,5,6
19:16 20:5,21
21:7 22:10,13
22:19,22 23:8
23:11,15 24:2
24:5,6,17,20
24:23,25 25:6
25:16,17,20,21
25:23,24,24,25
26:1,4,9,22
27:4,5,8,13,16
27:23,25 28:2
28:5,9,17,20
28:21,24 29:4
29:9,11,17
30:5,11,12,24
31:3,5,12,16
31:17,22 35:11
35:12,13,17,23
35:25 36:1
43:25 47:14,18
48:21,22,24
49:3 50:3,5
51:6 52:8,8
53:16 54:11,14
54:17,19,20,23
54:24 55:3,4,7
55:12 56:17,24
57:7,25 58:8
60:5,7,9,11,13
60:14,16,25
61:3,5,6,7,13
61:16,18,20
62:11 63:6,7
63:25 66:20
71:5,8,15
72:19 73:25
74:2 75:2,9,18
75:22,25 76:5
76:5,13,16
77:13 80:12
85:5,6,25
86:22,25 87:1
87:3,7,8,11,24
88:9,13,17
89:4,6 92:4,12
93:6,16 97:17
99:21 103:4,16
103:19,21
104:5 105:3,8
112:23 113:11
117:15 121:15
127:20 130:12
132:9,10
133:18,18
136:16 144:15
144:19 154:7
154:10,19
159:20 160:17
162:25 163:2
164:4 165:12
165:15
**partners'** 20:24
22:16 50:1
54:8
**partnership**
16:17 17:6,20
19:4 21:12,13
22:18 24:4,9
30:2 31:6,14
85:24
**partnerships**
29:19 30:1
**parts** 170:2
**party** 57:2 58:15
59:5,6 62:14
116:7 118:8
124:25 125:2
126:15 134:11
134:13 183:10
**PASHMAN** 3:3
**pass-through**
163:17
**passed** 25:13
109:1
**passing** 109:3
**passive** 52:14,16
**pause** 9:10
163:19
**pay** 25:25 26:21
87:24 88:24
181:25
**payables** 140:5
**paycheck** 176:8
**paying** 88:3,8,12
88:17
**payment** 88:1,5
163:18 180:3
**payments**
165:20
**payroll** 130:20
131:2,8,13
137:8,9,12
138:6,8,12
182:15
**pays** 25:23
26:22
**peak** 143:15
**pending** 32:20
**Pennsauken**
170:15 174:24
180:21 187:18
**Pennsylvania**
1:23 2:14,21
180:18
**pension** 15:14
**people** 9:7 16:6
50:24 93:9
99:18 146:23
147:1,3,10
151:7,11,17
156:16 158:15
171:9 173:12
173:19 174:5
174:15,19
175:2,8,22
176:2 177:16
178:1,7,7,15
178:19 179:6
183:23 187:3
190:24 191:3
**perceived** 80:23
**percent** 18:22,22
18:24,25 20:3
20:4 31:8,11
31:13,16,18,23
32:11,12 33:1
36:20 42:8
49:14 79:14,15
79:16,17 81:19
81:21 111:1
132:21 155:17
**percentage**
19:25 24:16
35:19,19 63:20
79:5,13 81:14
81:25 114:8
140:3 145:23
146:1
**perform** 144:25
**performance**
24:15 28:10
66:10 87:19
113:14 145:3,4
145:7
**period** 34:18,22
38:9,14 39:19
40:2,11 60:1
67:13 68:1,19
70:6 83:21
94:2 95:9 98:7
98:10 116:25
143:5,9,16
144:6 189:8,11
**periodic** 112:4
**periods** 143:12
162:22
**permanent**
46:24
**permit** 116:12
**permitted** 24:8
110:10
**person** 78:24
92:19 98:3,23
99:1 101:8,16
101:25 102:1
105:10,11,25
115:2,7 128:18
150:18 155:19
157:22 177:4
178:18 179:5
179:15 182:19
185:4
**personal** 49:25
85:8 155:15
**pertain** 90:8
**pertaining**
158:24
**pertains** 62:8,10
**Philadelphia**
1:23 2:14,21
**phrase** 63:13
**physical** 61:8
**pitch** 129:4,5
**PK** 131:17
**place** 2:12 39:25
46:7 53:6
56:13 57:22
66:12,15,18,21
67:5,8,11 69:2
93:6 114:8
123:21 131:9
143:7
**placed** 15:18,24
51:10
**placement** 92:13
**plain** 123:2
**plaintiffs** 1:8 2:8
2:16 7:9 179:7
**plan** 34:12 46:7
46:11 49:17,18
49:22 50:8,13
50:20 51:1,4
52:10 148:9,9
148:11,16,18
185:11,12,25
186:20
**planned** 135:9
**planning** 101:25
141:7
**plans** 100:14
123:21 188:25
**play** 92:5
**played** 70:16
**Plaza** 3:5
**please** 12:4

78:14 139:13 153:4 164:23
**pledge** 4:24 62:20,24 64:1 66:11,21 67:4 67:7,14,19 68:1,3,4,11,16 68:20,21 69:1 69:7,11 73:17 76:14,15,21,25 77:2,6,21 109:6 130:10
**pledged** 73:24 74:1,11,13 75:1
**pledgor** 74:9 75:17,19,22,25
**plex** 151:20
**plural** 42:11
**plus** 89:10 181:12
**point** 37:8 39:7 67:17 70:24 72:18 78:17,19 88:4,16 95:7 98:9 109:2 116:4 126:21 128:3 129:7,12 129:13,21 130:2 131:22 140:17,20 142:3 143:24 146:2 152:24 166:5 177:4
**point-of-sale** 50:25
**points** 130:8 140:3
**policies** 90:9,12 90:15,17,19,21 110:5
**policy** 158:6,8 158:10,12,13 169:11
**policyholder** 158:20
**portfolio** 27:6,13 28:10 30:11,19 30:25 48:11 87:6 155:10,12 155:18,21 157:4,9,11,14 157:17,19,20 157:23 158:2 160:13,16,22 164:5 165:17 167:13
**portion** 74:11
**position** 12:8 51:11 69:19 70:7 88:23 143:3 152:9 174:6
**positions** 92:11
**positive** 14:12 28:7 61:21 91:21 96:1 105:1 110:3,3 110:13 111:1,3 111:6,7 132:15 132:21 133:8 134:5,8,12 155:17 162:22
**possibility** 180:13
**possible** 48:15 66:10 68:23 97:4 99:25 148:14 184:12 188:15,19
**possibly** 100:1 117:24 144:24
**post** 187:5
**potential** 28:22 29:20 124:6 151:1,21,22,23 151:24 166:25 169:19
**potentially** 59:19 71:7 142:18 145:11 145:14,16
152:15 153:2 153:10,23
**power** 23:25
**powers** 24:3
**pre-allowed** 23:1
**precarious** 122:12
**preceded** 39:17
**predecessor** 111:17
**preferable** 79:23
**preference** 8:5
**preferred** 80:16
**prepare** 10:3,21 128:25
**prepared** 8:15
**present** 69:3 97:1,3 100:20 101:8,11,24 102:10,14 106:21 112:4 112:20
**presentation** 102:3,7
**presentations** 102:8 129:6
**presented** 44:9 90:3 167:7
**president** 36:22 37:8 38:5,6,9 38:15,25 40:11 40:12,17,18 41:2,12,17,19 41:20 42:25 43:6,9,12,15 45:24 46:2 106:2 124:21 127:14
**press** 4:21 47:13 47:17 48:12 50:19
**pressures** 188:23 189:10
**pretty** 30:21
**previously** 10:6
10:19 11:4 35:11 48:10 92:8,15 100:7 107:21 131:19 141:20 147:2
**price** 78:17,19 78:21,22
**prices** 145:9,11
**primarily** 35:16 71:5 114:5
**primary** 113:15 116:20 120:9 177:4
**principal** 13:8
**principles** 65:22
**printouts** 11:3
**prior** 8:10 13:5 13:22 30:6 40:7 46:25 50:6 51:3,21 54:7 60:3,4 62:13 70:15 92:9 94:6 95:9 95:13 98:5,18 98:22,25 112:23 113:7,9 113:12 123:20 123:24 124:2,5 125:20 128:6 132:4 143:20 144:4 148:18 151:4 152:16 155:25 156:3,6 162:18 172:9 174:8,23 175:8 177:25 190:25
**priority** 50:22
**private** 12:14,16 12:17 20:17 31:4 79:19 84:22 126:7 127:11
**privilege** 154:22 154:25
**privy** 183:8
**probably** 108:4
132:13 145:20
**probing** 144:22
**problem** 44:17 191:16
**problems** 68:5 130:20
**procedures** 87:23 90:10,15
**proceedings** 193:4
**process** 17:16 50:15 118:8 122:22 128:21 131:9 135:21 144:16,19,21 161:25 162:11
**produce** 12:4 97:24
**produced** 11:8 11:16 12:2 37:18 42:6,11 84:15 97:20 165:2
**production** 6:3 10:16 97:22 148:6
**products** 146:7
**profitable** 28:22
**prohibited** 1:24
**projections** 113:14 117:24 144:20
**promise** 78:10 79:25
**promoted** 13:21
**pronounce** 48:15
**properly** 143:14
**proportion** 18:21
**proportions** 19:17
**proven** 28:22
**provide** 8:12 12:22 14:20 54:3 63:8 73:6

74:21 83:9 86:14,16,19,24 87:2,11,21 90:15 112:9,11 112:13,14,16 112:22 113:1 117:22 131:21 148:7 154:15 154:17 161:15 162:8,9 167:9 168:3 176:15 176:20 180:16 182:16 189:5
**provided** 10:6 11:21,23 53:20 54:4 65:24 67:22 75:4 80:18 83:13 87:9 89:5,6,13 89:25 113:22 113:22 121:24 126:21,23 133:22 135:22 141:10 144:24 147:13 178:22 190:15 191:9
**provides** 63:10
**providing** 47:24 89:16 121:14 144:21 180:2
**provision** 110:20,25 111:23 121:17 141:1,20
**provisions** 118:1 146:1
**Public** 1:18
**pull** 7:15 41:13 71:21,23 178:13,23 190:11
**pulled** 115:12 182:19
**pulling** 73:16
**pumped** 121:21
**purchase** 33:5 80:7,8 108:4,7
**purchased** 17:5 17:12,14 18:5 31:23 33:11
**purchaser** 129:20
**purchases** 16:13 28:18 52:9 108:13 138:13
**purchasing** 90:21 91:3 107:5 108:14
**purpose** 20:15 26:16 36:5 52:14 120:22
**purposes** 115:10 139:3 164:12 168:12
**pursuant** 21:13 57:23 87:6 135:22 183:6
**pursued** 51:4
**put** 22:25 23:23 53:5 55:2 56:13 57:21 64:21 66:12 67:8,10 77:1 78:6,8 83:15 114:7 118:3 123:4 130:11 131:9 165:9
**puts** 57:6
**putting** 37:25 146:22

**Q**

**Q1** 98:12
**Q2** 98:13
**Q4** 188:19
**qualified** 105:22
**quarter** 116:13 116:22,23 117:11 143:11 188:18
**quarterback** 176:12
**quarterly** 96:3
**question** 9:8,9 9:13 11:20 31:10 32:20,21 33:22 38:12 47:7 52:7,18 61:22 62:2,13 68:2,7 69:21 70:9 76:11 81:5 123:16 126:13 140:23 153:6,12 155:7 161:23 162:6 165:11 167:9 167:22 169:5 179:23 182:13 186:12 187:16 187:16,23 190:13,23 191:1,2
**questioning** 191:20
**questions** 6:23 8:16 10:7,23 11:14 21:21 85:3 186:8 191:13,19,22 191:23,25
**quite** 114:25
**quotes** 47:20

**R**

**R** 2:1 3:1 193:1
**raise** 15:10 54:21 108:16 163:10
**raised** 107:9,14 108:5 133:11 163:5
**raises** 12:18 54:19
**raising** 31:4 145:9
**ran** 30:16
**rare** 32:15
**rate** 25:2,10 139:16,24 140:2,4,7
**rates** 25:14 133:5
**ratio** 109:20
**reached** 156:15
**read** 136:10,12 169:4,6 185:17 187:25 191:18
**reading** 169:9
**reaffirmation** 125:11,22 126:3 127:9
**realized** 24:17 73:9
**really** 9:22 65:4 79:3 113:13 116:10 133:19 137:16 140:24 142:17 187:16
**reason** 59:22,22 67:25 123:12 138:8 179:14 179:21,22
**reasonably** 122:21 128:2
**recall** 43:16 47:8 82:19 83:9,11 83:19 90:13,18 90:20 97:3,5 99:8,9 101:12 101:21 107:8 110:15,18 117:7,9 124:1 143:6,23 147:5 148:20 150:16 159:7 161:7 164:10 165:24 170:13 184:13 187:13
**receipt** 80:21
**receivable** 63:20
**receivables** 91:1 114:6
**receive** 14:7,10 14:16,18 15:8 21:2 24:18 25:4,5,16 31:19 34:9 116:21 158:4 165:19,20,21 166:15
**received** 10:2 16:1 24:25 34:5 78:12,13 157:14 167:12 172:1
**receives** 15:1,16 15:21
**receiving** 165:7
**recess** 43:20 81:10 118:15 149:8 163:22 188:10
**recipient** 34:8 61:12,18
**recollection** 67:8 79:18 86:16 93:10 95:16 98:24 103:24 110:24 112:10 115:5 121:12 138:9 140:2 143:7 156:20
**recommended** 153:17
**record** 8:3 136:12 171:21 187:25
**recover** 123:13
**recruited** 48:25
**recruiting** 93:14 93:15,17
**reducing** 145:13 189:20
**reduction** 173:3 185:13,25 186:3,21
**reductions** 171:4,23
**refer** 98:10
**reference** 23:15

79:20
**referenced** 11:4 14:13,23 24:10 25:15 39:16 49:17 62:25 65:7 89:3 95:6 100:6 111:24 127:19 141:20 143:10 144:9 151:11 156:10 166:20
**references** 59:18 85:20,22 86:5 119:19 148:8
**referencing** 33:18 42:6 56:19 83:4 148:12 151:10
**referred** 137:25 150:24 185:5
**referring** 48:17 56:17 57:7 97:8 103:12 126:11 136:17 136:19 137:1 137:19 165:5 185:23 190:20
**refers** 24:16 186:20
**reframe** 68:7
**refresh** 116:5 121:11
**refund** 116:22 117:1
**refused** 130:23
**regarding** 139:10 177:7
**regardless** 138:11 187:20
**regional** 30:16
**regular** 65:19
**regulations** 25:11
**regurgitate** 178:21
**relate** 64:6
**related** 11:19 43:11 57:24 90:16 147:3 172:11
**relates** 66:3,4 91:4 126:17
**relationship** 48:23 51:18 54:7,11 55:4 111:20
**relationships** 30:7 31:2
**relative** 62:4,7 72:16 113:18 117:23 156:13
**release** 4:21 47:13,17 48:12 50:19 69:23
**remain** 75:15
**remaining** 18:25 154:23
**remember** 11:22 13:6,22 19:20 35:21 36:10 38:11,24 39:3 39:14,23 58:14 64:20 70:1 71:22 79:16 81:18,24 83:20 83:25 85:13 94:5,7 95:23 99:5 101:18 102:21 104:12 106:9 109:4 112:12 118:22 120:18 124:4 129:17 133:5 134:14 140:4 144:6 145:25 152:18 156:9 160:23 161:1 167:13 169:8 170:22 171:8 173:6,8 178:24 184:12 190:2
**remembering** 59:23
**removal** 150:1
**removed** 150:2
**renegotiate** 145:21
**rent** 26:24 145:19,23,24 146:1,2
**repay** 74:21 78:10 79:25
**repayment** 69:6
**repeat** 26:3 33:17 81:14 187:22
**replace** 155:12
**replaced** 82:21 95:5 108:22 150:4,18 153:22 155:19
**replacement** 39:22 46:14,16
**replacing** 150:20
**replenish** 146:12
**report** 14:7,14 94:11
**reported** 14:8 15:8 66:7 94:12
**reporter** 9:6,6 9:17,22 136:12 187:25 192:3 193:19
**reporting** 87:23
**reports** 112:4,8
**represent** 7:9
**representative** 7:12,21,23 8:21,23 41:1 101:24 102:4 102:11 151:18
**representatives** 96:24
**represented** 44:4 103:1 128:15
**representing** 60:10,15 159:14
**reproduction** 1:24 193:17
**request** 6:3 135:22 140:25 166:24 182:16
**requested** 7:21 10:22 42:7 100:13 136:13 188:1
**requests** 10:17 11:11
**require** 22:18 40:16 56:12 68:15 106:8 155:1 162:18 174:7
**required** 21:18 22:22 40:15,20 40:21 41:6 57:17 66:7 74:5 75:6,6 80:1,17 81:16 82:1 83:16 84:25 85:12,15 85:17 88:1 89:1 106:14,20 107:6,13,25 108:9 109:19 110:7 112:3,8 112:10,13,14 112:15,20 113:19 114:7 114:10 133:20 140:13 142:10 147:10 148:6 162:21
**requirement** 34:20 72:21 73:13 80:2 81:23 143:18
**requirements** 22:25 25:12 34:14,16 69:6 69:10,12 80:11 120:9 144:13 147:12 162:12 172:5,8
**requires** 20:18 84:19 179:12
**requiring** 87:22 156:23
**reservation** 139:11
**reserve** 137:10
**reserves** 114:7
**resetting** 120:8
**resign** 151:15
**resignation** 38:17,18,19,21 38:22,23,25 39:2,6 41:23 41:24,25 42:3 42:4,5,10 95:6 95:10,14 150:8 150:10,12,15 152:13
**resigned** 39:8,12 39:21 108:19 150:19
**resource** 90:12
**resources** 29:19 30:10,24 50:25 90:16 101:11 101:13 163:11
**respect** 24:22 55:8 64:9 122:23
**respective** 102:9
**responded** 11:20
**responding** 9:10
**response** 10:16 11:10
**responses** 11:2 11:18
**responsibilities** 40:18 173:2
**responsible** 97:15 154:1 179:5,15
**responsive** 10:23

11:13,17 12:4
**restated** 4:19 42:23 44:22 45:1,6
**restricted** 83:8
**restrictions** 118:3
**result** 116:23 121:5 176:9 180:15
**resulting** 161:25
**retail** 48:9
**retain** 32:4,7
**retained** 5:24 91:16,17 97:18 166:12
**retainer** 164:8 164:23 165:3,7 166:6,10,15,24
**return** 12:22 28:7
**returns** 24:16
**reveal** 153:4 154:25 155:2
**revealing** 154:21 155:5
**revenue** 65:4 109:16
**revenues** 65:2
**review** 37:25 38:13 57:11 87:19 90:22 100:13 112:23 113:3 148:5 159:8,18,20
**reviewed** 10:5 10:14,18 60:10 60:12 159:9
**reviewing** 87:4 144:20
**revolver** 83:12 83:13 136:5
**revolving** 54:5 114:13 130:24
**reword** 52:24
**Richard** 47:22 47:22
**Rick** 32:23 46:25 50:11 59:22 60:3 128:15
**right** 13:15 15:11,25 17:21 22:6,11 23:4 23:12 24:6,7 24:19 26:2,10 27:12,12 33:2 33:8 35:6 36:12,20,25 37:22 40:8,23 45:21 48:6 56:6,22 57:3,9 57:13 58:17,23 64:22 66:13 67:1,11,15 68:6,12 70:3,4 72:10,23 74:3 74:10,11,17 75:7,10,14 76:3,4 78:16 78:18,23 82:7 82:14,16,20 83:1 85:22 89:13 91:8 93:5,21 94:25 95:3,11,12 96:14 103:15 103:18,23,25 104:3,8,10 105:4,9,10,11 106:9,15,25 107:2 108:9 111:8,11 112:20 118:6 118:10 119:17 119:20 121:3 121:22 122:6 123:10 124:13 124:22 125:11 125:16 126:3,4 127:14 128:1,6 129:1,25 135:9 135:17 137:23 139:8 140:8 141:18 145:20 145:21 146:4 149:3 150:2,5 150:20 151:8 152:17 153:15 153:22 156:19 157:20 158:11 158:13,25 159:3,15 160:13 166:6 167:20 169:23 170:21,23 172:5,15 175:15 177:2,8 177:11,17 178:2,8,14,16 180:18,19,22 181:13 182:10 182:20 183:3 183:23 184:17 185:11 186:9 186:18 190:6
**right-hand** 11:5
**rights** 22:14,16 127:5,6 130:15 139:11
**rise** 153:2 174:1
**risk** 80:19,23 82:2 168:9 182:14
**road** 48:2
**role** 20:22 30:18 40:12,14 49:21 50:1,12 70:16 92:4 116:20 144:15 166:24
**roles** 173:1
**rollover** 31:20 32:13
**Rome** 3:11 102:20
**Ron** 13:1
**Rooks** 2:3,4 4:6 7:6,9,19,25 12:3,7 37:2,11 42:9,14 43:17 43:23 44:11,17 47:9 50:2 55:19 62:17 81:7 84:3 85:6 114:14 115:9 118:13 134:16 136:9 138:14 139:3 147:16 149:5,11 153:6 155:3 159:23 163:19 164:11 168:11 171:18 173:17 183:25 184:21,23 186:9,13 188:7 190:10
**room** 183:12
**Rossi** 1:5 7:10
**roughly** 18:24 27:21 31:14 77:12,16,17 189:8
**round** 81:20 178:5
**rounds** 41:5
**Route** 2:5
**routine** 183:19
**RPR** 193:11
**rules** 9:5
**run** 21:7 172:24
**rung** 30:22
**running** 174:20
**Russell** 136:9 193:11
**Russell,RPR** 1:17

**S**

**S** 2:1 3:1 4:11 5:2 36:9 150:5 150:22
**sale** 89:12 90:6 94:6,9 98:18 98:22,25 100:16 101:20 122:22 123:4 123:21,24 128:16 129:5 129:18 130:4 151:21,25 171:11 177:5,7 177:15,16,21 177:25 181:24 187:9,21 188:15
**sales** 116:24 131:2 135:12 135:15 136:22 137:3,4,5 145:5,6,12,25 146:11,14 189:20
**Sam** 176:25
**Sammy** 171:12 176:14 184:16 184:16 185:5,5 185:10,13,25 186:21,25
**Sammy's** 188:5
**sat** 60:2
**satisfied** 69:5,9
**satisfy** 79:4 131:2 163:4,9 163:12 167:25
**saw** 50:7 91:22 166:9
**saying** 13:14 21:20 68:9,18 77:14 86:18 88:8 102:15,20 103:22 121:20 135:4 150:14 153:14 155:18 157:22 163:9 182:8,9,11 186:11 188:21 190:24
**says** 29:16 36:19 37:21 41:13 45:20 47:21

48:2 50:19 51:12 56:21,24 57:2,15 58:11 58:19 59:5,7 60:7 74:9 76:5 76:6 84:15 85:6,21 116:7 116:11,16 119:12,13,25 121:9 122:7,20 124:19 125:22 126:5 128:1 135:4,14 136:21 137:7 138:5 139:13 148:9,17 149:22,25 150:1 164:23 178:24 184:15 185:9,12
**scenario** 137:3,5 154:8 162:7,8
**scenarios** 135:15 136:22 137:2 162:3
**schedule** 14:13
**scope** 85:2 155:15
**scrambling** 137:8
**screen** 11:1 29:7 169:6
**scroll** 38:4 42:24 61:24 114:24 120:21 122:15 124:10 160:10
**scrolled** 125:5
**scrolling** 45:11 59:16 60:21
**se** 61:8 127:6 142:3 158:9
**search** 91:16,17
**searching** 46:14 46:15,16,22
**season** 143:9
**SEC** 84:10,18,20 84:25 85:15
**second** 7:15,25 13:2 29:7 41:12 44:9,12 44:16 59:17 72:13 73:21 133:17 163:19 171:18 185:12
**secretary** 36:25 95:21
**section** 115:13 121:9,11 122:16 139:16
**sector** 23:7 28:23
**secure** 80:1 81:20 144:24
**secured** 57:2 59:5,6 103:13 131:4 138:1 142:18 154:4
**securing** 80:13
**securities** 152:8
**security** 4:24 5:6 62:21,25 66:11 66:21 67:5,14 67:19 68:2,4,5 68:11,16,20,22 69:1 73:17 77:2,6 109:6 114:16,18 115:16 130:11
**see** 12:1 29:21 38:17 41:14 43:1 44:12 45:18 51:13 56:20 58:20 59:11 73:14,19 73:22 84:11 115:14,23 116:14 119:15 119:25 120:21 121:7 122:16 122:25 123:18 124:24 125:8 126:3,8 127:11 135:2 137:12 139:11,17 148:2 149:23 156:16 160:6 164:18,24 165:5 168:22 178:24 182:1,4 184:7
**seeing** 184:12
**seek** 108:9 154:22 155:5 173:22
**seen** 8:13 36:16 37:19 45:10 47:18 56:3 57:13 63:2 113:12 114:22 119:10 135:19 135:20 139:5 148:4,5 149:20 167:3 184:11 184:25
**selected** 49:3
**selection** 47:24
**sell** 128:24 129:7 142:1,3,12,16 146:7 176:6 191:7,11
**seller** 31:19,24 32:1,4,7
**selling** 124:2 128:22 143:16 146:11 187:19
**send** 164:23
**sense** 50:17,18 61:21 98:25 148:12 168:9 186:25 187:4 191:2
**sent** 8:10 10:19 11:9 113:12 169:22
**sentence** 169:4 185:11
**separate** 11:11 82:13 104:13 125:4,6,10,14 126:22 150:11 157:24 158:5 161:1,4
**separation** 189:9 191:5
**sequentially** 183:18
**series** 21:21
**serve** 20:16 156:24 165:7
**served** 43:11 75:12 165:22
**serves** 74:7 79:17 87:5 157:22 181:8
**service** 146:22 165:18
**services** 86:12 86:13,17,20,24 87:1,9,12,16 87:17,25 89:4 89:6,13,17,24 90:8,14 91:6
**serving** 151:17 157:9 161:19 164:5 165:13 169:16
**session** 135:9 136:21
**set** 65:22 78:17 116:13 145:1
**setting** 145:2
**setup** 36:4
**seven** 56:1
**severe** 140:20
**shakes** 9:18
**share** 29:7 44:11 61:6 164:18
**shareholder** 29:17 33:11,20 77:1,25 103:20 104:6 105:7 171:13 177:3
**shareholders** 36:11 70:15,20 71:1,4,19 72:1 79:11 103:8,14 126:22,25 152:6 154:3
**shares** 78:10 79:6,8,9,10
**sharing** 40:5,6 43:8 51:25 138:14
**shipping** 146:15
**Shoppers** 90:6 94:7 130:7,8 165:25 171:11 171:13 176:7 177:1 187:10 187:19 188:15
**shopping** 50:23
**short** 43:20 81:10 149:8 163:22 188:10
**show** 84:12 185:10
**showed** 167:17
**shows** 185:13,25 186:1
**shut** 186:15
**shutdown** 182:2
**side** 9:11 159:13
**sign** 191:18
**signatories** 41:11 124:10
**signatory** 41:12 59:9,10 61:25 125:19,20,24 158:7
**signature** 40:9 40:16 42:25 45:13,16 59:8 60:22 62:1 76:3,9 124:13 124:21 138:19
**signatures** 37:25 45:14 60:22
**signed** 40:23 41:2 127:13 134:2

**significant** 29:17 93:17 130:22 136:2 174:13 178:3 189:14 189:15
**significantly** 116:24
**signing** 59:24 124:9
**similar** 113:21 185:2
**similarly-situa...** 1:7
**simplified** 79:22
**simply** 86:15,21 159:8
**simultaneously** 111:18 150:17
**singing** 183:19
**single** 150:4,18 155:13,19
**sit** 10:25 43:10
**situation** 59:14 78:25 119:23 135:25 166:22
**six** 122:18 181:4 181:7
**skinny** 185:14 186:1,2
**skipped** 84:1
**small** 15:14 51:5
**smaller** 35:3 127:18
**smell** 144:21
**social** 98:13
**sold** 22:6 32:10 32:12 33:1 69:23,24 123:10 129:24 142:20 165:25 189:20
**sole** 33:11,20 151:14 155:25 156:13 169:16 175:13 179:17 179:20
**solving** 180:4
**somebody** 178:13,14 183:11
**sorry** 33:17 35:25 44:6 53:24 57:10 69:8 81:2 86:18 87:14 157:17 162:8 177:22
**sort** 32:7
**sought** 169:2
**sound** 48:5 70:3 92:20 95:11 129:1 164:9
**sounds** 18:17 72:24 95:12 130:1 150:21 170:23
**source** 78:2 93:9
**sourced** 93:11
**South** 1:22 3:5
**speak** 105:11 142:1,12 155:7
**speaking** 124:7 161:8 169:17
**specific** 23:6 24:3 26:14,15 26:16 65:16,17 65:24 76:12 110:19,25 116:4 120:18 126:17 143:6 147:5 162:3,14
**specifically** 26:17,23 59:18 74:23 131:23 141:2 161:14 162:17 172:20 174:10 180:1 181:17 189:3 189:24 190:23
**specifics** 106:11
**specified** 118:21 139:14
**speculating** 184:24
**speculation** 179:13
**speculations** 186:6
**speed** 137:3
**spending** 74:20 89:16,20 100:14 108:2
**split** 77:12,14,17
**splits** 19:20
**spoke** 144:5
**spoken** 9:20 105:24
**spot** 62:1
**spots** 40:9
**staff** 89:10 148:23,24 149:2 170:21 170:25 171:4,4 172:14 173:2 174:24 180:9 182:9 185:14 185:20 186:2 186:24 187:3,8 187:14
**staffed** 143:15
**staffing** 146:9 147:3,5 148:10 148:17,18,19 171:23 185:12 185:25 186:20
**stamp** 160:8
**stamped** 4:15,17 4:20,22,24 5:7 5:10,11,13,14 5:16,18,19,20 11:5 37:5,15 45:7 55:23 134:22 138:25 147:17,21 149:13,17 160:2 164:15 168:16 184:4
**standard** 166:23
**standing** 110:6
**start** 98:11 115:21 167:11
**started** 85:13
**starting** 143:5
**starts** 44:20 65:14
**state** 1:18 66:10 130:19 162:15 162:17
**stated** 191:2
**statement** 29:23 79:22
**statements** 112:14,16
**states** 1:1 62:24 172:20 181:1,7
**status** 122:10,12
**statute** 190:5,6
**stay** 34:18,20 144:14 181:23
**staying** 83:23
**steady** 66:10
**STEIN** 3:3
**Stipulations** 6:18
**stock** 4:15 37:4 44:1,3,7 122:23
**stop** 40:5,6 43:8 51:25 59:16 138:14
**stopped** 88:17
**store** 106:18 107:12,13 146:9
**stores** 73:11 74:21 100:7 146:15,23 180:18 181:23
**strategic** 46:7,11 49:16,17,22 50:13 152:11 174:13,16
**strategies** 146:21
**strategy** 21:8 187:1
**Street** 1:22 2:13 2:20 3:6
**strictly** 161:17 163:16 168:25
**strike** 62:3
**string** 186:6
**structure** 20:17 146:3
**Stu** 171:10
**Stuart** 5:17 164:14,22 170:1
**style** 47:24
**Sub** 36:3,8,12,18 36:20,23 43:5 43:14 44:13
**subject** 114:6
**submission** 150:15
**submit** 113:19 131:12 134:3
**submitted** 38:23 39:1,5 95:6 133:21,25 134:11,13 150:8,10,11 180:3
**submitting** 112:23
**subscription** 16:7,9 23:12 26:2,5
**subsidiary** 59:3
**substance** 155:6
**substantial** 35:22 100:15 116:21
**substantially** 113:21 122:24
**subtract** 65:17
**successes** 30:6
**successor** 91:11 91:12 94:9 137:18 138:21

**succinctly** 70:13
**Suite** 1:22 2:5 2:13,20
**Sullivan** 91:23 91:23,25 92:5 92:7 94:5 115:3,4,6
**sum** 74:11,13
**supervision** 193:19
**support** 6:1 89:10 121:14
**supported** 51:12
**supporting** 50:24
**sure** 7:20 15:20 38:2 42:8,12 68:9 70:18,23 111:11 113:22 118:1 130:16 136:7 142:14 142:16 143:13 144:17 151:9 158:3 159:16 159:18 175:4
**surfaced** 91:19 93:7
**surprise** 170:24
**sustained** 69:19
**sworn** 7:3
**synergies** 187:2
**synonymous** 49:13
**synthetic** 34:10
**system** 50:25 108:15
**systems** 100:8

**T**

**T** 4:11 5:2 193:1 193:1
**take** 9:6 22:20 24:8 32:18 43:17 51:9 57:20 79:20 81:7 139:13 144:16 170:7 170:11 173:23 173:25 185:16 186:2 188:7
**taken** 1:17,19 26:12 43:21,25 46:13 53:3 79:9 81:11 118:16 149:9 163:23 172:24 173:13 175:9 188:11 193:6
**takes** 28:5
**talk** 17:18 28:13 53:18 95:9 98:6,9 112:7 138:6 147:4 149:11 155:1
**talked** 27:3 44:12 61:14 77:19 82:20 106:6,9,11 109:8 118:20 137:14 141:12 143:17,19 147:1 150:7 173:1 189:25
**talking** 9:7 11:15 21:22 24:22 41:25 45:23 48:20 52:24,25 58:6 71:4,21 77:25 81:13 98:18 99:3 100:24 104:8,9 106:4 118:18 129:8 143:4 148:11 155:22 162:14 163:25
**talks** 86:5,12 135:11
**targets** 117:8
**tax** 59:22 116:21 117:1
**taxed** 25:9
**team** 47:22 48:3 91:7 92:6 93:20 100:7 147:9,13
**teams** 29:20 30:4
**tease** 74:23
**technology** 108:15
**telephone** 99:4,6
**telephonic** 128:19
**telephonically** 99:2,3
**tell** 28:14 29:25 63:4,16 64:18 65:9 73:3 78:14 84:16 140:20 155:9 169:1 183:3
**ten** 27:21
**ten-minute** 81:7
**tend** 9:15
**term** 24:11 27:6 27:7 31:20 46:2 54:4 59:15 65:21 129:3
**terminate** 173:12,19 179:16
**terminated** 171:1 178:2,16 180:6 182:22 183:3 187:6 188:23 190:22 190:25 191:4
**terminating** 170:15 179:6
**termination** 162:19 170:20 173:16 174:15 174:19,23 175:2,8,22 176:2 178:19 186:23 187:8 187:17 188:4 190:25
**terminations** 147:14 172:14 180:25 182:9 182:19
**terminology** 23:22
**terms** 18:17 23:13,25 35:18 63:22 65:11 79:13 82:23 106:6 147:13 152:10 154:16 156:12 159:11 173:10 189:17 189:18
**test** 65:5
**testified** 7:3 40:10 51:9 52:9 54:14 68:24 72:5 118:9 167:11 172:4 190:4
**testifying** 167:14
**testimony** 8:12 9:6 171:25 172:23 183:16 189:2 190:9
**testing** 144:21
**thank** 12:7 76:1 121:1 191:14 192:1
**theory** 174:2
**thesis** 23:3
**thing** 48:13 49:13 113:15 113:18 139:19
**things** 9:16,18 22:22 23:16 30:23 40:23 73:21 82:9 87:23 100:3,6 110:4,9 112:17 112:19 113:13 120:10 130:5,9 146:24 176:1
**think** 9:22 10:10 14:2 23:21 25:15 28:6,14 29:3 41:8 47:3 52:9 54:14 55:14 67:1 68:24 69:25 70:12 78:18 79:21,22 81:19 82:6 84:4 85:9 85:14 86:7 88:6,18 91:25 93:3,3,4 94:7 95:2,24 97:13 97:13,19 98:12 100:6 101:22 103:18 104:15 105:4,19 108:24 111:20 113:10,15 115:16,17 125:4,21 129:18,21 131:16,17 132:15 133:11 134:7 137:9,16 137:18 141:4 142:13,17 144:4 145:18 150:25 151:12 155:16,17 158:8 163:13 166:9,23 168:5 171:9,12 172:2 172:14 174:11 174:18 176:11 177:6,13,14 181:8,11,21 182:4 185:1,4 186:16 188:19 188:24 189:23 190:4,7,13 191:2
**Thinking** 131:11 131:12,14,15

131:16,17,24 131:25 132:6,8 132:14,23,25 133:6,9,16,24 134:4,10 150:25 156:21 161:9 180:2 182:7
**Thinking's** 133:21
**third** 58:15 126:15 154:19
**third-party** 57:23 100:10 102:17,19 131:10,18
**thought** 44:7,15 50:16,17 57:10 97:20 115:4 124:2 128:5
**Threadstone** 128:9,10,12,14 128:15,17,19 171:10
**three** 18:18 19:23 31:12 33:5 35:10 56:21 135:15 136:22 137:2 178:11
**thresholds** 118:19
**thrown** 72:25
**tied** 63:20 90:23 91:1 146:10
**Tiffany** 30:20
**time** 8:2 25:11 29:11 32:18 34:19 37:4,8 37:14 38:9,14 39:7,19 40:2 40:11 42:19 43:20 45:5 47:13 55:22 60:1 62:16,20 64:19,22 67:14 67:17 68:1,19 70:6,24 71:16 72:1,10,13,17 75:7 80:14 81:10 83:15,17 83:18,19,21 84:6 88:7 89:19 92:23,25 94:1,4 95:9 96:7,7 98:7 100:5 101:20 102:8 108:17 114:18 116:12 118:15 119:5 122:10,11 128:3 129:8,12 129:13,22 130:2,19 132:16,20 133:17 134:20 138:24 141:4 143:5,9,24 144:6 147:20 148:23 149:8 149:16 151:3,3 151:17 152:12 152:18,19,24 153:19 154:5 160:1 162:22 163:22 164:14 168:16 170:12 171:20 173:16 173:18 176:13 180:20,24 181:9 184:4 188:10 191:14 191:22,24 192:1
**timeframe** 143:4
**times** 9:15 72:2 72:2 75:15 76:25 116:7 155:10,11
**timing** 187:13
**Tish** 187:22
**title** 13:24,25 14:2,24 15:4 45:20
**titles** 38:7 95:19 95:22,23
**Tobias** 1:13 3:9 150:5,22 160:21 161:2 170:1 175:6 183:11,15
**Toby** 5:17 151:2 164:15,22 168:24 184:15
**today** 7:11 8:19 10:8,21,25 43:10 183:14 184:16 191:14
**today's** 10:4
**told** 82:4
**Tompkins** 51:13 51:17
**Tony** 91:23,23 91:25 94:5,12 115:4,6 185:1
**top** 39:3 41:9 56:21 71:22 83:25 93:20 120:1 160:10 165:24
**topic** 122:2 155:1
**topics** 8:11,16
**touch** 84:1
**touched** 140:15
**track** 89:18,21
**transaction** 26:25 32:1 59:25 130:9 176:14 187:15 189:22
**transactions** 11:12
**transcribe** 9:18 9:23
**transcribed** 9:5
**transcript** 1:24 192:4 193:7,16
**transferred** 60:3
**transition** 48:3 50:11 90:5 100:9
**treasurer** 124:17
**trend** 135:15 137:4,6
**trends** 136:6,22
**trigger** 111:13 117:12 123:5 141:22 162:4 178:13 182:19
**triggered** 68:15 110:23 150:15
**trucking** 146:13
**true** 29:23 66:10 99:4
**truly** 34:12 99:6 142:15
**try** 71:21
**trying** 55:14 64:21 93:3 95:24 108:24 136:6 141:25 191:7
**turnaround** 143:2
**twice** 72:4
**two** 4:15 9:7 18:14 20:22,25 30:12 37:4 40:9 41:11 44:3,7,18 45:14,25 49:12 51:17 71:6 72:2 73:18,21 76:13 82:16 104:13 111:21 125:6,21 140:3 141:21 152:2 155:16,17,18 155:20 170:19 184:15
**two-week** 189:8 189:10
**type** 28:19 46:7 109:24 113:3 124:25 154:22
**types** 9:24 89:23 100:3 154:20
**typical** 20:17 32:3 34:20 100:21 108:12 143:12
**typically** 12:18 27:24 34:17 52:22 56:12 80:17 96:4,9 97:14 98:1 99:19 105:5 107:14 112:25 116:21 145:22 146:2 157:6 158:4,14,15,18

**U**

**uh-huhs** 9:23
**ultimate** 21:9 100:15 123:17
**ultimately** 12:21 12:21 21:1 30:17 58:13 65:14 91:10 96:20 109:22 134:1 190:21
**um-hmms** 9:23
**umbrella** 89:24
**unable** 162:11
**unaffiliated** 58:18
**unanimous** 149:22
**uncertainty** 189:21
**unclear** 176:23
**uncommon** 145:22
**underlying** 15:21 16:4 157:17
**underperform...** 64:24 109:12

109:15
**understand** 13:24 46:4 50:6 70:19,23 111:11 142:14 170:3 180:12 182:8 186:12 188:21 190:22 191:1
**understanding** 7:11 68:8 91:2 142:2 153:16 174:12 186:19 188:3
**understood** 8:25 9:21 32:22 73:22 115:19 116:3
**undervalued** 28:18
**unexpectedly** 130:23
**unfolding** 154:9 154:13,14 162:1
**Unfortunately** 176:17
**uninterested** 171:14
**unit** 90:1 91:5
**UNITED** 1:1
**units** 18:21 34:7 34:24 35:4,18 35:19 90:2 181:9
**unlimited** 94:14 106:12
**unpredictable** 176:19
**unsecured** 103:13 154:4
**unusual** 80:11 120:11,13 160:19 166:19 174:18,19
**unwilling** 122:13 169:19 182:16
**unwillingness** 180:15
**upfront** 166:24
**upgraded** 50:25
**usable** 137:23
**use** 48:15 61:20 74:25 75:3 133:24
**Usually** 96:12 158:7,9
**utilize** 57:22 93:16
**utilized** 55:7,12 93:16

**V**

**V** 7:2
**validity** 144:22
**value** 28:9,15 29:17 47:25 52:10,12 77:4 142:17
**variable** 146:4,5
**varied** 90:7 96:19 97:13 100:5 102:6
**varies** 165:19
**variety** 87:23 110:2
**various** 14:19 19:15,15 27:10 30:16 34:1 35:7 41:5 50:17 54:21 55:14 80:10 92:16 98:24
**vehicle** 15:18,21 16:16 20:23,25 163:17
**vehicles** 14:20 16:5 24:14
**venture** 72:4
**verbiage** 178:25
**version** 62:25 66:17
**versus** 74:24 108:14 187:14 189:19
**vest** 34:23
**vesting** 34:21
**veto** 24:7
**video** 128:19
**Videoconfere...** 1:16
**view** 100:2
**viewed** 121:16
**Villa** 48:12 49:1
**violate** 110:12 110:16
**violated** 110:18 111:12
**violation** 111:24
**vis-a-vis** 178:4
**vote** 22:23 23:16 24:2
**votes** 23:16
**voting** 22:14,16 23:25
**VS** 1:9

**W**

**W-2** 14:8,10 17:24
**W-2s** 17:25
**waive** 130:15
**waived** 88:1,4 88:18,22
**waiver** 5:7 119:1 119:5,13 121:18 125:7 141:12,13 154:17
**WALDER** 3:3
**want** 9:4,10 10:11 29:6 32:20 41:14 44:24 55:19 70:18,23 76:22 82:9 84:1 85:3 92:19 101:17 111:10 118:24 142:22,25 144:12 147:16 149:5,11 155:23 169:6 170:19 173:4 191:14 192:3
**wanted** 22:24 50:14 73:12 92:15 100:8,9 106:17 107:4 107:11,23 108:3,7 116:6 123:3,4,13,18 130:8,13,14 142:13,16,19 161:16 173:19 174:5 177:20 177:22 183:22 186:17 187:4
**wants** 9:11 24:8
**warehouse** 102:1 131:20 132:17,19 146:13
**WARN** 147:12 147:15 162:12 162:13,14,15 162:17 168:25 169:11,19 170:4,5 172:5 172:8,11 190:1 190:5,6 191:9
**warrant** 78:13 78:15,16,23,25 79:4,8
**warrants** 79:13 79:24 80:1,6,9 80:12,15,21 81:13,16 82:25 83:16
**wasn't** 42:15 72:9 79:9 128:6 137:22 142:3 153:22 160:21,24 167:17 172:1 182:20 187:16
**way** 85:15 103:25 104:5 114:24 117:16 145:13 161:21 176:1
**We'll** 14:22 42:9 118:13 147:15 166:13
**we're** 17:18 21:21 60:21 71:21 74:20 100:24 104:8,9 105:21 129:8 136:21 146:11 146:15 176:8 183:14
**we've** 14:20 30:6 31:13,15 35:23 93:17,20 100:24 124:10 124:11 134:17 155:23 166:21
**webpage** 4:14 29:8,12
**website** 4:21 29:4,16 43:24 43:25 47:14,18
**week** 89:16 137:8 138:11 185:15
**weekly** 112:12 114:10
**weeks** 170:19
**Weinstein** 48:4 48:4,8,9,18,23 48:25 49:3,18 49:23 50:13 51:10,12 91:9 108:21
**Weinstein's** 91:12
**Wells** 53:22,24
**went** 70:10 125:10 138:12

144:21 171:8
**weren't** 80:3 90:16 171:23
**wife** 109:1
**wife's** 109:3
**willing** 63:21 64:1 138:11 142:6 154:17
**withdraw** 74:11
**withdrawal** 75:8 75:10
**witness** 4:4 6:13 44:10,15 49:25 76:18 81:2 85:3 184:24 187:22 191:17 191:19 192:9
**witnesses** 186:7
**WOLFE** 1:22
**word** 9:20 16:17 72:23 161:20
**words** 80:15 149:2
**work** 50:8 90:4 117:25 135:8 136:21
**worked** 50:5 92:7,15 93:8 131:25 132:14 132:16,20 144:23 184:16
**working** 90:9 135:5,24 142:23 171:10
**world** 90:7 94:7 130:7,8 166:1 171:12,13 176:7 177:2 185:5 187:10 187:19 188:15
**worse** 64:14,17 135:16 136:23 136:25
**worth** 15:11,15 15:17,23 16:25
**would-be** 128:25
129:11
**wouldn't** 35:1 40:2 109:11 163:5
**wrap** 188:8
**written** 149:22
**wrong** 17:5 23:3 28:14 92:1

**X**

**X** 4:2,11 5:2

**Y**

**Yeah** 102:21
**year** 17:23 85:9 85:10 88:15 143:9,9 144:4 144:4
**years** 50:21 67:9
**Yep** 115:19
**York** 3:14,14 128:13

**Z**

**zero** 78:21
**Zoom** 1:17 99:6

**0**

**00530** 168:20
**07601** 3:7
**08053** 2:6

**1**

**1** 4:14
**1:24-CV-09478** 1:3
**10** 5:6 20:4 79:17 81:19 114:15,16,19 115:10
**100** 31:7,16 32:11,12 33:1 36:19 42:8 49:14 111:1 132:21 155:16
**10020** 3:14
**104** 2:5
**11** 5:7 118:25 119:7
**114** 5:6
**119** 5:7
**12** 5:9 134:17,22
**1271** 3:13
**13** 5:11 120:3,14 126:24 138:16 139:1 142:23
**134** 5:9
**138** 5:11
**14** 5:7,12 119:2 119:6,13,25 120:12 123:8 125:8,12,16 126:6 141:14 142:9 143:17 147:17,22 193:13
**147** 5:12
**149** 5:14
**15** 5:14 64:20 66:23 67:4,10 68:11 69:2 70:5,15,16,24 70:25 71:20 77:14 138:24 139:7,16 140:19 149:13 149:18
**16** 5:16 159:24 160:3
**160** 5:16
**164** 5:17
**1650** 2:13,20
**168** 5:19
**16th** 76:15
**17** 5:17 88:14 164:12,16
**18** 5:19 88:14 168:11,12,18
**184** 5:20
**18th** 76:15
**19** 5:20 88:14 148:22 184:2,5
**1910** 1:23
**19103** 2:14,21

**2**

**2** 4:15 5:5 37:2,6 44:1,8,17 84:7 84:16,17
**20** 79:17 81:19 81:21
**20-year** 30:15
**200** 3:6
**2004** 12:12 85:16
**2016** 58:6 67:1,3 67:10 68:10 85:18 89:11 93:9 108:18 132:4
**2017** 88:14 91:21
**2018** 76:18,20 77:8,9,19,20 83:22 109:9,11
**2019** 76:20 77:10,20 88:6 88:8,16,21
**2020** 76:20 77:20 78:4 81:6 83:20 86:3 98:8,13 126:6 176:12
**2021** 64:21 66:23 67:4,10 68:11 69:2 70:5,15,16,24 70:25 71:20 77:10 83:22
**2022** 121:7
**2023** 39:13 69:25 70:3,6 89:12,15 95:11 95:13 98:15,22 98:25 108:19 122:6 124:5,8 129:9,24,24 136:1 138:25 139:7,16
140:19 143:5 147:4 148:22 148:23 149:12 166:2,5 170:18 189:6,7
**2025** 1:19 84:6 84:24
**2026** 193:13
**21** 3:6 76:21
**215** 1:23
**22** 188:19
**22nd** 39:21
**23** 1:19 188:18 188:20
**230** 1:22
**23rd** 39:22
**24** 170:18 189:6
**24th** 166:4
**26** 121:7
**27** 122:6
**27th** 129:23
**2800** 2:20
**29** 4:14
**29th** 76:18

**3**

**3** 4:16 37:12,16 41:11 44:5,19 74:23,24,25 75:11
**3,079,000** 74:16 75:6
**3,079,275.48** 73:19
**3.1** 139:16
**3/31/25** 5:5
**3:35** 192:10
**30** 77:12
**30th** 116:25
**30XI00234100** 1:18 193:12
**31** 84:6,24
**31st** 116:25 143:11
**34** 155:23
**35** 155:23

**3600** 2:13
**37** 4:15,16

**4**

**4** 4:18 42:17,20 42:22 44:22 58:6
**4.7** 116:16
**40** 181:8,10,11 181:12
**42** 4:18 6:5
**45** 4:19
**47** 4:21

**5**

**5** 4:19 44:25 45:8 126:21
**5/15/23** 5:11
**50** 18:21,24,25 31:11,13
**50/50** 31:14 77:17
**500** 108:4
**500,000** 88:15
**525** 2:5
**55** 4:22
**5th** 180:25 181:1 190:16

**6**

**6** 4:21 47:10,14 189:7
**6(a)** 128:1
**60** 162:23
**602** 1:22
**62** 4:24
**68** 115:12
**6th** 170:20

**7**

**7** 4:6,22 55:20 55:24 121:10
**73** 2:5
**75** 18:22 31:18 31:23 173:4,12 173:19 174:5 174:15,19 175:2,8,22 176:2 178:1,5 178:6,7,19

**8**

**8** 4:24 62:18,22 62:24 126:23 127:19
**8.01(b)** 121:11
**84** 5:5
**85,000** 164:9,23 165:3,7 166:6 166:15

**9**

**9** 5:5 6:5 84:4,7 116:18
**9.9** 116:17
**9:05** 1:20
**90** 20:3 162:23
**922-7112** 1:23